```
1           IN THE UNITED STATES DISTRICT COURT
         FOR THE EASTERN DISTRICT OF PENNSYLVANIA
2


3
    GENE R. ROMERO, ET AL          :  CIVIL ACTION
4

5         VS.

6    ALLSTATE INSURANCE COMPANY, ET AL: 01-3894
                                       01-6764
7


8
                    TUESDAY, JUNE 16, 2015
9                        DAY 10
                      JURY TRIAL
10                      - - -

11   BEFORE: THE HONORABLE RONALD L. BUCKWALTER, SJ.

12                        - - -
     APPEARANCES:
13
     COLEEN M. MEEHAN, ESQUIRE
14   BRIAN M. ERCOLE, ESQUIRE
     JACQUELINE C. GORBEY, ESQUIRE
15   DAVID MARSTON, JR., ESQUIRE
     WILLIAM QUINN, ESQUIRE
16   MORGAN, LEWIS & BOCKIUS
     1701 MARKET STREET
17   PHILADELPHIA, PA 19103

18   REPRESENTING PLAINTIFFS

19
                SUZANNE R. WHITE, RPR, CM, FCRR
20              OFFICIAL COURT REPORTER
                FIRST FLOOR - U.S. COURTHOUSE
21              601 MARKET STREET
                PHILADELPHIA, PA 19106
22              (215)627-1882

23       (TRANSCRIPT PRODUCED BY MACHINE SHORTHAND
     VIA C.A.T.)
24

25
```

```
 1    APPEARANCES CONTINUED:

 2
      MICHAEL D. LIEDER, ESQUIRE
 3    SPRENGER & LANG
      1400 EYE STREET, N.W.
 4    WASHINGTON, DC. 20005

 5    REPRESENTING PLAINTIFFS

 6
      RICHARD C. GODFREY, ESQUIRE
 7    SALLIE G. SMYLIE, ESQUIRE
      ERICA B. ZOLNER, ESQUIRE
 8    JORDAN M. HEINZ, ESQUIRE
      HARIKLIA KARIS, ESQUIRE
 9    KIRKLAND & ELLIS, LLP
      300 N. LASALLE
10    CHICAGO, IL 60654

11    REPRESENTING THE DEFENDANTS

12
      KATHERINE MENAPACE KATCHEN, ESQUIRE
13    AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
      2001 MARKET STREET
14    SUITE 4100
      PHILADELPHIA, PA 19103
15
      REPRESENTING THE DEFENDANTS
16

17    JOHN LANGEL, ESQUIRE
      CHRISTOPHER COGNATO, ESQUIRE
18    BALLARD SPAHR LLP
      51ST FLOOR
19    1735 MARKET STREET
      PHILADELPHIA, PA 19103
20
      REPRESENTING EDWARD LIDDY
21
      ALSO PRESENT:
22
      VALERIE WHITFIELD
23    RHONDA HARRISON RASHID
      GREG ROHLFING
24    DONALD LIVINGSTON
      CAROLINE LEPPERT
25
```

```
 1                    (THE CLERK OPENS COURT.)

 2                    (JURY IN.)

 3                    THE COURT:  GOOD MORNING, EVERYONE.

 4      PLEASE BE SEATED.

 5                    MEMBERS OF THE JURY, AS YOU KNOW, TODAY

 6      IS THE DAY OF CLOSING ARGUMENTS.  AND IT WILL BEGIN

 7      WITH THE DEFENDANT GIVING THE CLOSING ARGUMENT

 8      FIRST, FOLLOWED BY THE PLAINTIFF.  AND THEN BECAUSE

 9      THE DEFENDANT HAS THE BURDEN OF PROOF IN THIS CASE,

10      AS YOU PROBABLY KNOW, THE DEFENDANT GETS A CHANCE TO

11      OFFER A REBUTTAL LATER ON.

12                    SO WE WILL START.  THERE YOU ARE.

13                    MR. GODFREY:  GOOD MORNING, YOUR HONOR.

14                    THE COURT:  GOOD MORNING.

15                    MR. GODFREY:  YOUR HONOR, IF I MIGHT

16      INQUIRE, I KNOW YOU WERE CONTEMPLATING SOME CHANGES

17      TO THE JURY INSTRUCTIONS LAST NIGHT.  ARE THEY AS WE

18      DISCUSSED YESTERDAY OR HAVE THEY CHANGED AT ALL?

19                    THE COURT:  NO.  THERE IS ONLY ONE

20      CHANGE THAT WE DISCUSSED WITH REGARD TO

21      MISREPRESENTATIONS.

22                    MR. GODFREY:  OKAY.

23                    THE COURT:  THAT'S THE ONLY ONE.

24                    MR. GODFREY:  THANK YOU VERY MUCH.

25                    GOOD MORNING.
```

1              THE JURY:  GOOD MORNING.

2              MR. GODFREY:  IT'S BEEN A PLEASURE TO

3    APPEAR BEFORE YOU.  IT'S SOMEWHAT OF AN ODD

4    EXPERIENCE, THOUGH.  YOU KNOW A GREAT DEAL ABOUT US,

5    YOU CAN SEE US EVERY DAY, YOU SEE HOW WE INTERACT,

6    YOU SEE WHAT WE DO, YOU SAY HELLO TO US IN THE HALL,

7    WE CAN'T SAY ANYTHING BACK.  IT'S MORE FOR YOUR

8    PROTECTION THAN OURS, BUT WE HAVE TO MAINTAIN A

9    CERTAIN DISTANCE.  BUT THIS IS CLOSING DAY.  THIS IS

10   DIFFERENT.

11             NOW WE GET TO SPEAK TO YOU ABOUT WHAT

12   WE THINK THE EVIDENCE SHOWED YOU AND WHAT WE

13   BELIEVE, IN MY CASE, MY CLIENT'S CASE, ALLSTATE, WHY

14   THE EVIDENCE WILL ESTABLISH BY A PREPONDERANCE THAT

15   EACH AND EVERY ONE OF THE PLAINTIFFS KNOWINGLY AND

16   VOLUNTARILY SIGNED THE RELEASE DOCUMENT.  MY CLIENT,

17   THE MEN AND WOMEN OF ALLSTATE, BOTH ITS CURRENT

18   EMPLOYEES, LIKE SUE ROSBOROUGH, AND ITS FORMER

19   EMPLOYEES, LIKE THE FORMER CHAIRMAN OF THE BOARD, ED

20   LIDDY, AND JEFF KAUFMAN WHO CAME FROM BOZEMAN,

21   MONTANA, THEY APPRECIATE VERY MUCH THE TIME THAT YOU

22   SPENT HERE, AS WE DO, TOO.

23             AS LAWYERS, WE KNOW THAT THIS IS

24   DISRUPTIVE TO YOUR LIVES.  WE KNOW THAT WE IMPOSE

25   UPON YOU.  WE HOPE THAT YOU FIND IT INTERESTING.

1    IT'S VERY IMPORTANT TO US, IT'S VERY IMPORTANT TO

2    OUR CLIENTS AND IT IS AFTER ALL PART OF OUR SYSTEM

3    OF JUSTICE.  THIS IS HOW JUSTICE IN OUR COUNTRY IS

4    ADMINISTERED.  YOU ARE THE FINAL REPOSITORIES OF

5    JUSTICE IN OUR COUNTRY.  YOU GET TO DECIDE, NOT THE

6    LAW, THAT'S JUDGE BUCKWALTER'S PURVIEW, HE TELLS

7    WHAT YOU THE LAW IS.  BUT YOU GET TO DECIDE THE

8    FACTS.  AND WHEN YOU HAVE DISPUTED QUESTIONS OF

9    FACT, YOU GET TO WEIGH THEM AND YOU GET TO DECIDE

10   THEM.  AND YOU CAN TELL US.  AND WE RESPECT THAT AND

11   WE THANK YOU FOR THAT.

12              THIS IS AN IMPORTANT SERVICE.  IT'S NOT

13   JUST IMPORTANT FOR ALLSTATE IN THIS CASE, IT'S ALSO

14   IMPORTANT FOR THE ALLSTATE INSURANCE AGENCY.  IT'S

15   ALSO IMPORTANT FOR THE COMPETITIVE AGENTS WHO TODAY

16   OPERATE AND SELL, AS INDEPENDENT CONTRACTORS,

17   INSURANCE FOR ALLSTATE.  AS MR. LIDDY PUT IT WHEN HE

18   ANNOUNCED THE PROGRAM, THAT IS THE PREPARING FOR THE

19   FUTURE PROGRAM BACK ON NOVEMBER 10, 1999 -- JASON,

20   IF YOU WOULD, PLEASE, DEFENDANT'S 207:  BY

21   ELIMINATING THE COMPLETION TEASE AND LIMITATIONS OF

22   THE EXISTING EMPLOYEE AGENT PROGRAMS, AGENCIES WILL

23   HAVE A GREATER OPPORTUNITY FOR GROWTH.  WE HOPE THAT

24   ALL EMPLOYEE AGENTS WILL CHOOSE TO BECOME EXCLUSIVE

25   AGENTS.  TO THAT END, WE ARE TAKING STEPS TO MAKE

```
1    THIS OPPORTUNITY AS ATTRACTIVE AS POSSIBLE WITH

2    CONVERSION INCENTIVES AND A POWERFUL COMMITMENT TO

3    OUR ENTIRE AGENCY FORCE.

4              THAT'S WHAT THEY DID.  I TOLD YOU AT

5    THE START THAT MILLIONS OF DOLLARS WERE PAID TO

6    THESE PLAINTIFFS.  THAT I WOULD TOTAL IT UP AND YOU

7    WILL SEE HOW MANY MILLIONS OF DOLLARS WERE PAID TO

8    THESE PLAINTIFFS BY ALLSTATE AT THE END.  BUT IT'S

9    OVER $3.5 MILLION, BUT I WILL GIVE YOU THE EXACT

10   NUMBERS AS WE GO ALONG.

11             I WOULD BE REMISS IF I DIDN'T SAY ONE

12   OTHER THING.  I'M PRIVILEGED.  I HAVE BEEN VERY

13   LUCKY IN MY LIFE, I'M PRIVILEGED TO GET TO SEE A LOT

14   OF COURTS IN THIS COUNTRY, ALL OVER THE COUNTRY.  I

15   CAN'T SAY I'VE BEEN IN EVERY COURTROOM, BUT I'VE

16   BEEN IN MOST STATES, MOST JURISDICTIONS.  AND ONE OF

17   THE THINGS THAT MAKES OUR SYSTEM WORK ARE THE COURT

18   PERSONNEL.  I DON'T MEAN THE JUDGE, THE JUDGE, OF

19   COURSE, IS IN CHARGE OF THIS.  I MEAN THE COURT

20   PERSONNEL.

21             I MEAN SUZANNE WHITE.  WHEN YOU GO HOME

22   AT NIGHT, MISS WHITE STAYS UP.  AND WHAT DOES SHE

23   DO?  SHE IS TYPING THE TRANSCRIPTS SO WE CAN LOOK AT

24   THE TRANSCRIPTS AND SAY, OH, I SEE WHAT THE WITNESS

25   SAID, OR, OH, I SEE WHAT THE WITNESS DIDN'T SAY.
```

1      YOU SHOULD THANK HER FOR THAT.

2                MR. HIGGINS, I HAVE NEVER BEEN IN A

3      SITUATION WHERE THE CLERK CONDUCTED VOIR DIRE.

4      MR. HIGGINS IS A WONDERFUL PERSON.  AND YOU SHOULD

5      THANK HIM FOR THAT.

6                MISS JENNIFER, THE LAW CLERK.  THEY ARE

7      CIVIL SERVANTS THAT MAKE OUR SYSTEM WORK, BUT THEY

8      ARE BOTH CIVIL AND THEY SERVE YOU WELL.  AND YOU

9      SHOULD THANK THEM FOR IT.

10                I KNOW WE DO, AND I'M CONFIDENT

11     MR. QUINN AND HIS TEAM DO.  AND I THINK -- I ALWAYS

12     FEEL THAT THAT'S IMPORTANT TO SAY THAT, BECAUSE WE

13     TAKE THEM FOR GRANTED, AND WE SHOULDN'T TAKE THEM

14     FOR GRANTED.  THEY'RE SPECIAL AND THEY DO A GREAT

15     JOB, FOR NOT JUST US IN THIS CASE, BUT THE HUNDREDS

16     OF CASES THAT YOU NEVER SEE.

17                SO WHY ARE YOU HERE?  WELL, YOU GOT A

18     LETTER IN THE MAIL.  YOU WERE SUMMONED HERE.  AND IN

19     THAT CASE, YOU ARE NO DIFFERENT THAN ALLSTATE.  WHEN

20     THE DEFENDANT IS SUED, MY CLIENT ALLSTATE WAS SUED,

21     WE HAVE TO SHOW UP AND WE HAVE TO DEFEND OURSELVES.

22     AND THAT IS WHY ALLSTATE IS HERE.

23                BUT IN THIS CASE UNIQUELY, ALLSTATE

24     SHOULDN'T BE HERE AT ALL.  IT SHOULDN'T BE HERE AT

25     ALL.  WHY DO I SAY THAT?  BECAUSE IN ALMOST --

1    UNLIKE ALMOST EVERY OTHER CASE, THERE IS A SINGLE

2    DOCUMENT IN THIS CASE THAT IS THE TRUMP CARD.  A

3    SINGLE DOCUMENT IN THIS CASE THAT ALLSTATE PAID FOR,

4    PAID A LOT OF MONEY AND ECONOMIC CONSIDERATION FOR,

5    SO THAT WE WOULD NEVER HAVE TO BEEN IN A COURTROOM.

6    AND THAT'S CALLED THE RELEASE, THE RELEASE CONTRACT.

7              ALLSTATE PAID MONEY IN EXCHANGE FOR THE

8    PROMISE.  I SEE MR. CREASE, I DON'T SEE ANY OTHER

9    PLAINTIFFS HERE, BUT MR. CREASE'S PROMISE THAT WE

10   WOULDN'T HAVE TO BE HERE.  THEY PROMISED TO WAIVE

11   AND GIVE UP ALL CLAIMS.

12             WE BELIEVE THEY ENTERED INTO IT

13   KNOWINGLY AND VOLUNTARILY FOR THE MONEY.  BUT

14   MR. QUINN IS RIGHT, IN THE WORDS OF THE OPENING, IF

15   YOU AGREE WITH US, THEN IT'S GAME OVER.  BUT THIS

16   TRUMP CARD, WE SHOULDN'T HAVE TO BE THERE.

17             IF YOU CAN PUT UP PLEASE THE NEXT

18   EXHIBIT, WHICH IS THE RELEASE, PLEASE.  THE LAST

19   PAGE, PLEASE.  VERY LAST PAGE.  ENLARGE THAT,

20   PLEASE, JASON.

21             IT'S MR. PETERSON'S.  I HAVE READ AND

22   UNDERSTOOD, STANDARD THE RELEASE, AS WELL AS

23   MATERIALS DESCRIBING THE PROGRAM, INCLUDING THE

24   PROGRAM INFORMATION BOOKLET.  I VOLUNTARILY MAKE THE

25   FOLLOWING ELECTION.

1           THEY DIDN'T HAVE TO DO THAT.  THEY HAD

2   ANY NUMBER OF OTHER CHOICES, BUT THEY CHOSE TO DO

3   THAT.  AND THEY CHOSE TO DO THAT BECAUSE THE

4   ECONOMIC INCENTIVES AND THE ECONOMIC OFFER TO THEM

5   WERE SUBSTANTIAL.

6           THERE ARE A FEW UNDISPUTED FACTS THAT

7   HAVE EMERGED, I THINK IN FAIRNESS WE CAN SAY THEY'RE

8   UNDISPUTED.  I THINK WE HAVE COMMON GROUND, BUT

9   MAYBE I WILL BE SURPRISED, MAYBE THERE WILL BE A

10  DISPUTE ABOUT THEM.  SOMETIMES THERE ARE.

11          NUMBER 1, ALLSTATE TOLD THESE

12  PLAINTIFFS TO GO SEE LAWYERS, CONSULT WITH LAWYERS.

13  WE WANT YOU TO UNDERSTAND THE RELEASE.  IF YOU DON'T

14  LIKE THE RELEASE AND DON'T LIKE THE OPTIONS, GO SEE

15  YOUR LAWYER.  ALMOST ALL OF THEM DID.  HECK,

16  MR. HARPER, HE SAW FOUR LAWYERS.  AND EACH ONE WHO

17  SAW A LAWYER WHOSE JOB IT IS TO PROTECT THEIR

18  INTERESTS, WHOSE JOB IT IS TO GIVE THEM LEGAL

19  ADVICE, WHAT DID THEY DO?  THEY SIGNED THE RELEASE.

20          SECOND, ALLSTATE GAVE EACH PLAINTIFF

21  SEVEN MONTHS TO STUDY THE RELEASE, CONSIDER IT, AND

22  THEY PAID THEM.  THEY PAID THEM FULL PAY AND

23  BENEFITS.  NOW, ONE OF THE SUGGESTIONS IN THIS TRIAL

24  HAS BEEN, OH, IF THEY HAD JUST BEEN ORDINARILY

25  SEVERED, LIKE THE OTHER PEOPLE WHO WERE SEVERED AT

1   THE TIME, THE PEOPLE IN THE CLAIMS CENTERS AND THAT

2   WHO WERE LET GO, THEY WEREN'T GIVEN SEVEN MONTHS.

3   THEY WEREN'T GIVEN SEVEN MONTHS AND THEN AN OFFER OF

4   BASE SEVERANCE, WITH A TOTAL OF TEN MONTHS IN TOTAL.

5   THEY HAD 60 DAYS.  THEY WEREN'T GIVEN THOSE

6   OPPORTUNITIES.

7            THIRD, EACH PLAINTIFF NOT ONLY SIGNED

8   THE RELEASE, EACH PLAINTIFF, WHEN THEY ASKED THE

9   LAWYERS ABOUT THEM, CONSIDERED THEIR LAWYER'S

10  ADVICE.  TAKE MR. CREASE.  HE ASKED DIFFERENT

11  LAWYERS ABOUT STOPPING THE RELEASE.  HE ASKED THEIR

12  OPINIONS ABOUT THE RELEASE.  AND AFTER HE GOT THEIR

13  OPINIONS, THIS IS TRANSCRIPT PAGE 44:7, LINE 7 TO 10

14  OF HIS TESTIMONY ON JUNE 3RD.  HE SIGNED THE RELEASE

15  BASED ON THE INFORMATION THAT HE HAD.

16           ONE LAWYER, ROBERT STEINBERG, THEY

17  BROUGHT THIS OUT ON REDIRECT, TOLD MR. CREASE THAT

18  THE RELEASE WAS ALMOST IRONCLAD, AND MR. CREASE AND

19  MR. KEARNEY SHOULD, QUOTE, GO SOMEWHERE ELSE, IN

20  ESSENCE, END QUOTE.  THEY WENT AND SAW OTHER

21  LAWYERS.  AND AT THE END, THEY ALL SIGNED THE

22  RELEASE.

23           MR. HARPER.  MR. HARPER IS A VERY GOOD

24  EXAMPLE.  HE DEALT WITH MR. LANCE RAPHAEL.  MR.

25  RAPHAEL SAID, HEY, YOU HAVE GOT 100, 150 AGENTS OUT

1    OF THE 6,200 PLUS TOGETHER, WE CAN FILE A LAWSUIT

2    AND STOP THIS RELEASE, WE CAN STOP IT.  BUT IN THE

3    END, THEY COULDN'T GET ENOUGH PEOPLE TO SUPPORT

4    STOPPING THE RELEASE, THAT'S WHAT MR. HARPER

5    TESTIFIED TO.  THUS, NO LAWSUIT WAS FILED.

6              EVEN MORE INTERESTING, YOU HEARD

7    MR. HARPER AND PLAINTIFF AFTER PLAINTIFF SAYING,

8    ESSENTIALLY, OH, MY HEAVENS, THIS WAS MY LIVELIHOOD,

9    I WAS FACING FINANCIAL RUIN, I COULDN'T SURVIVE.

10             PUT UP DTX 507, PLEASE, JASON.

11             AND YET HERE IT IS, IN FEBRUARY OF

12   2000, MR. HARPER WON'T EVEN SPEND $2,000 OF HIS OWN

13   MONEY TO FILE A LAWSUIT TO STOP IT.  DOES THAT MAKE

14   SENSE TO YOU?  THIS IS SO CRITICAL TO THEM, SO

15   OUTRAGEOUS TO THEM, SO MUCH OF A RISK TO THEM, BUT

16   THEY WON'T EVEN SPEND $2,000 TO FILE A LAWSUIT AND

17   STOP IT?  THAT WE LEAVE TO YOUR COLLECTIVE WISDOM

18   AND JUDGMENT, LADIES AND GENTLEMEN.  IT DOESN'T RING

19   TRUE.

20             MS. CREWS KELLY.  MS. CREWS KELLY WAS

21   VERY PERSONABLE.  SHE WAS A GOOD INSURANCE AGENT, I

22   COULD SEE THAT, THE WOMAN FROM TAMPA, SHE WAS A GOOD

23   INSURANCE AGENT.  SHE WAS SO GOOD THAT SHE COULD

24   SELL A STORY TO ANYONE.  IN FACT, I BET -- I DON'T

25   KNOW IF ANY OF YOU ARE FOOTBALL FANS, I BET SHE

```
1      COULD SELL FULLY-INFLATED FOOTBALLS TO BILL

2      BELICHICK OF THE NEW ENGLAND PATRIOTS.  THAT'S HOW

3      GOOD SHE WAS.  SHE WAS GOOD.

4                  BUT SHE WENT TO A LAWYER.  AND WHAT

5      HAPPENED?  SHE SIGNED THE RELEASE.  AND NOT ONLY

6      THAT, SHE SOLD HER BOOK OF BUSINESS BEFORE SHE

7      SIGNED THE RELEASE.  SHE SIGNED THE CONTRACT AND

8      SOLD THE BOOK OF BUSINESS AND ENTERED INTO A

9      CONTRACT OF SALE BEFORE SHE SIGNED THE RELEASE.  NOT

10     AFTER SHE SIGNED THE RELEASE.

11                 MR. PERKINS CONSULTED WITH TWO LAWYERS,

12     THEN SIGNED THE RELEASE.  MR. MURRAY TOOK ALL THE

13     PROGRAM MATERIALS TO THE LAWYERS.  AFTER TALKING

14     WITH THE LAWYERS, SIGNED THE RELEASE.

15                 FOURTH, A COUPLE PLAINTIFFS DIDN'T

16     DISCUSS -- TALK TO LAWYERS.  MR. PETERSON DIDN'T GO

17     TO LAWYERS.  AT DEPOSITION, HE SWORE THAT HE DIDN'T

18     GO TO LAWYERS BECAUSE, HE SAID, I DO NOT LIKE

19     LAWYERS.  THAT WAS AMUSING, I DON'T TAKE OFFENSE,

20     BUT THAT'S WHAT MR. PETERSON SAID.

21                 AT THIS TRIAL, 13 YEARS AFTER HIS

22     DEPOSITION, OR 10 YEARS AFTER HIS DEPOSITION, HE

23     SAID SOMETHING DIFFERENT, THAT HE DIDN'T THINK A

24     LAWYER COULD DO ANYTHING.  THAT WASN'T WHAT HE SAID

25     AT DEPOSITION.  AND I LEAVE YOU TO SQUARE THAT
```

1   TESTIMONY OF WHAT HE SAID AT THE TIME VERSUS WHAT HE

2   SAID NOW.

3          MR. LAWSON, HE DIDN'T GO TO A LAWYER.

4   HE SAID HE WAS A GOOD BUSINESSMAN.  HE COULD HANDLE

5   THINGS HIMSELF, AND BOY, DID HE EVER.  HE GOT

6   ROUGHLY $1.2 MILLION.  HE SAID HE DIDN'T WANT TO

7   WORK FOR ALLSTATE ANYMORE.  HE DIDN'T LIKE WHAT THEY

8   DID.  SO HE CASHED OUT, GOT $1.2 MILLION, AND IS

9   STILL GETTING PAID ON THAT CONTRACT $4,100 A MONTH,

10  WHICH, BY THE WAY, HE SAID WAS THE LARGEST SINGLE

11  PAYDAY IN HIS LIFE.

12          I THINK FINALLY WHAT IS ALSO EQUALLY

13  UNDISPUTED, OR SHOULD BE UNDISPUTED, ALTHOUGH WE HAD

14  SOME TROUBLE, YOU SAW WE HAD SOME TROUBLE, THAT EACH

15  PLAINTIFF KNOWINGLY UNDERSTOOD WHAT THEY WERE DOING

16  WHEN THEY SIGNED THE RELEASE.  NOW, WE DIDN'T ALWAYS

17  GET THERE.  I COULDN'T ALWAYS GET THEM TO SAY THAT,

18  BUT SOMETIMES THE JUDGE SAID, YOU SAW THIS, WHAT IS

19  IT THAT YOU DON'T UNDERSTAND?  BUT IN THE END, EACH

20  PLAINTIFF UNDERSTOOD THAT WHEN THEY SIGNED THE

21  RELEASE, THEY WERE GIVING THEIR PROMISE TO GIVE UP

22  ANY CLAIMS THEY THOUGHT THEY HAD AGAINST ALLSTATE.

23          MR. CREASE, AND YOU READ AND UNDERSTOOD

24  THE MATERIALS FROM THE PROGRAM?  YES.  INCLUDING THE

25  PROGRAM INFORMATION BOOKLET?  THAT WAS HIS TESTIMONY

```
1     OF JUNE THE 3RD.

2               MR. PERKINS.  CAN WE PUT UP DEM 213.

3     THIS IS A TYPICAL.

4               THAT IS WHAT I'M GETTING TO.  YOU

5     UNDERSTOOD WHEN YOU SIGNED THE RELEASE ON MAY THE

6     12TH, 2000 THAT ALLSTATE WAS ASKING YOU TO WAIVE

7     YOUR RIGHT TO SUE IT FOR ANY CLAIMS, DAMAGES,

8     COMPLAINTS.  WHATEVER BEEF, AS THEY SAY, YOU HAD

9     WITH ALLSTATE, ALLSTATE WAS ASKING YOU TO WAIVE THAT

10    AND SURRENDER THOSE CLAIMS, CORRECT?

11              I ASKED HIM AT THE TIME YOU SIGNED THE

12    RELEASE YOU KNEW PRECISELY WHAT YOU WERE GIVING UP?

13              ANSWER:  YES.

14              PLAINTIFF AFTER PLAINTIFF, ONE WAY OR

15    THE OTHER, EVENTUALLY ADMITTED THE OBVIOUS.  THERE

16    WAS AN INFORMATION PAGE, YOU'LL RECALL, A NOTICE,

17    TWO PAGES, AND THEY HAD BIG BOLD THAT SAID -- THIS

18    IS DTX 4, JASON, IF YOU HAVE THAT -- SAID ON THE

19    SECOND PAGE, THE BOLD, IF YOU SIGN THE RELEASE, YOU

20    WILL BE WAIVING YOUR RIGHTS AND CLAIMS.

21              TO SUGGEST THAT YOU DIDN'T UNDERSTAND

22    THAT IS TO SUGGEST EITHER, A, THAT YOU'RE NOT

23    INTELLIGENT, AND THESE ARE HIGHLY INTELLIGENT

24    PEOPLE, THEY WERE HIGHLY SKILLED.  OR B, THAT YOU

25    WEREN'T EDUCATED, OR C, THAT YOU CAN'T READ.
```

```
 1                    BUT THAT'S THE STORY THAT SOME OF THEM
 2      WANTED TO TELL, UNTIL ON CROSS EXAMINATION THEY
 3      ADMITTED THAT THEY UNDERSTOOD THE OBVIOUS.
 4                    SO WHAT IS IT FOR YOU TO DECIDE, GIVEN
 5      THESE FACTS THAT WE THINK ARE UNDISPUTED?  WHAT IS
 6      IT THAT YOU'RE HERE TO DECIDE?  PLAINTIFFS CLAIM
 7      THAT THE RELEASE WAS SIGNED NOT ONLY NOT KNOWINGLY,
 8      INTERESTING IN LIGHT OF THE TESTIMONY YOU'VE HEARD
 9      AND SEEN, BUT NOT VOLUNTARILY.  SOME CLAIM DURESS.
10      SOME CLAIM THAT THEY HAD NO REAL CHOICE.  SOME SAY
11      THEY HAD NO MEANINGFUL CHOICE, OR NO MEANINGFUL
12      ALTERNATIVE.  AND YOU WILL SEE THE JURY INSTRUCTIONS
13      ON THIS, WHICH WILL TALK ABOUT THAT.
14                    BUT HERE IS THE POINT.  ASIDE FROM
15      THEIR TESTIMONY AND THEIR ADMISSIONS, THEY ALL SAY
16      THEY DIDN'T LIKE IT.  AND NONE OF THEM, IN 1999 FOR
17      SEVEN MONTHS, IN 2000, FILED A LAWSUIT AGAINST
18      ALLSTATE TO STOP IT, EVEN THOUGH THEY WERE TOLD THEY
19      COULD.  NONE OF THEM IN THE BALANCE OF 2000 FILED A
20      LAWSUIT AGAINST ALLSTATE.  NONE OF THEM SUED UNTIL
21      AUGUST OF 2001, LONG AFTER THEY HAD MADE THEIR CASE
22      AND LONG AFTER THEY HAD GOTTEN THEIR MONEY, OR THE
23      PROMISES TO GET THEIR MONEY, OR THEIR ABILITY TO
24      CONTINUE AS AN ALLSTATE AGENT, A NEW JOB
25      OPPORTUNITY.
```

1          SO HOW ARE YOU SUPPOSED TO DECIDE?  HOW

2    IS A JURY SUPPOSED TO DECIDE AND SORT ALL THIS OUT?

3    JUDGE BUCKWALTER GIVES YOU THE LAW, YOU DECIDE THE

4    FACTS, YOU DECIDE THE FACTS BASED ON YOUR ASSESSMENT

5    OF WHAT YOU'VE HEARD AND SEEN.  I'M JUST THE LAWYER,

6    I'M AN ADVOCATE.  I TRY TO BE ACCURATE TO THE

7    RECORD, BUT IT'S WHAT YOU REMEMBER.  IT'S WHAT YOU

8    SAW, NOT WHAT I SAY.  I'M HERE TO REMIND YOU AND

9    GUIDE YOU, BUT IT'S UP TO YOU, NOT UP TO ME.  IF YOU

10   DISAGREE WITH ME, I RESPECT YOU FOR DOING THAT.

11          WE TRY TO GIVE YOU GUIDEPOSTS TO WHERE

12   THE TRUTH LIES.  BUT YOU, AS A COLLECTIVE BODY, YOU

13   FIND THE TRUTH AND YOU WILL LET US KNOW WHAT IT IS.

14   BUT COMMON SENSE AND LIFE EXPERIENCE, COMMON SENSE

15   AND LIFE EXPERIENCE GUIDES YOU.  AND THAT IS VERY

16   IMPORTANT IN THIS CASE, BECAUSE YOU'RE GOING TO BE

17   ASKING YOURSELF, I THINK, SOME QUESTIONS.  IT IS

18   LOGICAL TO BELIEVE WHAT PLAINTIFFS SAID ON DIRECT IN

19   LIGHT OF WHAT WE SAW UNDER CROSS EXAMINATION?  IS IT

20   LOGICAL TO BELIEVE WHAT PLAINTIFFS SAY TODAY VERSUS

21   WHAT THEY SAID UNDER OATH 10 OR 12 YEARS AGO.  IT IS

22   LOGICAL TO BELIEVE WHAT PLAINTIFFS SAY TODAY, WHEN

23   THEY WANT TO SUE, CONTRARY TO THE RELEASE, AS

24   COMPARED TO WHAT THEY DID AND SAID AT THE TIME IN

25   WRITING.  AND THAT WE WOULD LEAVE TO YOUR COLLECTIVE

```
 1    WISDOM AND JUDGMENT.

 2              IS IT LOGICAL TO TESTIFY ON THE STAND

 3    AS MR. HARPER, A VERY CHARMING GENTLEMAN FROM

 4    GEORGIA, I LOVE IT, THOMSON, GEORGIA, IT'S A NICE

 5    PART OF THE WORLD.  HE GOT ON THE STAND AND HE SAID

 6    HE WAS WILLING TO DO ANYTHING TO STOP THE RELEASE,

 7    QUOTE, SHORT OF CHALLENGING SOMEBODY TO A DUEL, AND

 8    I WOULD HAVE DONE THAT IF I COULD HAVE.  AND IF YOU

 9    BELIEVE THAT, HE WOULDN'T EVEN PUT UP $2,000 TO FILE

10    A LAWSUIT TO TRY TO STOP IT?  REALLY?  DOES THAT

11    MAKE SENSE?  IS THAT LOGICAL TO YOU?  THAT'S YOUR

12    JUDGMENT.

13              SO TO HELP YOU EVALUATE THE EVIDENCE,

14    WE ORGANIZED IT INTO FOUR BUCKETS.  D 104, PLEASE,

15    JASON.  EVERY SINGLE FACT, EVERY SINGLE THING YOU'VE

16    HEARD CAN BE ANALYZED THROUGH THE PRISM OF THE FOUR

17    BUCKETS:  TIME, CHOICES, PAYMENTS, A DEAL, A PROMISE

18    AND AGREEMENT.  IN THIS TRIAL, NOT UNLIKE OTHERS, A

19    FIFTH BUCKET HAS EMERGED.  NO SIXTH, BUT A FIFTH.

20    AND IT'S CALLED CREDIBILITY.  DOES THE PLAINTIFF'S

21    STORY MAKE SENSE COMPARED TO WHAT YOU SAW AND HEARD

22    IN WRITING?  DOES IT MAKE SENSE THAT MS. REINERIO,

23    FROM CENTRAL WISCONSIN, SO DESPERATE FOR WORK IN

24    1990 WHEN SHE HAD BEEN LAID OFF BY THE SOO LINE AND

25    FOR TWO YEARS HAD NOTHING BUT ODDS AND ENDS TO DO,
```

1    SNOWPLOWING, ET CETERA.  DOES IT MAKE SENSE THAT SHE

2    SAID SHE WOULD SIGN ANY DOCUMENT PUT IN FRONT OF HER

3    BECAUSE SHE WAS OUT OF WORK AND YOU DON'T DICTATE

4    TERMS TO AN EMPLOYER.  DOES IT MAKE SENSE THAT SHE

5    SIGNED IT ONLY IF IT WAS A CONTRACT FOR LIFE,

6    GUARANTEED FOR LIFE?  IN OUR SOCIETY, FOLKS, THERE

7    IS ONLY ONE JOB GUARANTEED FOR LIFE.  YOU ARE

8    APPOINTED BY THE PRESIDENT, YOU ARE INVESTIGATED BY

9    THE FBI, WHICH IS NOT A PLEASANT PROSPECT.  YOU ARE

10   CROSS-EXAMINED BY THE SENATE AND THEN YOU ARE

11   ELEVATED TO THE BENCH.

12          GIVE YOU A FEW OTHER EXAMPLES.  MS.

13   CREWS KELLY.  SHE DECIDED TO SELL HER ECONOMIC

14   INTEREST BOOK OF BUSINESS THAT WAS BEING TRANSFERRED

15   TO HER IN THIS PROGRAM.  SHE SIGNED THE SALE OF THAT

16   BEFORE SHE SIGNED THE RELEASE.  GOT IT BACKWARDS.

17   BUT, MORE IMPORTANTLY, DID YOU CATCH WHAT SHE DID

18   WHEN SHE SOLD IT TO THE SON OF A WEALTHY FAMILY

19   FRIEND.  AND SHE SOLD IT FOR LESS THAN IT WAS WORTH.

20   SHE TESTIFIED THAT SHE TURNED DOWN AND WAS NOT

21   INTERESTED IN GREATER VALUES OF MONEY BEING OFFERED

22   TO HER FOR THE ECONOMIC INTEREST THAT ALLSTATE WAS

23   OFFERING HER, SO SHE SHOULD GO INTO BUSINESS WITH

24   REGGIE MASON, THE FRIEND, FAMILY FRIEND'S SON.

25          IF SHE IS IN SUCH DURESS, IF SHE IS IN

1  SUCH AGONY, IF SHE IS IN SUCH DESPERATE STRAITS, SHE

2  TURNED DOWN MORE MONEY, WASN'T EVEN INTERESTED IN

3  MORE MONEY TO HELP OUT A CLOSE FAMILY FRIEND?  DOES

4  THAT MAKE SENSE TO YOU?

5           JASON, CAN YOU PLEASE PUT UP THE 6/4/15

6  CREWS KELLY TESTIMONY AT 192, LINES 19 TO LINE 193,

7  LINE 9, PLEASE.  ENLARGE THE BOTTOM -- NO.  NO.

8  STARTING AT LINE 19, PLEASE, JASON.  THERE YOU GO.

9  THANK YOU.

10           QUESTION:  SO HOW MUCH MORE MONEY WERE

11  YOU OFFERED BY OTHER AGENTS FOR THE VALUE OF YOUR

12  BOOK OF BUSINESS IN JUNE OF 2000 THAT YOU TURNED

13  DOWN TO HELP OUT A FAMILY FRIEND?

14           ANSWER:  I NEVER ASKED THEM, THREE

15  TIMES OR THIS TIMES OR THAT TIMES.

16           GO TO NEXT PAGE, PLEASE, JASON.

17           SO YOU TURNED DOWN MORE THAN ULTIMATELY

18  500,000 YOU GOT BECAUSE YOU WANTED TO HELP YOUR

19  FAMILY FRIEND AND PUT HIM IN BUSINESS?

20           ANSWER:  YES, I DID.

21           YOU CANNOT EXPLAIN THE STORY THAT YOU

22  HEARD ON THE STAND OF THE NO CHOICE, NO ALTERNATIVE,

23  WE ARE LOSING MONEY, THIS IS UNFAIR, WHEN SHE SIGNED

24  THE DEAL TO SELL THE BOOK OF BUSINESS BEFORE THE

25  RELEASE AND SHE TURNED DOWN MORE MONEY THAT SHE

1    OTHERWISE COULD HAVE GOTTEN.

2              DOES THAT MAKE COMMON SENSE?  IS THAT

3    LOGICAL TO YOU?  AND BY THE WAY, WHAT DID SHE DO

4    AFTER THAT?  SHE WENT TO WORK FOR THE NEW MASON

5    CREWS AGENCY.  DOING WHAT?  SELLING ALLSTATE

6    INSURANCE.  THE COMPANY THAT SHE CAME IN HERE AND

7    TOLD US SHE WAS SO ANGRY ABOUT BECAUSE THEY HAD SO

8    MISTREATED HER.  REALLY?  COMMON SENSE.  COMMON

9    SENSE.

10              DOWN IN THE LOBBY OF THIS COURTHOUSE,

11   THERE'S THIS GLASS BLOCK, BIG GLASS BLOCK.  IT

12   QUOTES THE STATUTE OF WESTMINSTER IN 1354, IT HAS A

13   GREAT QUOTE FROM OLIVER WENDELL HOLMES.  OLIVER

14   WENDELL HOLMES WAS ONE OF THE GREATEST, HE WAS

15   CALLED THE GREAT DISSENTER.  MOST OF THE DISSENTS

16   EVENTUALLY BECAME THE LAW OF THE LAND.  HE WAS ON

17   THE SUPREME COURT OF THE UNITED STATES.  HE WAS A

18   VERY DIRECT PERSON, THE CIVIL WAR HERO, WOUNDED

19   THREE TIMES, SHOULD HAVE DIED.  HIS FAMILY WAS A

20   LEADING ABOLITIONIST FAMILY IN NEW ENGLAND.  HE WAS

21   SO DIRECT THAT IN 1864 OR 1865 ABRAHAM LINCOLN

22   VISITED THE FRONT LINES AND THEY WERE BEING SHOT AT

23   AND HOLMES SAID, GET DOWN, YOU FOOL, TO THE

24   PRESIDENT.  HE CALLED THEM AS HE SAW THEM.

25              BUT IN THE LATE 1800S, BEFORE HE WAS ON

1    THE SUPREME COURT, HE WROTE A WONDERFUL LITTLE BOOK.

2    AND IN IT HE STARTED OUT BY SAYING QUOTE:  THE LIFE

3    OF THE LAW HAS NOT BEEN LOGIC.  IT HAS BEEN

4    EXPERIENCE.

5              TRANSLATION?  COMMON SENSE.  DOES THE

6    STORY THAT YOU HAVE BEEN TOLD AND THAT THE INSURANCE

7    AGENTS WANT TO SELL YOU MAKE COMMON SENSE?  IS IT

8    LOGICAL?  DOES IT HANG TOGETHER?  DOES IT RING TRUE?

9    YOU'RE GOING TO HAVE TO EVALUATE THAT.  WE'RE GOING

10   TO POINT OUT SOME OF THE INCONSISTENCIES AS WE GO

11   ALONG, BECAUSE I THINK YOU ALREADY KNOW THE ANSWER

12   TO THAT QUESTION.

13             DOES IT MAKE SENSE THAT MISS CREWS

14   KELLY HAD NO CHOICE, HAD TO DO THIS?  BUT THEN

15   TURNED DOWN MORE MONEY TO GO INTO BUSINESS WITH A

16   CLOSE FAMILY FRIEND'S SON?

17             YOU HAVE HEARD FROM THE PLAINTIFFS THAT

18   THEY HAD JOBS FOR LIFE.  COULDN'T BE FIRED UNLESS

19   THEY LIED, STOLE OR CHEATED.  YET WHEN I CONFRONTED

20   THEM WITH THE TERMS OF THEIR AGREEMENTS, WHEN I

21   CONFRONTED THEM WITH THE HUMAN RESOURCE MANUALS,

22   WHEN I CONFRONTED THEM WITH THE HR POLICY MANUALS,

23   ALL SAYING TERMINABLE AT WILL, THEY HAD DIFFERENT

24   RESPONSES.  OH, THAT DOESN'T APPLY TO ME.  OH, I

25   NEVER READ THAT.  OH, I HAD A CONTRACT, THAT

1    COULDN'T APPLY TO ME.

2                  OF COURSE THEY ALL KNEW WHAT THE ANSWER

3    WAS.  AND THE TRUTH SNEAKS OUT IN A TRIAL.  THE

4    GREAT BRITISH STATESMAN CHURCHILL ONCE HAD THIS

5    GREAT LINE ABOUT THE TRUTH, HE SAID:  YOU CAN DENY

6    IT, YOU CAN DENIGRATE IT, YOU CAN HIDE IT, YOU CAN

7    SECRETE IT, BUT IN THE END, IT EMERGES JUST THE SAME

8    AS MAGNIFICENT GLORY IN HARSH LIGHT.

9                  AND THAT'S WHAT HAPPENED HERE AND I'M

10   GOING TO GIVE YOU TWO SPECIFIC ANSWERS.  MR. HARPER.

11   I HAD A JOB FOR LIFE, THEY COULDN'T TERMINATE ME, ET

12   CETERA, ET CETERA, ET CETERA.  YOU HEARD HIM.  PUNCH

13   UP PX 649, PLEASE, JASON.

14                  THIS DOCUMENT WAS WRITTEN OVER A YEAR

15   BEFORE PREPARING FOR THE FUTURE WAS EVEN KNOWN.

16   THIS WAS THE IRS ACKNOWLEDGMENT FORM.  MR. HARPER

17   WROTE THIS IN HIS OWN HANDWRITING AT THE TIME.  I

18   SIGN UNDER FEAR OF TERMINATION.  IF HE HAD A JOB FOR

19   LIFE, LADIES AND GENTLEMEN, IF HE HAD A GUARANTEED

20   JOB, HE HAD NOTHING TO FEAR, BUT HE KNEW HE DIDN'T.

21   ACTIONS AND CONDUCT AT THE TIME SPEAKS LOUDER THAN

22   THE WORDS ON THE WITNESS STAND WHEN THEY WANT TO

23   WALK AWAY FROM THE PROMISES THAT THEY MADE IN

24   EXCHANGE FOR MONEY.

25                  SECOND, MS. CREWS KELLY.  MS. CREWS

```
1    KELLY TOLD YOU IT WAS UNFAIR, THIS WAS WRONG, SHE
2    WAS AN NOA AGENT, SHE MADE ALL THESE INVESTMENTS.  I
3    DIDN'T CATCH THIS AT FIRST UNTIL I LOOKED AT THE
4    TRANSCRIPT.  BUT DO YOU REMEMBER WHAT SHE TOLD YOU
5    ABOUT HOW SHE BECAME AN NOA AGENT?  BECAUSE
6    REMEMBER, THAT'S WHAT THEY ARE SAYING, SHE SHOULD
7    HAVE BEEN ALLOWED TO KEEP BEING AN NOA AGENT, AN
8    EMPLOYEE AGENT.  REMEMBER WHAT SHE TOLD YOU?  SHE
9    TOLD YOU THAT SHE WAS FORCED TO BECOME ONE AND SHE
10   HAD NO CHOICE.
11             JASON, PLEASE, 6/4, TRANSCRIPT, 160,
12   LINE 25, TO 161.  LINE 16, NOW THIS IS ON DIRECT.
13   THIS ISN'T ME ASKING THE QUESTIONS.
14             AT SOME POINT, DID YOU BECOME AN NOA
15   AGENT?
16             YES.  AROUND 1989, THEY STARTED THE
17   PROGRAM AND WE WERE MORE OR LESS FORCED TO BECOME
18   NOA'S.
19             HE SAID, MORE OR LESS FORCED TO BECOME
20   NOA'S, WHAT DO YOU MEAN BY THAT?
21             WELL, ALLSTATE MANAGEMENT CAME BY AND
22   SAID THAT THEY WERE NO LONGER GOING TO MAINTAIN THE
23   ALLSTATE PAID-FOR OFFICES.  THAT IF WE DID NOT
24   CHOOSE TO BECOME AN NOA, THEY COULD GO TO A LESS
25   DESIRABLE LOCATION.  THEY WOULD MOVE US OR IT JUST
```

```
 1    WASN'T AN OPTION.  SO BECAUSE I HAD BEEN THERE SO
 2    LONG, I HAD SEEN DIFFERENT PROGRAMS, I SAID, OKAY,
 3    FINE, I WILL DO THAT.  SO I BECAME AN NOA.
 4              NOW, JASON, GO TO 211:22 TO 213:6.
 5              NOW I'M ASKING THE QUESTIONS.
 6              JASON, IS IT 211 LINE 13?
 7              QUESTION -- SECOND LINE, 22, THAT IS MY
 8    FAULT, JASON.
 9              I WAS PUZZLED BY SOMETHING YOU SAID IN
10    YOUR DIRECT, MA'AM.  YOU SAID THAT, I WROTE THIS
11    DOWN BECAUSE I COULDN'T -- I DIDN'T QUITE UNDERSTAND
12    WHAT YOU WERE TRYING TO CONVEY TO US.  YOU SAID YOU
13    WERE FORCED TO BECOME A NEIGHBORHOOD OFFICE AGENT BY
14    ALLSTATE.  FORCED.  WHAT DID YOU MEAN BY THE WORD
15    "FORCED" TO BECOME A NEIGHBORHOOD OFFICE AGENT?
16         A.   IT TAKES MORE THAN A YES OR NO.
17              THE COURT:  THAT IS NOT A YES OR NO?
18    YOU CAN EXPLAIN.
19              THE WITNESS:  OKAY.  AFTER WE WERE
20    THERE, AND JUST LIKE THIS STATEMENT, THIS IS A
21    STATEMENT FOR THE '94, SAID THEY PUT ALL THIS IN, TO
22    TAKE ALL THE BROCHURES EVERYTHING.  THEY SHOWED US
23    OVER 20 YEARS OUT OF CONTENTION FOR ANYBODY ELSE TO
24    CONSIDER.
25              THE COURT:  WHAT DO YOU MEAN WHEN YOU
```

1     SAY --

2                    THE WITNESS:  WELL, THE SAME THING WITH

3     THE NOA.  THEY CAME TO US, WE HAD BEEN THERE IN THIS

4     BUILDING.  AND THEY SAID WE ARE -- WE WANT YOU TO GO

5     TO NOA NOW.  WE ALL SAID NO, WE DON'T WANT TO.  WE

6     DON'T WANT TO HAVE THAT EXTRA BURDEN.  EXCUSE ME?  I

7     SAID NO, AND MY PARTNER SAID NO.  AND SO THEY SAID,

8     WELL, WE WILL PUT YOU AWAY FROM YOUR CUSTOMERS IN

9     ANOTHER AREA OF THE CITY IN A LARGE OFFICE WITH THE

10    OTHER 20 AGENTS THAT DON'T WANT TO GO TO NOA.  YOU

11    WILL BE SITTING THERE IN THIS BUILDING OFF THE WALL,

12    OR WE WILL PUT NEW AGENTS RIGHT NEXT TO YOU ON THE

13    STREET.  AND YOU CAN EITHER CHOOSE TO BE AN NOA OR

14    GO ALONG WITH THE PROGRAM AND PAY YOUR EXPENSES OR

15    THAT IS WHAT WE WILL DO TO YOU.  SO WE CHOSE TO BE

16    NOA'S, SAME.  THERE WAS NO CHOICE.

17                    BOY, DOES THAT STORY SOUND FAMILIAR?

18    BUT NOW THE STORY ON THE WITNESS STAND IS, OH, YES,

19    WE WANT TO BE AN NOA.  I WAS AN NOA, AND ALLSTATE IS

20    FORCING ME TO DO THIS.  INCONSISTENT TESTIMONY THAT

21    SHOULD NOT EXIST IF THE CONTRACTS WERE NOT

22    TERMINABLE AT WILL.  IT CANNOT BE SQUARED.

23                    YOU ALSO SAW THROUGHOUT THE TRIAL

24    OBVIOUS QUESTIONS SEEKING OBVIOUS ANSWERS WHERE

25    PLAINTIFFS WOULD QUIBBLE.

1                     MR. HARPER, DID YOU UNDERSTAND THAT

2      THAT MEANT YOU WERE WAIVING AND SURRENDERING YOUR

3      CLAIMS AGAINST ALLSTATE?

4                     ANSWER:  NO, SIR.

5                     THE COURT:  WHY DON'T YOU?  WHY DON'T

6      YOU UNDERSTAND BY READING THAT YOU ARE WAIVING?

7      WHAT IS ABOUT IT THAT IS NOT CLEAR?  IT SAYS YOU ARE

8      WAIVING ALL YOUR RIGHTS AGAINST ALLSTATE, DOESN'T

9      IT?  IS THERE SOMETHING ABOUT THAT THAT IS NOT

10     CLEAR?

11                    THE WITNESS:  YOUR HONOR --

12                    THE COURT:  I UNDERSTAND WHY YOU SIGNED

13     IT.  YOU EXPLAINED TO ME WHY YOU SIGNED IT AND

14     EXPLAINED TO THE JURY WHY YOU SIGNED IT BECAUSE YOU

15     WERE UNDER DURESS.  DIDN'T YOU READ THAT PLAIN

16     LANGUAGE AND REALIZED WHAT YOU WERE GIVING UP?

17                    THE WITNESS:  I DID.  THAT IS WHY I

18     FOUND IT TO BE SUCH AN ONEROUS DOCUMENT.

19                    I WAS NOT ABLE TO GET MR. HARPER TO

20     ADMIT THE OBVIOUS.  YOU SAW THAT.  AND YOU SAW

21     PLAINTIFF AFTER PLAINTIFF DO THAT.

22                    TAKE MR. LAWSON.  MR. LAWSON SAYS HE

23     WAS NOT A WEALTHY MAN.  YET YOU SAW HIS INCOME.  YOU

24     KNOW HOW MANY PROPERTIES HE HAD.  YOU SAW WHAT HE

25     MADE PER YEAR.  YOU SAW THAT HE HAD THE STABLE AND

1    THE HORSE FARM WITH 55 ACRES.  AND YOU SAW THAT HE

2    MADE A DECISION TO CASH OUT AND GET $1.2 MILLION.

3    WHY IS THAT IMPORTANT?  BECAUSE THE STORY WAS, WE

4    HAD NO CHOICE.  HE HAD A LOT OF CHOICES.  HE JUST

5    DID NOT LIKE THE CONSEQUENCES OF SOME OF THE

6    CHOICES.  THERE'S A DIFFERENCE.  THEY HAVE CONFUSED

7    CONSEQUENCES AND CHOICES THROUGHOUT THIS.

8              THERE IS A LOT MORE TO SAY ABOUT THIS

9    NEW BUCKET CALLED CREDIBILITY, BUT THE FACTS THAT

10   YOU SAW AND THE FACTS THAT YOU HEARD ARE VERY

11   DIFFERENT THAN THE STORIES THAT YOU WERE TOLD.

12             NOW, TYPICALLY -- AND THE COURT, JUDGE

13   BUCKWALTER, ALREADY GAVE YOU A FORESHADOWING OF THIS

14   -- TYPICALLY, THE DEFENDANT LIKE ALLSTATE DOES NOT

15   HAVE THE BURDEN OF PROOF.  TYPICALLY, IT'S ON THE

16   PLAINTIFF.  BUT THIS CASE IS DIFFERENT.  WE HAVE THE

17   BURDEN OF PROOF HERE.  WHY?  A RELEASE CONTRACT IS

18   WHAT IS WHAT IS CALLED AN AFFIRMATIVE DEFENSE.  SO

19   SOMEONE SUES US AND WE SAY, OH, WE HAVE A RELEASE.

20   YOU PROMISED THAT YOU WERE WAIVING AND SURRENDERING

21   ALL OF YOUR CLAIMS.  AND BECAUSE IT'S AN AFFIRMATIVE

22   DEFENSE, WE THEREFORE HAVE TO PROVE THAT THE RELEASE

23   WAS SIGNED KNOWINGLY AND VOLUNTARILY.  SO THE BURDEN

24   IS ON US.  MAKE NO MISTAKE ABOUT IT, WE HAVE THE

25   BURDEN OF PROOF ON THAT BY A PREPONDERANCE.

1            THE JUDGE WILL EXPLAIN TO YOU WHAT A

2    PREPONDERANCE OF THE EVIDENCE IS, AND I WILL LET THE

3    JUDGE'S INSTRUCTIONS SPEAK FOR THAT.  I WON'T SPEAK

4    FOR THE JUDGE ON THAT.

5            BUT WHEN YOU APPLY THE LAW TO THE

6    EVIDENCE HERE, AND YOU ARE GOING TO APPLY IT TO EACH

7    PLAINTIFF INDIVIDUALLY, ONE OF THE INSTRUCTIONS THAT

8    YOU ARE GOING TO HEAR IS THAT THESE ARE REALLY TEN

9    INDIVIDUAL TRIALS.  WHAT WAS TRUE FOR ONE PLAINTIFF

10   IS NOT TRUE FOR THE OTHER PLAINTIFF.  THESE ARE

11   FACT-SPECIFIC PLAINTIFF BY PLAINTIFF.  WHEN YOU

12   APPLY THE EVIDENCE, YOU HAVE A VERDICT FORM FOR EACH

13   PLAINTIFF.  SO IF WE CAN PUT UP THE VERDICT FORM,

14   PLEASE, JASON.

15           THE VERDICT FORM IS VERY SIMPLE:  WE

16   THE JURY EMPANELED AND SWORN IN THE ABOVE ENTITLED

17   ACTION FIND AS FOLLOWS:  HAS ALLSTATE PROVEN BY A

18   PREPONDERANCE OF THE EVIDENCE THAT ROGER BOYD SIGNED

19   THE RELEASE KNOWINGLY AND VOLUNTARILY?  YOU ARE

20   GOING TO HAVE TEN OF THOSE.  YOU ARE GOING TO CHECK

21   YES OR YOU ARE GOING TO CHECK NO ON EACH ONE.

22           WE THINK THE EVIDENCE ESTABLISHES, AND

23   ALLSTATE SUBMITS THAT THE EVIDENCE ESTABLISHES THAT

24   YOU SHOULD CHECK YES, ALLSTATE HAS PROVEN BY A

25   PREPONDERANCE OF THE EVIDENCE THAT ROGER BOYD -- BUT

1     YOU MAY FIND THAT IT'S TRUE FOR EIGHT PLAINTIFFS AND

2     NOT FOR TWO OTHERS.  YOU MAY FIND IT'S TRUE FOR SOME

3     AND NOT OTHERS.  THIS IS YOUR COLLECTIVE WISDOM AND

4     JUDGMENT.  WE SUBMIT TO YOU THE EVIDENCE JUSTIFIES

5     CHECKING YES ON EACH, BUT THAT IS UP TO YOU.

6               SO NOW LET'S TURN TO THE FOUR ORIGINAL

7     FACT BUCKETS.  WE ARE GOING TO START WITH TIME, D

8     208, PLEASE, JASON.  TIME, NOVEMBER OF 1999.

9     ALLSTATE INFORMS THE AGENTS OF THE PREPARING FOR THE

10    FUTURE PROGRAM.  THE PRIOR OCTOBER, YOU SAW, GAVE

11    KIND OF A HEADS-UP WARNING IN AN E-MAIL, IN A

12    LETTER.  IT THEN INVITED AGENTS TO MEETINGS.  IT

13    EXPLAINED THE PROGRAM TO THEM.  IT HAD THAT WHITE

14    BOX, THAT BIG WHITE BOX, PREPARING FOR THE FUTURE,

15    WHICH I SHOWED YOU IN THE OPENING.  IN THE WHITE BOX

16    WAS THE RELEASE, THE INFORMATION BOOKLETS, THE

17    INFORMATION NOTICE.  ALLSTATE DID THE QUESTIONS AND

18    ANSWERS.  D 106, PLEASE, JASON.  THIS IS AN EXAMPLE

19    OF JUST SOME OF THE STUFF THAT WAS PROVIDED IN THE

20    WHITE BOX OR OTHERWISE.  THERE WAS NO ATTEMPT TO

21    HIDE OR MISLEAD OR COVER AND NOT TELL.  THEY LAID IT

22    ALL OUT THERE.

23              SO WHY IS THE TIME BUCKET IMPORTANT?

24    WELL, FIRST, IT GIVES THEM SEVEN MONTHS TO PLAN WHAT

25    THEY WANT TO DO.  MOST PEOPLE WHEN THEY ARE LAID OFF

```
 1     GET ALMOST NO TIME.  WE JUST SAW THERE WAS A GREAT

 2     RECESSION.  YOU KNOW FROM YOUR OWN COMMON EXPERIENCE

 3     EXACTLY HOW IT WORKS.  WHO GETS SEVEN MONTHS PLUS AN

 4     OFFER OF ANOTHER THREE MONTHS OF BASE SEVERANCE, TEN

 5     MONTHS AT A MINIMUM?  WHO GETS THAT?  IT'S ALMOST

 6     UNHEARD OF.  YOU KNOW THAT FROM YOUR OWN COMMON LIFE

 7     EXPERIENCES.

 8               SECONDLY, WHEN PEOPLE TALK ABOUT BEING

 9     FORCED OR PRESSURED, THEY TYPICALLY ARE TALKING

10     ABOUT AT THE MOMENT, THEY HAVE NO TIME, THERE IS NO

11     TIME TO PLAN, THERE IS NO TIME TO ADJUST, THERE'S NO

12     TIME TO THINK ABOUT THINGS.  HERE THEY HAD SEVEN

13     FULL MONTHS, ALMOST SEVEN FULL MONTHS.

14               FINALLY, EACH PLAINTIFF WAS GIVEN THE

15     ABSOLUTE RIGHT TO REVOKE.  THEY COULD SIGN IT AND

16     THEN THEY HAD SEVEN DAYS TO REVOKE IT.  OF COURSE,

17     NONE OF THEM DID.

18               SO NOW BECAUSE THIS IS, AND WE TOLD YOU

19     IN OUR OPENING WE WOULD DO THIS, BECAUSE THIS IS A

20     TRIAL OF PLAINTIFF BY PLAINTIFF, AS I GO THROUGH

21     EACH FACT BUCKET I'M GOING TO ILLUSTRATE THE

22     SPECIFIC FACTS FOR A COUPLE OF PLAINTIFFS.  SO FOR

23     THE FACT TIME BUCKET I'M GOING TO ILLUSTRATE THE

24     SPECIFIC FACTS FOR TWO PLAINTIFFS, MR. PERKINS AND

25     MS. CREWS KELLY.  WE ARE GOING TO DO A DEEP DIVE ON
```

1     THE FACTS FOR THOSE TWO PLAINTIFFS.

2               LET'S START WITH MR. PERKINS, PLEASE.

3     SEVEN MONTHS TO MAKE A DECISION.  HE RECEIVED SEVEN

4     MONTHS OF PAY FROM ALLSTATE.  WAS GIVEN SEVEN DAYS

5     TO RESCIND, BUT DID NOT.  NEVER TESTIFIED THAT HE

6     SOUGHT ANOTHER JOB.

7               DID YOU NOTICE SOMETHING IN THIS TRIAL?

8     THEY ARE GIVEN NEARLY SEVEN MONTHS NOTICE AND THEY

9     ALL SAY -- NOT ALL OF THEM.  SEVERAL OF THEM SAY, I

10    WAS GOING TO LOSE EVERYTHING, ET CETERA, ET CETERA.

11    NOT A ONE OF THEM MADE AN EFFORT TO FIND ANOTHER

12    JOB.  UNFORTUNATELY, IN OUR SOCIETY PEOPLE GET LAID

13    OFF ALL THE TIME AND PEOPLE THEN GO OUT AND LOOK FOR

14    WORK.  NOT A ONE OF THESE PEOPLE TESTIFIED THAT THEY

15    DID THAT EXCEPT FOR MR. KEARNEY, WHO SAID HE MADE

16    SOME CALLS TO WORK FOR ALLSTATE.  THEY DID NOT EVEN

17    TRY TO FIND ANOTHER JOB.  THAT WAS THEIR CHOICE.

18              MR. PERKINS TESTIFIED THAT HE CHOSE TO

19    OPEN A NEW INDEPENDENT INSURANCE AGENCY SELLING

20    INSURANCE.  HE DID NOT FILE A LAWSUIT PRIOR TO

21    JULY 31ST, 2001.  NEXT PAGE.  HIS CHOICES.  HE HAD

22    THE FOUR PROGRAM OPTIONS.  HE HAD THE LAWSUIT

23    OPTION.  HE HAD ANOTHER BUSINESS OPTION.  HE HAD

24    ANOTHER JOB OPTION.  HE HAD ANOTHER ALLSTATE JOB

25    OPTION.  HAD HE CHOSEN TO TAKE ANY OF THEM -- OF

1    COURSE, HE DID NOT WANT TO WORK FOR ALLSTATE AFTER

2    THIS.

3            NOW, IT'S TRUE ON DIRECT HE HAD A

4    STORY.  HE WAS FACING FINANCIAL RUIN IF HE TOOK THE

5    BASE SEVERANCE, THAT IS, IF HE DIDN'T DO ANYTHING,

6    IF HE DID NOT LOOK FOR ANOTHER JOB, IF HE DID NOT DO

7    ANYTHING AT ALL, OF COURSE HE DID NOT BRING HIS

8    FINANCIALS IN TO SAY THAT.  HE DID NOT SHOW US

9    EXACTLY WHAT HIS BANK ACCOUNT SHOWED.  BUT IN OUR

10   COUNTRY WHEN YOU ARE LAID OFF, THIS MAN HAD AT LEAST

11   TEN MONTHS OF PAY, THE SEVEN -- NEARLY SEVEN MONTHS

12   THAT ALLSTATE WAS PAYING HIM AND THEN THE 13 WEEKS

13   OF BASE SEVERANCE THAT HE DID NOT HAVE TO SIGN A

14   RELEASE FOR.  THAT IS PRETTY UNUSUAL.

15           HE ABSOLUTELY CONSIDERED THE FOUR

16   OPTIONS.  HE NEVER TESTIFIED THAT HE COMPLAINED TO

17   ALLSTATE IN WRITING BEFORE SIGNING THE RELEASE.  HE

18   MET WITH A LAWYER AND HE SIGNED THE RELEASE.

19           NEXT PAGE, PLEASE.  IN EXCHANGE FOR

20   SIGNING THE RELEASE, MR. PERKINS RECEIVED AN

21   ECONOMIC INTEREST IN THE BOOK OF BUSINESS.  THEY

22   DIDN'T OWN IT.  IT'S UNDISPUTED THEY DID NOT OWN THE

23   ECONOMIC INTEREST IN THE BOOK OF BUSINESS, AND YOU

24   KNOW WHY YOU CAN KNOW THAT FOR CERTAINTY?  MS.

25   REINERIO WHEN SHE TESTIFIED, CAME IN AND SAID THAT

1    SHE INHERITED, SHE TOOK OVER THE BOOK OF BUSINESS

2    FROM A DEPARTED AGENT.  NOT ONLY DID THEY ALL ADMIT

3    IT, BUT MS. REINERIO ADMITTED IT.  HE RECEIVED

4    $5,000 IN CASH.  HE SOLD THE BOOK OF BUSINESS FOR

5    $148,000 AND HE USED THE MONEY HE RECEIVED UNDER

6    OPTION 2 TO OPEN UP AN INDEPENDENT INSURANCE AGENCY.

7              HOLD THE PRESSES.  STOP THIS GAME.  ALL

8    THESE PEOPLE -- NOT ALL OF THEM.  SOME OF THESE

9    PEOPLE SAID THAT THE COVENANT NOT TO COMPETE KEPT

10   THEM OUT OF THE INSURANCE BUSINESS.  YOU CAN'T

11   EXPLAIN MR. PERKINS.  HE CASHED OUT.  HE CASHED OUT.

12   HE FIGURED OUT HOW MUCH MONEY HE NEEDED.  HE OPENED

13   UP A NEW INSURANCE AGENCY SHORTLY THEREAFTER SELLING

14   INSURANCE.  THAT STORY CAN'T BE EXISTING OR CAN'T BE

15   TRUE IF THEIR ARGUMENT THAT THE COVENANT NOT TO

16   COMPETE PREVENTED THEM FROM OPERATING EVER AGAIN AS

17   AN INSURANCE AGENT.  AND, BY THE WAY, MS. CREWS

18   KELLY DID THE SAME BECAUSE SHE WENT INTO BUSINESS IN

19   THE NEW MASON CREWS AGENCY.  NEXT, PLEASE.

20             PERKINS MADE A PROMISE TO ALLSTATE.

21   ALLSTATE FULFILLED ITS PART OF THE BARGAIN.  MR.

22   PERKINS DID IT AT FIRST, BUT THEN OVER A YEAR LATER,

23   AFTER HE RECEIVED THE BENEFIT, AFTER HE RECEIVED THE

24   MONEY, AFTER HE RECEIVED THE ECONOMIC INTEREST, HE

25   SUED AND ATTEMPTS TO TAKE BACK HIS PROMISE.  IT'S UP

1    TO YOU TO DETERMINE WHETHER THAT IS RIGHT.

2              NEXT SLIDE, PLEASE.  WAS HIS CHOICE

3    KNOWING?  COLLEGE DEGREE, SOPHISTICATED,

4    INTELLIGENT, EDUCATED.  YES, HE READ AND UNDERSTOOD

5    THE RELEASE.  YES, HE KNEW WHAT HE WAS GIVING UP.  I

6    ASKED YOU AT THE TIME YOU SIGNED THE RELEASE YOU

7    KNEW PRECISELY WHAT YOU WERE GIVING UP, RIGHT?  YES.

8              NEXT SLIDE, PLEASE.  HE MADE A

9    CONSCIOUS, INTELLIGENT CHOICE ABOUT WHAT WAS BEST

10   FOR HIM.  YOU WANTED TO SELL YOUR BOOK OF BUSINESS,

11   RIGHT?  GIVEN THE OPTIONS THAT ALLSTATE GAVE US, IT

12   WAS MY BEST OPTION.  I ASKED HIM.  I VOLUNTARILY

13   MAKE THE FOLLOWING ELECTION.  I ASKED HIM THAT.  HE

14   SAID HE DID.  AT THE TIME ON THIS WITNESS STAND HE

15   SAID HE VOLUNTARILY MADE THE ELECTION.  OF COURSE,

16   ON DIRECT HE SAID I HAD NO CHOICE.  YOU DECIDE WHO

17   IS TELLING THE TRUTH.  THAT IS IN WRITING.  THAT IS

18   IN HIS TESTIMONY ON CROSS EXAMINATION, WHICH IS THE

19   ONLY WAY WE CAN HAVE A FERRETING OUT THE TRUTH IN

20   OUR SOCIETY SOMETIMES.

21             NEXT PAGE.  CHOICE VOLUNTARY.  YEAH.

22   THIS WAS ON DIRECT.  WHEN YOU DECIDED TO SELL YOUR

23   BOOK OF BUSINESS, BUT YOU ALSO SAID YOU WOULD

24   CONTINUE YOUR CAREER AS AN INSURANCE AGENT.  HOW

25   WERE YOU GOING TO CONTINUE AS AN INSURANCE AGENT

1    ONCE YOU SOLD YOUR BOOK?  ONCE I SOLD MY BOOK, I

2    COULD THEN INVEST IN START-UP EXPENSES AND HAVE

3    ENOUGH TO REPLACE THE LOST INCOME.  I ESTIMATED THAT

4    IT WOULD TAKE ABOUT 150,000 TO DO THAT.  ALL RIGHT.

5    SO IN ORDER TO STAY AS AN INSURANCE AGENT YOU

6    ELECTED TO SELL YOUR BOOK OF BUSINESS AND USE THE

7    PROCEEDS TO START UP A NEW INDEPENDENT AGENCY?

8    THAT'S CORRECT.  WHICH IS WHAT HE DID.

9            NEXT SLIDE, PLEASE.  HE ACCEPTED THE

10   PROGRAM AND AGREED TO BE BOUND BY THE RELEASE.  THIS

11   IS ON CROSS EXAMINATION.  I ASKED HIM:  YOU AGREED

12   TO THAT AT THE TIME?  I DID.

13           NEXT SLIDE, PLEASE.  MR. PERKINS'

14   CREDIBILITY.  HE CLAIMED HIS MANAGER VERBALLY TOLD

15   HIM THAT HE WOULD BE HOME FREE AFTER LIFE

16   VALIDATION.  BUT THE R830 DOES NOT SAY THAT.  AND HE

17   ADMITS THAT THERE IS NO JOB FOR LIFE LANGUAGE IN HIS

18   CONTRACT.

19           NEXT SLIDE, PLEASE.  HE CLAIMS HE MADE

20   INVESTMENTS OF 17,000, BUT ON CROSS EXAMINATION

21   ADMITTED THAT AT THE DEPOSITION HE PREVIOUSLY HAD

22   TESTIFIED THAT ALLSTATE'S OEA FOR THE MOST PART

23   COVERED HIS EXPENSES.  WHEN WE TOOK HIS DEPOSITION,

24   HE SAID MOST OF THOSE EXPENSES WERE COVERED BY

25   ALLSTATE'S OEA.  NOW HE CLAIMS 17,000.  YOU KNOW

1    WHAT?  GIVE IT TO HIM, BECAUSE YOU ARE GOING TO SEE

2    IN A MINUTE THIS GUY IS THE WARREN BUFFETT OF THE

3    INSURANCE AGENTS HERE.

4              NEXT SLIDE, PLEASE.  HE CLAIMS HE MADE

5    17,000 INVESTMENTS, BUT HE TOOK THEM AS A TAX

6    DEDUCTION AS EXPENSES.  LOOK, FEDERAL TAXES ARE

7    ACCORDING TO WHAT THE RULES ARE AND THE LAW.  HE

8    WANTS TO TELL YOU THEY ARE INVESTMENTS.  HE TOLD THE

9    IRS THAT THEY WERE EXPENSES FOR WHICH HE PAID LESS

10   TAXES.  THE TWO STORIES DO NOT HANG TOGETHER.  HE

11   CLAIMS HE MADE INVESTMENTS OF 17,000, WHICH WERE

12   THINGS LIKE VEHICLES, UTILITIES AND MEALS.  EVERY

13   WORKING AMERICAN HAS A VEHICLE, JUST ABOUT,

14   UTILITIES AND MEALS.  THESE ARE NOT INVESTMENTS.  HE

15   MADE 17,000 OUT-OF-POCKET INVESTMENTS, BUT HE WOULD

16   NOT AGREE TO THE OBVIOUS WHEN ASKED WHETHER SELLING

17   THE BOOK OF BUSINESS FOR 148,000 MEANT THAT HE HAD

18   870 PERCENT RETURN.  HE SAID OH, WELL, I ALSO WORKED

19   HARD, FOR WHICH HE WAS PAID WELL AT THE TIME.  BUT

20   IF HE HAD 17,000 INVESTMENTS, HE SOLD THE BOOK,

21   ECONOMIC INTEREST IN THE BOOK OF BUSINESS FOR 148,

22   THAT IS AN 870 PERCENT RETURN.  THAT IS A WARREN

23   BUFFETT ACCORDING TO HIS TAX RETURN HE EARNED

24   $550,009 FROM 1986 TO '94.

25              NEXT SLIDE, PLEASE.  MADE INVESTMENTS

1    BUT HE RECOUPED THEM.  TELLS YOU HE MAKES

2    INVESTMENTS.  THE FACTS ARE HE RECOUPED THEM.

3                NEXT SLIDE, PLEASE.  THAT IS MR.

4    PERKINS.  IN EXCHANGE FOR A PIECE OF PAPER THAT HE

5    GAVE ALLSTATE, ALLSTATE TRANSFERRED TO HIM $153,000

6    IN MONEY OR ECONOMIC CONSIDERATION WHICH HE HAS KEPT

7    EVER SINCE.  HE HAS BEEN IN THE INSURANCE BUSINESS

8    EVER SINCE, ACCORDING TO HIS TESTIMONY.

9                SECOND DEEP DIVE, CREWS KELLY.  SEVEN

10   MONTHS, 200 DAYS TO MAKE THE DECISION.  SEVEN MONTHS

11   OF PAY FROM ALLSTATE.  DID NOT REVOKE.  NEVER

12   TESTIFIED THAT SHE SOUGHT ANOTHER JOB.  SHE SAID SHE

13   SOLD TO REGGIE.  LUCKY REGGIE.  SHE SOLD TO HIM FOR

14   LESS THAN IT WAS WORTH BECAUSE SHE WANTED TO GO INTO

15   BUSINESS WITH HIM.  DID NOT FILE A LAWSUIT.

16               NEXT SLIDE, PLEASE.  SHE HAD THE SAME

17   OPTIONS.  SHE NEVER TESTIFIED SHE COMPLAINED TO

18   ALLSTATE IN WRITING BEFORE SIGNING THE RELEASE.

19   CONSULTED WITH HER TAX ACCOUNTANT PRIOR TO SIGNING

20   THE RELEASE.  HE GAVE HER HIS OPINION ON WHAT SHE

21   SHOULD DO.  AFTER SHE MET WITH THE ACCOUNTANT AS

22   WELL AS HER LAWYER, SHE DECIDED TO SELL HER BOOK OF

23   BUSINESS AND SIGN THE RELEASE.  AND SHE SOLD THE

24   BOOK OF BUSINESS.  THE CONTRACT WAS ENTERED INTO

25   BEFORE SHE SIGNED THE RELEASE.

```
 1              NEXT SLIDE, PLEASE.  TALKS ABOUT
 2    MEETING WITH LAWYERS.
 3              NEXT SLIDE, PLEASE.  IN EXCHANGE FOR
 4    THE RELEASE, SHE GOT OVER $500,000, 419 PAID IN
 5    INSTALLMENTS OVER FIVE YEARS AT 8-AND-A-HALF PERCENT
 6    INTEREST.  SHE RECEIVED THE ABILITY TO CONTINUE
 7    SELLING ALLSTATE INSURANCE, WORKING AT THE MASON
 8    CREWS AGENCY.  SHE RECEIVED DEBT FORGIVENESS.  SHE
 9    RECEIVED $5,000 IN CASH.  SHE KEPT HER VESTED
10    MEDICAL BENEFITS AND SHE KEPT HER VESTED PENSION.
11              WHEN THEY SAY THEY LOST THINGS, NO.
12    WHEN YOU LOSE A JOB, YOU DON'T KEEP ACCRUING PENSION
13    BENEFITS.  THEY LOST THEIR JOBS.  THEY WERE
14    TERMINATED.  THEY DID NOT LOSE WHAT THEY HAD.
15              NEXT SLIDE, PLEASE.  SHE MADE A PROMISE
16    TO ALLSTATE BUT AGAIN WANTS TO BACK OUT OF IT.
17              NEXT SLIDE, JASON.  WAS SHE KNOWING?
18    VERY SOPHISTICATED, VERY EDUCATED, VERY INTELLIGENT.
19    TALKED WITH A LAWYER, TALKED WITH HER ACCOUNTANT.
20    DID SHE INTEND TO HONOR HER PROMISE OF WAIVING ALL
21    CLAIMS AGAINST ALLSTATE?  SHE SAYS ONLY IF IT'S
22    LEGAL.  WHAT DOES THAT MEAN?  YOU KNOW, WHEN YOU
23    WERE KIDS, THERE USED TO BE THIS THING -- AT LEAST
24    IN THE UPPER MIDWEST WHERE I'M FROM.  YOU HAD THIS
25    SHAKE HANDS AND THEN THE GUY WOULD HAVE CROSSED HIS
```

1    FINGERS BEHIND HIS BACK.  WHAT IS THAT?  IS THAT

2    WHEN SHE DID HERE?  SHE SIGNED THE RELEASE BECAUSE

3    SHE SAID ONLY IF IT'S LEGAL BUT I WILL TAKE THE

4    MONEY IN THE MEANTIME?  REALLY?  SHE ADMITS ALLSTATE

5    PROVIDED TONS OF MATERIAL ON THE PROGRAM.

6            NEXT SLIDE, PLEASE.  MADE A CONSCIOUS,

7    INTELLIGENT CHOICE.  SOLD HER BOOK OF BUSINESS

8    15 DAYS BEFORE SIGNING THE RELEASE.  SHE TURNED DOWN

9    OFFERS FOR MUCH, MUCH MORE THAN THE 500,000.  SIGNED

10   THE RELEASE AFTER SPEAKING WITH HER LAWYER.

11           NEXT SLIDE.  CREDIBILITY.  SHE SAYS SHE

12   WAS TOLD IN 1980 IN VERBAL CONVERSATION SHE WOULD

13   STAY AT ALLSTATE FOR THE REST OF HER CAREER.  ADMITS

14   THAT ALLSTATE NEVER SAID TOLD HER A JOB FOR LIFE.

15   R830 CONTRACT WAS TERMINABLE AT WILL.  ADMITS SHE

16   NEVER THOUGHT ABOUT THE TERMINATION PROVISION IN HER

17   CONTRACT BEFORE NOW.  SHE SAID SHE HAD NO CHOICE,

18   BUT WAS FORCED.  NOW SHE IS SAYING THAT WAS TRUE OF

19   THE NOA WHEN SHE WAS AN NOA THAT SHE SUPPOSEDLY

20   LIKED SO MUCH.  SHE CLAIMED SHE WAS FORCED TO SIGN

21   THE RELEASE, BUT SHE SOLD THE BOOK OF BUSINESS FOR

22   LESS MONEY TO A GOOD FRIEND'S SON.

23           NEXT SLIDE, PLEASE.  CLAIMS ALLSTATE

24   HAD WRONGED HER.  I MEAN, WHO -- IF YOU HAVE A CLOSE

25   FRIEND AND IT'S HIS SON AND YOU ARE SO ANGRY AT THE

1    EMPLOYER WHO HAS WRONGED YOU, WHO, SERIOUSLY, SAYS

2    OH, GO WORK FOR THAT COMPANY WHO HAS BEEN SO MEAN TO

3    ME AND I'M SO ANGRY ABOUT, PARTICULARLY WHEN YOU CAN

4    SELL TO OTHERS.  DOES THAT RING TRUE?  SOME FRIEND.

5              SHE MADE 180,000 OUT OF POCKET IN

6    INVESTMENTS, SHE SAYS, BUT OF COURSE SHE TOOK TAX

7    DEDUCTIONS ON THEM, NOT AS INVESTMENTS BUT AS

8    EXPENSES.  AND SHE EARNED $922,000 BETWEEN 1990 AND

9    1999.  SHE WAS WELL, WELL PAID.  SHE CLAIMS SHE

10   NEVER WANTED TO BECOME AN EA INDEPENDENT CONTRACTOR

11   AGENT BECAUSE OF THE 90 DAYS NOTICE.  YOU HEARD THAT

12   REPEATEDLY.  OF COURSE, THAT 90 DAYS WAS A

13   GUARANTEE.  TERMINABLE AT WILL, BUT YOU CAN DO IT ON

14   30 DAYS.  THAT IS WHAT THE CONTRACT PROVIDED.

15             NEXT SLIDE, PLEASE.  SHE SAID SHE WAS

16   ANGRY, BUT SHE SOLD IT TO THE FAMILY FRIEND AND SHE

17   SAID SHE WAS SO ANGRY THAT SHE WOULD NOT EVEN PONY

18   UP -- SHE KNEW WHAT PONY UP MEANT, SHE HAS HORSES, I

19   GUESS OR KNOWS ABOUT HORSES -- WOULD NOT EVEN PONY

20   UP $2,000 TO SUE ALLSTATE TO STOP THE RELEASE.

21             NEXT SLIDE.  THAT IS HOW MUCH SHE GOT.

22   IN EXCHANGE FOR SIGNING THE RELEASE, SHE GOT

23   $503,497.

24             OKAY, NOW, WE ARE GOING TO GO TO BASIC

25   FACT NUMBER TWO, CHOICES.  ALLSTATE TERMINATED THESE

1    PEOPLE.  THAT IS A FACT.  THEY GAVE THEM FOUR

2    OPTIONS.  THAT IS AN UNDISPUTED FACT.

3                DTX 107, PLEASE.  CONVERSION,

4    CONVERSION AND SALE, ENHANCED SEVERANCE AND BASE

5    SEVERANCE.  NOW, MR. HARPER TESTIFIED ABOUT A BOOK

6    OF BUSINESS.  HE SAID IT WAS LIKE PLANTING ORCHARDS,

7    PEACH TREES OR APPLE TREES OR OTHER CROPS.  YOU ALL

8    REMEMBER THAT HE USED THAT ANALOGY.  THE PROBLEM IS,

9    IT WAS NOT HIS LAND.  THEY WERE NOT HIS TREES.  THEY

10   WERE NOT HIS CROP, AND THEY WERE NOT HIS FRUIT.

11   THEY BELONGED TO ALLSTATE.  THAT IS WHAT THE

12   CONTRACT PROVIDED, WHICH THEY ADMITTED.

13                AND THAT'S WHAT MS. REINERIO CONFIRMED

14   FOR YOU WHEN SHE SAID SHE TOOK OVER A BOOK OF

15   BUSINESS TO SERVICE FROM A DEPARTING AGENT.  IT'S

16   ALSO ESTABLISHED FACT NUMBER 18.  SO IF YOU LOOK AT

17   YOUR ESTABLISHED FACTS, PUT THAT UP FOR US, JASON.

18   THAT WAS FACT 18.  THE COMPANY OWNS THE BUSINESS.

19   ESTABLISHED FACT.  NOW OF COURSE IF YOU THINK THE

20   EVIDENCE IS DIFFERENT, YOU CAN REJECT THE

21   ESTABLISHED FACTS, AS JUDGE BUCKWALTER SAID.  BUT

22   THAT IS AN ESTABLISHED FACT.

23                BUT EACH OF THE PLAINTIFFS TESTIFIED IN

24   THE END THAT THEY UNDERSTOOD THAT THE BOOK OF

25   BUSINESS BELONGED TO ALLSTATE, AND THESE BOOKS OF

1    BUSINESSES WERE VERY, VERY VALUABLE.  WE HAVE SEEN

2    THAT WITH CREWS KELLY, WITH MR. PERKINS.  HOW MUCH

3    TOTAL WERE THE BOOKS OF BUSINESS WORTH?  NOT THE

4    TOTAL AMOUNT THAT THESE PEOPLE WERE PAID.  HOW MUCH

5    WERE THE BOOKS OF BUSINESS WORTH?

6              D 209, PLEASE, JASON.  THAT IS THE BOOK

7    OF BUSINESS SALES AMOUNTS:  3,419,797.  WHAT

8    EMPLOYER IS SO BAD THAT WHEN THEY TERMINATE YOU

9    AFTER GIVING YOU SEVEN MONTHS THEY TRANSFER TO YOU

10   ECONOMIC VALUE WORTH 3.4 MILLION, ALL IN EXCHANGE

11   FOR A PIECE OF PAPER SAYING YOU WON'T SUE THEM AND

12   THEN YOU TURN AROUND AND SUE THEM ANYWAY.

13             NOW LET'S DO A DEEP DIVE ON

14   MR. PETERSON AND MR. CREASE.  UNDER CHOICES.

15   MR. PETERSON'S TIME.  SEVEN MONTHS.  DECIDED TO SIGN

16   THE RELEASE THREE MONTHS EARLY, FOREGO THREE MONTHS

17   OF BENEFITS AND SALARY.  THAT WAS HIS CHOICE.  HE

18   DID NOT HAVE TO DO IT THAT WAY.  DID NOT RESCIND.

19   NEVER SOUGHT ANOTHER JOB.  NEVER SOUGHT AN ALLSTATE

20   JOB.  DID NOT FILE A LAWSUIT.

21             NEXT SLIDE, PLEASE.  HE HAD THE SAME

22   OPTIONS.  HE DID NOT WANT OPTIONS 2 TO 4.  HE TURNED

23   DOWN 103,000 IN ENHANCED SEVERANCE.  HE NEVER

24   COMPLAINED TO ALLSTATE IN WRITING.  HE CHOSE NOT TO

25   CONSULT A LAWYER BECAUSE AS HE SAID AT DEPOSITION,

1    HE DID NOT LIKE LAWYERS.

2              NEXT SLIDE, PLEASE.  WHAT DID HE GET

3    FOR SIGNING THE RELEASE?  HE GOT A NEW JOB, GOT A

4    NEW JOB THAT OTHERWISE HE WOULD NOT HAVE GOTTEN.  HE

5    GOT DEBT FORGIVENESS AND THE NEW JOB AS A BUSINESS

6    OWNER SELLING ALLSTATE INSURANCE, HIGHER

7    COMMISSIONS, PARTICIPATION IN THE STOCK BONUS PLAN,

8    ECONOMIC INTEREST IN THE BOOK OF BUSINESS THAT IS

9    WORTH $325,000, THE ABILITY TO BUY ANOTHER AGENT'S

10   BOOK OF BUSINESS.  DID YOU HEAR MR. PETERSON SAY

11   THERE WAS A MARKET?  OTHER TERMINATED AGENTS WERE

12   BUYING OTHER AGENTS' BOOKS OF BUSINESS BECAUSE THEY

13   COULD GROW.  THAT IS WHAT MR. LIDDY SAID.  THEY

14   COULD GROW THEIR BUSINESSES.  HE HAD A SATELLITE

15   LOCATION AND HE GOT $5,000 IN CASH.

16             NEXT SLIDE, PLEASE.  HE MADE THE SAME

17   PROMISE THAT HE NOW WANTS TO TAKE BACK.

18             NEXT SLIDE, PLEASE.  HE WAS A

19   SOPHISTICATED, INTELLIGENT MAN, COLLEGE DEGREE.  HE

20   READ AND UNDERSTOOD THE RELEASE.  HE KNEW WHAT HE

21   WAS GIVING UP.  HE EVALUATED EACH OF THE OPTIONS.

22   THAT IS WHAT HE TESTIFIED TO.

23             NEXT SLIDE, PLEASE.  AND I ASKED HIM,

24   JUST LIKE MR. PERKINS, UNDER CROSS EXAMINATION:

25   DESPITE WHAT YOU SAID ON DIRECT, WHEN YOU SIGNED

1    YOUR NAME TO THE RELEASE DID YOU AGREE TO ACCEPT THE

2    PROGRAM AND AGREE TO BE BOUND BY ITS TERMS AND THE

3    TERMS OF THE RELEASE OR DID YOU NOT AGREE?  YES.

4    YOU AGREED?  YES.  HE AGREED.  HE LOOKED YOU IN THE

5    EYE AND TOLD YOU HE AGREED BACK THEN.

6              SO WHAT CHANGED?  NOT A SINGLE

7    PLAINTIFF HAS EXPLAINED TO YOU WHY THEY DID NOT FILE

8    A LAWSUIT BEFORE THE PROGRAM, OTHER THAN ALLSTATE'S

9    A BIG COMPANY, ALTHOUGH THEY FILED ONE LATER.  NOT A

10   SINGLE ONE EXPLAINED TO YOU WHY AFTER THEY SIGNED

11   THE RELEASE DID NOT FILE A SUIT UNTIL AUGUST OF

12   2001.

13             WAS IT VOLUNTARY?  HE SAYS HE WOULD

14   HAVE CHOSEN OPTION 1 EVEN WITHOUT THE RELEASE.  THE

15   RELEASE WAS NOT MATERIAL TO THIS MAN.

16             NEXT SLIDE, PLEASE.  CREDIBILITY.  HE

17   SAID HE WANTED TO REMAIN AN AGENT EMPLOYEE, BUT HE

18   DECIDED TO SIGN THE RELEASE THREE MONTHS EARLY.

19   REMEMBER THE MAN?  HE WAS TICKLED PINK WHEN I ASKED

20   HIM ABOUT THE MEDICAL BENEFITS.  CALLED HIS WIFE AND

21   SAID HONEY, IS THIS WHAT I THINK IT IS?  WE GOT

22   MEDICAL BENEFITS.  ALLSTATE DID RIGHT BY THESE

23   PEOPLE.

24             NEXT SLIDE.  HE CLAIMED HIS MANAGERS

25   TOLD HIM THAT HE HAD A LIFETIME CAREER, BUT HIS

1    CONTRACT WAS TERMINABLE AT WILL.  HE NEVER REQUESTED

2    AN AGENT REVIEW BOARD.  HE KNEW FROM HIS DEGREE IN

3    BUSINESS THAT ALLSTATE COULD BE REORGANIZED OR

4    DOWNSIZED.  AND HE AGREED THAT ALLSTATE COULD SHUT

5    DOWN OR WITHDRAW FROM MARKETS.  DO YOU REMEMBER

6    MR. KAUFMAN TALK ABOUT ALLSTATE WITHDREW FROM THE

7    MASSACHUSETTS MARKET?  NO MORE AGENTS.  WHY?

8    BECAUSE IT'S TERMINABLE AT WILL.

9              NEXT SLIDE, PLEASE.  HE CLAIMED HE MADE

10   INVESTMENTS, BUT HE HAS NO RECORDS OF THEM, NONE

11   WHATSOEVER, NOT A SINGLE PIECE OF PAPER.  COULD NOT

12   SAY IN ANY GIVEN YEAR HOW MUCH OEA HE HAD.  HE

13   ADMITTED THAT HE AND HIS OFFICE MATES EXCEEDED THEIR

14   OEA'S BY VERY LITTLE.  AND THEN HE SOLD HIS BOOK OF

15   BUSINESS FOR $325,000.  FINAL SLIDE.  HE CLAIMED

16   40,000 OUT OF POCKET, BUT HE RECOUPED 4 TO 1.  IF

17   THAT WAS TRUE, HE RECOUPED IT 4 TO 1, 400 PERCENT

18   RETURN.  AND IN 1997 HE IS EARNING $100,000 A YEAR.

19   SO THAT IS MR. PETERSON.

20             NOW MR. CREASE, DEEP DIVE.

21             OH, BY THE WAY, 330,000.  MR. PETERSON

22   GOT 330,000 FOR SIGNING THE PIECE OF PAPER, MAKING A

23   PROMISE.  REMEMBER MR. HARPER SAID, I SELL PROMISES?

24   IF YOU SELL A PROMISE, YOU ARE OBLIGATED TO KEEP IT,

25   NOT TAKE THE MONEY AND RUN AND THEN TRY TO TAKE IT

1     BACK.

2            SO NEXT SLIDE, MR. CREASE.  SAME DEAL,

3     SEVEN MONTHS, SEVEN MONTHS OF PAY, SEVEN DAYS TO

4     RESCIND.  NEVER SOUGHT ANOTHER JOB.  NEVER PURSUED

5     ANOTHER BUSINESS OPPORTUNITY.  DID NOT EVEN SEEK

6     ANOTHER ALLSTATE JOB.  THOUGHT ABOUT IT, BUT DID NOT

7     SEEK IT.  DID NOT FILE A LAWSUIT.

8            NEXT SLIDE.  HAD THE SAME CHOICES.  HE

9     CHOSE NOT TO COMPLAIN TO ALLSTATE IN WRITING BEFORE

10    SIGNING THE RELEASE.  MET WITH THREE LAWYERS.  AFTER

11    HE GOT THE LEGAL ADVICE, INCLUDING IRONCLAD, WHAT

12    DID HE DO?  HE SIGNED THE RELEASE.  WE HAVE A ROLE

13    IN OUR SOCIETY OF LAWYERS.  YOU GO TO A LAWYER, YOU

14    GET LEGAL ADVICE.  YOU CHOOSE TO FOLLOW LEGAL

15    ADVICE.  DON'T COMPLAIN TO SOMEONE ELSE WHEN YOU

16    FOLLOW THE LEGAL ADVICE.

17           NEXT SLIDE, PLEASE.  WHAT DID HE GET?

18    HE GOT A NEW JOB WORKING IN A DIFFERENT RELATIONSHIP

19    AS AN INDEPENDENT CONTRACTOR.  DEBT FORGIVENESS,

20    HIGHER COMMISSIONS, PARTICIPATION IN THE STOCK BONUS

21    PLAN, ECONOMIC INTEREST IN THE BOOK OF BUSINESS,

22    $250,000, THE ABILITY TO BUY ANOTHER AGENT'S BOOK OF

23    BUSINESS, 5,000 IN CASH.  NOW HE CLAIMS THAT 250 WAS

24    THE RESULT OF HIS SUBSEQUENT WORK AND SUBSEQUENT

25    INVESTMENTS.  I WILL NEED LEAVE THAT FOR YOU TO

```
 1     DECIDE.  WE DON'T KNOW WHAT THOSE INVESTMENTS WERE.
 2     YOU WILL HAVE TO DECIDE WHETHER THAT RINGS TRUE.
 3               NEXT SLIDE, PLEASE.  HE MADE A PROMISE.
 4     YOU KNOW, WHEN YOU SIGN YOUR NAME TO SOMETHING AS A
 5     PROMISE IN EXCHANGE FOR MONEY, HOPEFULLY IT MEANS
 6     SOMETHING.  IT SHOULD MEAN SOMETHING.  I THINK WHEN
 7     MOST PEOPLE SIGN IT, IT MEANS SOMETHING.  THEY ARE
 8     ASKING YOU TO SAY IT MEANS NOTHING.
 9               NEXT SLIDE, PLEASE.  IN DEPOSITION WHEN
10     YOU SIGNED THE RELEASE AND PROMISED THAT YOU WERE
11     WAIVING ALL YOUR CLAIMS, DID YOU INTEND TO KEEP YOUR
12     PROMISE?  IF THE RELEASE WAS FOUND TO BE LEGAL, OF
13     COURSE I INTEND TO BE BOUND BY THAT.  WHAT KIND OF
14     ANSWER IS THAT?  YOU EITHER AGREE TO THE DEAL OR YOU
15     DON'T AGREE TO THE DEAL.  YOU DON'T SAY I'M
16     RELEASING MY CLAIMS, BUT I'M GOING TO SUE YOU ANYWAY
17     TO FIND OUT WHETHER I HAVE CLAIMS THAT I'M NOT
18     RELEASING.
19               NEXT SLIDE, PLEASE.  WAS HE KNOWING?
20     SOPHISTICATED, INTELLIGENT.  YOU SAW HIM.  HE READ
21     AND UNDERSTOOD IT.  HE KNEW PRECISELY WHAT HE WAS
22     GIVING UP.
23               NEXT SLIDE, PLEASE.  VOLUNTARY?  HE
24     MADE A CONSCIOUS, INTELLIGENT CHOICE OF WHAT WAS
25     BEST FOR HIM.  HE SAID I WAS FACING FINANCIAL RUIN.
```

```
 1    HE DID NOT HAVE TO SIGN THE RELEASE AND HE HAD

 2    BASICALLY TEN MONTHS OF INCOME TO DO ANY NUMBER OF

 3    OTHER THINGS.  MOST AMERICANS WHEN THEY'RE LAID OFF,

 4    AND YOU KNOW THIS FROM THE GREAT RECESSION, THEY

 5    DON'T HAVE ANY TIME.  TEN MONTHS OF INCOME AT HIS

 6    INCOME?  AND HE IS FACING FINANCIAL RUIN?  NO.  THAT

 7    IS THE CONSEQUENCE OF A CHOICE THAT HE DOES NOT LIKE

 8    NECESSARILY, BUT HE KNOWS IT'S A GOOD ECONOMIC

 9    CHOICE FOR HIM.  THEN INCREDIBLY I SAID:  LET'S JUST

10    SAY THAT THE OPTION 1 DID NOT REQUIRE A RELEASE.

11    WHAT YOU WOULD HAVE DONE?  HE WOULD HAVE SIGNED

12    OPTION 1 ANYWAY, PROVING THAT THE RELEASE IS

13    COMPLETELY IMMATERIAL TO HIM.  DID NOT CARE.  WANTED

14    OPTION 1.

15              NEXT SLIDE.  ASSIGNED NO VALUE TO THE

16    RELEASE.  FOLLOWED HIS LAWYER'S ADVICE.

17              262, PLEASE.  WE'VE ALREADY COVERED

18    THIS ONE.  THAT IS THE IRON CLAD STATEMENT.

19              263.  WE ASKED HIM AT DEPOSITION:  WAS

20    IT KNOWING AND VOLUNTARY?  HE SAID:  AT THE END

21    THOSE ARE ALLSTATE'S WORDS.  THAT IS WHAT I READ AT

22    THAT TIME, YES.  YOU ARE GOING TO HAVE TO DECIDE WAS

23    HE TELLING THE TRUTH AT DEPOSITION OR WAS HE TELLING

24    THE TRUTH NOW.  YOU FUNDAMENTALLY HAVE TO DECIDE.

25    DOES IT MAKE SENSE THAT THE MAN DID NOT CARE ABOUT
```

1    THE RELEASE, HE WOULD HAVE TAKEN OPTION NUMBER 1

2    ANYWAY, BUT SUDDENLY NOW THAT THE RELEASE IS ALL

3    THAT IMPORTANT, AND HE WAS FORCED TO SIGN IT.  YOU

4    WILL HAVE TO DECIDE THAT.

5              264, PLEASE.  WE JUST COVERED THAT.

6              265.  CLAIMS HIS MANAGERS VERBALLY TOLD

7    HIM IN '82 HE HAD A JOB AS LONG AS YOU WANT IT WITH

8    US.  CONTRACT IS TERMINABLE AT WILL.  IT DOES NOT

9    SAY THAT.  HE TOLD US IF IT'S NOT IN WRITING, IT

10   DOES NOT COUNT, BASICALLY.

11             266, PLEASE.  COULD NOT IDENTIFY ANY

12   CONTRACT THAT SAID HE HAD JOB SECURITY.  NO JOB FOR

13   LIFE LANGUAGE IN HIS CONTRACTS.  ADMITS HE WAS NOT

14   TERMINATED BECAUSE OF UNSATISFACTORY JOB

15   PERFORMANCE.

16             267, PLEASE.  CLAIMS JOB FOR LIFE, BUT

17   ADMITS THAT ALLSTATE COMPLIED WITH THE TERMINATION

18   PROVISIONS.  REMEMBER MR. KAUFMAN CAME IN WITH THE

19   STATEMENT, THE SIGNATURES OF ALL THE VARIOUS

20   REGIONAL VICE PRESIDENTS AND PEOPLE.  THEY FOLLOWED

21   THE PROCEDURES?  ALLSTATE COMPLIED WITH THE CONTRACT

22   WHEN THEY TERMINATED THEM.

23             NEXT SLIDE, PLEASE.  SAYS ALLSTATE KEPT

24   ITS END OF THE BARGAIN, BUT THEN SAYS AND INTERJECTS

25   VOLUNTARILY, BUT I WILL GIVE THE CASH BACK.  REALLY?

1    WOULD YOU BELIEVE THAT MAN WAS GOING TO WALK OFF THE

2    WITNESS STAND, GO TO THE BACK OF THE COURTROOM AND

3    WRITE A CHECK TO ALLSTATE FOR A COUPLE HUNDRED

4    THOUSAND DOLLARS?  WELL, THAT IS UP TO YOU TO

5    DECIDE.  THERE USED TO BE AN EXPRESSION IF YOU HAVE

6    A BRIDGE IN BROOKLYN, I HAVE GOT A PRICE.  IT

7    CAPTURES VERY WELL WHAT YOU ALL SAW FROM THE WITNESS

8    STAND.  CLAIMED HE HAD A PROPRIETARY INTEREST IN HIS

9    BOOK OF BUSINESS, BUT ADMITS THAT ALLSTATE OWNS THE

10   BOOK.

11              NEXT SLIDE, PLEASE.  CLAIMS HE MADE

12   120,000 IN OUT-OF-POCKET INVESTMENTS OVER 12 YEARS,

13   BUT THOSE WERE EXPENSES THAT HE TOOK AS TAX

14   DEDUCTIONS ON HIS TAX RETURNS.  LOOK, YOU EITHER ARE

15   TELLING THE IRS THE TRUTH OR YOU ARE TELLING THE

16   JURY THE TRUTH, BUT THE TWO DON'T MATCH.  THAT IS UP

17   TO YOU TO DECIDE.  AND EXPENSES WERE THINGS LIKE

18   MILEAGE, MEALS, ENTERTAINMENT.  THOSE ARE NOT

19   INVESTMENTS.  THEY ARE EXPENSES.

20              FINALLY, WHO TOLD YOU ABOUT THE

21   $250,000 BOOK OF BUSINESS SALE?  PLAINTIFFS DID NOT

22   SAY ANYTHING ABOUT THAT IN OPENING AND THEY DID NOT

23   BRING IT ON DIRECT WITH MR. CREASE.  I HAD TO ASK

24   HIM ABOUT IT.  WHAT WAS THE VALUE?  I HAD TO BRING

25   THAT OUT.

1            NEXT SLIDE, PLEASE.  SO WHAT DID HE

2     GET?  256,250.  WHAT DID ALLSTATE GET?  A PIECE OF

3     PAPER WITH A MAN'S PROMISE AND HIS SIGNATURE.

4     PROMISES THAT ARE SIGNED SHOULD MEAN SOMETHING IN

5     OUR SOCIETY, I SUBMIT TO YOU.  YOU SHOULD NOT BE

6     ABLE TO WALK AWAY FROM THEM AFTER YOU'VE GOTTEN

7     ECONOMIC INTEREST AND YOU'VE GOTTEN THE VALUE THAT

8     WAS PAID FOR YOU FOR THAT PROMISE.

9            BASIC FACT NUMBER TWO, OPTIONS

10    CONVERSION.  THIS WAS THE OPTION WHERE IF YOU DID

11    NOT WANT TO STAY WITH ALLSTATE, YOU COULD CONVERT.

12    ALLSTATE WOULD TRANSFER THE ECONOMIC INTEREST TO YOU

13    AND YOU COULD CONVERT.  IT IS UNDISPUTED THAT THREE

14    EMPLOYEE AGENTS TOOK THIS OPTION.  THE VERY WEALTHY

15    MR. LAWSON FROM SOUTH CAROLINA, MS.  CREWS KELLY WHO

16    ALSO GOT A VERY LARGE PAYDAY, AND MR. PERKINS WHO

17    CASHED OUT.

18            LET'S DO A DEEP DIVE ON MR. LAWSON.

19    SEVEN MONTHS PAY, SEVEN MONTHS TO DECIDE, NEVER

20    SOUGHT ANOTHER JOB.  SOUGHT ANOTHER ALLSTATE JOB?

21    IN FACT, NO, HE WANTED TO LEAVE.  HE WAS SO UPSET HE

22    WANTED TO LEAVE ALLSTATE.  HE DIDN'T WANT TO STAY

23    WITH ALLSTATE.  HE DID NOT PURSUE ANOTHER BUSINESS

24    OPPORTUNITY.

25            NEXT SLIDE, PLEASE.  HE HAD THE SAME

```
 1    OPTIONS, BUT HE TURNED DOWN AN ENHANCED SEVERANCE
 2    OFFER OF 345,093.  I TOLD YOU THAT IN OPENING.
 3    REMEMBER I SAID, WHO TURNS DOWN $345,093 WHEN YOU
 4    ARE ABOUT TO BE LAID OFF?  THAT IS A LOT OF MONEY,
 5    FOLKS.  HE TURNS IT DOWN BECAUSE HE KNEW THE BOOK OF
 6    BUSINESS WAS MORE VALUABLE.  HE WANTED TO PLAN HIS
 7    RETIREMENT.  HE WAS GOING TO USE THAT MONEY TO SELL
 8    HIS AGENCY, USE THAT MONEY FOR RETIREMENT FOR HIM
 9    AND HIS WIFE.  CHOSE NOT TO SPEAK WITH A LAWYER.
10              NEXT SLIDE.  WANTED TO LEAVE ALLSTATE
11    AND GET HIS MONEY OUT.  HE SAID HE DID NOT TRUST
12    ALLSTATE ANYMORE.  HE DIDN'T WANT TO WORK FOR THEM
13    ANYMORE.  THAT WAS HIS CHOICE.  AND SO HE SIGNED THE
14    RELEASE, TOOK OPTION 2, GOT THE ECONOMIC INTEREST IN
15    THE BOOK OF BUSINESS, AND CASHED OUT.  MY INTENTION
16    WAS TO LEAVE ALLSTATE AS QUICK AS I COULD.
17              NEXT SLIDE, PLEASE.  WHAT DID HE GET?
18    HE GOT AN EXTENSION OF TIME FROM ALLSTATE TO SELL
19    THE BOOK BECAUSE HE COULD NOT SELL IT IMMEDIATELY.
20    HE GOT 910,000 PURCHASE PRICE WHICH WITH INTEREST
21    CAME TO JUST ABOUT 1.2 MILLION, HE TESTIFIED.  HE
22    RECEIVED ALLSTATE RETIREE MEDICAL BENEFITS, ALTHOUGH
23    HE DID NOT TELL ME THAT INITIALLY.  I HAD TO HAVE A
24    LITTLE HELP FROM THE JUDGE.  I DID NOT REALIZE THAT
25    MEDICARE KICKED IN.  YOU MAY REMEMBER THAT?  HE
```

```
 1    SAID, NO, HE WAS NOT GETTING BENEFITS.  WELL, HE DID

 2    GET THEM UNTIL HE NO LONGER NEEDED THEM BECAUSE HE

 3    WAS GETTING THEM FROM MEDICARE, BUT HE DIDN'T WANT

 4    TO TELL ME THAT.  AND HE KEPT HIS 401(K) PLAN.

 5                 NEXT SLIDE, PLEASE.  HE MADE A PROMISE.

 6    ALLSTATE PAID HIM FOR THE PROMISE.

 7                 NEXT SLIDE.  WAS HE KNOWING,

 8    SOPHISTICATED, INTELLIGENT?  HE WAS A GAMECOCK FROM

 9    THE UNIVERSITY OF SOUTH CAROLINA.  HE UNDERSTOOD

10    WHAT ALLSTATE WAS ASKING US TO DO.  HE UNDERSTOOD

11    THAT HIS JOB WAS GONE AS OF JUNE 30.  THAT WAS CLEAR

12    TO ME, RIGHT.  HE WAS TERMINATED.  HE WAS GOING TO

13    BE UNEMPLOYED, JUST LIKE MANY OTHER PEOPLE GOT

14    UNEMPLOYED.  BUT UNFORTUNATELY, FOR MANY OTHER

15    PEOPLE THEY WERE NOT OFFERED WHAT ALLSTATE OFFERED.

16                 NEXT SLIDE.  HE MADE A CONSCIOUS,

17    INTELLIGENT CHOICE.  HE ACKNOWLEDGED HE RECEIVED THE

18    BENEFITS OF THE PROGRAM.  HE ACKNOWLEDGED THAT THE

19    R1500 CONTRACT LANGUAGE CONTAINED LANGUAGE THAT

20    ALLSTATE COULD CHANGE HIS COMMISSION RATES.

21    REMEMBER ALL THIS CONCERN ABOUT COMMISSION RATES?

22    THE EXISTING CONTRACT HE HAD, HE ADMITTED ON THE

23    WITNESS STAND COMMISSION RATES COULD BE REDUCED BY

24    ALLSTATE ANY TIME IT WANTED.  HE SAW THE SALE AS A

25    RETURN ON MY INVESTMENT AND MY RETIREMENT INCOME.
```

1              NEXT SLIDE, PLEASE.  HE WANTED TO GET

2      OUT.  DID NOT TRUST ALLSTATE.  WANTED TO LEAVE AS

3      FAST AS POSSIBLE.

4              NEXT SLIDE, PLEASE.  CREDIBILITY.  HE

5      CLAIMS HE HAD A LONG CAREER, BUT NO ONE EVER TOLD ME

6      LIFETIME EMPLOYMENT.  THERE WAS NOT A CHANGE TO HIS

7      CONTRACT.  THE TERMS OF THE R1500 CONTRACT SAID IT

8      WAS TERMINABLE AT WILL.  HE ADMITS ALLSTATE COULD

9      CHANGE HIS COMMISSION RATES UNDER THE TERMS OF THE

10     CONTRACT.

11             HE ADMITTED THAT ALLSTATE KEPT ITS PART

12     OF THE BARGAIN, BUT HE DOESN'T KNOW -- HE DOESN'T

13     KNOW IF HE INTENDED TO BE BOUND BY THE RELEASE.  WE

14     ARE PAYING HIM.  ALLSTATE IS PAYING HIM IN EXCHANGE

15     FOR A PROMISE AND HE TESTIFIES TO YOU THAT HE DOES

16     KNOW IF HE INTENDS TO BE BOUND BY IT?  THIS IS NOT A

17     GAME, LADIES AND GENTLEMEN.  IT'S LIKE BUYING A

18     HOUSE AND SAYING I PUT MY MONEY DOWN, YOU'RE GOING

19     TO SELL ME THE HOUSE.  COMES TIME TO CLOSE AND THE

20     GUY GOES, I GOT YOUR MONEY BUT I DON'T KNOW IF I'M

21     GOING TO GIVE YOU THE HOUSE.  SERIOUSLY?

22             NEXT SLIDE, PLEASE.  PLAINTIFF'S

23     PROPRIETARY INTEREST IN THE BOOK OF BUSINESS.

24     ADMITS IT'S NOT IN HIS CONTRACT.  ADMITS THAT

25     ALLSTATE OWNS THE ECONOMIC INTEREST.

```
 1                    NEXT SLIDE, PLEASE.  CLAIMS HE MADE A
 2      MILLION DOLLARS IN OUT-OF-POCKET INVESTMENTS.
 3      ACTUALLY, MAYBE HE MADE MORE THAN THAT, MAYBE IT'S
 4      1.2 MILLION.  IT'S A LITTLE UNCLEAR ON THE RECORD TO
 5      US BUT HE DEDUCTED IT AS EXPENSES, SO HE NEVER PAID
 6      ACTUALLY THAT AMOUNT BECAUSE HE GOT MONEY BACK ON
 7      TAXES, THINGS LIKE PEST CONTROL, YARD WORK,
 8      VEHICLES.  HE SAYS THAT ADVERTISING DOESN'T COST
 9      YOU, IT PAYS.  HE RECEIVED AS MUCH AS 71,696 IN OEA
10      FROM ALLSTATE AND HE RECOUPED THOSE TAX DEDUCTIBLE
11      EXPENSES WE THINK BY 1 TO 1.  BUT EITHER WAY YOU
12      LOOK AT IT, HE HAD THE LARGEST SINGLE PAYDAY IN HIS
13      LIFE WHEN HE SOLD THAT BOOK OF BUSINESS.
14                    NEXT SLIDE, PLEASE.  OH, ONE THING.  HE
15      MADE 1.276 MILLION FROM '95 TO '99.  SO HE WAS A
16      VERY WELL-PAID MAN.  HE WAS A VERY WEALTHY MAN.  THE
17      NOTION THAT HE WAS FACING FINANCIAL RUIN GIVEN ALL
18      THE PROPERTIES HE HAD, THAT'S AN INTERESTING FISCAL
19      DISCUSSION, I GUESS.  IT'S NOT FINANCIAL RUIN BY THE
20      DEFINITION THAT MOST PEOPLE UNDERSTAND.
21                    NEXT SLIDE, PLEASE.  TOLD YOU I'M NOT A
22      WEALTHY MAN.  I WILL LET YOU DECIDE WHAT WEALTH IS
23      IN THIS COUNTRY WITH HIS INCOME.  THOSE ARE HIS
24      WAGES.  AND THE COURT -- I ASKED HIM FINALLY BECAUSE
25      I WAS FRUSTRATED ABOUT WEALTHY MAN.  I SAID, YOU
```

1    WOULD ADMIT THAT ANY WAY YOU LOOK AT IT, IT'S A

2    HEALTHY INCOME YOU HAVE BEEN MAKING, A HEALTHY

3    POSITION.  AND TO THE COURT AT LEAST HE WAS ABLE TO

4    GET THE TRUTHFUL ANSWER.  YES, IT IS.

5              NEXT SLIDE, PLEASE.  HE HAD AN OFFICE

6    BUILDING, BEAUTY SHOP, TWO RENTAL PROPERTIES, A

7    55-ACRE GETAWAY WITH A HORSE STABLE, VACATION

8    PROPERTY IN NORTH CAROLINA.  I'M A LITTLE UNCLEAR ON

9    THAT ONE.  I LOOKED AT THE TESTIMONY SEVERAL TIMES.

10   HE HAD TWO OR THREE, SOLD THEM, DID NOT SELL THEM.

11   THE POINT BEING THE MAN HAD MEANS.  THE MAN WAS NOT

12   FACING ECONOMIC CATASTROPHE.  THE MAN WANTED OUT

13   FROM ALLSTATE BECAUSE HE DIDN'T LIKE WHAT THEY DID

14   AND HE MADE THE CHOICES HE MADE.

15             NOW WE GO THE ENHANCED SEVERANCE

16   OPTION.  THIS IS ALL OTHER CHOICES.  ENHANCED

17   SEVERANCE.  SO THIS IS IF YOU DON'T WANT TO

18   STAY WITH ALLSTATE.  OH, BY THE WAY, THAT IS THE

19   AMOUNT OF MONEY THAT MR. LAWSON ENDED UP NETTING,

20   1,199,300.  THAT IS WHAT HE GOT FOR THE PIECE OF

21   PAPER TO GIVE ALLSTATE.

22             ENHANCED SEVERANCE, SLIDE D 110,

23   PLEASE, JASON.  PAID AN ENHANCED SEVERANCE BENEFIT

24   OF ONE YEAR'S FULL PAY.  ALLSTATE ASSUMED FULL

25   RESPONSIBILITY FOR OFFICE AND EQUIPMENT LEASES,

1    RELEASE OF ANY CLAIMS AGAINST ALLSTATE.  IN LAWSON'S

2    CASE, THIS 345,093, I MEAN THAT IS REAL MONEY.  I

3    MEAN, THAT IS WAY ABOVE THE AVERAGE INCOME.  YOU

4    HEARD HIM TELL THE AVERAGE INCOMES OF THE PEOPLE IN

5    SOUTH CAROLINA.  HAIRDRESSER MAKING 25,000, THE

6    OTHER PERSON MAKING 75,000, A LAWYER MADE 65,000.

7    THAT IS SERIOUS MONEY.  HE TURNED THAT DOWN BECAUSE

8    OF THE VALUE OF THE ECONOMIC INTEREST.  MS. CREWS

9    KELLY WAS OFFERED 114,000.  SHE MADE A WISE ECONOMIC

10   CHOICE.  SHE GOT OVER 500,000.  MR. PERKINS CASHED

11   OUT TO START A NEW INSURANCE AGENCY.

12            BUT TWO PLAINTIFFS DID CHOSE OPTION 3,

13   MR. BOYD AND MS. REINERIO.  LET'S TALK ABOUT

14   MS. REINERIO FIRST.

15            MS. REINERIO IS THE WOMAN FROM MIDDLE

16   OF WISCONSIN.  SEVEN MONTHS PAY, SEVEN MONTHS

17   BENEFITS, SEVEN MONTHS TO DECIDE.  DID NOT REVOKE.

18   NEVER PURSUED ANOTHER BUSINESS OPPORTUNITY.  DID NOT

19   FILE A LAWSUIT.

20            I WANT TO FOCUS ON SOMETHING.  CONTRAST

21   HOW ALLSTATE TREATED MS. REINERIO TO HOW THE SOO

22   LINE DID.  SHE WORKED FOR THE SOO LINE.  SHE WAS

23   VERY PROUD OF IT.  A WOMAN DOING A MAN'S WORK IN THE

24   RAILROAD BUSINESS.  IT'S UNFAIR TO SAY MAN'S WORK.

25   WHAT SHE IS REALLY DOING IS SHE IS CHANGING THE WAY

1    LIFE IS TO WHAT IT SHOULD BE.  SHE WAS ABLE TO

2    SUCCESSFULLY INTEGRATE THE RAILROAD BUSINESS AS A

3    LINEMAN, AS A BRAKEMAN.  THAT IS A VERY GOOD THING

4    TO HAVE DONE.  SHE SHOULD BE CREDITED WITH THAT.  WE

5    SHOULD BE PROUD OF HER FOR DOING THAT.  IT'S A

6    TESTAMENT TO HER WILL POWER.  BUT WHEN THEY

7    TERMINATED HER, THEY OFFERED HER NOTHING.  FOR TWO

8    YEARS SHE WAS UNEMPLOYED, DOING ODDS AND ENDS, SNOW

9    PLOWING.  CONTRAST THAT TO WHAT ALLSTATE DID.

10   ALLSTATE OFFERED HER A BOOK OF BUSINESS WHICH SHE

11   TRIED TO SELL UNSUCCESSFULLY, AND THEN SHE TOOK

12   ENHANCED SEVERANCE.

13            LET'S DO THE DEEP DIVE NOW ON

14   MS. REINERIO ON THE SECOND PAGE.  THESE WERE HER

15   OPTIONS.  SHE WANTED THE BOOK OF BUSINESS SALE, BUT

16   IT FELL THROUGH.  SHE NEVER TESTIFIED OR COMPLAINED

17   ABOUT ALLSTATE.  SHE RETAINED A LAWYER FOR PURPOSES

18   OF REVIEWING THE ECONOMIC INTEREST IN THE BOOK OF

19   BUSINESS SALE, BUT NEVER DISCUSSED THE RELEASE WITH

20   HIM.

21            NEXT SLIDE, PLEASE.  SHE RECEIVED

22   ENHANCED SEVERANCE OF 68,000 AND CHANGE.  SHE

23   RECEIVED DEBT FORGIVENESS.  SHE KEPT HER VESTED

24   BENEFITS.  SHE DID NOT PARTICIPATE IN 401(K).

25            NEXT SLIDE.  WHAT DID SHE GIVE

 1    ALLSTATE?  A PROMISE.  SOMETHING SHE NEVER GOT FROM

 2    THE SOO LINE.  THEY NEVER OFFERED HER THIS.  SHE WAS

 3    TWO YEARS HARD TIMES.

 4              NEXT SLIDE, PLEASE.  SOPHISTICATED,

 5    EDUCATED, INTELLIGENT.  SHE UNDERSTOOD STARTING OVER

 6    BECAUSE SHE HAD DONE IT BEFORE WHEN SHE LOST HER JOB

 7    WITH THE SOO LINE.  SHE ENTERED THE R1500 AGREEMENT

 8    BECAUSE IT'S WHAT SHE HAD TO DO TO ACCEPT THE

 9    POSITION.  SHE WAS NOT CONCERNED ABOUT OR FOCUSED ON

10    THE RELEASE BECAUSE SHE WAS TRYING TO SELL HER BOOK

11    OF BUSINESS.  SHE WAS FOCUSED ON SELLING HER

12    BUSINESS.

13              SECOND, NEXT SLIDE.  SHE MADE A

14    CONSCIOUS, INTELLIGENT CHOICE.  I WANT YOU TO READ

15    THIS CAREFULLY.  THIS RINGS SO TRUE COMPARED TO THE

16    SOO LINE.  BY SIGNING THE RELEASE AND ACCEPTING THE

17    ENHANCED SEVERANCE WHICH GAVE ME THAT 56,000, IT

18    GAVE ME A CHANCE, AN OPPORTUNITY TO RETOOL MYSELF

19    OVER A TWO-YEAR PERIOD OF TIME.  IT PROVIDED ME A

20    STEADY STREAM OF INCOME AND IT DID GIVE ME THE

21    OPPORTUNITY TO BE ABLE TO FIGURE OUT HOW I COULD

22    RECREATE MY LIFE.  VERY FEW EMPLOYERS IN THIS

23    COUNTRY, AND YOU KNOW THIS, MAKE THOSE KINDS OF

24    OFFERS TO PEOPLE.  AND SHE SAW IT AS AN OPPORTUNITY

25    WHICH SHE CHOSE TO ACCEPT AND WHAT SHE DID ACCEPT.

1                NEXT SLIDE, PLEASE.  CREDIBILITY?  SHE

2   COULD NOT RECALL IF HER MANAGER SAID SHE HAD A JOB

3   FOR LIFE, BUT SHE TESTIFIED HIS STATEMENTS LED ME TO

4   BELIEVE THAT I WOULD.  OKAY.  SO SHE HAD A

5   PERCEPTION CONTRARY TO THE AGREEMENT.  BUT SHE ALSO

6   SAID HIS STATEMENTS ABOUT A SIX FIGURE INCOME, SHE

7   SAID ALMOST UNDER HER BREATH, SHE WILL SEE THAT WHEN

8   SHE BELIEVES IT.  SHE IS A SOPHISTICATED WOMAN.  SHE

9   UNDERSTOOD WHAT THE DEAL WAS.

10             NEXT SLIDE.  SHE DOES NOT DISPUTE

11  ALLSTATE KEPT ITS END OF THE BARGAIN.  SHE CLAIMED

12  SHE MADE OUT OF POCKET INVESTMENTS OF APPROXIMATELY

13  60,000, BUT SHE RECOUPED THEM ALMOST 1 TO 1 BY THE

14  DEAL SHE TOOK.  AND ACCORDING TO HER TAX RETURNS,

15  SHE EARNED $489,758.

16             GO TO THE FINAL SLIDE, PLEASE, JASON.

17  THE AMOUNT OF MONEY SHE GOT.  SHE GOT $68,000.  THAT

18  WAS HER CHOICE.

19             FINAL, BASE SEVERANCE.  NO ONE TOOK

20  BASE SEVERANCE.  NO ONE IN THIS CASE TOOK BASE

21  SEVERANCE.  EVERYONE SAID IF I TOOK BASE SEVERANCE

22  AND DID NOT SIGN THE RELEASE, I COULD NOT HAVE

23  SURVIVED.  OF COURSE THAT WAS NOT THE CHOICE THEY

24  HAD.  THEY COULD HAVE DONE OTHER THINGS.  THEY COULD

25  HAVE GONE OUT AND GOT ANOTHER JOB.  WHEN ALLSTATE

```
 1    OFFERS YOU VERY VALUABLE CHOICES, THEY ARE NOT
 2    FORCING YOU TO TAKE ANY OF THEM.  THE FACT THAT THEY
 3    ARE SO VALUABLE THAT YOU CHOOSE TO TAKE THEM DOESN'T
 4    MEAN YOU'RE FORCED.  IT'S THE CONSEQUENCE OF THE
 5    VOLUNTARY CHOICE THAT YOU MAKE.
 6              ONE OF THE ARGUMENTS THAT'S BEEN MADE
 7    IS IF THEY HAD JUST BEEN FIRED, THEY WOULD HAVE BEEN
 8    ENTITLED TO A SEVERANCE PLAN.  THAT IS ONE OF THE
 9    ARGUMENTS.  OF COURSE, MS. ROSBOROUGH PATIENTLY
10    EXPLAINED THAT THEY HAD NO SEVERANCE PLAN.  NO
11    SEVERANCE PLAN APPLIED TO GROUP REORGANIZATION.
12    THAT WAS WHAT SHE TESTIFIED TO.
13              GO TO SLIDE D 48, PLEASE.  UNDER THE
14    ALLSTATE SERVICE ALLOWANCE PLAN, YOU WERE ONLY
15    ELIGIBLE FOR SEVERANCE IF YOU WERE INVOLUNTARILY
16    TERMINATED DUE TO POOR PERFORMANCE.  THAT IS NOT
17    WHAT HAPPENED HERE.  WE KNOW THAT.  THEY WERE ALL
18    TERMINATED.
19              THEN GO TO DEM SLIDE 4 -- 4951, PLEASE,
20    JASON.  UNDER ALLSTATE'S SEVERANCE PAY PLAN, THAT IS
21    WHAT IT PROVIDED.  THAT IS WHAT IT PROVIDED FOR
22    ELIGIBLE EMPLOYEES.
23              NEXT SLIDE PLEASE, JASON, BUT YOU WERE
24    NOT ELIGIBLE IF YOU WERE TERMINATED UNDER THE TERMS
25    OF A FORMER GROUP REORGANIZATION.  THAT IS WHY
```

1    ALLSTATE ADOPTED THE TRANSITION SEVERANCE PLAN.  IF

2    IT HAD JUST TERMINATED THESE PEOPLE, THEY WOULD HAVE

3    GOTTEN NOTHING.  NO BASE SEVERANCE.  NO NOTHING.

4    THEY DIDN'T HAVE TO SIGN A RELEASE.  ALLSTATE GAVE

5    THEM 13 ADDITIONAL WEEKS ON TOP OF NEARLY SEVEN

6    MONTHS OF PAY.  THINK ABOUT IT PLEASE, LADIES AND

7    GENTLEMEN.  WHO GETS TERMINATED?  YOU'RE TOLD YOU

8    ARE GOING TO LOSE YOUR JOB, BUT IF YOU DON'T WANT TO

9    SIGN A RELEASE, THAT IS OKAY.  WE ARE GOING TO GIVE

10   YOU WILL ALMOST TEN FULL MONTHS OF PAY.  PRETTY GOOD

11   DEAL, GIVEN THE ALTERNATIVES IN OUR SOCIETY THAT WE

12   HAVE ALL SEEN.

13             NOW, ONE POINT HERE, LET'S PUT

14   ESTABLISHED FACTS 74 AND 75, PLEASE.  THERE ARE

15   MINIMUM LEGAL REQUIREMENTS FOR RELEASE, FEDERAL LAW

16   REQUIREMENTS.  THAT IS DESCRIBED IN ESTABLISHED FACT

17   74.  AND ESTABLISHED FACT 75, THE COURT HAS ALREADY

18   FOUND AS A MATTER OF LAW THAT THE RELEASE AT ISSUE

19   IN THIS CASE HAS COMPLIED WITH THE MINIMUM

20   REQUIREMENTS UNDER THE OLDER WORKERS BENEFIT

21   PROTECTION ACT.  THIS CASE IS NOT ABOUT THAT.

22   ALLSTATE COMPLIED WITH THE MINIMUM LEGAL

23   REQUIREMENTS AS THE COURT HAS FOUND UNDER THE OWBPA.

24   THIS CASE IS ABOUT WHETHER IT WAS VOLUNTARY AND

25   KNOWING.

1              IN ADDITION, THE JUDGE WILL INSTRUCT

2     YOU.  BUT I TOLD YOU IN OPENING PLAINTIFFS BROUGHT

3     THIS LAWSUIT IN AUGUST OF 2001.  MR. QUINN AND I

4     BOTH AGREE THAT YOU SHOULD NOT SPECULATE ABOUT THE

5     REASONS FOR THE DELAY FROM AUGUST 2001 THROUGH

6     TODAY.  THIS DELAY WAS NOT THE FAULT OF ANY PARTY

7     FROM AUGUST 1ST, 2001 UNTIL TODAY.

8              I ALSO TOLD YOU IN OPENING THAT

9     ALLSTATE HAS NOT BEEN FOUND TO HAVE DONE ANYTHING

10    WRONG.  THIS IS ABOUT WHETHER FOR THESE TEN

11    PLAINTIFFS -- WHETHER FOR THESE TEN PLAINTIFFS WE

12    CAN PROVE BY A BURDEN OF PROOF THAT THERE WAS

13    KNOWING AND VOLUNTARY.

14             CHOICES AND CONSEQUENCES ARE DIFFERENT.

15    A CONSEQUENCE IS A FOLLOW-ON FROM A CHOICE, BUT THE

16    PLAINTIFFS HAVE CONFUSED CHOICES AND CONSEQUENCES

17    THROUGHOUT THIS CASE.  THEY SAY THEY HAD NO CHOICE

18    BUT TO SIGN.  NO, THEY HAD A CHOICE TO SIGN OR NOT.

19    IF THEY CHOSE ONE OPTION, 1, THEY COULD CONTINUE

20    WITH ALLSTATE IN A NEW WORKING RELATIONSHIP AND A

21    NEW JOB.  THE CONSEQUENCES WAS THEY GOT A LOT OF

22    MONEY.  IF THEY CHOSE OPTION 2 THE CONSEQUENCES, GOT

23    A LOT OF MONEY.  NO ONE FORCED THEM TO SIGN.

24             AND ONE OF THE INSTRUCTIONS THAT YOU

25    ARE GOING TO SEE AND HEAR IS GOING TO TELL YOU THAT

1    FINANCIAL PRESSURE, EVERYONE FACES FINANCIAL

2    PRESSURE WHEN THEY ARE TERMINATED.  FINANCIAL

3    PRESSURE ALONE IS NOT SUFFICIENT.  THE JUDGE WILL

4    READ YOU THIS INSTRUCTION, AND YOU WILL BE BOUND BY

5    THE INSTRUCTION.

6              THESE ARE THE INSTRUCTIONS.  YOU ARE

7    GOING TO BE GIVEN A COPY OF THEM.  AND THERE IS A

8    DEFINITION OF VOLUNTARY.  INSTRUCTION 5 AND 6, AT

9    LEAST ON THE DRAFT AS OF LAST NIGHT, AND I THINK IT

10   WILL PROBABLY BE THE SAME, BUT YOU WILL FIGURE IT

11   OUT IF IT'S NOT.  AMONG OTHER THINGS IT SAYS:

12   VOLUNTARY, AN ACT IS DONE VOLUNTARILY IF IT IS

13   SOMETHING YOU WANT TO DO AND NOT BECAUSE YOU ARE

14   FORCED TO DO IT.  SO DID THEY WANT TO DO THIS?

15   YEAH, THEY MADE CONSCIOUS ECONOMIC DECISIONS WHAT

16   WAS IN THEIR OWN BEST ECONOMIC INTERESTS.  THEY MAY

17   NOT HAVE LIKED IT, BUT NO ONE SAID THEY WERE FORCED

18   TO DO IT.  THESE WERE MEANINGFUL CHOICES.  BECAUSE

19   THE ALTERNATIVE WAS THEY WOULD BE UNEMPLOYED.  THE

20   ALTERNATIVE WAS THEY COULD GO GET A JOB.  THE

21   ALTERNATIVE WAS TEN MONTHS BASICALLY OF PAYMENTS

22   THAT THEY OTHERWISE WERE NOT ENTITLED TO.  BUT THESE

23   WERE MEANINGFUL CHOICES.

24              BUT UNDER THE TOTALITY OF THE

25   CIRCUMSTANCES WHICH EXPLAINS THIS FURTHER IT SAYS,

1    YOU LOOK AT THINGS LIKE THE CLARITY OF THE RELEASE

2    LANGUAGE.  I THINK YOU SAW HOW CLEAR IT WAS IN THEIR

3    TESTIMONY.  YOU LOOK AT THEIR EDUCATION AND BUSINESS

4    EXPERIENCE.  YOU LOOK AT THE AMOUNT OF TIME THEY HAD

5    FOR THEIR DELIBERATION.  THEY HAD TONS OF TIME.  YOU

6    LOOK AT WHETHER THEY WERE ENCOURAGED TO SEEK

7    LAWYERS, AND THEY WERE.

8              YOU LOOK AT WHETHER THERE WAS AN

9    OPPORTUNITY FOR NEGOTIATION OF RELEASE AND THERE WAS

10   NOT THAT.  WE STIPULATED TO THAT.  THEY DID NOT HAVE

11   AN OPPORTUNITY TO NEGOTIATE THE TERMS OF RELEASE.

12   WHY?  IF YOU ARE TERMINATING OVER 6,200 PEOPLE, YOU

13   DON'T SIT DOWN AND NEGOTIATE THE TERMS OF THE

14   RELEASE.  YOU GIVE THE FAIREST RELEASE YOU CAN.  YOU

15   TELL THEM THE DEAL AND YOU LET THEM DECIDE WITH

16   THEIR LAWYERS.

17             THEN WHETHER THERE IS CONSIDERATION,

18   THAT IS MONEY OR AN ECONOMIC VALUE GIVEN IN

19   EXCHANGE.  BUT THEN THE INSTRUCTIONS SAY, NOW THERE

20   IS ALWAYS SOME FINANCIAL PRESSURE IN EMPLOYMENT

21   TERMINATION SITUATIONS.  THAT FINANCIAL PRESSURE

22   STANDING ALONE IS INSUFFICIENT TO PROVE

23   INVOLUNTARINESS.  SO WHEN THEY SAY, OH, I MIGHT HAVE

24   FACED FINANCIAL RUIN, SOMETHING THEY DID NOT

25   DOCUMENT WITH ANY FINANCIAL RECORDS, THAT IS NOT

```
1    SUFFICIENT.  WHAT THEY HAVE TO SHOW, WE SUBMIT TO
2    YOU, IS THAT THEY WERE FORCED TO DO THIS AND THAT
3    THEY WERE UNABLE -- THEY HAD NO ABILITY TO MAKE ANY
4    RATIONAL, ECONOMIC CHOICE WHEN THE EVIDENCE HERE IS
5    SIGNIFICANT TO THE CONTRARY.
6              THE COURT SAYS IT HAS TO BE A
7    MEANINGFUL CHOICE.  THEY HAD MEANINGFUL
8    ALTERNATIVES.  THEY COULD HAVE TAKEN BASICALLY THE
9    TEN MONTHS OF SEVERANCE AND FULL PAY AND NOT SIGNED
10   THE RELEASE.  THEY COULD HAVE STARTED ANOTHER JOB.
11   THEY COULD HAVE SUED AND TRIED TO STOP THIS.  THEY
12   HAD MEANINGFUL CHOICES.  THE FACT THAT AN OFFER IS
13   SO VALUABLE ECONOMICALLY THAT YOU'D BE FOOLISH NOT
14   TO TAKE IT DOES NOT MEAN YOU DON'T HAVE A MEANINGFUL
15   CHOICE.  HOW MUCH MEANINGFUL CHOICE DID THEY HAVE?
16   THEY HAD OVER $3.5 MILLION WORTH OF MEANINGFUL
17   CHOICES, AND THEY TOOK THOSE MEANINGFUL CHOICES.
18             BASIC FACT NUMBER THREE, D 201.  THIS
19   IS WHAT ALLSTATE PAID EACH OF THE PLAINTIFFS.  I
20   TOLD YOU WE WOULD ADD IT UP.  BASED ON THE EVIDENCE,
21   THIS IS WHAT THEY PAID THEM EACH.
22             D 202, 3,574,509.  ONE WANTS TO TALK
23   ABOUT MEANINGFUL CHOICE, A REAL ALTERNATIVE, WHICH
24   IS WHAT THE PLAINTIFFS SAY, A REAL CHOICE?  HOW
25   ABOUT 3.574 MILLION REAL CHOICES, OPPORTUNITIES.
```

1    THAT IS WHAT ALLSTATE PAID.  WHAT DID ALLSTATE GET

2    IN EXCHANGE?  A PIECE OF PAPER WITH MEN AND WOMEN'S

3    PROMISES ON IT.  PEOPLE OF HONOR, PEOPLE OF

4    INTEGRITY FULFILL THEIR PROMISES AFTER THEY HAVE

5    BEEN PAID.  THEY DON'T CROSS THEIR FINGERS BEHIND

6    THEIR BACK AND PRETEND I'M ONLY BOUND IF YOU, THE

7    JURY, TELL ME I'M BOUND.

8            LET'S DO A DEEP DIVE ON THE TWO

9    REMAINING PLAINTIFFS, MR. KEARNEY AND MR. MURRAY.

10   MR. KEARNEY.  SEVEN MONTHS, SEVEN MONTHS OF PAY, DID

11   NOT RESCIND.  NEVER SOUGHT ANOTHER JOB.  NEVER

12   PURSUED ANOTHER BUSINESS OPPORTUNITY.  NEVER FILLED

13   OUT AN APPLICATION FORM FOR AN ALLSTATE JOB.  MADE A

14   FEW PHONE CALLS.  DID NOT FILE A LAWSUIT FOR A LONG

15   TIME.

16           NEXT PAGE.  HE HAD OPTIONS.  TURNED

17   DOWN 85,000 IN ENHANCED SEVERANCE.  THE MAN TELLS

18   YOU HE'S FACING FINANCIAL RUIN.  HE IS GOING TO GET

19   SEVEN MONTHS OF FULL PAY AND BENEFITS AND THEN

20   ANOTHER 85,000.  WHO IN OUR SOCIETY IS LAID OFF AND

21   GETS BASICALLY -- BY THE AVERAGE INCOME IN THIS

22   COUNTRY THAT IS LIKE TWO YEARS.  THAT IS A LOT OF

23   MONEY.  HE HAD CHOICES THAT WERE MEANINGFUL.  HE

24   NEVER TESTIFIED HE COMPLAINED TO ALLSTATE IN WRITING

25   BEFORE SIGNING THE RELEASE.  HE PLAYED A TAPE

1    RECORDING.  WE DON'T HAVE THE WHOLE TAPE RECORDING.

2    HE RECORDED A COUPLE OF MINUTES.  WHO KNOWS WHAT

3    HAPPENED AT THE MEETING THEY HAD A RECORDING OF?

4    YOU HAVE TO DECIDE WHY HE ONLY RECORDED OR ONLY GAVE

5    US A COUPLE OF MINUTES OF THE RECORDING.

6              NEXT SLIDE, 308.  MET WITH A LAWYER

7    BEFORE SIGNING THE RELEASE.  AFTER MEETING WITH THE

8    LAWYER, SIGNED THE RELEASE.  CONSULTED WITH HIS

9    FATHER, VERY BRIGHT CPA, ABOUT HIS OPTIONS.  HIS

10   FATHER TOLD HIM HE HAD NO CHOICE.  THAT IS WHAT THE

11   FATHER TOLD HIM.  THE FATHER, WHO WAS A VERY BRIGHT

12   CPA WITH GOOD COMMON SENSE, ECONOMICALLY THIS WAS A

13   GOOD DEAL FOR MR. KEARNEY.

14             NEXT SLIDE, PLEASE.  ALLSTATE PAID

15   MR. KEARNEY ECONOMIC INTEREST FOR WHICH HE GOT

16   425,700 IN CASH, COULD HAVE OTHER AGENTS' BOOKS OF

17   BUSINESS IF HE WANTED TO.  NEW JOB.  HIGHER

18   COMMISSIONS.

19             NEXT SLIDE, PLEASE.  WHAT DID ALLSTATE

20   GET?  THE MAN'S WORD.  IN OUR SOCIETY, A MAN'S WORD

21   USED TO BE HIS BOND.  IT USED TO MEAN SOMETHING,

22   PARTICULARLY WHEN YOU PAID HIM FOR IT.

23             NEXT SLIDE, PLEASE.  HE WAS

24   SOPHISTICATED, INTELLIGENT.  HE READ AND UNDERSTOOD

25   THE RELEASE.  HE KNEW WHAT HE WAS GIVING UP.

1          NEXT SLIDE, PLEASE.  HE MADE A

2    CONSCIOUS INTELLIGENT CHOICE.  HE CHOSE OPTION 1 TO

3    OBTAIN THE BENEFITS AND THE VALUE OFFERED.  HE

4    DISCUSSED IT WITH HIS LAWYER AND WITH HIS FATHER.

5    HE CHOSE NOT TO EVEN PURSUE OTHER BUSINESS

6    OPPORTUNITIES, DID NOT EVEN TRY.  HE IS SUPPOSED TO

7    BE UNEMPLOYED AND SAYS I HAVE NO CHOICE.  HE DID NOT

8    EVEN TRY TO SEE WHAT ELSE WAS ON THE MARKET,

9    PARTICULARLY AT THAT TIME, 1999 TO 2000.  I WILL

10   LEAVE IT TO YOU TO REMEMBER WHETHER THAT WAS A VERY

11   STRONG ECONOMIC TIME UNDER PRESIDENT CLINTON OR NOT.

12          NEXT SLIDE, PLEASE.  VOLUNTARILY MAKE

13   THE FOLLOWING SELECTION.  EVERY TIME ONE OF THESE

14   PEOPLE SIGNED IT, APPARENTLY THEY WERE SECRETLY

15   SAYING TO THEMSELVES, NOT TO ALLSTATE, I'M NOT DOING

16   IT.  I HAVE MY FINGERS CROSSED BEHIND MY BACK SO IT

17   DOESN'T COUNT.

18          NEXT SLIDE, PLEASE.  TESTIFIED THAT THE

19   BASE SEVERANCE AND NO RELEASE WOULD HAVE RUINED HIM,

20   BUT ADMITTED HIS BASE SEVERANCE WOULD HAVE ALLOWED

21   HIM TO PAY HIS BASIC MONTHLY BILLS FOR FOUR OR FIVE

22   MONTHS.  THAT IS ON TOP OF THE SEVEN MONTHS.  SO

23   THIS GUY HAS GOT OVER A YEAR OF INCOME WITHOUT

24   SIGNING THE RELEASE.  OF COURSE IT'S A MEANINGFUL

25   CHOICE IF SOMEONE SAYS YOU WANT A NEW JOB, WELL,

1    THEN YOU EXCHANGE, SIGN THE RELEASE.  HE TESTIFIED

2    AT TRIAL HE DID NOT TALK TO A LAWYER ABOUT THE

3    RELEASE, BUT IN HIS 2002 DEPOSITION HE ADMITTED HE

4    DID CONSULT WITH A LAWYER.  MAYBE HE FORGOT AT

5    TRIAL.  YOU WILL DECIDE.

6               NEXT SLIDE, PLEASE.  CLAIMED THAT HE

7    HAD A CAREER FOR THE REST OF HIS LIFE.  THE CONTRACT

8    WAS TERMINABLE AT WILL, TO WHICH HE AGREED.  HE

9    TESTIFIED HE HAD A TENDENCY NOT TO READ THINGS FROM

10   THE REGIONAL OFFICE BECAUSE A LOT OF TIMES THEY WERE

11   FLUFF.  SO WHEN I CONFRONTED HIM WITH THE HR MANUALS

12   AND THE POLICY MANUALS, ET CETERA, HE CLAIMED NOT TO

13   HAVE SEEN THOSE.  DIDN'T SEE THOSE.  HE WAS NOT

14   GOING TO BOTHER HIMSELF WITH THE FACT THAT THEY ALL

15   SAID TERMINABLE AT WILL.

16              NEXT SLIDE, PLEASE.  NO ONE EVER TOLD

17   HIM THAT HIS EMPLOYMENT WAS BEING TERMINATED FOR

18   UNSATISFACTORY PERFORMANCE, AND HE UNDERSTOOD THAT A

19   JOB IN JEOPARDY NOTICE ONLY APPLIED TO AN AGENT WHO

20   HAD UNSATISFACTORY PERFORMANCE.

21              NEXT SLIDE, PLEASE.  HE CLAIMED HE MADE

22   $75,000 IN INVESTMENTS, BUT GOT AND ADMITTED TO GET

23   REPAID IN RENEWAL INCOME.  ADMITTED HE TOOK A TAX

24   DEDUCTION OF THOSE EXPENSES, THINGS LIKE GAS,

25   BRAKES, TIRES.  SINCE WHEN, FRIENDS, IS A TIRE AN

1    INVESTMENT?  IT'S AN EXPENSE.  HE RECOUPED THOSE TAX

2    DEDUCTIBLE EXPENSES BY NEARLY 6 TO 1 WHEN HE SOLD

3    THE BOOK OF BUSINESS.  HE MAY ARGUE THAT HE HAD MORE

4    EXPENSES AFTER THE TIME, WE DON'T KNOW.  THAT IS NOT

5    IN EVIDENCE.  BUT ASSUME HE DID.  EITHER WAY HE MADE

6    OUT VERY WELL.  HE EARNED 438,603, THE MAN FROM -- I

7    CAN'T SAY THAT WORD.  HE'S FROM KANSAS, IT'S THAT

8    WORD, OLATHE, THE MAN FROM KANSAS, HE DID PRETTY

9    WELL WITH ALLSTATE.  ALLSTATE DID PRETTY WELL BY

10   HIM -- FOR HIM.

11          NEXT SLIDE, PLEASE.  CLAIMED AT TRIAL

12   THAT HE DIDN'T TAKE ANY COLLEGE LEVEL MANAGEMENT

13   COURSES BUT AT DEPOSITION HE SAID HE HAD.  WHY WOULD

14   YOU ADMIT AT DEPOSITION TAKING COLLEGE LEVEL

15   MANAGEMENT COURSES AND THEN TELL YOU, THE JURY, HE

16   HAD NOT.  WHY WOULD YOU DO THAT?  EVERYBODY KNOWS

17   WHAT THEY TOOK IN COLLEGE.  I DON'T UNDERSTAND.  HE

18   ADMITTED HE HAD NO ECONOMIC VESTED INTEREST IN THE

19   BOOK OF BUSINESS.  WHO TOLD YOU, THE JURY, ABOUT THE

20   $425,000 BOOK OF BUSINESS SALE?  WE DID.  PLAINTIFFS

21   DIDN'T TELL YOU ABOUT THAT.  HE TESTIFIED ABOUT

22   THIS.  HE TESTIFIED ABOUT THIS BAD DEAL.  HE DID NOT

23   TELL YOU ABOUT THAT.  WE HAD TO BRING THAT OUT ON

24   CROSS EXAMINATION.  THINK ABOUT THAT.  IF YOU ARE

25   TELLING SOMEONE IT'S A BAD DEAL, TELL THE WHOLE

```
 1    TRUTH AND NOTHING BUT THE TRUTH, NOT ONLY THE PARTS
 2    THAT YOU WOULD LIKE US TO BELIEVE ARE TRUE AND SELL
 3    TO THE JURY.
 4              NEXT SLIDE, PLEASE.  WHERE DID HE GET
 5    432?  A MEANINGFUL CHOICE.  A MEANINGFUL ALTERNATIVE
 6    AND HE MADE IT.
 7              NOW LET'S DO MR. MURRAY.  SAME DEAL.
 8    SEVEN MONTHS, SEVEN MONTHS OF PAY, DID NOT RESCIND,
 9    NEVER SOUGHT ANOTHER JOB, NEVER SOUGHT AN ALLSTATE
10    JOB, NEVER SOUGHT ANOTHER BUSINESS OPPORTUNITY, DID
11    NOT SUE.  ALL OF THOSE ARE CHOICES, MEANINGFUL
12    CHOICES, REAL CHOICES THAT THEY CHOSE NOT TO TAKE.
13              NEXT SLIDE, PLEASE.  NEVER COMPLAINED
14    TO ALLSTATE IN WRITING.  MET WITH A LAWYER.  AFTER
15    MEETING WITH A LAWYER, WHAT DID HE DO?  SIGNED THE
16    RELEASE.  IF THE LAWYER TOLD HIM NOT TO SIGN THE
17    RELEASE AND THAT WAS THE CHOICE.  IF A LAWYER TOLD
18    HIM TO SIGN THE RELEASE, THAT WAS THE CHOICE.
19    EITHER WAY, HE GOT LEGAL ADVICE AND HE MADE A
20    CONSCIOUS INTELLIGENT DECISION.
21              NEXT SLIDE, PLEASE.  ALLSTATE PAID
22    MR. MURRAY.  NEW JOB, WORKING AS A NEW BUSINESS,
23    INDEPENDENT CONTRACTOR, HIGHER COMMISSIONS,
24    PARTICIPATION IN STOCK BONUS, ECONOMIC INTEREST IN
25    THE BOOK OF BUSINESS, 430,000.  THE ABILITY TO BUY
```

1    OTHER AGENTS' BOOKS OF BUSINESS.  5,000 IN CASH.

2              JASON.  NOW WHAT DID ALLSTATE GET?  A

3    MAN'S WORD ON A PIECE OF PAPER, A PROMISE THAT THEY

4    NOW WANT TO TAKE BACK.

5              NEXT SLIDE.  WAS IT KNOWING?  HE WAS

6    SOPHISTICATED, EDUCATED, INTELLIGENT.  WENT TO

7    COLLEGE.  TOOK THE RELEASE TO HIS LAWYER, SIGNED THE

8    RELEASE AFTER SPEAKING WITH HIS LAWYER.

9              NEXT SLIDE, JASON.  HE CHOSE OPTION 1.

10   HE TURNED DOWN OPTION 3.  HE DID NOT SUE TO AVOID

11   SIGNING THE RELEASE.  HE WANTED A NEW JOB

12   OPPORTUNITY.  HE LOOKED AROUND AND SAID THIS IS A

13   GOOD DEAL FOR ME AND HE TOOK IT.  BECAUSE THE

14   ALTERNATIVE WAS, IF HE DID NOT WANT THESE OPTIONS,

15   ALLSTATE HAD TERMINATED HIS JOB.

16              THE PLAINTIFFS KEEP SAYING TO YOU, OH,

17   ALLSTATE TOOK AWAY THINGS.  OH, I HAD NO CHOICE BUT

18   TO KEEP MY JOB.  THAT IS A FALSE SYLLOGISM.  IT'S A

19   FALSE PREDICATE.  THEY HAD LOST THEIR JOB.  THEY

20   WERE ABOUT TO BE UNEMPLOYED.  ALLSTATE MADE THIS

21   OFFER TO THEM.  IT DID NOT HAVE TO MAKE IT TO THEM,

22   BUT IT MADE THE OFFER TO THEM.  THEY COULD NOT DO

23   ANYTHING TO KEEP THEIR JOB.  THEY ALREADY LOST THEIR

24   JOB.  ALLSTATE TERMINATED.

25              NEXT SLIDE, PLEASE.  CREDIBILITY.

1    COULD NOT TERMINATE, HE SAID HIS MANAGER TOLD HIM,

2    BUT HE ADMITTED THE AGENT REVIEW BOARD DETERMINATION

3    IS ULTIMATELY MADE BY ALLSTATE'S PRESIDENT, ADMITTED

4    HE NEVER ASKED FOR AN AGENT REVIEW BOARD.  AND HE

5    DEFENDED HIS JOB IN JEOPARDY NOTICE CONCERNING THE

6    BACKDATING OF A POLICY BY SAYING HE DISAGREED WITH

7    THE CLIENT'S ACTIONS.  THE MAN MAILED A BACKDATED

8    INSURANCE POLICY FOR A CLIENT.  HE DISAGREES WITH

9    THAT, HE SAYS.  DISAGREES WITH THE JOB IN JEOPARDY.

10            NEXT SLIDE, PLEASE.  CLAIMS ALLSTATE

11   COULD NOT TERMINATE HIS CONTRACT, BUT COULD NOT

12   ACCEPT OR DENY THAT HE RECEIVED NOTICES FOR FOUR

13   YEARS ABOUT HIS FAILURE TO MEET EXPECTED RESULTS AS

14   AN INDEPENDENT CONTRACTOR AGENT.  COULD NOT

15   REMEMBER.  YOU KNOW, IF I HAD MY AGENCY TERMINATE --

16   STRIKE THAT.  IF YOU HAD -- STRIKE THAT.  LET ME

17   REPHRASE THAT.

18            DOES IT MAKE SENSE TO YOU IF A MAN

19   SAYS, I LOST MY AGENCY BECAUSE I WAS TERMINATED IN

20   2008, BUT I DON'T REMEMBER WHY, DOES THAT MAKE SENSE

21   TO YOU?  I WILL LEAVE THAT TO YOU TO DECIDE.

22            NEXT SLIDE, PLEASE.  CLAIMED HE MADE

23   47,000 OUT OF POCKET INVESTMENTS, BUT TOOK A TAX

24   DEDUCTION, RECOUPED THOSE TAX DEDUCTIBLE EXPENSES

25   WHEN HE SOLD.  EARNED 648,000 IN INCOME, SHARED

1    OFFICE EXPENSES AND SPACE WITH OTHERS AND ADMITTED

2    THAT NO ONE DEMANDED THE INVESTMENT IN THE AGENCY.

3              NEXT SLIDE, PLEASE.  HE ADMITTED AT

4    DEPOSITION THAT BY SIGNING THE RELEASE HE HAD

5    CONTINUED EMPLOYMENT.  ADD TRIAL HE SAID HE DIDN'T.

6    AND WHO TOLD YOU, YOU, THE JURY, ABOUT THE BOOK OF

7    BUSINESS SALE?  WHO TOLD YOU HE GOT 430?  ALLSTATE

8    DID.  HE DID NOT TELL YOU THAT ON DIRECT.

9              SO HOW MUCH DID MR. MURRAY GET IN

10   TOTAL?  FINAL SLIDE.  $435,000.

11             SO KNOWING.  WAS IT KNOWING?  THESE ARE

12   THE TWO QUESTIONS.  WE HAVE NOW GONE THROUGH THE

13   FOUR BASIC FACTS.  WAS IT KNOWING?  WE SUBMIT THEY

14   KNEW.  WE SUBMIT THEY UNDERSTOOD, UNDERSTOOD VERY

15   WELL AND FULLY.  THEY ARE SMART, THEY ARE

16   EXPERIENCED.  THEY WENT TO LAWYERS, MOST OF THEM.

17   SOME CONSIDERED SUING AND IN THE END THEY DECIDED

18   NOT TO.  THEY MADE SUGGESTIONS THAT SOMEHOW THEY

19   WERE MISLED ABOUT THE COMMISSION RATES.  IT DOES NOT

20   APPLY TO THOSE WHO DID NOT CHOOSE OPTION 1.  BUT YOU

21   SAW THE DOCUMENTS.  ALLSTATE DID NOT RAISE

22   COMMISSION RATES IN '99, 2000, 2001, 2002, DID NOT

23   RAISE COMMISSION RATES IN 2003.  THEY COMPLAINED

24   ABOUT THE COVENANT NOT TO COMPETE, BUT YOU SAW

25   MR. PERKINS.  HE OPENED UP A NEW INSURANCE AGENCY.

1    HE KNEW HOW TO COMPLY WITH HIS CONTRACTS AND TO GO

2    FORWARD SELLING INSURANCE.  THEY TALK ABOUT THE

3    REHIRE POLICY.  NO ONE EXCEPT MR. KEARNEY AND

4    MR. CREASE THOUGHT ABOUT IT.  MR. KEARNEY ACTUALLY

5    CALLED ABOUT IT.  THEY NEVER APPLIED.  THEY KNEW AND

6    THEY UNDERSTOOD.

7              LET'S TALK ABOUT VOLUNTARINESS.  THESE

8    ARE INSTRUCTIONS 5 AND 6, WHICH I HAVE REFERRED TO

9    BEFORE.  A COUPLE BASIC POINTS.

10             FIRST, PLAINTIFFS' JOBS WERE

11   TERMINATED.  THERE IS NOTHING THEY COULD DO ABOUT

12   THAT.  ALLSTATE DID NOT HAVE TO MAKE THESE OFFERS,

13   BUT IT DID.  THEIR JOBS WERE TERMINATED SO THEY SAY

14   WELL, I HAD NO CHOICE BECAUSE I WANTED TO KEEP MY

15   JOB.  NOW, THAT WAS A CHOICE.  ALLSTATE GAVE YOU AN

16   OPPORTUNITY THAT IT HAD NO OBLIGATION TO GIVE YOU.

17   YOU MADE A CHOICE.  YOU COULD HAVE CHOSEN TO TAKE

18   THE SEVEN MONTHS OF PAY AND THE 13 WEEKS OF

19   SEVERANCE AND MOVE ON.  BUT THEY MADE A CHOICE.

20   THESE WERE MEANINGFUL CHOICES.

21             SECOND, WHEN THEY SAY THEY WERE FORCED

22   TO SIGN TO RECOUP THEIR EXPENSES -- RECOUP THEIR

23   INVESTMENTS, THESE WERE EXPENSES.  WHEN THEY LEFT

24   THE BUSINESS, THEY WERE NOT GOING TO RECOUP THOSE

25   EXPENSES.  THEY HAD ALREADY TAKEN TAX DEDUCTIONS ON

1     THEM IF THEY STAYED WITH ALLSTATE.  THEY WERE NOT

2     GOING TO RECOUP THEM IF ALLSTATE CONTINUED ON WITH

3     EMPLOYEE AGENTS.

4               THIRD, SOME SAY THEY HAD NO CHOICE

5     BECAUSE OF THE COVENANT NOT TO COMPETE.  MR. PERKINS

6     PROVED THAT WRONG.  BUT MORE IMPORTANTLY, FROM DAY

7     ONE WHEN THEY ENTERED INTO THEIR EMPLOYMENT

8     AGREEMENTS THERE WAS A COVENANT NOT TO COMPETE.  IT

9     WAS NOT SOMETHING NEW.

10              FOURTH, DID THEY HAVE MEANINGFUL

11    CHOICES?  DID THEY HAVE REAL CHOICES?  YES.  USE

12    YOUR COMMON SENSE.  WHO OFFERS YOU EFFECTIVELY OVER

13    $3.5 MILLION?  THE FACT THAT A CHOICE IS SO

14    LUCRATIVE AND THE CONSEQUENCES OF THE CHOICE ARE SO

15    BENEFICIAL DOES NOT MEAN YOU DON'T HAVE REAL

16    CHOICES.  THEY HAD A MEANINGFUL CHOICE NOT TO SIGN

17    THE RELEASE.  THEY COULD HAVE TAKEN SEVEN MONTHS OF

18    FULL PAY AND BENEFITS, NEARLY SEVEN MONTHS.  THEY

19    COULD HAVE TAKEN THE 13 WEEKS, SOMETHING FAIRLY

20    IMPRESSIVE IN OUR SOCIETY.  THEY COULD HAVE BEEN

21    LIKE EVERY OTHER PERSON WHO IS UNEMPLOYED IN OUR

22    COUNTRY WHEN THEIR JOBS ARE TERMINATED.  THE

23    DIFFERENCE BEING THEY'RE GETTING OVER TEN MONTHS OF

24    INCOME TO READJUST AND RETOOL.  THEY HAD THAT

25    CHOICE.  THEY COULD HAVE CHOSEN TO GO OUT AND GET

1    ANOTHER JOB.  BUT THEY CHOSE THE OPTION THAT WAS IN

2    THEIR OWN ECONOMIC BEST INTEREST ON THE ADVICE OF

3    COUNSEL OR THE ADVICE OF THEIR ACCOUNTANTS AND

4    FRIENDS, OR MR. LAWSON'S VIEW, HE IS A GOOD ENOUGH

5    BUSINESSMAN, HE DID NOT NEED THE ADVICE OF OTHERS.

6              THIS WAS NOT, THEREFORE, AS PLAINTIFFS

7    HAVE TRIED TO PORTRAY IT, SIGN THE RELEASE OR LOSE

8    YOUR JOB AND BENEFITS.  THOSE WERE ALREADY

9    TERMINATED.  THAT IS A FALSE SYLLOGISM.  INSTEAD,

10   THIS WAS YOUR JOBS HAVE BEEN TERMINATED, WE HAVE

11   FOUR OPTIONS FOR YOU, HERE ARE THE OPTIONS, YOU CAN

12   CHOOSE.  ADVICE, SEEK ADVICE OF COUNSEL.  SEEK

13   ADVICE OF YOUR ACCOUNTANTS, SEEK ADVICE OF YOUR TAX

14   ADVISOR.  SEEK ADVICE OF YOUR FRIENDS.  PLAINTIFFS

15   WERE FREE TO CHOOSE, AND THAT IS WHAT TOOK PLACE

16   HERE.

17             AND AS A RESULT, $3.5 MILLION.  WHEN

18   SOMEONE SAYS I HAD NO CHOICE, NO REAL MEANINGFUL

19   CHOICE, CAN YOU SQUARE THAT WITH SOMEONE WHO ENDS UP

20   GETTING PAID AS A COLLECTIVE GROUP, $3.5 MILLION?

21   MOST PEOPLE IN OUR SOCIETY WOULD SAY THAT IS REAL

22   MONEY.  THERE'S A GREAT MOVIE, JERRY MCGUIRE, WITH

23   TOM CRUISE SAYS, GIVE ME THE MONEY.  REMEMBER THAT?

24   IF YOU ARE OLD ENOUGH TO REMEMBER IT.  THEY TOOK THE

25   MONEY.  THEY RAN WITH THE MONEY.  THEY GAVE ALLSTATE

1     A PROMISE.  THEY GAVE ALLSTATE THEIR WORD, AND NOW

2     THEY WANT YOU TO TAKE IT BACK BECAUSE 3.5 MILLION

3     PLUS IS NOT ENOUGH?

4                ONE OF MY COLLEAGUES IS WORRIED THAT I

5     SKIPPED THE DEEP DIVE ON TWO PEOPLE, BUT I HAVE NOT.

6     I HAVE NOT GOTTEN THERE YET.

7                SO LET ME SUM UP THE VARIOUS CHOICES

8     AND THEN WE WILL DO THE FINAL DEEP DIVE.  CREASE, HE

9     SAID HE WOULD HAVE SELECTED OPTION 1 EVEN IF THE

10    RELEASE WAS NOT PART OF IT.  THE RELEASE IS

11    IRRELEVANT.  HE WANTED THAT OPTION.  LAWSON SAID HE

12    DIDN'T WANT TO WORK FOR ALLSTATE ANYMORE.  HE WANTED

13    TO CASH OUT GET HIS 1.2 MILLION.  HARPER CONSIDERED

14    SUING BUT THEN DECIDED HIS SPENDING $2,000 FOR A

15    LAWSUIT WAS NOT WORTH IT.

16                BOYD DECIDED TO CASH OUT HE DIDN'T WANT

17    TO COMPETE WITH HIS YOUNG COLLEAGUE, GLENN BANDY.

18    CREWS KELLY, SHE SOLD OUT TO REGGIE BEFORE SHE

19    SIGNED THE RELEASE, REGGIE MASON, THE SON OF A

20    WEALTHY FAMILY FRIEND.  MS. REINERIO, SHE WANTED

21    ENHANCED SEVERANCE.  SHE GOT SOMETHING THAT THE SOO

22    LINE NEVER GAVE HER.  MR. PETERSON AND MR. PERKINS,

23    UNDER CROSS EXAMINATION THEY ADMITTED THAT THEY

24    SIGNED IT KNOWINGLY AND VOLUNTARILY.

25                NOW LET'S DO THE DEEP DIVE ON MR. BOYD

1    AND MR. HARPER.  MR. BOYD, SEVEN MONTHS,

2    SEVEN MONTHS OF PAY, SEVEN DAYS TO RESCIND OR

3    REVOKE.  NEVER TESTIFIED HE LOOKED FOR OTHER JOBS.

4    NEVER LOOKED FOR OTHER JOBS WITHIN ALLSTATE.  DIDN'T

5    FILE A LAWSUIT.

6                 NEXT SLIDE, PLEASE.  HE HAD VARIOUS

7    OPTIONS.  THIS IS THE GUY THAT WORKED WITH HIS WIFE,

8    THE UNIVERSITY PROFESSOR.  HE WAS CONCERNED NOT THAT

9    SHE DID NOT HAVE A JOB OR SHE MIGHT NOT BE RENEWED;

10   OF COURSE, SHE WAS RENEWED.  HE WAS ADVISED BY

11   ALLSTATE TO CONSULT A LAWYER, BUT HE CHOSE NOT TO DO

12   SO.

13                 NEXT SLIDE.  IN EXCHANGE FOR SIGNING

14   THE RELEASE, HE GOT ENHANCED SEVERANCE.  HE KEPT HIS

15   VESTED PENSION.  HE KEPT HIS BENEFITS.

16                 NEXT SLIDE, PLEASE.  WHAT DID HE GIVE

17   ALLSTATE?  HIS PROMISE WHICH HE APPARENTLY NOW WANTS

18   TO TAKE BACK.

19                 NEXT SLIDE.  WAS HE SOPHISTICATED?  OH,

20   YES, THIS MAN IS A VERY SOPHISTICATED PLAYER.  HE

21   HAS TWO MASTERS DEGREES.  HE READ AND UNDERSTOOD THE

22   RELEASE.  HE KNEW WHAT HE WAS GIVING UP.  NO

23   QUESTION ABOUT IT.

24                 NEXT SLIDE, PLEASE.  CHOSE OPTION 3.

25                 NEXT SLIDE, PLEASE.  HE MADE A

```
1    CONSCIOUS, INTELLIGENT CHOICE.  HE CHOSE OPTION 3
2    BECAUSE IT WAS THE BEST OPTION FOR HIM UNDER THE
3    CIRCUMSTANCES.  HE DIDN'T WANT TO COMPETE WITH
4    GLENN.  REMEMBER, HE BROUGHT INTO THE BUSINESS A
5    YOUNG MAN WITH A YOUNG FAMILY, GLENN BANDY.  HE DID
6    NOT WANT TO COMPETE WITH HIM.  IT WAS A NOBLE THING
7    TO DO, BUT THAT WAS HIS CHOICE.  IT WAS NOT
8    ALLSTATE'S CHOICE.  HE WAS ON HIS WIFE'S MEDICAL AND
9    DENTAL BENEFITS PLAN.
10                NEXT SLIDE, PLEASE.  CREDIBILITY.
11   CLAIMED THAT ALLSTATE JUST VIOLATED THE TERMS OF THE
12   CONTRACT AND FIRED EVERYONE, BUT HE ADMITS THAT THE
13   R1500 WAS TERMINABLE AT WILL.  HE MISSED THE
14   LANGUAGE.  THEY ALL ARGUE -- THEY ALL SAY, JUST TO
15   BE CLEAR, THEY ALL SAY THEY HAD A JOB FOR LIFE,
16   NOTWITHSTANDING THE LANGUAGE.  YOU HAVE TO DECIDE
17   WHETHER THAT MAKES SENSE.
18                BY THE WAY, ON THAT POINT, IN SOME 20
19   OR 25 YEARS AS YOU WORK WITH A COMPANY AND THE
20   COMPANY KEEPS SENDING YOU STUFF SAYING TERMINABLE AT
21   WILL, AND THE CONTRACT SAYS TERMINABLE AT WILL.  IF
22   YOU REALLY CONSIDER IT A JOB FOR LIFE, DON'T YOU
23   THINK YOU WOULD PICK UP THE PHONE OR CALL OR WRITE A
24   LETTER AND SAY, HEY, YOU ARE TELLING ME IT'S
25   TERMINABLE AT WILL, BUT I HAVE A JOB FOR LIFE.
```

1    DON'T YOU THINK SOMEONE WOULD HAVE THAT

2    CONVERSATION?  NOT ONE OF THESE TEN DID.

3             HE ADMITS THE R1500 CONTRACT TERMINATES

4    -- SUPERSEDES EVERYTHING ELSE.  ADMITTED THAT THE

5    TERMINATION PROCEDURES DID NOT APPLY TO HIM BECAUSE

6    HE WAS NOT TERMINATED FOR UNSATISFACTORY JOB

7    PERFORMANCE.

8             NEXT SLIDE, PLEASE.  HE CLAIMS HE MADE

9    APPROXIMATELY 28,000 IN INVESTMENTS.  OF COURSE, HE

10   DID NOT TAKE THESE AS DEDUCTIONS BECAUSE THEY WERE

11   NOT THE STANDARD DEDUCTION, AS YOU ARE ENTITLED TO

12   DO.  AND HE RECOUPED THAT WITH HIS 42,462 SEVERANCE.

13   NOW, REMEMBER THIS 42,462 IS ACTUALLY UNDERSTATED,

14   BECAUSE HE HAD SEVEN MONTHS OF PAY BEFORE THAT.  SO

15   HE HAS GOT THE FULL SEVEN MONTHS BEFORE THEN, THEN

16   HE HAS 42,000 ON TOP OF THAT.  ACCORDING TO HIS TAX

17   RETURNS, HE EARNED 141,000.  WHAT DID WE GET FOR MR.

18   BOYD'S TOTAL -- WHAT WAS THE TOTAL AMOUNT AT THE

19   VERY END?  THAT IS WHAT HE GOT FOR HIS PROMISE,

20   WHICH IS ROUGHLY EQUIVALENT TO HIS INCOME, AS YOU

21   SAW BEFORE.

22             FINALLY, MR. HARPER, THE MAN FROM

23   THOMSON, GEORGIA.  SEVEN MONTHS TO MAKE A DECISION,

24   SEVEN MONTHS OF PAY, SEVEN DAYS TO RESCIND OR

25   REVOKE, NEVER SOUGHT ANOTHER JOB, NEVER PURSUED

1    ANOTHER BUSINESS OPPORTUNITY, DID NOT FILE A

2    LAWSUIT.  THOUGHT ABOUT IT, WAS NOT WILLING TO PUT

3    $2,000 DOWN TO CHALLENGE SOMETHING THAT HE CLAIMS HE

4    THOUGHT WAS WRONG.

5           NEXT SLIDE.  A NUMBER OF OPTIONS.

6    NEVER COMPLAINED TO ALLSTATE IN WRITING BEFORE

7    SIGNING THE RELEASE.  HE COMPLAINED ABOUT THE ERISA

8    PLAN BUT NOT ABOUT THE RELEASE AFTERWARDS, NOT

9    BEFORE.  MET WITH FOUR LAWYERS, CHOSE TO SIGN THE

10   RELEASE ANYWAY.

11          NEXT SLIDE.  WHAT DID HE GET?  HE GOT A

12   NEW JOB, HE GOT DEBT FORGIVENESS, HIGHER

13   COMMISSIONS, STOCK BONUS PLAN, ECONOMIC INTEREST IN

14   THE BOOK OF BUSINESS, $150,000, THE ABILITY TO BUY

15   ANOTHER AGENT'S BOOK OF BUSINESS, 5,000 IN CASH.

16          NEXT SLIDE, PLEASE.  WHAT DID ALLSTATE

17   GET?  A PROMISE, A MAN'S WORD.  THEY PAID VALUE.

18   THEY PAID MONEY.  THEY GOT A PROMISE, A MAN'S WORD,

19   A WOMAN'S WORD.  THOSE USED TO MEAN SOMETHING IN OUR

20   SOCIETY, WHEN YOU PUT IT IN WRITING.  IT'S UP TO YOU

21   TO DECIDE WHETHER THEY STILL DO.

22          NEXT SLIDE, PLEASE.  HE WAS

23   SOPHISTICATED, INTELLIGENT.  YOU SAW HIM.  THE MAN

24   WAS VERY, VERY, VERY GOOD BUSINESS PERSON.  TALKED

25   TO FOUR LAWYERS ABOUT SIGNING THE RELEASE.

1          NEXT SLIDE.  HE READ AND UNDERSTOOD THE

2     RELEASE.  HE KNEW WHAT HE WAS GIVING UP.

3          NEXT SLIDE.  WAS IT VOLUNTARY?  HE MADE

4     A CONSCIOUS INTELLIGENT CHOICE WHAT WAS BEST FOR

5     HIM.  HE CHOSE TO SIGN RATHER THAN FILING A LAWSUIT

6     BECAUSE HE DID NOT VALUE THE RELEASE.  HE DID NOT

7     VALUE IT.  IF HE THOUGHT THE LAWSUIT WAS SO

8     VALUABLE, THEN HE WOULD HAVE PURSUED THE LAWSUIT.

9     HE DID NOT CHOOSE TO DO THAT.  HE SIGNED THE R3001

10    CONTRACT ON MAY 23RD AND HE SIGNED THE RELEASE

11    AFTERWARDS.

12          NOW, THE REASON THAT IS IMPORTANT,

13    LADIES AND GENTLEMEN, THIS WAS TRUE OF A COUPLE OF

14    THEM, THE R3001 CONTRACT CANCELLED ALL OTHER

15    CONTRACTS BEFORE THEN.  IT CANCELLED HIS PRIOR

16    EMPLOYMENT AGREEMENT.  HE SIGNED THAT FIRST BEFORE

17    HE SIGNED THE RELEASE.  THAT WAS HIS CHOICE.

18    PURSUED NO OTHER OPTIONS.

19          NEXT SLIDE, PLEASE.  CLAIMED ALLSTATE

20    HAD NO RIGHT TO TERMINATE EXCEPT FOR CAUSE, BUT THE

21    CONTRACT SAYS TERMINABLE AT WILL.  COULD NOT

22    IDENTIFY ANY CONTRACT THAT SAID HE HAD JOB SECURITY.

23    SIGNED AN ACKNOWLEDGMENT OF UNDERSTANDING UNDER FEAR

24    OF TERMINATION.  WE SAW THAT BEFORE.  YOU CANNOT

25    SQUARE -- THAT DOCUMENT SHOULD NOT EXIST, THAT 1998

1    DOCUMENT THAT HE SIGNED UNDER FEAR OF TERMINATION,

2    IF HE TOLD YOU THE TRUTH THAT THIS CONTRACT WAS ONLY

3    TERMINABLE FOR CAUSE.  THAT DOCUMENT CANNOT EXIST.

4    AND YET IT DOES.  AND THE TRUTH EKES OUT, IN ALL OF

5    ITS MAJESTY, AS CHURCHILL SAID.

6              NEXT SLIDE.  HE CLAIMED HE HAD NO RIGHT

7    TO TERMINATE THE CONTRACT EXCEPT FOR CAUSE.  BUT HE

8    UNDERSTOOD ALLSTATE COULD REDUCE COMMISSIONS UNDER

9    THE CONTRACT, 50, 75, 90 PERCENT.  HE ADMITTED THAT

10   THE PRESIDENT HAD THE FINAL SAY OVER AGENT REVIEW

11   BOARD DETERMINATIONS.

12             NEXT SLIDE, PLEASE.  HE ADMITTED THAT

13   ALLSTATE KEPT ITS END OF THE BARGAIN.

14             AND WHAT DID MR. HARPER GET PAID TOTAL,

15   JASON?  $155,000 IN EXCHANGE FOR A PIECE OF PAPER

16   AND A PROMISE.  PLAINTIFFS ARGUE THAT THEY HAD JOBS

17   FOR LIFE.  THE CONTRACTS WHICH YOU SAW SAY SOMETHING

18   QUITE DIFFERENT.

19             I THINK AT SOME POINT I MUST HAVE BORED

20   ALL OF YOU TO TEARS WITH EACH PLAINTIFF, PUTTING THE

21   CONTRACT LANGUAGE UP, POINTING THE HR MANUAL

22   LANGUAGE UP, PUTTING THE HUMAN RESOURCE MANUAL

23   LANGUAGE UP.  THOSE ARE ALL CONTEMPORANEOUS

24   DOCUMENTS, NOT THE STORIES PEOPLE WANT TO TELL YOU

25   NOW.  I'M NOT GOING TO REPEAT IT NOW.  IF I HAVE TO,

1    I WILL, BUT I WON'T DO IT.  I THINK YOU PROBABLY

2    WILL APPRECIATE THAT.

3                 THE PLAINTIFFS SAY THAT THEY MADE

4    INVESTMENTS.  THEY HAD TO RECOUP THEIR INVESTMENTS.

5    THESE WERE EXPENSES.  BUT THEY CHOSE THE OPTIONS

6    THEY DID AND THEY RECOUPED THEIR INVESTMENTS.

7                 PLAINTIFFS SAY THEY DID NOT WANT TO

8    LOSE THEIR BENEFITS.  BUT THEY DID NOT LOSE BENEFITS

9    THAT THEY HAD VESTED.  IN FACT, THEY GOT BENEFITS

10   THEY DID NOT EVEN REMEMBER.  YOU REMEMBER -- I LOVED

11   IT, MR. PETERSON, HE WAS TICKLED PINK, IT'S LIKE

12   CHRISTMAS IN JULY.  HE TOLD THAT STORY TO YOU TWICE.

13   HE GOT MEDICAL BENEFITS.  IT WAS A GOOD THING.

14   ALLSTATE KEPT ITS PART OF THE BARGAIN, AND PETERSON

15   DID NOT EVEN KNOW THAT WAS PART OF THE BARGAIN.  HE

16   DID NOT KNOW THAT ALLSTATE WAS GOING TO DO THAT FOR

17   HIM.  BUT ALLSTATE DID THE RIGHT THING.

18                 COVENANT NOT TO COMPETE, WE DISCUSSED

19   THAT.  THEY COULD HAVE FOUND OTHER WAYS TO SELL

20   INSURANCE.  MR. PERKINS CERTAINLY DID.

21                 FINAL BASIC FACT.  A DEAL IS A DEAL IS

22   A DEAL.  YOUR DECISION ULTIMATELY IS GOING TO BE DO

23   THESE PEOPLE GET TO WALK AWAY FROM THEIR PROMISE FOR

24   WHICH THEY WERE PAID?  YOU HAVE TO LOOK AT

25   YOURSELVES, EACH OF YOU, IN THE EYE, AND DECIDE

1   WHETHER THAT IS SOMETHING YOU THINK SHOULD TAKE

2   PLACE IN OUR SOCIETY, WHETHER YOU THINK THAT SHOULD

3   TAKE PLACE GIVEN THE AMOUNT THAT THEY WERE PAID

4   TODAY.  WE LEAVE THAT TO YOUR COLLECTIVE WISDOM AND

5   JUDGMENT.

6           SO I'M GOING TO WRAP UP NOW IN THE NEXT

7   FOUR MINUTES.  BUT I'M NOT DONE WITH YOU.  USUALLY

8   WHEN I REPRESENT A DEFENDANT, I GET TO SPEAK ONLY

9   ONCE, THIS IS A NOVEL EXPERIENCE.  NOT UNIQUE.  I

10  HAVE HAD THIS HAPPEN ONCE OR TWICE BEFORE.  BUT THIS

11  IS PRETTY NOVEL.  SO I'M NOT QUITE DONE WITH YOU.  I

12  GET A REBUTTAL, SHORT REBUTTAL.

13          BUT THE ISSUES AT HAND ARE WAS IT

14  KNOWING?  WE SUBMIT TO YOU THAT THE EVIDENCE SHOWS

15  BY A PREPONDERANCE OF THE EVIDENCE THAT IT WAS

16  KNOWING, AND THAT THEY WELL UNDERSTOOD WHAT THEY

17  WERE GIVING UP BY SIGNING THE RELEASE.

18          WAS IT VOLUNTARY?  DID THEY HAVE A REAL

19  CHOICE?  WE SUBMIT THAT THE EVIDENCE SHOWS YOU THEY

20  HAD MANY REAL CHOICES AND MANY MEANINGFUL CHOICES.

21  AND THEY CHOSE THE CHOICES THAT WERE MOST MEANINGFUL

22  AND REAL TO THEM.

23          AND WE NOW CAN QUANTIFY THEM.  WE DID

24  NOT KNOW AT THE START OF THE TRIAL PRECISELY THE

25  VALUE OF THE CHOICES TO THEM, BUT NOW WE DO.  IT'S

1     OVER $3.5 MILLION.

2               SO I THANK YOU VERY MUCH FOR YOUR

3     PATIENCE.

4               YOU KNOW, IN THE OLD DAYS, BEFORE TV,

5     THERE WERE TWO GREAT TRIAL LAWYERS, ONE IN EACH

6     CENTURY, ONE WAS BY THE NAME OF CLARENCE DARROW.

7     CLARENCE DARROW WOULD GIVE CLOSINGS FOR EIGHT OR

8     NINE HOURS.  PEOPLE WOULD COME FROM MILES AROUND.

9               A, I'M NOT CLARENCE DARROW IN ANY SENSE

10    OF THE WORD.  AND, B, I DON'T THINK I COULD TALK

11    THAT LONG.  BELIEVE IT OR NOT, I DON'T THINK I COULD

12    MAKE IT EIGHT OR NINE HOURS.  SO THIS IS GOING TO BE

13    SHORTER.

14              THE OTHER GREAT TRIAL LAWYER IS FROM A

15    PRIOR CENTURY, A MAN NAMED ABRAHAM LINCOLN.  MOST

16    PEOPLE DON'T KNOW THAT.  LINCOLN WAS ONE OF THE

17    GREATEST TRIAL LAWYERS WHO EVER GRACED THIS EARTH.

18    LINCOLN WOULD FIND A PITHY SAYING THAT COULD CAPTURE

19    AND ENCAPSULATE WHAT THE ESSENCE OF THE TRIAL WAS.

20    UNFORTUNATELY, I'M NEITHER LINCOLN NOR DARROW, SO I

21    HAVE TO SPEAK LONGER THAN LINCOLN, BUT SHORTER THAN

22    DARROW.

23              BUT I THINK I CAN CAPTURE THIS FOR YOU.

24    KNOWING AND VOLUNTARY, YOU CAN MEASURE IT

25    ECONOMICALLY, YOU CAN MEASURE IT BY THEIR CONDUCT.

```
 1      AND AT THE END OF THE DAY, IT'S A VERY SIMPLE
 2      QUESTION FOR YOU:  WHEN THEY PUT THEIR PEN AND MADE
 3      THEIR CHOICES AND SIGNED THEIR NAMES TO THAT PIECE
 4      OF PAPER, DID THEY INTEND TO HONOR THE PROMISE THAT
 5      THEY MADE ALLSTATE?  BECAUSE ALLSTATE ASSUREDLY
 6      HONORED THE PROMISE THAT IT MADE TO THEM BY PAYING
 7      THEM, BY GIVING THEM THINGS THAT THEY WERE NOT
 8      ENTITLED TO, AND BY HELPING THEM SECURE THEIR
 9      FUTURES, WHICH AS YOU KNOW, HAVING JUST LIVED
10      THROUGH THE GREAT RECESSION, MOST EMPLOYERS COULD
11      NOT DO OR WOULD NOT DO.
12                  SO THANK YOU AND I WILL SEE YOU A
13      LITTLE LATER TODAY.  THANK YOU.
14                  THE COURT:  MEMBERS OF THE JURY, WE
15      WILL TAKE A BREAK BEFORE THE NEXT CLOSING.
16                  (JURY OUT.)
17                  (BREAK TAKEN.)
18                  THE CLERK:  COURT IS NOW IN SESSION.
19                  THE COURT:  PLEASE BE SEATED.
20                  MR. QUINN, I UNDERSTAND YOU WANT TO
21      DISCUSS SOMETHING?
22                  MR. QUINN:  YEAH, BRIEFLY.
23                  I DIDN'T WANT TO OBJECT DURING
24      MR. GODFREY'S CLOSING, BUT THERE IS AN ISSUE THAT I
25      WOULD LIKE TO RAISE.
```

1          AS YOUR HONOR KNOWS, ONE OF -- THERE

2     HAS BEEN TESTIMONY TO THE EFFECT THAT BECAUSE OF THE

3     WAY ALLSTATE STRUCTURED THINGS --

4          THE COURT:  YOU MAY BE SEATED IN THE

5     BACK.  YOU DON'T HAVE TO STAND.  I'M STANDING

6     BECAUSE I'M TIRED OF SITTING.

7          MR. QUINN:  IT WOULD NOT HAVE BEEN

8     VIABLE, OR AT LEAST THE PLAINTIFFS WOULD NOT HAVE

9     PERCEIVED THAT A VIABLE OPTION WAS TO ESTABLISH A

10    COMPETING INSURANCE AGENCY, IN OTHER WORDS, TO GO

11    INTO BUSINESS SELLING INSURANCE FOR AN ALLSTATE

12    COMPETITOR.

13          AND DURING MR. GODFREY'S ARGUMENT, HE

14    SUGGESTED THAT THAT WAS UNTRUE.  AND HE GAVE AS AN

15    EXAMPLE THE FACT THAT ONE OF THE PLAINTIFFS, CHRIS

16    PERKINS, DID ELECT TO START A COMPETING AGENCY.  AND

17    IT SUGGESTS TO THE JURY THAT IT WORKED OUT JUST FINE

18    FOR HIM.  IMPLYING THAT PLAINTIFFS' INTENTION THAT

19    THAT WAS NOT A TRUE ALTERNATIVE, TRUE POSSIBILITY,

20    WAS UNFAIR.

21          THE PROBLEM IS THAT, AS YOUR HONOR

22    KNOWS, WE WERE PREVENTED FROM PRESENTING ANY

23    EVIDENCE OF WHAT ACTUALLY HAPPENED WITH THE

24    PLAINTIFFS, OF HOW THEIR LIVES FARED AFTER THEY

25    SIGNED THE RELEASE.  AND AS IT HAPPENS, MR. PERKINS

1    FOUND OUT THAT EXACTLY WHAT THEY FEARED WAS TRUE.

2    THINGS DID NOT WORK OUT WELL FOR HIM.  HE IMPLIED

3    THAT MR. PERKINS ACTUALLY SUCCEEDED AS A COMPETING

4    INSURANCE AGENT WHEN THAT IS SIMPLY UNTRUE.  AND SO

5    I'M JUST SUGGESTING THAT AT THE END OF THE CASE, THE

6    COURT SHOULD BE TOLD THAT WE WERE NOT PERMITTED --

7    SORRY, AT THE END OF THE ARGUMENT OR AS PART OF THE

8    INSTRUCTIONS THAT THE JURY SHOULD BE TOLD THAT THE

9    PARTIES WERE NOT PERMITTED TO INTRODUCE EVIDENCE OF

10   THE ACTUAL CONDITION OF FINANCIAL FORTUNES OF ANY OF

11   THE PLAINTIFFS AFTER THEY SIGNED THE RELEASE.

12   OTHERWISE, THE JURY WILL BE MISLED BY MR. GODFREY'S

13   REMARKS.

14              MR. GODFREY:  TWO POINTS --

15              THE COURT:  MR. PERKINS -- ARE WE

16   TALKING ABOUT PERKINS?

17              MR. QUINN:  YES.

18              THE COURT:  HE DID, IN FACT, OPEN AN

19   INDEPENDENT AGENCY?

20              MR. QUINN:  AND IT DID NOT DO WELL, FOR

21   THE VERY REASONS THAT WE --

22              THE COURT:  I DON'T THINK HE SAID IT

23   DID WELL.  I DON'T THINK HE SAID THAT.  HE SAID HE

24   OPENED AN AGENCY.

25              MR. GODFREY:  RIGHT.

1           THE COURT:  OKAY.  I WILL TAKE YOUR

2    NOTE INTO CONSIDERATION.

3           MR. GODFREY:  MAY I RESPOND, YOUR

4    HONOR?

5           THE COURT:  WELL, I'M NOT GOING TO GIVE

6    AN INSTRUCTION.

7           MR. GODFREY:  JUST FOR THE RECORD.  TWO

8    POINTS.  I QUOTED WHAT THE MAN TESTIFIED TO ON

9    DIRECT.  AND MY POINT WAS, THE NOTION THAT THEY

10   DIDN'T HAVE AN ALTERNATIVE OF OPENING UP ANOTHER

11   AGENCY OR DOING SOMETHING ELSE WAS DISPROVEN BY WHAT

12   THE MAN SAID.  I WASN'T SAYING THAT I KNEW, BECAUSE

13   WE DON'T KNOW WHAT THE GUY DID 12 -- THE NEXT

14   12 YEARS.

15          MR. QUINN:  NEVERTHELESS, HE CALLED HIM

16   WARREN BUFFETT.

17          THE COURT:  VERY WELL.

18          MR. GODFREY:  THAT WAS BASED ON HIS TAX

19   RETURN.

20          THE COURT:  I HEAR YOUR OBJECTIONS.

21   THEY ARE ON THE RECORD.

22          AND, MR. QUINN, YOU ARE READY WHEN THE

23   JURY COMES IN?

24          MR. QUINN:  WELL, PROBABLY NOT, YOUR

25   HONOR, BUT I WILL DO IT ANYWAY.

```
 1                    THE COURT:  I SUSPECT YOU ARE.

 2                    (JURY IN.)

 3                    THE COURT:  OKAY.  EVERYBODY PLEASE BE

 4      SEATED.  WE ARE READY FOR THE NEXT CLOSING.

 5                    MR. QUINN?

 6                    MR. QUINN:  GOOD MORNING, FOLKS.

 7                    THE JURY:  GOOD MORNING.

 8                    MR. QUINN:  ONE OF THE DISADVANTAGES OF

 9      GOING SECOND IS THAT YOU CAN'T ALWAYS PREPARE.  YOU

10      CAN'T WRITE OUT A SCRIPT AND NECESSARILY STICK TO IT

11      BECAUSE, TO SOME EXTENT YOU NEED TO RESPOND TO WHAT

12      HAS BEEN SAID IN THE FIRST ARGUMENT.  AND AS A

13      RESULT, IT MAY NOT SEEM AS POLISHED OR AS LINEAR AS

14      I MIGHT LIKE.

15                    BEFORE GETTING TO MY PREPARED REMARKS,

16      I WANT TO SAY A COUPLE OF THINGS.  FIRST, I WANT TO

17      POINT OUT THAT I AGREE WITH FOUR THINGS THAT

18      MR. GODFREY SAID, FOUR IMPORTANT THINGS.  THE FIRST

19      ARE THE I THINK VERY ELOQUENT THINGS THAT HE SAID

20      WHEN HE WAS THANKING YOU FOR YOUR SERVICE.  I'M NOT

21      CLARENCE DARROW, I'M NOT ABRAHAM LINCOLN AND I'M NOT

22      RICK GODFREY, SO I DON'T THINK I CAN FOLLOW THAT ACT

23      OTHER THAN BY SAYING I AGREE WITH WHAT HE SAID.

24                    WE ARE VERY GRATEFUL FOR YOUR SERVICE.

25      WE ARE GRATEFUL FOR THE WORK THAT WE KNOW THE COURT,
```

1    JUDGE BUCKWALTER AND HIS STAFF HAVE PUT INTO THIS
2    OVER A PERIOD OF MANY YEARS.  AND I'M SINCERE.
3    WE'RE NOT JUST SAYING IT.  WE GET THAT THIS IS A
4    HUGE IMPOSITION ON YOUR LIVES.  WE GET THAT THERE
5    ARE TIMES THAT YOU PROBABLY FEEL LIKE CLIMBING OVER
6    THAT BARRIER RIGHT THERE AND STRANGLING US FOR
7    ASKING THE SAME QUESTION THE 15TH TIME.  SO WE DO
8    GET IT.  AND THANK YOU.  SO THAT'S THE FIRST THING.
9              SECOND, I DON'T REMEMBER HOW
10   MR. GODFREY PUT IT, I THINK HE SAID THAT ONE OF THE
11   GREAT THINGS ABOUT TRIALS IS THE TRUTH IN ALL ITS
12   MAJESTY COMES OUT.  THAT IS EXACTLY RIGHT.  THE
13   TRUTH COMES OUT.  IT'S NOT ABOUT WHAT LAWYERS SAY
14   THE TRUTH IS, IT'S WHAT THE WITNESSES SAY.  AND I
15   RAISE THAT BECAUSE YOU NEED TO MAKE A JUDGMENT ABOUT
16   THE TRUTH.  NOT BASED ON WHAT THE LAWYERS SAY YOU
17   HEARD, NOT BASED ON WHAT THE LAWYERS SAY THE
18   TESTIMONY WAS.  YOU NEED TO DECIDE THE TRUTH BASED
19   ON WHAT YOU HEARD FROM THE WITNESSES WITH YOUR EARS.
20   IN SOME CASES, THAT'S MORE IMPORTANT THAN OTHERS.
21              THIRD, I COMPLETELY AGREE WITH
22   MR. GODFREY'S SUGGESTION THAT CREDIBILITY MATTERS.
23   I THINK IN SOME CASES IT CAN AND SHOULD BE DECISIVE.
24   NOW, AS YOU KNOW, ALLSTATE HAS THE BURDEN OF PROOF
25   HERE, WHICH MEANS THAT IF YOU END UP ON THE FENCE,

```
 1    YOU DON'T KNOW WHICH WAY TO GO, YOU MUST FIND FOR

 2    THE PLAINTIFFS.  BUT IF THERE WERE A SITUATION IN

 3    WHICH THERE WERE A TIEBREAKER, I THINK CREDIBILITY

 4    SHOULD BE IT.  I THINK IT'S NOT ONLY FAIR BUT IT'S

 5    ACTUALLY CRITICALLY IMPORTANT THAT ONE OF THE

 6    QUESTIONS YOU ASK YOURSELVES IS WHICH SIDE IS BEING

 7    STRAIGHT WITH US?  WHICH SIDE IS TRYING TO BRING OUT

 8    THE TRUTH AND WHICH SIDE IS TRYING TO FUDGE IT?

 9              FINALLY, I AGREE WITH MR. GODFREY'S

10    STATEMENT, I THINK HE SAID IT A COUPLE OF TIMES,

11    THAT PROMISES MATTER.  A DEAL IS A DEAL.  AND I

12    THINK THAT'S AN IMPORTANT PROPOSITION.  I THINK IT'S

13    ONE THAT SHOULD AND I HOPE WILL FACTOR INTO YOUR

14    ANALYSIS.  BECAUSE INTEGRITY IS PART OF IT.  AND

15    PROMISES MEAN SOMETHING.

16              ONE OTHER THING BEFORE I GET TO WHAT I

17    WAS PLANNING TO SAY.  AS I WAS LISTENING TO

18    MR. GODFREY, IT REMINDED ME OF THE GAME THAT --

19    THING THAT I USED TO PLAY WITH MY DAUGHTER WHEN SHE

20    WAS YOUNG, SHE WAS ABOUT FIVE OR SO.  AND WE WOULD

21    BE ROUGHHOUSING IN THE HALLWAY OUTSIDE HER BEDROOM

22    AND IT WAS TIME FOR HER TO GO TO BED, SHE DIDN'T

23    WANT TO GO TO BED.  I WOULD GET HER IN THE ROOM, SHE

24    WOULD RUN OUT.  AND EVENTUALLY THERE WAS A STANDOFF

25    IN THE DOORWAY, SHE IS GOING LIKE THAT AND I'M GOING
```

1    LIKE THIS, WHAT SHE WOULD DO IS SHE WOULD SAY, LOOK,

2    IT'S A MONKEY, AND I WOULD TURN AROUND AND SHE WOULD

3    BLOW RIGHT BY ME.  IT WORKED EVERY TIME.  EVERY

4    SINGLE TIME.  SHE IS A LOT BRIGHTER THAN I AM.  BUT

5    YOU KNOW WHAT?  NOT ONCE WAS THERE A MONKEY.  NOT

6    ONCE.

7              THE REASON I WAS THINKING THAT AS I

8    LISTENED TO MR. GODFREY -- WELL, ACTUALLY, THERE ARE

9    SEVERAL REASONS, BUT THERE IS ONE IN PARTICULAR THAT

10   I THINK GOES TO THE VERY ROOT OF THE ARGUMENT THAT

11   HE IS MAKING TO YOU, THE VERY ROOT OF THE ARGUMENT

12   HE IS ASKING YOU TO ACCEPT.

13             THIS CASE IS ABOUT CHOICE.  AND THERE

14   WAS ONLY TWO OPTIONS TO CHOOSE FROM THAT ARE

15   RELEVANT.  ALLSTATE TALKS A LOT ABOUT WE HAD OPTION

16   1 AND OPTION 2 AND OPTION 3.  WELL, THOSE OPTIONS

17   DON'T MATTER IN THIS CASE.  IT DOESN'T MATTER

18   WHETHER SOMEBODY CHOSE ONE OR THE OTHER OF TWO OF

19   THE OPTIONS THAT REQUIRED THE SIGNING OF THE

20   RELEASE.  THE ISSUE HERE WAS THE CHOICE BETWEEN

21   TAKING ONE OF THE THREE OPTIONS THAT REQUIRED THE

22   RELEASE AND THE ONLY OPTION THAT DID NOT.  THERE

23   WERE TWO CHOICES, YOU SIGN OR YOU DON'T SIGN.  AND

24   THAT IS THE CHOICE THAT YOU NEED TO EVALUATE.

25             NOW, WHEN YOU ARE PRESENTED WITH A

1    CHOICE BETWEEN JUST TWO THINGS, IN THIS CASE,

2    SIGNING THE RELEASE OR NOT SIGNING THE RELEASE, IT

3    IS ONLY A MEANINGFUL CHOICE IF THEY ARE BOTH REAL

4    POSSIBILITIES.  IF ONE OF THE TWO CHOICES SIMPLY

5    DOESN'T WORK, NOT BECAUSE I DON'T LIKE IT, BUT

6    BECAUSE THE CONSEQUENCES OF ACCEPTING IT ARE

7    DEVASTATING, IF ONE OF THE TWO DOORS I CAN GO

8    THROUGH RESULTS IN DESTRUCTION, I DON'T HAVE A

9    CHOICE.  I SELECT THE OTHER OPTION NO MATTER HOW

10   GREAT IT IS.  IT MAY BE A GREAT OPTION, BUT THE FACT

11   REMAINS, I DIDN'T HAVE A CHOICE IF ONE OF THE TWO

12   THINGS THAT WAS AVAILABLE TO ME WAS NOT REALLY A

13   CHOICE, IF IT WAS NOT REALLY A MEANINGFUL CHOICE.

14             NOW, TO THE MONKEYS.  VIRTUALLY

15   EVERYTHING THAT MR. GODFREY DISCUSSED WITH YOU WAS

16   WHAT THE PLAINTIFFS GOT BY PICKING DOOR A, BY

17   SIGNING THE RELEASE.  LOOK AT THESE WONDERFUL THINGS

18   THEY GOT.  LOOK AT THIS RETURN ON THEIR INVESTMENT.

19   THAT'S WHAT HE WANTS YOU TO FOCUS ON.

20             WHAT HE DIDN'T EVEN MENTION UNTIL I

21   THINK ONE OF HIS LAST SLIDES WAS THE ISSUE HERE,

22   WHICH IS THE ALTERNATIVE.  THE BASE SEVERANCE

23   OPTION.  IF THE BASE SEVERANCE OPTION IS SOMETHING

24   THAT NO REASONABLE PERSON UNDER THESE CIRCUMSTANCES

25   COULD HAVE BEEN EXPECTED TO ACCEPT, THERE WAS NO

1     CHOICE.  THERE WAS ONLY ONE OPTION THAT I COULD TAKE

2     WITHOUT KNEECAPPING MYSELF AND MY FAMILY.

3                    HE DOESN'T WANT YOU, FOR VERY GOOD

4     REASON, TO ACTUALLY ASK THE RIGHT QUESTION.  AND THE

5     QUESTION IS, WAS THE BASE SEVERANCE OPTION A

6     MEANINGFUL ALTERNATIVE?  HE EVEN TALKED ABOUT

7     WHETHER THE OPTIONS OF CONVERTING OR SELLING WERE

8     MEANINGFUL CHOICES.  WELL, OF COURSE THEY WERE

9     MEANINGFUL CHOICES.  THAT'S NOT THE QUESTION.

10                    THE QUESTION IS, IS THE BASE SEVERANCE

11    OPTION, THE THING I HAD TO SELECT IN ORDER TO AVOID

12    SIGNING THE RELEASE, IS THAT A REASONABLE

13    ALTERNATIVE?  THAT IS THE ISSUE.  THAT IS NOT THE

14    MONKEY.

15                    NOW, THERE HAS BEEN A LOT, A LOT OF

16    ARGUMENT AND TESTIMONY ON THE FOLLOWING ISSUE, AND

17    THAT IS WHETHER THE PLAINTIFFS WERE AT-WILL

18    EMPLOYEES.  IT'S ALMOST AS IF THIS TRIAL WAS ABOUT

19    WHETHER THEY WERE TERMINATED WRONGFULLY BECAUSE THEY

20    HAD PROTECTIONS AGAINST SECURITY, BECAUSE THEY WERE

21    NOT AT WILL.  THERE IS A REASON FOR THAT.  BUT

22    THERE'S A REASON -- BUT THAT'S NOT WHAT THIS TRIAL

23    IS ABOUT.

24                    EVEN THOUGH THE PLAINTIFFS CAN'T PROVE

25    THEIR CLAIMS THAT THEY WERE NOT AT-WILL EMPLOYEES

1     UNLESS YOU FIND IN THEIR FAVOR, THE QUESTION OF

2     WHETHER THEY WERE AT-WILL EMPLOYEES, OR AT LEAST

3     WHETHER THEY PERCEIVED THEY WERE AT-WILL EMPLOYEES,

4     IS CRITICALLY IMPORTANT TO THIS CASE.  AND HERE IS

5     WHY.  TO BE CLEAR, AT WILL, TO SAY YOU'RE AN AT-WILL

6     EMPLOYEE SIMPLY MEANS YOU CAN BE TERMINATED AT ANY

7     TIME FOR ANY REASON AND FOR NO REASON.  YOU HAVE

8     ZERO JOB SECURITY.  THERE IS NOTHING.  YOU HAVE NO

9     RIGHTS, NO PROTECTION AGAINST TERMINATION.  AT-WILL

10    IS THE OPPOSITE OF JOB SECURITY.  TWO DIFFERENT

11    SIDES OF THE COIN.

12          IT'S CRITICAL THAT ALLSTATE PERSUADE

13    YOU THAT THESE WERE AT-WILL EMPLOYEES.  ONLY BY

14    PERSUADING YOU OF THAT CAN YOU AGREE THAT, LOOK AT

15    THIS, THEY GOT THESE WONDERFUL THINGS IN EXCHANGE

16    FOR SIGNING THE RELEASE.  WE ARE REALLY GOOD FOLKS.

17    WE HAVE GOT A BIG CORPORATE HEART.  WE GAVE YOU ALL

18    THESE THINGS.  WE GAVE YOU ALL THESE RICHES IN

19    EXCHANGE FOR A SIMPLE ACT, SIGNING THE RELEASE.

20          WELL, THAT ASSUMES THAT ALLSTATE HAD A

21    RIGHT TO DO WHAT IT DID.  IT ASSUMES THAT THESE WERE

22    AT-WILL CONTRACTS.  MR. GODFREY JUST DECLARES, HE

23    JUST PUTS UP A SCREEN, SAYS THEY ARE AT-WILL

24    CONTRACTS, AS IF THAT RESOLVES IT.

25          YOU SEE, THEIR PREMISE FALLS APART IF

1   YOU CONCLUDE THAT THE PLAINTIFFS WERE TOLD THEY HAD

2   JOB SECURITY, BELIEVED THEY HAD JOB SECURITY,

3   BELIEVED THAT THEY COULDN'T BE TERMINATED AT WILL.

4   AND HERE'S WHY.

5           YOU HEARD MR. HARPER SAY THAT THIS IS

6   HOW HE PERCEIVED WHAT HAD HAPPENED.  NOVEMBER 15TH,

7   THE DAY BEFORE THE PROGRAM WAS ANNOUNCED, HE HAD

8   FIVE THINGS:  HE HAD A JOB, HE HAD BENEFITS, HE HAD

9   A BOOK OF BUSINESS THAT HE INVESTED MANY YEARS AND A

10  LOT OF MONEY IN, HE HAD JOB SECURITY, AND HE HAD A

11  RIGHT TO HAVE A BIG CHUNK OF HIS EXPENSES

12  REIMBURSED.  HE HAD THOSE FIVE THINGS.

13          ON THE 16TH, HE GETS A BOX.  AND IN THE

14  BOX HE FINDS OUT THAT ALLSTATE HAS TAKEN ALL FIVE OF

15  THOSE THINGS AWAY FROM HIM.  THE BOX ALSO TELLS HIM,

16  GOOD NEWS, MR. HARPER, YOU CAN HAVE TWO OF THOSE

17  THINGS BACK.  YOU CAN HAVE YOUR JOB BACK, YOU CAN

18  KEEP SELLING ALLSTATE INSURANCE BUT AS AN

19  INDEPENDENT CONTRACTOR, WHICH MEANS NO BENEFITS, NO

20  EXPENSE REIMBURSEMENT.  YOU CAN HAVE YOUR JOB BACK

21  AND YOU CAN HAVE YOUR BOOK OF BUSINESS BACK.  THE

22  OTHER THREE ARE GONE, FORGET ABOUT IT, NOT ON THE

23  TABLE.  YOU CAN HAVE TWO OF THE FIVE BACK, BUT

24  THERE'S A CATCH.  THE CATCH IS, YOU'VE GOT TO SIGN

25  THIS RELEASE.  YOU CAN'T HAVE THOSE THINGS BACK IF

1    YOU DON'T SIGN THE RELEASE.

2              AND BY THE WAY, THE RELEASE HAS TO SAY

3    EXACTLY WHAT WE WANT IT TO SAY.  YOU HAVE TO SAY,

4    YOU'VE GOT TO USE OUR WORDS, YOU'VE GOT TO SAY I'M

5    DOING THIS VOLUNTARILY.

6              NOW, OF COURSE HE WAS GIVEN AN OPTION

7    TO NOT SIGN THE RELEASE.  ALLSTATE SAID, GOOD NEWS,

8    MR. HARPER, IF YOU DON'T WANT TO SIGN THE RELEASE,

9    THAT'S NOT A PROBLEM, JUST CHECK THIS BOX HERE, JUST

10   CHECK THE BASE SEVERANCE OPTION, THE OPTION THEY

11   DON'T WANT TO TALK ABOUT.

12             THE BAD NEWS, MR. HARPER, IS IF YOU

13   CHECK THAT BOX TO AVOID SIGNING THE RELEASE, YOU ARE

14   GOING TO BE IN A WORLD OF HURT.  YOU WILL HAVE NO

15   JOB, YOU WILL HAVE NO BENEFITS, YOU WILL HAVE NO

16   BOOK, YOU WON'T HAVE ANYTHING.  THE ONLY THING THAT

17   YOU WILL GET IS, GET THIS, UP TO, UP TO 13 WEEKS OF

18   PAY.  YOU DON'T EVEN GET IT IN 13 WEEKS, IT'S SPREAD

19   OUT OVER SIX MONTHS.  WHICH MEANS THAT IF MR. HARPER

20   HAD CHECKED THAT BOX, AGAIN, OUT OF A JOB, NO

21   BENEFITS, NO MONEY, NO INCOME, A MEASLY 13 WEEKS

22   PAY, A FRACTION OF WHAT HE HAD INVESTED.

23             AND AS MR. HARPER EXPLAINED IT, FOR HIM

24   THAT MEANT LITERALLY FINANCIAL RUIN.  IT WAS A

25   PERFECT STORM FOR HIM.  HE HAD HAD HIS WIFE, HE WAS

```
1     UNDER PRESSURE FROM ALLSTATE, YOU NEED MORE HELP,
2     YOU NEED MORE HELP.  SO HE TALKED HIS WIFE INTO
3     QUITTING HER JOB, WHERE, BY THE WAY, SHE HAD
4     BENEFITS, TO JOIN HIM AT THE AGENCY, TO HELP
5     SUPPORT, BUILD THE AGENCY.  SHE DIDN'T HAVE A JOB
6     ANYMORE.  NO INCOME.  MR. HARPER WAS LITERALLY
7     LOOKING AT IT WAS A LIFE-CHANGING EVENT.  AND HE
8     TOLD YOU HE WASN'T VERY HAPPY ABOUT IT.  THEY WANT
9     YOU TO BELIEVE THAT HE WAS JUST HAPPY AS A CLAM.  I
10    WILL TAKE OPTION 1 AND SIGN WHATEVER YOU WANT.
11             WELL, THAT'S NOT TRUE.  YOU HEARD WHAT
12    MR. HARPER SAID.  HE DID EVERYTHING HE COULD TO STOP
13    ALLSTATE FROM PUTTING HIM IN THAT BOX.  HE STARTED
14    AN ONLINE CLEARINGHOUSE FOR AGENTS SEEKING
15    INFORMATION CALLED RUNNING CLOCK, MEANING THE CLOCK
16    IS RUNNING, WE HAVE GOT TO DO SOMETHING.  HE
17    TALKED -- HE FILED A CHARGE WITH THE EQUAL
18    EMPLOYMENT OPPORTUNITY COMMISSION, WHICH IS A
19    FEDERAL GOVERNMENT AGENCY THAT HE HOPED WOULD STEP
20    IN.  IT'S AN AGENCY THAT'S RESPONSIBLE FOR
21    PROTECTING EMPLOYEES' RIGHTS.  DIDN'T HAPPEN.
22             BECAUSE IT DIDN'T HAPPEN, HE FOUND
23    HIMSELF ON THE DEADLINE OF HAVING THAT CHOICE.  THE
24    CHOICE, AM I GOING TO GIVE IN TO SAVE MY CAREER, TO
25    BE ABLE TO CONTINUE SUPPORTING MY FAMILY, TO AVOID
```

1    FINANCIAL RUIN AND SIGN THAT RELEASE?  OR AM I GOING

2    TO LET IT ALL FALL DOWN AROUND ME AND MY FAMILY?

3    WELL, YEAH, HE SIGNED THE RELEASE.  BUT HE FELT HE

4    HAD TO.  BUT HE DID NOT DO IT VOLUNTARILY.  AND, IN

5    FACT, YOU HEARD HIM TESTIFY THAT HE TRIED TO WRITE

6    ON IT THAT HE DID IT UNDER DURESS.  THEY WOULDN'T

7    ACCEPT THAT.  THEY DIDN'T WANT TO HEAR THAT.  THEY

8    WANTED HIM TO USE THEIR WORDS.

9              SO WHAT I'M SAYING IS WHETHER THERE WAS

10   JOB SECURITY, WHETHER THE PLAINTIFFS BELIEVED THAT

11   THEY HAD PROTECTIONS AGAINST TERMINATION IS

12   FUNDAMENTAL TO YOUR ANALYSIS OF WHETHER THEY HAD

13   REAL CHOICE.

14             SO LET'S TALK ABOUT THE EVIDENCE YOU

15   HEARD ON JOB SECURITY.  LET'S TALK ABOUT WHETHER

16   THERE IS ANY CREDIBILITY AT ALL TO ALLSTATE'S

17   POSITION THAT THESE WERE AT-WILL EMPLOYEES THAT

18   COULD HAVE BEEN DISPOSED OF AT THE DROP OF A HAT.

19             NOW, YOU HEARD THAT EACH OF THESE

20   PLAINTIFFS TESTIFIED ABOUT WHAT THEY WERE TOLD WHEN

21   THEY WERE INTERVIEWING AT ALLSTATE.  YOU HEARD THEM

22   SAY THAT ONE OF THE PROMINENT PARTS, ONE OF THE

23   IMPORTANT PARTS OF THE PACKAGE THAT WAS BEING

24   PITCHED WAS JOB SECURITY.  THERE WAS A REASON FOR

25   THAT.  BECAUSE, I THINK THIS IS UNCONTESTED, THEY

1    ALL UNDERSTOOD, THEIR MANAGERS UNDERSTOOD, ALLSTATE

2    UNDERSTOOD, THAT IF THEY CHOSE TO WORK FOR ANOTHER

3    INSURANCE COMPANY AS AN INDEPENDENT CONTRACTOR, THEY

4    WOULD HAVE NOT HAD BENEFITS, THEY WOULD HAVE NOT HAD

5    ANY KIND OF JOB SECURITY.  SO THAT WAS A BIG PART OF

6    THE PITCH.

7                YOU HEARD THEM SAY I WAS TOLD THAT YOU

8    HAVE TO CLEAR ONE HURDLE.  YOU HAVE TO CLEAR WHAT

9    THEY CALL LIFE VALIDATION, WHICH MEANT ESSENTIALLY

10   THAT YOU HAD TO SELL A CERTAIN AMOUNT OF LIFE

11   INSURANCE WITHIN I THINK THE FIRST THREE YEARS.  AND

12   THE IDEA WAS, WE'RE NOT GOING TO GIVE YOU ANY KIND

13   OF JOB SECURITY IF YOU CAN'T SHOW THAT YOU CAN SELL

14   INSURANCE.  THAT WAS KIND OF A TEST.  THAT'S WHAT

15   THE LIFE VALIDATION WAS ABOUT.

16               NOW, THEY WERE TOLD THAT IF YOU DID

17   THAT, IF YOU DID THAT, YOU WOULD HAVE JOB SECURITY.

18   THAT IF YOU LIVED UP TO YOUR RESPONSIBILITIES, IF

19   YOU HELD UP YOUR END OF THE BARGAIN, IF YOU DIDN'T

20   LIE, CHEAT OR STEAL, YOU HAD A JOB AS LONG AS YOU

21   WANTED IT.

22               LET ME PAUSE THERE FOR A MINUTE.

23               ONE THING LAWYERS DO IS THEY SET UP

24   WHAT THEY CALL STRAW MEN.  A STRAW MAN IS A STRAW

25   MAN THAT YOU CAN JUST BLOW OVER.  THEY PRETEND THAT

```
 1    YOU'RE MAKING AN ARGUMENT THAT YOU NEVER REALLY

 2    MADE.  AND THEY KNOCK THE ARGUMENT THAT YOU NEVER

 3    MADE DOWN.

 4              MR. GODFREY SUGGESTS THAT THE

 5    PLAINTIFFS WERE TELLING YOU THAT THEY BELIEVED THAT

 6    THEY WERE LIKE JUDGE BUCKWALTER, THAT THEY COULD

 7    NEVER BE REMOVED NO MATTER WHAT THEY DID.  THAT'S

 8    NONSENSE.  NONE OF THEM SAID THAT.  ALL OF THEM

 9    ACKNOWLEDGED THAT THEY HAD RESPONSIBILITIES.  ALL OF

10    THEM ACKNOWLEDGED THAT IF THEY DID SOMETHING WRONG,

11    ALL OF THEM ACKNOWLEDGED THAT IF YOU BREACH YOUR

12    OBLIGATIONS, THEY COULD BE FIRED.  THERE WAS A

13    PROCESS FOR THAT, JOB IN JEOPARDY.  THEY WEREN'T

14    TELLING YOU THEY HAD A JOB FOR LIFE IN THE SENSE

15    THEY COULD NEVER BE FIRED.  THAT'S A STRAW MAN.

16              NOW, EVERY ONE OF THEM HEARD THE SAME

17    THING.  JOB SECURITY, JOB FOR LIFE, IF YOU LIVE UP

18    TO YOUR RESPONSIBILITIES, YOU CAN HAVE A JOB AS LONG

19    AS YOU WANT SO LONG AS YOU LIVE UP TO YOUR END OF

20    THE BARGAIN.  AND AS I WAS LISTENING TO IT, IT

21    ALMOST SOUNDED LIKE IT WAS -- THEY WERE SO SIMILAR

22    FROM PERSON TO PERSON WHAT THEY WERE SAYING, IT WAS

23    ALMOST LIKE IT WAS REHEARSED.  AND THEN WE FOUND OUT

24    WHY THEY WERE HEARING THE SAME THING.

25              I ASKED MR. KAUFMAN ABOUT THE WAY THAT
```

1     ALLSTATE CONTROLLED THE MESSAGE.  I SAID, ISN'T IT

2     THE CASE THAT FROM TIME TO TIME ALLSTATE WOULD

3     PREPARE MANUALS, GUIDANCE DOCUMENTS, THAT SORT OF

4     THING, TO GIVE TO ITS MANAGERS, TO GIVE THEM

5     GUIDANCE AS TO WHAT THEY SHOULD SAY TO AGENTS, HOW

6     THEY SHOULD DEAL WITH AGENTS?

7              YES.

8              SO, FOR EXAMPLE, MANAGERS WHOSE

9     RESPONSIBILITY IT WAS TO RECRUIT NEW AGENTS, TO

10    INTERVIEW NEW AGENTS, WERE TOLD BY ALLSTATE WHAT

11    THEY SHOULD SAY, HOW THEY SHOULD APPROACH IT, WHO

12    THEY SHOULD LOOK FOR, THAT SORT OF THING?

13             ANSWER:  YES.

14             IN FACT, ALLSTATE WAS PRETTY CAREFUL

15    ABOUT CONTROLLING THE MESSAGE, ISN'T THAT FAIR?

16             YES.

17             WELL, THAT EXPLAINS IT.  IT WASN'T A

18    COINCIDENCE THAT THEY WERE ALL HEARING THE SAME

19    THING.  THEY WERE HEARING IT BECAUSE THAT WAS THE

20    PITCH.  IT CAME FROM THE TOP.  THE MANAGERS THAT

21    INTERVIEWED THESE PEOPLE WERE TOLD TO TELL THEM THEY

22    HAD JOB SECURITY.  AND YOU KNOW WHAT?  SOMETIMES IN

23    A TRIAL THE MOST IMPORTANT EVIDENCE IS THE EVIDENCE

24    YOU DON'T HEAR.  AND YOU HAD 10 PLAINTIFFS COME IN

25    HERE, SAY THAT THEY TALKED IN SOME CASES TO MULTIPLE

1    MANAGERS AND THEY ALL SAID THE SAME THING.  FIGURE

2    THAT'S 20 ALLSTATE MANAGERS THAT THEY TESTIFIED

3    ABOUT.  NOT ONE OF THOSE MANAGERS, THOSE ALLSTATE

4    MANAGERS, CAME IN HERE TO DENY IT.  THEY DIDN'T

5    BRING A SINGLE ALLSTATE MANAGER IN HERE TO SAY WE

6    NEVER SAID THAT, WE NEVER PROMISED THEM JOB

7    SECURITY.  THEY ARE NOT DENYING IT.  THEY ARE JUST

8    IGNORING IT.

9              NOW, WHEN IT CAME TO THE NEIGHBORHOOD

10   OFFICE AGENT PROGRAM, THE NOA PROGRAM, AS YOU HEARD,

11   ALLSTATE DOUBLED DOWN ON ITS PROMISES OF JOB

12   SECURITY.  REMEMBER, ONE OF THE KEY FEATURES OF THE

13   NOA PROGRAM IS THAT IF YOU'RE GOING TO DO THAT,

14   YOU'RE GOING TO GO OUT OF POCKET.  YOU'RE GOING TO

15   HAVE TO PAY SOME OF YOUR EXPENSES.  AND ALLSTATE

16   KNEW THAT.  THEY KNEW, ALLSTATE KNEW THAT AGENTS

17   WOULD HAVE TO SPEND THEIR OWN MONEY AND HAVE TO

18   PERSUADE THEM, HAVE TO GIVE THEM A REASON WHY THEY

19   WOULD SPEND THEIR OWN MONEY, WHY THEY WOULD

20   SUBSIDIZE THEIR EMPLOYER.

21             SO WHAT ALLSTATE DID IS IT GRABBED ONTO

22   SOMETHING THAT I TALKED A LITTLE BIT ABOUT IN MY

23   OPENING, I THINK I REFERRED TO IT AS SORT OF THE

24   MAGIC OF RENEWAL COMMISSIONS.  YOU SEE, INSURANCE

25   AGENTS ARE PAID A COMMISSION.  YOU KNOW THAT.  AND

1     THEY GET COMMISSION NOT JUST ON NEW POLICIES, BUT

2     THEY GET A COMMISSION EVERY TIME THAT POLICY RENEWS.

3     AND THE VAST MAJORITY OF POLICIES DO RENEW.

4              SO WHAT THAT MEANS IS IF AN AGENT

5     INVESTS IN HIS FUTURE BY SPENDING MONEY ON

6     ADVERTISING, ON REFRIGERATOR MAGNETS, ON SPONSORING

7     A LITTLE LEAGUE TEAM TO GET A NEW POLICY IN THE

8     DOOR, THEN THAT NEW POLICY IS GOING TO PAY OFF OVER

9     TIME IN THE FORM OF RENEWALS.  NOW, THE ACTUAL

10    COMMISSION ON RENEWALS IS A BIT LOWER, SO IT MAY

11    TAKE A WHILE, IT MAY TAKE YEARS BEFORE YOU GET THAT

12    INVESTMENT IN THE NEW POLICY BACK IN THE FORM OF

13    RENEWALS.

14              AND THIS IS AN IMPORTANT CONCEPT, SO IF

15    YOU WOULD INDULGE ME, I WANT TO EXPLAIN EXACTLY WHAT

16    IT MEANS TO BUILD A BOOK OF BUSINESS.  HOW IT IS A

17    BOOK OF BUSINESS IS ESSENTIAL TO HOW INSURANCE

18    AGENTS LOOK AT THEIR JOBS AND HOW ALLSTATE WANTED

19    THEM TO LOOK AT THEIR JOBS.

20              THIS -- THAT'S NOT ACTUALLY WHAT

21    MR. CREASE'S AGENCY LOOKS LIKE, BUT WE'RE GOING TO

22    USE AS AN EXAMPLE THE CRAIG CREASE ALLSTATE

23    INSURANCE AGENCY.  NOW, MR. CREASE IS STARTING OUT.

24    BY DEFINITION, HE'S NOT GETTING RENEWALS, BECAUSE HE

25    DOESN'T HAVE A BOOK.  SO IN HIS FIRST YEAR, THE ONLY

1    THING HE'S GOING TO EARN ARE COMMISSIONS ON NEW

2    POLICIES.  LET'S ASSUME THAT HE SELLS 100 POLICIES.

3    HE GETS A COMMISSION ON 100 POLICIES.  HE IS ON THE

4    GROUND FLOOR.

5              THE SECOND YEAR, HE SELLS ANOTHER 100

6    POLICIES.  BUT GUESS WHAT?  85 PERCENT OF THE

7    POLICIES HE SOLD IN THE FIRST YEAR HAVE RENEWED, SO

8    HE GETS COMMISSION ON 185 POLICIES, EVEN THOUGH HE

9    ONLY SOLD 100.

10              THE THIRD YEAR, IT STARTS TO COMPOUND.

11   BECAUSE IN THE THIRD YEAR, AGAIN, LET'S ASSUME HE

12   SOLD ONLY 100 NEW POLICIES, BUT HE IS GETTING

13   85 PERCENT RENEWALS NOT JUST ON THE POLICIES HE SOLD

14   IN THE LAST YEAR, BUT THE POLICIES THAT WERE STILL

15   IN EFFECT FROM THE YEAR BEFORE THAT.

16              AND IT CONTINUES.  YEAR FOUR, IT GOES

17   UP TO A COMMISSION ON 319 POLICIES, ON THIS SET OF

18   ASSUMPTIONS.

19              YEAR FIVE.  HE IS UP TO 371 POLICIES

20   THAT HE GETS COMMISSION ON, EVEN THOUGH HE HAS ONLY

21   SOLD 100.

22              AND BY YEAR SIX, HE IS GETTING A

23   COMMISSION ON 415 POLICIES, EVEN THOUGH HE ONLY SOLD

24   100.

25              THE POINT IS THIS:  THAT'S WHAT IT

1    MEANS TO BUILD A BOOK.  AND THAT'S WHAT I MEAN WHEN

2    I SAY THE MAGIC OF RENEWALS.

3                NOW, MR. GODFREY SAID TO YOU --

4    SOMETIMES WE TALK ABOUT THIS AS AN ORCHARD, AN

5    ORCHARD WITH FRUIT TREES THAT GIVES OFF FRUIT.  AND

6    HE SAID ALLSTATE OWNS THE LAND, THEY OWN THE TREES,

7    AND THEY OWN THE FRUIT.  WELL, IT'S TRUE THAT IN A

8    TECHNICAL SENSE THAT, SINCE THE AGENTS UNDER THE NOA

9    PROGRAM DIDN'T HAVE A VESTED INTEREST IN THEIR

10   BOOKS, THAT ALLSTATE DID OWN THE LAND AND THE TREES.

11   THE STATEMENT THAT ALLSTATE OWNED THE FRUIT IS JUST

12   WRONG.

13                IF YOU LOOK AT THE POLICIES, THEY HAVE

14   PROVISIONS THAT ARE CALLED COMPENSATION INTEREST.

15   AND WHAT THAT MEANS IS, IT SAYS THAT, TO EACH AGENT,

16   IF YOU SELL A POLICY AND YOUR NAME IS ON THAT

17   POLICY, YOU HAVE A LEGAL RIGHT UNDER THE CONTRACT TO

18   GET THE COMMISSIONS THAT ARE PAID UNDER THAT POLICY

19   YEAR AFTER YEAR AFTER YEAR.  THE CONTRACTS SAY IT'S

20   YOUR FRUIT.  IT'S YOUR FRUIT.  THERE IS NO DISPUTE

21   ABOUT THAT.

22                BUT IT TAKES TIME TO GET YOUR

23   INVESTMENT BACK.  AND THAT'S WHY JOB SECURITY IS SO

24   IMPORTANT.  IN ORDER TO PROMOTE THE -- THAT IS THE

25   COMPENSATION INTEREST PROVISION, I DIDN'T EVEN KNOW

1    YOU SLIPPED IT IN THERE.  IT SAYS, WHENEVER YOU

2    WRITE A PERSONALLY SECURED NEW POLICY IN A MAJOR

3    LINE OR WRITE A PERSONALLY SECURED MAJOR COVERAGE IN

4    A MAJOR LINE, WHICH IS FREE OF ANY OTHER ALLSTATE

5    AGENT'S COMPENSATION INTEREST, YOU WILL RECEIVE

6    COMPENSATION INTEREST IN EACH EXISTING UNREPRESENTED

7    POLICY BELONGING TO RELATED INSUREDS IN THAT LINE OR

8    ANY OTHER LINE WHICH IS FREE OF ANY OTHER ALLSTATE

9    AGENT COMPENSATION, WHICH IS A LONG WAY OF SAYING

10   YOU OWN THE FRUIT.

11            NOW, ALLSTATE NEEDED ITS AGENTS TO

12   INVEST.  THEY WEREN'T GOING TO COVER THE EXPENSES

13   THEMSELVES.  THEY NEEDED THE AGENT TO GO OUT OF

14   POCKET.  THEY NEEDED THE AGENT TO SPEND HIS OR HER

15   OWN MONEY BUILDING THE BOOK.  AND SO THEY TOLD

16   AGENTS WHO WERE CONSIDERING THE NOA PROGRAM, WHEN

17   YOU SPEND A DOLLAR, YOU WILL GET DOUBLE, TRIPLE,

18   QUADRUPLE YOUR INVESTMENT.  THAT WAS THE PITCH.

19            THEY ALSO RECOGNIZED THAT THERE WAS A

20   TIME COMPONENT.  THEY SAID, YOU NEED TO KNOW IT

21   TAKES MONEY TO MAKE MONEY, YOU NEED TO BE WILLING

22   AND ABLE TO INVEST MONEY IMMEDIATELY, NOW.  YOU NEED

23   TO BE WILLING TO TAKE A FINANCIAL RISK AND KNOW THAT

24   HE/SHE WILL RECOUP MONEY MORE IN THE FUTURE.  THEY

25   WERE TOLD PUT THE MONEY IN TODAY, GET YOUR RETURN ON

1    INVESTMENT IN THE FUTURE.

2              THAT'S WHERE JOB SECURITY COMES IN.  AS

3    LONG AS THEY CAN'T FIRE YOU OTHER THAN FOR NOT DOING

4    YOUR JOB, THEY CAN'T TAKE THE FRUIT AWAY FROM YOU.

5    YOU CAN GET A RETURN ON YOUR INVESTMENT.

6              AND THAT'S WHY, WHEN THEY SOLD THE

7    AGENTS ON THE NOA PROGRAM, WHAT DID THEY SAY?  THEY

8    SAID YOU WILL HAVE JOB SECURITY.  JOB SECURITY IS

9    THE OPPOSITE OF BEING AN EMPLOYEE AT WILL.

10             THIS IS THEIR BOOK.  YOU HAVEN'T HEARD

11   A SINGLE WITNESS COME IN HERE FOR ALLSTATE AND

12   EXPLAIN HOW IT IS THESE AGENTS THOUGHT THEY WERE

13   EMPLOYEES AT WILL IF THEY WERE TOLD IN BLACK AND

14   WHITE THEY HAD JOB SECURITY.

15             ALLSTATE WENT FURTHER THAN THAT,

16   ACTUALLY.  AND THIS GOES TO THE BASIC CONCEPT OF THE

17   NOA PROGRAM.  THEY SAID, YOU HAVE A PROPRIETARY

18   INTEREST IN YOUR BUSINESS, IT'S YOUR BUSINESS.

19   PROPRIETARY MEANS OWNERSHIP.  ONE OF THE FEATURES OF

20   OWNERSHIP IS NOBODY CAN FIRE YOU.  THERE IS NO

21   QUESTION THAT THEY WERE GETTING THESE FOLKS TO COME

22   IN, TO INVEST THEIR OWN MONEY, BY TELLING THEM, YOU

23   HAVE JOB SECURITY.  WE ARE NOT GOING TO TAKE THE

24   TREES AWAY FROM YOU AS LONG AS YOU DO YOUR JOB.

25             NOW, THE PLAINTIFFS BELIEVED WHAT THEY

1    WERE TOLD.  EACH AND EVERY ONE OF THEM INVESTED A

2    SUBSTANTIAL AMOUNT OF MONEY OUT OF THEIR OWN

3    POCKETS.  MR. LAWSON HIMSELF INVESTED OVER A MILLION

4    DOLLARS.  THAT'S MONEY HE PUT INTO HIS AGENCY,

5    THAT'S MONEY HE SPENT TO GROW THE BUSINESS THAT WAS

6    NOT REIMBURSED.

7              THEY ALL TESTIFIED THAT THEY NEVER

8    WOULD HAVE DONE THAT IF THEY THOUGHT THAT ALLSTATE

9    COULD JUST COME IN AND TAKE IT ALL AWAY FROM THEM ON

10   A MOMENT'S NOTICE.  AND, REALLY, IF YOU THINK ABOUT

11   IT, WHO WOULD?

12             NOW, HERE AGAIN, NOBODY CAME IN FROM

13   ALLSTATE TO SAY WE DID NOT TELL THEM TO INVEST.

14   NOBODY CAME IN TO CONTRADICT THE TESTIMONY YOU HEARD

15   FROM WITNESS AFTER WITNESS SAYING THEY TOLD ME TO

16   INVEST, THEY TOLD ME TO INVEST.  MR. KEARNEY

17   TESTIFIED THAT HIS MANAGER NOT ONLY TOLD HIM TO

18   INVEST BUT SAID, LOOK, IF YOU DON'T HAVE ENOUGH

19   CASH, REFINANCE YOUR HOUSE TO GET CASH.  AND THAT'S

20   WHAT HE DID.  HE HAD TO REFINANCE HIS HOME IN ORDER

21   TO GET CASH OUT TO INVEST IN HIS BUSINESS.  NOBODY

22   CAME IN HERE TO SAY THAT DIDN'T HAPPEN.

23             INSTEAD, YOU HAVE ALLSTATE'S LAWYERS

24   MOCKING THE PLAINTIFFS, SAYING WE NEVER TOLD YOU TO

25   INVEST.  YOU DECLARED THESE EXPENSES ON YOUR TAX

1    RETURNS AS BUSINESS EXPENSES.  WELL, IF IT'S A

2    BUSINESS EXPENSE, IT'S NOT AN INVESTMENT.  PLEASE.

3    FOR TAX REASONS, THEY ARE BUSINESS EXPENSES.  BUT

4    WE'RE NOT TALKING ABOUT INVESTMENTS IN A TAX SENSE,

5    WE ARE TALKING ABOUT INVESTMENTS IN A COMMON SENSE

6    WAY.  YOU PUT MONEY IN, YOU GET A RETURN IN THE

7    FUTURE.  THE BEST THEY CAN DO IS IGNORE ALL OF THE

8    EVIDENCE, THE UNCONTESTED EVIDENCE THAT THESE FOLKS

9    WERE PRESSURED, IN WRITING AND ORALLY, TO INVEST

10   THEIR MONEY IN THE BELIEF THAT THEY HAD JOB

11   SECURITY.  THE MOST THEY CAN TO IS JUST MOCK THEM,

12   SAY THEY ARE MAKING IT UP.

13              NOW, THE CONTRACTS THEMSELVES.  WHAT DO

14   THE CONTRACTS SAY?  MR. GODFREY SAID IT'S REAL

15   SIMPLE, THE CONTRACTS ARE AT WILL.  AND HE DID

16   SOMETHING THAT A LOT OF LAWYERS DO.  THIS IS FROM

17   THEIR PRESENTATION.  THEY PULLED UP A SENTENCE OUT

18   OF THE R830 CONTRACT.  IT SAYS:  EITHER YOU OR

19   ALLSTATE HAVE THE RIGHT TO TERMINATE THIS AGREEMENT

20   UPON MAILING TO THE OTHER AT HIS OR ITS LAST KNOWN

21   ADDRESS WRITTEN NOTICE OF TERMINATION.

22              THERE, THAT'S AN AT-WILL CONTRACT.

23   THAT IS THE END OF IT.  RIGHT?  WELL, MAYBE NOT.

24   MAYBE HE SHOULD HAVE SHOWN YOU THE REST OF THE

25   CONTRACT.  IT'S IN THE SAME PROVISION, THE SAME PART

1   OF THE CONTRACT, IT SAYS, WAIT A MINUTE.  THE

2   COMPANY WILL NOT TERMINATE YOUR EMPLOYMENT BECAUSE

3   OF UNSATISFACTORY WORK UNLESS YOU HAVE BEEN NOTIFIED

4   THAT YOUR WORK IS UNSATISFACTORY AND THAT YOUR JOB

5   IS IN JEOPARDY AND UNLESS YOU HAVE BEEN GIVEN A

6   REASONABLE OPPORTUNITY TO BRING YOUR PERFORMANCE UP

7   TO SATISFACTORY STANDARDS.

8           THAT IS ONE PROTECTION AGAINST

9   TERMINATION.  IT ALSO SAYS:  IN NO EVENT SHALL YOU

10  BE RELEASED FOR ANY REASON WITHOUT THE FOLLOWING

11  REVIEW AND APPROVAL PROCEDURE HAVING BEEN ADHERED

12  TO.  AND THEN THERE IS MORE, ALTHOUGH IT'S NOT IN

13  THE CONTRACT, THE MAIN CONTRACT.  THERE WAS AN

14  AMENDMENT THAT WAS SIGNED THAT SAID THAT THE

15  EMPLOYEES WHO HAD R830 CONTRACTS HAD A RIGHT TO HAVE

16  ANY INVOLUNTARY TERMINATION REVIEWED BY THE AGENT

17  REVIEW BOARD.

18          FOLKS, THOSE ARE PROTECTIONS AGAINST

19  TERMINATION.  THOSE ARE PROVISIONS THAT MEAN, NO

20  MATTER HOW YOU READ THEM, IT'S NOT AN AT-WILL

21  CONTRACT.  THIS IS A CONTRACT THAT GAVE THEM JOB

22  SECURITY.

23          LET'S JUST EXPLORE THAT A LITTLE BIT

24  FURTHER, I WANT TO COME BACK TO THAT.  I ASKED

25  MR. KAUFMAN ABOUT THAT PROVISION.  ONE OF THE

1    PROVISIONS SAYS, AND THIS IS IN BOTH CONTRACTS, YOU

2    CAN NOT BE TERMINATED FOR UNSATISFACTORY PERFORMANCE

3    UNLESS, FIRST, WE GIVE YOU NOTICE THAT YOU ARE NOT

4    DOING YOUR JOB WELL ENOUGH; SECOND, YOU ARE GIVEN AN

5    OPPORTUNITY TO FIX IT; AND, THIRD, YOU FAIL TO FIX

6    IT, THEN WE CAN TERMINATE YOU.

7              WELL, I SAID TO MR. KAUFMAN, WELL, WHAT

8    IF SOMEBODY IS DROPPING THE BALL, THEY ARE GIVEN

9    NOTICE, AN OPPORTUNITY TO FIX IT, AND THEY DO FIX

10   IT.  CAN YOU FIRE THEM THEN?  HE SAID, NO.  WELL, OF

11   COURSE YOU CAN'T.  THAT PROVISION WOULDN'T MAKE ANY

12   SENSE AT ALL UNLESS IT WERE THE CASE THAT IF YOU DID

13   RESPOND, IF YOU DID FIX IT, YOU COULDN'T BE FIRED.

14   SO HOW CAN THEY SAY THAT THIS IS A CONTRACT THAT

15   ALLOWS ALLSTATE TO TERMINATE ANYBODY AT ANY TIME FOR

16   ANY REASON?  IT'S NONSENSE.

17             WELL, MR. GODFREY WOULD RESPOND TO THAT

18   BY SAYING, WELL, WAIT A MINUTE, THE PROGRAM WAS NOT

19   ABOUT UNSATISFACTORY PERFORMANCE, THE PROGRAM WAS

20   ABOUT SOMETHING ELSE.  WE DIDN'T FIRE THEM BECAUSE

21   THEY WEREN'T DOING THEIR JOBS, WE FIRED THEM

22   BECAUSE THERE WERE GREAT REASONS FOR FIRING THEM,

23   INCLUDING MAKING LIVES BETTER FOR EVERYBODY BY

24   GIVING THEM ALL OF THESE RICHES.  SO HE SAID THAT'S

25   NOT A RELEVANT PROVISION.

```
1                  WELL, THINK ABOUT WHETHER THAT MAKES
2    SENSE.  HE IS TELLING YOU THAT UNDER THESE CONTRACTS
3    PEOPLE WHO WERE DOING THEIR JOBS, PEOPLE WHO
4    COULDN'T BE FIRED FOR POOR PERFORMANCE, HAVE GREATER
5    PROTECTION -- SORRY -- HAVE LESS PROTECTION THAN
6    PEOPLE THAT WERE NOT DOING THEIR JOBS.  HE IS
7    TELLING YOU THAT EVEN THOUGH THIS CONTRACT SAYS YOU
8    CAN'T BE FIRED IF YOU ARE PERFORMING POORLY BUT
9    IMPROVE YOUR SITUATION, BUT YOU CAN BE FIRED IF YOU
10   WERE PERFORMING WELL ALL ALONG?  THAT DOESN'T MAKE
11   ANY SENSE.
12                  NOW, THERE ARE TWO CONTRACTS, AS YOU
13   KNOW, THERE'S THE R830 AND THERE'S THE R1500.  WHEN
14   HE WAS TALKING ABOUT THE R1500, MR. GODFREY DID THE
15   SAME THING, HE CHERRY-PICKED.  HE PULLED JUST THIS
16   PART OF THE SENTENCE OUT.  NOW, THIS SENTENCE DOES
17   SAY YOU MAY BE TERMINATED AT WILL.  HE SAID, LOOK AT
18   THAT.  THIS IS WHAT HE SHOWED YOU.  LOOKS LIKE THERE
19   IS A PERIOD AFTER THE WORD PARTY, DOESN'T IT?  IT'S
20   NOT.  HE DIDN'T SHOW YOU REST OF THE SENTENCE.  HE
21   DIDN'T WANT TO TALK ABOUT THE REST OF THE SENTENCE.
22   HERE IS THE REST OF THE SENTENCE.  IT SAYS:  YOUR
23   EMPLOYMENT AND THIS AGREEMENT MAY BE TERMINATED AT
24   WILL BY EITHER PARTY, SUBJECT ONLY TO SUCH
25   LIMITATIONS AND RESTRICTIONS AS MAY BE IMPOSED BY
```

1    LAW AND IN ACCORDANCE WITH COMPANY RULES AND

2    PROCEDURES.

3              HE DIDN'T WANT YOU TO SEE THAT.  IT

4    SAYS IF THE LAW SAYS YOU CAN'T BE TERMINATED, YOU'RE

5    NOT AT WILL.  AND IF THERE ARE PROVISIONS IN THE

6    COMPANY PROCEDURES THAT SAY YOU CAN'T BE TERMINATED,

7    YOU'RE NOT AT WILL.

8              AND, IN FACT, THERE ARE SUCH

9    PROTECTIONS IN THE COMPANY DOCUMENTS, IN THE R1500

10   PROCEDURE MANUAL, THAT SAYS THAT REGARDLESS OF THE

11   LANGUAGE IN THE CONTRACT, YOU CANNOT TERMINATE AN

12   R1500 AGENT WITHOUT PROVIDING THE AGENT AN

13   OPPORTUNITY TO RECEIVE A JOB IN JEOPARDY NOTICE, A

14   REASONABLE OPPORTUNITY TO CURE AND A REVIEW OF THE

15   TERMINATION THROUGH THE AGENT REVIEW BOARD.

16             NOW, THERE IS NO GETTING AROUND THE

17   FACT THAT THESE CONTRACTS GIVE THESE PROTECTIONS

18   AGAINST -- GIVE THEM PROTECTION AGAINST TERMINATION,

19   SO WHEN THE WITNESSES WOULD NOT ALLOW MR. GODFREY TO

20   IGNORE THESE PROVISIONS, HE TRIED SOMETHING ELSE.

21   WHAT HE DID IS, HE WOULD TAKE DOCUMENTS THAT ARE NOT

22   PART OF THE CONTRACT, HE WOULD TAKE THIS HR MANUAL

23   OR SOME OTHER DOCUMENT, AND HE WOULD SHOW IT TO THE

24   WITNESS TO SAY, DOESN'T THIS SAY AT WILL.  HE TRIED

25   TO POINT TO SOMETHING OUTSIDE THE CONTRACT TO SAY,

1     WELL, DOESN'T IT SAY AT WILL?  SO YOU ARE AN AT-WILL

2     EMPLOYEE.

3              A COUPLE OF PROBLEMS WITH THAT.  FIRST

4     OF ALL, THE R830 CONTRACT HAS WHAT'S KNOWN AS AN

5     INTEGRATION CLAUSE.  IT SAYS WE CAN'T CHANGE THE

6     TERMS OF THE CONTRACT WITH SOME OTHER DOCUMENT

7     UNLESS BOTH PARTIES AGREE.  AND THAT DIDN'T HAPPEN.

8     SO ALL OF THOSE OTHER DOCUMENTS THAT HE WAS SHOWING

9     THE WITNESSES TRYING TO MAKE IT SEEM LIKE THEY WERE

10    AT-WILL EMPLOYEES, THEY ARE NOT PART OF THE

11    CONTRACT, THEY DON'T HAVE ANYTHING TO DO WITH THE

12    ANALYSIS.  IT WAS A PARLOR TRICK.

13              ANOTHER THING HE DID IS HE WOULD TAKE

14    SENTENCES OUT OF CONTEXT, OF THESE OTHER DOCUMENTS,

15    GIVE THEM TO THE WITNESS AND PUSH THEM, PUSH THEM,

16    PUSH THEM TO GET THEM TO AGREE, DOESN'T THIS MEAN

17    YOU'RE AN AT-WILL EMPLOYEE.  FOR EXAMPLE, HE SHOWED

18    MR. CREASE SOMETHING CALLED THE HR MANUAL.  HE ASKED

19    HIM, MR. CREASE, IT SAYS RIGHT HERE, ALLSTATE

20    RESERVES THE RIGHT IN ALL CIRCUMSTANCES TO DETERMINE

21    WHETHER AN EMPLOYMENT WOULD BE TERMINATED.  ALLSTATE

22    RESERVES THE RIGHT TO DEPART FROM ITS STANDARD

23    DISCIPLINARY PROCEDURES WHEN, IN ITS DISCRETION,

24    SUCH A DEPARTURE IS WARRANTED.  MR. CREASE SAID,

25    YEAH, THAT'S WHAT IT SAYS.

1           WELL, GUESS WHAT?  FIRST OF ALL, THAT

2     MANUAL APPLIES TO ALL ALLSTATE EMPLOYEES, INCLUDING

3     THOSE WHO ARE NOT AT WILL.  IT'S NOT TALKING JUST

4     ABOUT THE ALLSTATE AGENTS.  BUT ALSO, HE DIDN'T SHOW

5     YOU THIS PROVISION.  THE HR MANUAL EXPRESSLY STATES

6     THAT IT IS NOT INTENDED AS A STATEMENT OF THE TERMS

7     AND CONDITIONS OF YOUR EMPLOYMENT AND NO RELIANCE

8     SHOULD BE PLACED ON THIS GUIDE FOR PURPOSES OF

9     DETERMINING THE TERMS AND CONDITIONS OF THE

10    EMPLOYMENT.  IT SAYS ON ITS FACE IT'S GOT NOTHING TO

11    DO WITH IT.

12          NOW, THERE WAS ANOTHER PROTECTION

13    AGAINST TERMINATION PROVISION.  IT SAID THAT YOU

14    CANNOT BE FIRED FOR ANY REASON UNLESS THE REASON FOR

15    THE FIRING HAS BEEN REVIEWED AND APPROVED.  WELL,

16    THINK ABOUT THAT.  DOESN'T THAT MEAN THAT THERE HAS

17    TO BE A REASON?  IF YOU SIGN A CONTRACT THAT SAYS

18    YOU CAN'T FIRE ME FOR ANY REASON WITHOUT REVIEWING

19    THE REASON FOR FIRING ME AND MAKING SURE SOMEBODY

20    APPROVES IT, DOESN'T IT MEAN THAT THERE HAS TO BE A

21    REASON?  ISN'T THAT WHAT IT MEANS?  DOESN'T IT MEAN

22    THERE HAS TO BE A REASON?  THERE IS SOMETHING ABOUT

23    YOU THAT'S NOT RIGHT AND THEY CAN'T EVEN FIRE YOU

24    FOR THAT REASON UNLESS IT'S BEEN REVIEWED AND

25    APPROVED BY SOMEBODY WHO AGREES THERE IS A VALID

1    REASON FOR TERMINATING YOU.  SO TO SUGGEST THAT

2    THESE ARE AT-WILL CONTRACTS IS NOT RIGHT.

3             NOW, PUT ASIDE THE CONTRACTS, PUT ASIDE

4    THE TESTIMONY, LET'S LOOK AT WHAT ALLSTATE ITSELF

5    HAS SAID IN OTHER CONTEXTS ABOUT WHETHER THESE ARE

6    AT-WILL CONTRACTS, ABOUT WHETHER IT HAD A RIGHT TO

7    TERMINATE THEM.  YOU HEARD MUCH MORE THAN YOU WANTED

8    TO ABOUT THE FACT THAT, IN THE LATE 1990S, ALLSTATE

9    GOT INTO A LITTLE HOT WATER WITH THE IRS.  IT HAD TO

10   DO WITH THE TAX STATUS OF THEIR BENEFIT PLANS.

11            THE ONLY THING THAT MATTERS ABOUT --

12   YOU DON'T NEED TO UNDERSTAND THE ISSUE.  WHAT YOU

13   NEED TO UNDERSTAND IS THE FOLLOWING:  IN THE COURSE

14   OF THE NEGOTIATIONS WITH THE IRS, THE IRS RAISED THE

15   POSSIBILITY OF SOLVING THE TAX PROBLEM, WHATEVER IT

16   WAS, BY JUST CONVERTING ALL OF THE AGENTS, JUST

17   CONVERTING THEM ALL, SAYING YOU'RE ALL FIRED, NOW

18   YOU CAN COME BACK AS INDEPENDENT CONTRACTORS.

19            WELL, IN THAT CONTEXT -- IN OTHER

20   WORDS, WHY DON'T DO YOU EXACTLY WHAT THEY ENDED UP

21   DOING IN THE PROGRAM.  WELL, IN THAT CONTEXT,

22   ALLSTATE WAS TRYING TO DO SOMETHING ELSE.  THEY

23   DIDN'T WANT TO TERMINATE THE PROGRAM.  YOU HEARD THE

24   TESTIMONY FROM ALLSTATE'S WITNESSES THAT THEY WERE

25   TRYING TO PRESERVE IT.  THEY WANTED TO KEEP THE NOA

```
 1    PROGRAM IN PLACE.  SO WHAT DID THEY TELL THE IRS?
 2    THEY SAID, WE CAN'T DO THAT, WE CAN'T FORCIBLY
 3    CONVERT THEM, BECAUSE WE ARE GOING TO GET SUED.  WE
 4    DON'T HAVE THE RIGHT TO DO THAT, OR AT LEAST THEY'RE
 5    GOING TO CLAIM THAT WE DON'T HAVE A RIGHT TO DO
 6    THAT.
 7              THAT'S BEEN READ SEVERAL TIMES, I'M NOT
 8    GOING TO READ IT AGAIN.  BUT WHAT IT SAYS IS THAT,
 9    IF WE DO THAT, IRS, IF WE DO EXACTLY WHAT WE ENDED
10    UP DOING IN THE PROGRAM, WE WILL FIND OURSELVES IN A
11    QUAGMIRE OF LITIGATION.  BUT THEY ALSO SAID
12    SOMETHING ELSE TO THE IRS.  THEY SAID THAT IT WOULD
13    SIMPLY BE UNFAIR.  THESE ARE LONG-SERVICE EMPLOYEES,
14    THEY EXPECTED TO BE COMPENSATED AS EMPLOYEES AND
15    RECEIVE THE FRINGE BENEFITS THAT ALLSTATE HAS
16    TRADITIONALLY PROVIDED.  NOT ONLY WOULD INDIVIDUALS
17    LOSE FUTURE BENEFIT PLAN ACCRUALS AND CONTRIBUTIONS
18    IF THEY WERE ALL CONVERTED TO INDEPENDENT
19    CONTRACTORS, MANY OF THESE INDIVIDUALS HAVE SPENT
20    ALL OF THEIR CAREERS WITH ALLSTATE AND HAVE HOPED TO
21    RETIRE WITH RETIREE LIFE AND MEDICAL BENEFITS.
22    CEASING THE NOA'S EMPLOYEE SERVICE AT THIS JUNCTURE
23    IN THEIR CAREERS WOULD HAVE SEVERE ECONOMIC
24    CONSEQUENCES.  THE CONSEQUENCE IS ACCEPTING THE BASE
25    SEVERANCE OPTION.
```

1              NOW, EVEN THOUGH ALLSTATE TOLD THE IRS

2    WE CAN'T DO THIS DOESN'T MEAN THEY DIDN'T WANT TO.

3    AS YOU HEARD YESTERDAY, ALLSTATE STOOD TO MAKE --

4    SAVE A LOT OF MONEY.  I'M SORRY THAT'S NOT VERY

5    CLEAR, BUT MR. LIDDY TESTIFIED ABOUT FINANCIAL

6    ANALYSIS THAT WAS DONE AND PRESENTED TO THE BOARD OF

7    DIRECTORS.  AND IT WAS PRESENTED TO THE BOARD OF

8    DIRECTORS RIGHT BEFORE THE PROGRAM.  AND HE WAS

9    PROJECTING THAT BY FORCING THE CONVERSION OF ALL OF

10   THESE AGENTS, ALLSTATE WOULD SAVE $588 MILLION --

11   SORRY, $88 MILLION IN THE FIRST YEAR, AND 175 IN THE

12   SECOND YEAR.  MILLION, THAT IS.  THEY ALSO PROJECTED

13   THAT MERELY BY TERMINATING CONTRIBUTIONS TO THE

14   PENSION PLAN, THEY WOULD PICK UP $98 MILLION.

15              THE POINT BEING IS THERE WAS A LOT OF

16   MONEY TO BE HAD IN TERMS OF SAVINGS IF THEY COULD

17   JUST FIND SOME WAY TO FORCE ALL OF THESE AGENTS TO

18   CONVERT.  THEY WERE IN A BIND.

19              GETS US TO THE PROGRAM.

20              HERE'S WHAT THE PROGRAM WAS ABOUT.  AS

21   I JUST SAID, ALLSTATE CLEARLY WANTED TO FORCE ALL OF

22   THESE FOLKS TO CONVERT.  BUT AS IT HAD TOLD THE IRS,

23   WE'RE GOING TO GET SUED IF WE DO THAT.  WE'RE GOING

24   TO HAVE A QUAGMIRE OF LITIGATION.  WELL, SOMEWHERE

25   ALONG THE LINE, I THINK MR. LIDDY TESTIFIED THIS WAS

1    SUGGESTED BY THEIR GENERAL COUNSEL SOME TIME IN

2    1999, SOMEONE CAME UP WITH AN IDEA.  IT WAS THE

3    RELEASE.  THEY FIGURED OUT A SOLUTION.  LET'S

4    TERMINATE ALL THESE FOLKS, FORCE THEM TO CONVERT OR

5    LEAVE, BUT DO IT IN A WAY THAT COVERS US, THAT

6    PREVENTS THEM FROM SUING US.  IT WAS ACTUALLY A

7    PRETTY BRILLIANT PLAN.

8              IT HAD SEVERAL STEPS.  STEP 1, CUT

9    THEIR LEGS OUT FROM UNDERNEATH THEM.  TELL THEM ALL

10   THAT AS OF A CERTAIN DATE YOU WILL BE ON YOUR KNEES,

11   YOU WILL HAVE NO JOB, YOU WILL HAVE NO BENEFITS, YOU

12   WILL HAVE NOTHING.  STEP 1, TELL THEM EVERYTHING IS

13   GONE.

14             STEP 2, THROW THEM A LIFELINE.  SAY TO

15   THEM, HEY, WE'RE GOING TO GIVE YOU AN OPPORTUNITY TO

16   GET BACK ON YOUR FEET.  WE'RE GOING TO GIVE YOU AN

17   OPPORTUNITY TO CONVERT TO AN INDEPENDENT CONTRACTOR.

18   YOU WON'T HAVE BENEFITS, YOU WON'T HAVE EXPENSE

19   REIMBURSEMENT, BUT IT'S BETTER THAN NOT HAVING A

20   JOB.  OR IF YOU DON'T WANT TO STAY WITH ALLSTATE,

21   WE'RE GOING TO GIVE YOU THE OPPORTUNITY TO SELL YOUR

22   BOOK, GET SOME MONEY.  OR IF YOU DON'T WANT THAT,

23   WE'LL GIVE YOU THE ENHANCED SEVERANCE OPTION, WHICH

24   WAS A YEAR'S PAY.  THAT WAY IF YOU DON'T WANT TO

25   STAY, AT LEAST YOU'RE GOING TO HAVE THE MONEY, AT

```
 1    LEAST YOU'RE GOING TO HAVE SOMETHING THAT WILL ALLOW
 2    YOU TO GET BACK ON YOUR FEET.  THAT WAS STEP 2.
 3                 STEP 3, SAY YOU ONLY GET THAT LIFELINE
 4    IF YOU SIGN THE RELEASE.  THESE ARE GOOD THINGS.
 5    YOU CAN HAVE THESE THINGS.  THEY'RE NOT WHAT YOU
 6    THOUGHT YOU HAD, BUT THEY ARE GOOD THINGS LIKE
 7    MR. GODFREY SAID.  WE ARE NOT DENYING THESE ARE GOOD
 8    THINGS.
 9                 BUT THAT GETS US TO STEP 4.  THEY GOT
10    TO SIGN THE RELEASE TO GET THEM, AND THE RELEASE HAS
11    TO SAY EXACTLY WHAT ALLSTATE WANTS IT TO SAY.  YOU
12    MUST SIGN A RELEASE AND IT MUST SAY YOU ARE DOING
13    THIS VOLUNTARILY AND KNOWINGLY.
14                 THE NEXT STEP IS, AND THIS IS THE MOST
15    IMPORTANT STEP.  YOU GIVE THEM A WAY NOT TO SIGN THE
16    RELEASE, AND ONLY ONE WAY.  AND THE OPTION THAT YOU
17    GIVE THEM TO NOT SIGN THE RELEASE HAS TO BE
18    DEVASTATING.  IT HAS TO BE SOMETHING THAT NOBODY,
19    UNLESS THEY ARE IN A DIFFERENT CIRCUMSTANCE, IS
20    GOING TO BE ABLE TO LIVE WITH.  WHAT YOU ARE TRYING
21    TO DO IS CREATE AS MUCH DISTANCE BETWEEN THE OPTION
22    OF SIGNING THE RELEASE AND THE THINGS YOU GET AND
23    WHAT HAPPENS IF YOU DON'T SIGN THE RELEASE.  YOU
24    WANT TO MAKE IT COMPLETELY INTOLERABLE.  YOU WANT TO
25    MAKE IT SO THAT NOBODY IS GOING TO DO THAT.  NOBODY
```

1    WHO WANTS A JOB, NOBODY WHO WANTS TO PAY THEIR

2    BILLS, NOBODY WHO DOESN'T WANT TO PULL THEIR SON OUT

3    OF COLLEGE IS GOING TO ACCEPT THAT.

4              AND THAT WAS THE BASE SEVERANCE OPTION.

5    BASE SEVERANCE OPTION IS YOU GET 13 WEEKS PAY, UP TO

6    13 WEEKS PAY, OVER SIX MONTHS.  WHICH, BY THE WAY,

7    IS ABOUT THE SAME THING THAT YOU WOULD GET IF YOU

8    WERE TERMINATED FOR CAUSE FOR NOT DOING YOUR JOB

9    UNDER THE SEVERANCE PLAN.  THAT'S THE BASE SEVERANCE

10   OPTION.

11             HERE IS WHAT'S INTERESTING, AND THIS IS

12   WHAT PROVES THAT THIS WAS DELIBERATE.  IT RAN INTO A

13   PROBLEM.  YOU HEARD A LOT ABOUT SEVERANCE PLANS.

14   AND I'M GUESSING YOU HAD NO IDEA WHY WE WERE TALKING

15   ABOUT THOSE SEVERANCE PLANS.  YOU HAD NO IDEA WHY WE

16   ARE TALKING ABOUT THIS PLAN AND THAT PLAN AND CHANGE

17   THIS.  IT'S ACTUALLY A PRETTY BIG PART OF THE STORY

18   IN EXPLAINING WHY.  THEY REALIZED WHEN THEY WERE

19   PLANNING THIS, THERE IS A LOOPHOLE THAT'S GOING TO

20   ALLOW THEM TO ESCAPE FROM THE BASE SEVERANCE OPTION.

21             THERE WERE TWO SEVERANCE PLANS IN

22   PLACE.  THIS IS IN THE ESTABLISHED FACTS.  THERE WAS

23   A SEVERANCE PAY PLAN AND A SEVERANCE ALLOWANCE PLAN.

24   THE SEVERANCE ALLOWANCE PLAN IS THE ONE THAT APPLIES

25   IF YOU ARE TERMINATED FOR UNSATISFACTORY

1    PERFORMANCE.  THAT'S NOT IMPORTANT HERE.

2              THE OTHER ONE IS THE SEVERANCE PAY

3    PLAN.  AND WHAT IT SAYS IS IF YOU ARE TERMINATED

4    INVOLUNTARILY AS A RESULT OF A REDUCTION IN FORCE,

5    YOU WILL GET UP TO 52 WEEKS PAY, UP TO A FULL YEAR

6    PAY.  THE KICKER IS YOU DON'T HAVE TO SIGN THE

7    RELEASE.  WELL, THAT'S A PROBLEM.  THAT LETS THEM

8    GET OUT OF THE BOX WE ARE TRYING TO PUT THEM IN.

9    SOMEBODY WHO COULD SAY I'M NOT GOING TO SIGN THE

10   RELEASE UNDER THIS PLAN WOULD STILL GET UP TO A

11   YEAR'S PAY WITHOUT SIGNING THE RELEASE.  IT'S A

12   PROBLEM FOR THEM.

13             THIS PLAN PROVIDED IF YOU WERE

14   TERMINATED UNDER CERTAIN CIRCUMSTANCES.  ONE OF THEM

15   IS A REDUCTION IN WORKFORCE.  THEY TRIED TO TELL YOU

16   THAT THIS WASN'T A REDUCTION IN WORKFORCE.  IT'S A

17   LITTLE HARD TO UNDERSTAND HOW IT IS THAT TERMINATING

18   6,200 EMPLOYEES IS NOT A REDUCTION IN WORKFORCE.

19   THAT ASIDE, IT'S PRETTY CLEAR FROM THE EVIDENCE THAT

20   EVEN IF YOU CONSIDER THE POSSIBILITY THAT SOME ARE

21   GOING TO COME BACK, ALLSTATE FULLY INTENDED, FULLY

22   EXPECTED THAT A SIGNIFICANT NUMBER OF AGENTS WOULD

23   LEAVE THE COMPANY AS A RESULT OF THE PROGRAM, AND,

24   IN FACT, THEY SET ASIDE $92 MILLION FOR SEPARATION

25   COSTS.  THERE IS NO QUESTION THAT IT WAS A REDUCTION

1    IN WORKFORCE, AND THEREFORE THERE'S NO QUESTION THAT

2    THESE AGENTS, AS PART OF THE PROGRAM, BEING

3    TERMINATED, WOULD HAVE BEEN ENTITLED TO UP TO A

4    YEAR'S PAY WITHOUT A RELEASE.

5              THERE WAS AN EXCEPTION IN THE PLAN.  IT

6    SAID, IT DOES NOT APPLY TO EMPLOYEES TERMINATED

7    UNDER THE TERMS OF ANY GROUP REORGANIZATION

8    STRUCTURING BENEFIT PLAN OR PROGRAM SPONSORED BY THE

9    EMPLOYER.  THEY SAID, I KNOW, HERE IS WHAT WE'LL DO.

10   WE'RE GOING TO CREATE A NEW PLAN AS PART OF THIS

11   SO-CALLED REORGANIZATION.  AND IF WE DO THAT, WE ARE

12   JUST GOING TO DO IT FOR EMPLOYEE AGENTS.  THEN THIS

13   PLAN, THE PLAN THAT WOULD PAY THEM UP TO A YEAR'S

14   SALARY, WON'T APPLY.  THAT WAS THE AGENT TRANSITION

15   SERVICE PLAN -- SEVERANCE PLAN.

16             THEY ADOPTED THAT LITERALLY TWO DAYS

17   BEFORE THEY ANNOUNCED THE PROGRAM.  THEY PLUGGED THE

18   LOOPHOLE.  BY DOING THAT ONE CHANGE WITH THE STROKE

19   OF A PEN, THEY RENDERED THE SEVERANCE PAY PLAN THAT

20   WOULD HAVE GIVEN THESE FOLKS UP TO A YEAR'S PAY

21   WITHOUT SIGNING THE RELEASE, WITH A PLAN THAT SAID,

22   IF YOU DON'T SIGN THE RELEASE, YOU ONLY GET 13 WEEKS

23   OVER SIX MONTHS.  IT'S PLAIN AS DAY WHAT THEY WERE

24   DOING.  THEY WERE STRUCTURING IT.  THEY WERE GOING

25   OUT OF THE WAY TO MAKE SURE THAT THE ONLY OPTION

1    THAT WOULD ALLOW YOU TO NOT SIGN THE RELEASE WAS AS

2    PAINFUL AS POSSIBLE.

3              ONCE THEY PLUGGED THAT LOOPHOLE, THEY

4    GOT EXACTLY WHAT THEY WANTED.  THEY HAD ALL OF THE

5    PLAINTIFFS IN THE BOX.  THEY CALLED IT PREPARING FOR

6    THE FUTURE.  I DON'T KNOW WHETHER THAT WAS A JOKE,

7    BUT MY IDEA OF PREPARING FOR THE FUTURE IS NOT

8    GETTING FIRED, BUT THEY CALLED IT PREPARING FOR THE

9    FUTURE.  THE WAY THEY STRUCTURED THE PROGRAM IS THAT

10   THERE WERE ONLY TWO WAYS OUT OF THE BOX.  ONE IS TO

11   SIGN THE RELEASE, IN WHICH CASE YOU GET THESE

12   WONDERFUL THINGS, OR NOT SIGN THE RELEASE, IN WHICH

13   CASE YOU FACED THE FOLLOWING.  ANY ONE OF THE

14   PLAINTIFFS WHO WAS SITTING TRYING TO DECIDE WHETHER

15   TO SIGN THE RELEASE TO GET OPTIONS 1, 2 OR 3, OR NOT

16   SIGN THE RELEASE, MEANING TAKE THE BASE SEVERANCE

17   OPTION, WAS FACED WITH THE FOLLOWING:  HE OR SHE

18   WOULD HAVE NO JOB.  NO JOB.

19             NO MATTER HOW LONG YOU HAD WORKED

20   THERE, NO MATTER HOW MUCH YOU INVESTED, YOU HAD NO

21   JOB.  YOU GOT NO BENEFITS.  YOUR CAREER WITH

22   ALLSTATE IS OVER, WHICH MATTERED TO SOME FOLKS.

23   THEY SPENT A LOT OF TIME DEVELOPING IT, THEY LIKED

24   IT.  OTHERS DIDN'T.  YOUR CAREER WITH ALLSTATE WAS

25   OVER IF YOU TAKE THE BASE SEVERANCE OPTION.

1                NOT ONLY THAT, YOUR CHANCES OF

2    SUCCESSFULLY STAYING IN THE BUSINESS OF SELLING

3    INSURANCE WERE PRETTY MUCH SHOT, PRETTY MUCH OF A

4    LONG SHOT, BECAUSE, YOU SEE, ALLSTATE TOLD ALL THESE

5    FOLKS THAT IF YOU GO TO WORK SELLING FOR ANOTHER

6    INSURANCE COMPANY AND YOU TRY TO SELL TO ONE OF THE

7    CUSTOMERS YOU HAD, ONE OF THE CUSTOMERS IN YOUR

8    BOOK, WE ARE GOING TO SUE YOU.  YOU CAN'T DO THAT.

9    THAT'S A VIOLATION OF YOUR NONCOMPETE PROVISION.

10   MAKES IT KIND OF TOUGH WHEN YOU'RE STARTING OVER IN

11   AN INSURANCE BUSINESS, YOU START WITHOUT YOUR BOOK,

12   YOU HAVE LOST YOUR BOOK, YOU'VE LOST YOUR INVESTMENT

13   IN THE BOOK.  YOU HAVE TO START FROM POLICY ONE ALL

14   OVER AGAIN.  BUT YOU HAVE TO DO IT BY FINDING

15   CUSTOMERS THAT YOU HAVEN'T BEEN ABLE TO FIND THE

16   ENTIRE TIME YOU'VE BEEN WITH ALLSTATE.

17                TO MAKE IT WORSE, THEY EVEN TOOK THEIR

18   PHONE NUMBERS.  THEY SAID YOU CAN'T USE YOUR PHONE

19   NUMBER, THE PHONE NUMBER THAT PEOPLE KNEW WHERE TO

20   REACH YOU.  YOU CAN'T HAVE THAT.

21                AND THEY ACTUALLY WENT FURTHER THAN

22   THAT.  WHAT THEY SAID IS, IN RESPONSE TO ONE OF THE

23   Q AND A, THE QUESTION WAS, IF I SEPARATE, IF I TAKE

24   THE BASE SEVERANCE OPTION, EVEN IF I DON'T, IF I

25   SEPARATE, CAN I SELL COKE TO MY FORMER CUSTOMERS?

1   CAN I SELL VACUUM CLEANERS TO MY FORMER CUSTOMERS?

2   ALLSTATE SAID NO, YOU CAN'T DO IT.

3           SO IN ADDITION TO LOSING THEIR JOBS AND

4   THEIR BENEFITS THEY WERE FACED WITH TREMENDOUS

5   OBSTACLES TO RECOVER.  NOW, MAYBE SOME OR ALL OF

6   THEM COULD HAVE FOUND A JOB.  MAYBE THEY COULD HAVE

7   SUCCEEDED SELLING INSURANCE FOR A COMPETITOR, EVEN

8   WITH THOSE RESTRICTIONS.  WHO KNOWS?  ALL THAT

9   MATTERS IS THAT THAT'S WHAT EACH OF THESE PLAINTIFFS

10  WERE LOOKING AT WHEN THEY WERE DECIDING WHETHER OR

11  NOT TO SIGN THE RELEASE.

12          THEY WERE LOOKING AT, AS YOU HEARD FROM

13  SOME OF THEM, A VERY REAL POSSIBILITY OF FINANCIAL

14  RUIN.  THEY TOLD YOU THE NUMBERS, THEY TOLD YOU HOW

15  MUCH THEY WERE SPENDING, HOW MUCH IN SAVINGS THEY

16  HAD, WHICH, IN SOME CASES, WAS NOT VERY MUCH,

17  BECAUSE THEY HAD BEEN INVESTING, AND HOW LONG THAT

18  MONEY WOULD LAST BEFORE THEY WERE WORRIED ABOUT

19  FORECLOSURE.

20          I WOULD SUGGEST TO YOU THAT THAT RAISES

21  SERIOUS QUESTIONS IN THE MIND OF ANY REASONABLE

22  PERSON ABOUT WHETHER IT'S REASONABLE TO ACCEPT THE

23  BASE SEVERANCE OPTION RATHER THAN ONE OF THE THREE

24  OPTIONS THAT WOULD REQUIRE YOU TO SIGN THE RELEASE.

25          THERE WAS ALSO SOMETHING ELSE AT STAKE

```
 1    HERE, AND YOU HEARD IT FROM MR. HARPER.  IT'S AN

 2    INTANGIBLE.  MAYBE IT'S SOMETHING ONE MIGHT THINK IS

 3    IMPORTANT OR NOT.  BUT IN MR. HARPER'S CASE, MAYBE

 4    IN OTHERS, HE IS THE ONE WHO SAID IT, THERE WAS

 5    SOMETHING ELSE.  IT WAS DIGNITY.  MR. HARPER, KIND

 6    OF AN OLD FASHIONED GUY, I GUESS, SAID THAT BEING

 7    THE BREADWINNER MATTERED TO HIM.  YOU RECALL THAT

 8    HIS WIFE HAD QUIT HER JOB AT THE CRICKET FARM, A JOB

 9    WITH BENEFITS, TO WORK WITH HIM AT ALLSTATE'S

10    SUGGESTION OR UNDER ALLSTATE'S PRESSURE.  HE WAS

11    GOING TO LOSE HIS JOB IF HE ACCEPTED THE BASE

12    SEVERANCE OPTION.  AND THAT WAS SOMETHING THAT WENT

13    RIGHT TO THE HEART OF HIS SELF-RESPECT AS A MAN.

14              NOW, AGAIN, YOU CAN DECIDE FOR YOURSELF

15    HOW MUCH VALUE YOU PLACE ON THAT, BUT I THINK IT'S

16    PRETTY CLEAR IT WAS IMPORTANT TO MR. HARPER.

17              NOW, LET ME TURN TO SOME OF THE THINGS

18    THAT ALLSTATE IS TRYING TO DO TO DISTRACT YOU.  LIKE

19    I SAID, ONE OF THE PROBLEMS IS I HAVE TO RESPOND TO

20    WHAT HE SAID, SO I'M LITTLE OFF SCRIPT, I APOLOGIZE

21    FOR THAT.

22              BUT LET ME ADDRESS SOME OF THE THINGS

23    THAT THEY ARE SAYING TO YOU IN AN EFFORT TO GET YOU

24    TO JUST KEEP YOUR EYE ON THOSE MONKEYS.  THEY SAY,

25    YOU KNOW, JEESH, WE PAID YOU FOR SEVEN MONTHS.  WE
```

1    PAID YOU FOR SEVEN MONTHS.  WHO GETS THAT?  I THINK

2    MR. GODFREY EVEN DESCRIBED IT AS, YOU KNOW, UNLIKE

3    ANY OTHER JOB, WE CONTINUED TO PAY YOU.  LET'S BE

4    CLEAR.  WHAT HE IS TALKING ABOUT IS THE SEVEN MONTHS

5    BETWEEN THE DATE THE PROGRAM WAS ANNOUNCED AND THE

6    DATE THE TERMINATION WOULD BECOME EFFECTIVE.  HE IS

7    TALKING ABOUT THE SEVEN MONTHS BETWEEN NOVEMBER OF

8    1999 AND JUNE OF 2000.  THEY ARE ACTUALLY TAKING

9    CREDIT FOR HAVING PAID THESE EMPLOYEES DURING THAT

10   PERIOD.

11            WELL, FOLKS, THEY WERE STILL EMPLOYEES,

12   THEY WERE REQUIRED TO SHOW UP FOR WORK EVERY SINGLE

13   DAY.  HOW DARE THEY TAKE CREDIT FOR THE FACT THAT

14   THEY WERE PAYING THEM FOR DOING WORK?  YOU KNOW, AND

15   IF YOU THINK ABOUT IT, IT'S EVEN MORE OUTRAGEOUS

16   THAN THAT.  THESE FOLKS WEREN'T DRAWING A SALARY FOR

17   SITTING IN THEIR OFFICES WITH THEIR FEET UP ON THEIR

18   DESK DOING CROSSWORD PUZZLES.  THEY GET PAID IN

19   COMMISSIONS.  DURING THOSE SEVEN MONTHS, EVERY

20   NICKEL THEY GOT PAID WAS BECAUSE THEY SOLD A POLICY

21   FOR ALLSTATE.  EVERY NICKEL.  AND FOR EVERY POLICY

22   THEY SOLD, ALLSTATE PUT A LOT MORE MONEY IN ITS

23   POCKET THAN THE PLAINTIFFS DID.

24            SO FOR THEM TO SUGGEST THAT, WOW,

25   ALLSTATE WAS REALLY DOING WELL BY THESE FOLKS BY

1      CONTINUING TO PAY THEM WHILE THEY WERE STILL

2      EMPLOYEES, BY CONTINUING TO HONOR ITS OBLIGATION TO

3      PAY COMMISSIONS ON POLICIES ACTUALLY SOLD OR

4      RENEWED, I THINK SAYS A LOT ABOUT ALLSTATE'S NOTION

5      OF WHAT IT IS TO BE IN GOOD HANDS WITH ALLSTATE.

6                     NOW, THERE IS ANOTHER ARGUMENT THAT

7      THEY MADE THAT I THINK IS WORTH TOUCHING ON.

8      BECAUSE YOU HEARD A LOT ABOUT IT.  YOU KNOW, YOU

9      SHOULD HAVE TALKED TO A LAWYER, YOU SHOULD HAVE SUED

10     US, THEY DIDN'T SUE US.

11                    LET'S THINK ABOUT THAT.  WE LAWYERS

12     LOVE TO THINK THAT WE ARE GODS.  ME, IN PARTICULAR.

13     BUT YOU GO TO A LAWYER, THERE'S ONLY TWO THINGS HE

14     OR SHE CAN DO FOR YOU.  THINK ABOUT IT.  ONE IS, I

15     CAN NEGOTIATE FOR YOU.  I CAN HELP YOU TRY TO WORK

16     SOMETHING OUT WITH ALLSTATE.  I CAN GO TO ALLSTATE

17     AND EXPLAIN TO THEM, WELL, YOU KNOW, THIS IS KIND OF

18     UNREASONABLE, HAVE LUNCH, DO YOU MIND IF WE, YOU

19     KNOW, TAKE OUT THE LANGUAGE IN THE RELEASE THAT SAYS

20     IT'S VOLUNTARY.  THAT'S ONE THING A LAWYER CAN DO

21     FOR YOU.

22                    WELL, HIRING A LAWYER TO NEGOTIATE WITH

23     ALLSTATE WOULD HAVE BEEN A WASTE OF MONEY.  BECAUSE

24     ALLSTATE MADE IT PRETTY CLEAR IT WASN'T NEGOTIATING.

25     SO WHO ARE YOU KIDDING ABOUT THAT?

1          NOW, THE OTHER THING A LAWYER CAN DO IS

2     THEY CAN SUE.  AND THEY SAY TO YOU AGAIN AND AGAIN

3     AND AGAIN, YOU SHOULD HAVE SUED US.  IT'S YOUR FAULT

4     THAT THIS HAPPENED.  THEY ARE ACTUALLY SAYING IT'S

5     THEIR FAULT, YOU SHOULD HAVE SUED US, SUCKERS.  YOU

6     DIDN'T SUE US, IT'S YOUR FAULT.  YOU PUT YOURSELF IN

7     THIS PREDICAMENT.

8          WELL, LET'S THINK ABOUT THAT.  ARE THEY

9     ACTUALLY SUGGESTING THAT A GROUP OF PEOPLE, EITHER

10    INDIVIDUALLY OR GETTING TOGETHER, PEOPLE WHO JUST

11    LOST THEIR JOBS, WERE REALLY IN A POSITION TO TAKE

12    ON AND BEAT ALLSTATE AND DO IT WITHIN SEVEN MONTHS?

13    THAT'S KIND OF A STRANGE ARGUMENT TO MAKE, IF YOU

14    THINK ABOUT IT, AS WE STAND HERE, 15 YEARS AFTER

15    THESE EVENTS HAPPENED AND WE ARE STILL ARGUING ABOUT

16    THIS.  FOR ALLSTATE TO SUGGEST TO YOU THAT THEY

17    SHOULD HAVE SUED BECAUSE IF THEY HAD SUED, ASSUMING

18    YOU COULD AFFORD IT, IT WOULD HAVE BEEN DIFFERENT,

19    YOU WOULD HAVE BEEN ABLE TO STOP US.  THAT'S A

20    RIDICULOUS ARGUMENT.

21          AND, IN FACT, BACK TO MY POINT ABOUT

22    LISTEN TO THE EVIDENCE RATHER THAN WHAT THE LAWYERS

23    SAY, WHETHER IT'S ME OR MR. GODFREY OR ANYBODY ELSE.

24    MR. GODFREY TALKED ABOUT THE FACT THAT SOME FOLKS

25    DID TALK TO LAWYERS.  AND HE SAID, WELL, IF YOU TALK

1    TO A LAWYER AND THEY SIGNED THE RELEASE, THAT MUST

2    MEAN YOU THOUGHT IT WAS OKAY TO DO.  I'M NOT SURE

3    THERE IS ANYTHING DIRECT TO SUPPORT THAT, BUT

4    ANOTHER THING HE SAID WAS, I'M PRETTY SURE HE SAID

5    DURING HIS CLOSING REMARKS, HE SAID THAT THE LAWYERS

6    SAID TO THEM WE CAN STOP THIS.  THAT THE LAWYERS

7    SAID TO THE PLAINTIFFS, THE LAWYERS THEY TALKED TO

8    SAID THAT THE LAWYERS COULD STOP IT, THAT THE

9    LAWYERS COULD FILE A LAWSUIT THAT WOULD STOP IT.  I

10   GUARANTEE YOU THERE IS NOTHING IN YOUR NOTES THAT

11   SAID THAT, BECAUSE THERE WAS NO TESTIMONY THAT EVER

12   SUGGESTED THAT A LAWYER SAID THAT THERE WAS SOME

13   POSSIBILITY OF ACTUALLY ACCOMPLISHING ANYTHING BY

14   SUING.

15          IN FACT, TO THE CONTRARY, MR. KEARNEY

16   TESTIFIED THAT ONE OF THE THINGS HE WAS TOLD WHEN HE

17   TALKED TO A LAWYER IS, THERE IS NOTHING THAT COULD

18   BE DONE, NOT BECAUSE THE RELEASE IS LEGAL, BUT IT

19   HAS TO DO WITH TIMING.  THIS ISSUE CALLED

20   IRREPARABLE HARM THAT WE TALKED ABOUT.  YOU CAN'T

21   GET AN INJUNCTION IF WHAT THEY ARE DOING TO YOU IS

22   SOMETHING THAT CAN BE FIXED THROUGH MONEY DAMAGES.

23   TO SUGGEST THAT IT'S THEIR FAULT FOR NOT HAVING

24   SUED, SUGGEST THAT THE FACT THAT THEY DIDN'T

25   MORTGAGE THEIR HOMES, HIRE LAWYERS TO STOP THIS

1    THING, IS A DISTRACTION, TO SAY THE LEAST.

2              NOW, ALLSTATE ALSO TOLD YOU THAT WE

3    THOUGHT THESE RELEASES WERE SIGNED KNOWINGLY.  WE

4    BELIEVED YOU.  WE BELIEVED YOU.  IT SAYS RIGHT THERE

5    IN THE RELEASE THAT YOU WERE SIGNING IT VOLUNTARILY

6    AND WE BELIEVED YOU.

7              NOW, REMEMBER, THOSE WERE ALLSTATE'S

8    WORDS.  BUT MS. SMYLIE, IN HER OPENING STATEMENT,

9    TOOK THAT A BIT FURTHER.  SHE TALKED ABOUT MISS

10   KELLY.  SHE SAID, NOW, MS. KELLY MAY TELL YOU THAT

11   HER SIGNATURE ON THIS DOCUMENT, ON THIS RELEASE,

12   MEANT NOTHING TO HER.  SHE SIGNED IT, BUT IT DIDN'T

13   MEAN ANYTHING.  WELL, LADIES AND GENTLEMEN, IT MEANT

14   SOMETHING TO ALLSTATE.  ALLSTATE THOUGHT SHE WAS

15   TELLING THE TRUTH.  SAY THAT AGAIN.  SHE TOLD YOU

16   THAT ALLSTATE THOUGHT SHE WAS TELLING THE TRUTH.

17   WHEN SHE SAID, I READ THIS RELEASE, I UNDERSTAND ITS

18   EFFECT AND I'M ACTING VOLUNTARILY AND OF MY OWN FREE

19   WILL, I VOLUNTARILY MAKE THE FOLLOWING ELECTION,

20   ALLSTATE BELIEVED HER.  THEY THOUGHT SHE WAS HONEST,

21   SHE WAS BEING SINCERE.

22             WELL, WHAT IS -- THIS IS THE RELEASE,

23   THIS IS WHERE IT SAID, WHERE MS. KELLY SAID, I'M

24   VOLUNTARILY DOING THIS.  THIS IS WHAT MS. SMYLIE

25   SUGGESTED THAT ALLSTATE TOOK AT FACE VALUE.

```
 1                    WELL, HERE WHAT MS. KELLY SAID ABOUT

 2      THAT.  SHE SAID THAT SHE TRIED TO TAKE THOSE WORDS

 3      OUT.  SHE TRIED TO WRITE ON IT "UNDER DURESS."  SHE

 4      TRIED TO TELL ALLSTATE THAT SHE WAS NOT DOING IT

 5      VOLUNTARILY.  WHAT HAPPENED?  ALLSTATE SAID, NO, YOU

 6      CAN'T DO THAT.  IT WAS SENT IN, IT WAS SENT BACK,

 7      TAKE IT OFF.  IF YOU DON'T WANT THE BASE SEVERANCE

 8      OPTION, IF YOU ARE NOT WILLING TO ACCEPT THOSE

 9      CONSEQUENCES, YOU MAY NOT CHANGE THE WORDS OF THE

10      RELEASE.  YOU HAVE TO TAKE OUR WORDS THAT YOU ARE

11      DOING IT VOLUNTARILY AND PRETEND THAT THEY ARE

12      YOURS.

13                    SO IT'S AN OUTRAGE TO SUGGEST, IT'S AN

14      OUTRAGE FOR ALLSTATE TO COME IN HERE AND SUGGEST

15      THAT THEY BELIEVED THAT THESE WERE ALL VOLUNTARILY

16      EXECUTED BECAUSE IT SAYS THAT.  THOSE WERE

17      ALLSTATE'S WORDS AND ALLSTATE KNOWS IT.

18                    AND IF YOU THINK ABOUT IT, IF YOU ARE

19      SIGNING A DOCUMENT BECAUSE YOU REALLY DON'T HAVE A

20      CHOICE, IT DOESN'T MAKE MUCH MATTER -- IT DOESN'T

21      MAKE MUCH DIFFERENCE WHAT IT SAYS.  THINK ABOUT IT?

22      THIS IS AN EXTREME EXAMPLE, BUT IF SOMEBODY SIGNED A

23      MURDER CONFESSION BECAUSE THEY HAVE BEEN BEATEN,

24      PERFECTLY INNOCENT, BUT THEY SIGN IT BECAUSE THEY

25      HAVE BEEN BEATEN, IT REALLY DOESN'T MATTER WHETHER
```

1    YOU CONFESS TO ONE MURDER OR 100.  WHATEVER THEY

2    WANT TO PUT INTO IT THEY CAN PUT INTO IT BECAUSE

3    THEY ARE GOING TO SIGN IT TO STOP THE BEATING.

4           SO JUST AS THESE PLAINTIFFS HAD TO SIGN

5    THAT PIECE OF PAPER IN ORDER TO AVOID THE

6    LIFE-CHANGING CONSEQUENCES OF THE BASE SEVERANCE

7    OPTION, THEY HAD TO USE EXACTLY THE WORDS THAT

8    ALLSTATE SAID HAD TO BE IN IT.

9           ACTUALLY, THE REASON ALLSTATE WANTED

10   THOSE WORDS IN IT, THE REASON ALLSTATE INSISTED THAT

11   THE RELEASE SAY, I'M GOOD WITH THIS, THIS IS

12   VOLUNTARY, IS PRETTY CLEAR.  IT'S BECAUSE THEY

13   WANTED TO MAKE THAT ARGUMENT TO YOU.  THEY WANTED TO

14   BE IN A POSITION, IF THIS HAPPENED, IF THIS TRIAL

15   HAPPENED, TO COME IN AND SAY, DON'T LOOK AT US, THEY

16   SAID THEY DID IT VOLUNTARILY.  THAT'S WHY THOSE

17   WORDS ARE THERE.  AND IT'S NOT BECAUSE THERE WAS

18   ANYTHING VOLUNTARY ABOUT IT.

19           NOW, I'M NOT GOING TO TAKE A LOT OF

20   TIME, BUT I WANT TO TALK BRIEFLY ABOUT THE PART OF

21   THE CASE THAT DEALS WITH WHETHER THE RELEASE WAS

22   SIGNED KNOWINGLY.  ALL OF THE PLAINTIFFS

23   ACKNOWLEDGED THAT THEY DID UNDERSTAND THAT BY

24   SIGNING IT, THEY WERE SAYING I'M GIVING UP CLAIMS

25   AGAINST ALLSTATE.  NO ONE IS DENYING THAT.  THEY

1    DIDN'T THINK THAT THEY WERE SIGNING A CHINESE MENU,

2    THEY UNDERSTOOD THAT IT WAS A RELEASE AND THEY

3    UNDERSTOOD WHAT THE RELEASE WAS ABOUT.

4              BUT THAT DOESN'T NECESSARILY MEAN THAT

5    IT WAS KNOWING.  IT'S NOT AT ALL CLEAR IN THE MINDS

6    OF SOME OF THEM EXACTLY WHAT THE LEGAL EFFECT OF IT

7    WAS.  BUT, MORE IMPORTANTLY, THERE IS PRETTY CLEAR

8    EVIDENCE THAT ALLSTATE WAS NOT ENTIRELY STRAIGHT

9    WITH THESE FOLKS ABOUT FACTS THAT WERE REALLY

10   IMPORTANT, FACTS THAT SHOULD HAVE BEEN DISCLOSED,

11   FACTS THAT WOULD HAVE BEEN IMPORTANT TO DECISIONS

12   THAT WERE BEING MADE.

13             ONE OF THEM RELATED TO COMMISSION

14   RATES.  OKAY.  COMMISSIONS MATTER IF YOU'RE GOING TO

15   BE AN INDEPENDENT CONTRACTOR.  YOU'RE NOT GOING TO

16   HAVE BENEFITS, YOU HAVE TO PAY ALL YOUR EXPENSES, SO

17   THE COMMISSION RATE YOU GET IS PRETTY IMPORTANT,

18   RIGHT?

19             AND, IN FACT, ONE OF THE SELLING POINTS

20   OF THE PROGRAM IS THAT WE'RE GOING TO MAKE YOU

21   INDEPENDENT CONTRACTORS IF YOU SIGN THE RELEASE.

22   AND ALTHOUGH YOU'RE NOT GETTING BENEFITS OR EXPENSE

23   REIMBURSEMENT, YOU'RE GOING TO GET COMMISSIONS AND

24   THEY ARE HIGHER.  THEY ARE HIGHER COMMISSIONS, GOOD

25   COMMISSIONS.  BUT ALLSTATE ALSO SAID, YOU KNOW, WE

1    HAVE -- WE RESERVE THE RIGHT TO CHANGE THEM.  SO IF

2    YOU'RE TRYING TO DECIDE WHETHER TO TAKE THE

3    CONVERSION OPTION, YOU WANT TO KNOW THAT.  YOU WOULD

4    WANT TO KNOW WHETHER, OKAY, ALLSTATE, I KNOW THAT

5    YOU HAVE THE RIGHT, BUT CAN YOU TELL ME WHETHER

6    YOU'RE PLANNING TO DO THAT?  BECAUSE I'M MAKING THIS

7    DECISION, I'M RUNNING THE NUMBERS AND I'M GOING TO

8    ASSUME THAT YOU'RE GOING TO PAY ME THESE COMMISSIONS

9    UNLESS YOU TELL ME THAT A CHANGE IS COMING DOWN THE

10   PIKE.  AND ALLSTATE SAID NO, WE ARE NOT EVALUATING

11   THE POSSIBILITY.  WE CAN, BUT WE'RE NOT PLANNING TO

12   DO IT.

13           FOR EXAMPLE, YOU HEARD ABOUT A LETTER

14   THAT MR. KAUFMAN SENT TO THE AGENTS IN APRIL OF

15   2000, THAT WAS DURING THE PERIOD THAT PEOPLE WERE

16   MAKING THE DECISIONS.  HE SAID THAT, YOU KNOW, I

17   KNOW A NUMBER OF YOU ARE CONCERNED ABOUT THE

18   POSSIBILITY OF COMMISSIONS BEING REDUCED, BUT I CAN

19   TELL YOU RIGHT NOW, THERE IS NO WORK GOING ON RIGHT

20   NOW THAT'S FOCUSED ON CHANGING EXCLUSIVE AGENCY P&C

21   COMMISSIONS.

22           WELL, A COUPLE YEARS LATER, IN

23   SEPTEMBER OF 2002, THEY ANNOUNCED, YES, FOLKS, WE

24   ARE GOING TO REDUCE YOUR COMMISSIONS.  WE ARE GOING

25   TO CUT IN HALF THE COMMISSION YOU GET ON THE MOST

```
 1    LUCRATIVE NEW POLICY.  WE ARE GOING TO CUT IT IN

 2    HALF.  WE TOLD YOU WE COULD DO THAT.

 3              BUT IN ANNOUNCING IT, WHAT THEY SAY IS

 4    THAT THEY HAD ONLY BEGUN TO CONSIDER MAKING THAT

 5    CHANGE SEVERAL MONTHS BEFORE THE ANNOUNCEMENT.  THIS

 6    IS SOMETHING NEW.  THIS ISN'T SOMETHING WE WERE

 7    PLANNING.  WE DIDN'T MISLEAD YOU.  YOU WERE RIGHT TO

 8    BELIEVE, BACK WHEN YOU WERE MAKING YOUR DECISION,

 9    THAT WE WERE NOT PLANNING TO REDUCE YOUR

10    COMMISSIONS, TO UNDERCUT THE DEAL THAT YOU THINK YOU

11    HAD.

12              WELL, THAT WAS NOT TRUE.

13              THIS IS A DOCUMENT, AN INTERNAL

14    DOCUMENT THAT WAS DATED AUGUST OF 1999 WHILE THEY

15    WERE PLANNING THE PROGRAM.  IT SHOWS THAT NOT ONLY

16    WERE THEY PLANNING TO REDUCE THE COMMISSIONS FOR

17    INDEPENDENT CONTRACTORS, IT SHOWS THAT THEY HAD

18    DECIDED TO DO IT.  IT SAYS:  COMMISSIONS FOR AGENCY

19    GENERATED P&C INSURANCE SALES WILL BE 10 PERCENT NEW

20    BUSINESS AND 10 PERCENT RENEWALS.

21              YOU SEE THAT AT THE BOTTOM, IT SAYS

22    APPROVED.

23              ALL RIGHT.  WELL, THAT'S DATED 1999.

24    THAT'S BACK BEFORE THEY ANNOUNCED THE PROGRAM, THEY

25    WERE JUST PLANNING FOR IT.  AND AS WE JUST NOTED
```

1    THAT THE COMMISSION CHANGE WASN'T MADE EFFECTIVE

2    UNTIL FOUR YEARS LATER, BEGINNING OF 2003.  AND SO

3    ALLSTATE TELLS YOU WELL, THERE IS NO CONNECTION

4    BETWEEN THE TWO.  THEY ARE JUST UNRELATED.

5             WELL, TAKE A LOOK AT THE TITLE.  IT

6    SAYS R3001 PROGRAM, 48 OR MORE CONTRACT MONTHS.

7    THAT MEANS 2003.  THEY DECIDED BACK IN 1999 THAT

8    THEY WERE GOING TO REDUCE THE COMMISSIONS.  BUT THEY

9    ALSO DECIDED THEY WERE GOING TO WAIT FOR 48 OR MORE

10   CONTRACT MONTHS, WHICH PUTS YOU RIGHT INTO 2003,

11   WHICH IS EXACTLY WHAT -- WHEN THEY DID IT.  AND IT'S

12   IN THE EXACT AMOUNT THEY DID IT.

13            THE POINT IS THIS:  THEY WEREN'T

14   STRAIGHT WITH AGENTS.  THEY KNEW ALL ALONG THAT

15   AFTER THEY HOOKED THEM, GOT THEM TO AGREE TO BECOME

16   INDEPENDENT CONTRACTORS WHO WERE DEPENDENT SOLELY ON

17   COMMISSIONS, THEY DIDN'T TELL THEM THAT THEY WERE

18   GOING TO CUT THEM JUST A FEW YEARS LATER.  AND THAT

19   RAISES SERIOUS QUESTIONS ABOUT WHETHER THEY SIGNED

20   THE RELEASE KNOWINGLY.

21            I HAVE ALREADY TALKED ABOUT THE FACT

22   THAT THEY TOLD FOLKS THAT YOU CANNOT, YOU MAY NOT

23   SELL PRODUCTS, EVEN NONINSURANCE PRODUCTS, TO YOUR

24   FORMER CUSTOMERS.  THE CONTRACT PREVENTED THAT.

25   THAT WASN'T TRUE.  THERE WAS AN INTERESTING EXCHANGE

```
 1    DURING THE CROSS EXAMINATION OF MR. KEARNEY.
 2    MR. KEARNEY SAID, MY UNDERSTANDING WAS THAT I
 3    WOULDN'T BE ABLE TO SELL COKE TO MY FORMER CUSTOMERS
 4    BECAUSE ALLSTATE TOLD ME THAT I'M NOT ALLOWED TO
 5    SELL EVEN NONINSURANCE PRODUCTS TO CUSTOMERS.  AND
 6    MS. SMYLIE GOT UP AND CROSS-EXAMINED AND SAID, WELL,
 7    THAT'S JUST NOT TRUE AND SHE TOOK HIM BACK TO THE
 8    CONTRACT.  SHE POINTED OUT THE CONFIDENTIALITY
 9    CLAUSE AND NONCOMPETE CLAUSE AND GOT HIM TO ADMIT
10    THAT, YOU'RE RIGHT, IT DOESN'T SAY THAT.  IT DOESN'T
11    SAY I CAN'T SELL NONINSURANCE PRODUCT.  I GUESS I
12    WAS MISTAKEN.
13              MS. SMYLIE MADE EXACTLY OUR POINT.  SHE
14    POINTED OUT, SHE SHOWED HIM, SHE GOT HIM TO AGREE
15    THAT THE STATEMENT HE THOUGHT HE HEARD WAS FALSE.
16    WELL, GUESS WHAT?  THEN I SHOWED HIM THE STATEMENT
17    THAT HE HAD IN MIND.  IT WAS Q AND A.  Q AND A
18    NUMBER 8.  IT SAID, YOU MAY NOT DO EXACTLY WHAT
19    MR. KEARNEY SAID HE COULDN'T DO, OR THOUGHT HE
20    COULDN'T DO, HE COULD NOT SELL NONINSURANCE PRODUCTS
21    TO HIS OWN CUSTOMERS.  THAT STATEMENT HAD THE
22    DESIRED EFFECT.  IT HAD THE EFFECT OF MAKING FOLKS
23    THINK, WELL, I CAN'T ACCEPT THE BASE SEVERANCE
24    OPTION, BECAUSE IF I DO THAT, NOT ONLY AM I OUT OF A
25    JOB, BUT I CAN'T EVEN SELL COKE TO MY OLD CUSTOMERS.
```

1    NOT JUST THAT I CAN'T SELL THEM INSURANCE PRODUCTS,

2    I CAN'T EVEN SELL COKE.

3              REAL BRIEFLY, YOU HEARD SOME TESTIMONY

4    ABOUT THE HIRING MORATORIUM.  YOU HEARD THAT -- A

5    TAPE WAS PLAYED.  YOU HEARD THAT MR. KEARNEY ASKED A

6    QUESTION DURING THE ANNOUNCEMENT MEETING.  HE SAID,

7    IS IT POSSIBLE TO GET JOBS ELSEWHERE IN THE COMPANY?

8    I WANT MY BENEFITS, I DON'T WANT TO BE AN

9    INDEPENDENT CONTRACTOR, ARE OTHER JOBS GOING TO BE

10   AVAILABLE.  THE ANSWER WAS YES.  HE ONLY TESTIFIED

11   TO WHAT YOU COULD HEAR ON THE TAPE.

12             WELL, JUST MONTHS AFTER THE EFFECTIVE

13   DATE OF THE PROGRAM, IN SEPTEMBER, THEY ANNOUNCED A

14   HIRING MORATORIUM.  AND THE HIRING MORATORIUM

15   SAID -- SAID THAT THE PURPOSE OF THE MORATORIUM, AND

16   THIS IS IN YOUR ESTABLISHED FACTS AT PARAGRAPH 80,

17   IT SAID THAT ALLSTATE WOULD NOT OFFER REEMPLOYMENT

18   TO FORMER EMPLOYEE AGENTS WHO LEFT ALLSTATE AS A

19   RESULT OF THE PROGRAM, AND STATED THAT SUCH FORMER

20   EMPLOYEE AGENTS WOULD BE ELIGIBLE FOR REEMPLOYMENT

21   WHEN THEY REACHED THE ONE-YEAR ANNIVERSARY OF THEIR

22   TERMINATION OR WERE NO LONGER RECEIVING ENHANCED

23   SEVERANCE PAYMENTS, WHICHEVER WAS LONGER.

24             LOOK AT PARAGRAPH 81.  THE POLICY HAD

25   THE EFFECT OF PREVENTING ANY EMPLOYEE WHO LEFT

1    ALLSTATE AS A RESULT OF THE PROGRAM AND WHO WAS NOT

2    REHIRED THEREAFTER FROM SATISFYING THE CONTINUOUS

3    SERVICE REQUIREMENT THAT WOULD ENTITLE THEM TO EARLY

4    RETIREMENT.

5             THE POINT OF THE HIRING MORATORIUM WAS

6    TO SAY, WE'RE NOT GOING TO LET YOU BACK.  BECAUSE IF

7    WE LET YOU BACK, THEN YOU CAN BRIDGE THE GAP ON

8    BENEFITS.  AND WE DON'T WANT YOU TO DO THAT.  BUT

9    THE EMPLOYEES WERE TOLD THAT THERE WERE JOBS

10   AVAILABLE.

11            NOW, ALLSTATE WILL TELL YOU, WELL, THIS

12   WASN'T ANNOUNCED UNTIL A FEW MONTHS AFTER THE

13   EFFECTIVE DATE OF THE PROGRAM, SO I GUESS MAYBE WE

14   DIDN'T EVEN THINK ABOUT IT.  WE WEREN'T PLANNING TO

15   DO IT.  THERE'S A PROBLEM WITH THAT BECAUSE A COUPLE

16   OF THE ALLSTATE MANAGERS WHO TALKED TO THE

17   PLAINTIFFS LEVELED WITH THEM.  YOU HEARD TESTIMONY

18   FROM MR. PEARSON, I BELIEVE, AND MS. KELLY, WHO SAID

19   WHEN THEY ASKED THE QUESTION WILL JOBS BE AVAILABLE,

20   THE ANSWER WAS NO.  THEY WERE TOLD THE TRUTH.

21   ALLSTATE WAS NOT BEING STRAIGHT WITH THE OTHERS.

22            LET ME SAY A FEW MORE WORDS ABOUT

23   CHOICE.  THIS CASE IS ABOUT CHOICE, BUT IT'S

24   IMPORTANT THAT YOU UNDERSTAND THE CRITICAL

25   DISTINCTION BETWEEN LITERAL CHOICE AND MEANINGFUL

1    CHOICE.  IN THE JURY INSTRUCTIONS YOU WILL RECEIVE,

2    THE QUESTION YOU WILL BE ASKED IS WHETHER THE

3    PLAINTIFFS HAD A MEANINGFUL CHOICE TO NOT SIGN THE

4    RELEASE.  WHETHER TAKING THE BASE SEVERANCE OPTION

5    WAS A MEANINGFUL CHOICE.  NOT LITERAL.  THERE IS A

6    DIFFERENCE.

7              THEY DID CHOOSE TO SIGN THE RELEASE IN

8    THE LITERAL SENSE.  NOBODY IS SAYING THAT ALLSTATE

9    PHYSICALLY GRABBED THEIR HANDS AND MADE THEM SIGN.

10   IN THE LITERAL SENSE, THEY DID CHOOSE.  THE QUESTION

11   IS WHETHER IT WAS MEANINGFUL.  THE DISTINCTION

12   BETWEEN LITERAL CHOICE AND MEANINGFUL CHOICE IS AN

13   IMPORTANT ONE.  IT'S ONE WE ENCOUNTER EVERY DAY.  I

14   WILL GIVE YOU MAYBE A SILLY EXAMPLE.

15             IF I'M STANDING AT A STREET CORNER

16   WAITING FOR THE LIGHT TO TURN, I'M IN A HURRY, THE

17   LIGHT HASN'T TURNED BUT THERE ARE CARS AND TRUCKS

18   GOING BY ME AT HIGH SPEED.  I HAVE A CHOICE.  IN THE

19   LITERAL SENSE I CAN PLOW AHEAD AND GET RUN OVER BY A

20   BUS.  OR I CAN WAIT FOR THE LIGHT TO CHANGE AND

21   CROSS WITH THE LIGHT, MAKE IT TO THE OTHER SIDE.

22   THAT'S A LITERAL CHOICE.  BUT IT'S NOT A MEANINGFUL

23   CHOICE.  NOBODY, IN A MEANINGFUL SENSE, HAS THE

24   OPTION OF STANDING IN FRONT OF A BUS.

25             I WILL GIVE YOU ANOTHER EXAMPLE THAT

1    MIGHT BE A LITTLE MORE RELEVANT TO YOU, AND THAT IS

2    THE FACT THAT YOU ARE HERE.  YOU ALL RECEIVED A

3    SUMMONS THAT SAID YOU'VE GOT TO COME DOWN TO FEDERAL

4    COURT TO SERVE ON A JURY.  NOW, IN A LITERAL SENSE

5    YOU HAD A CHOICE.  YOU COULD HAVE JUST THROWN THAT

6    IN THE TRASH.  YOU COULD, BUT YOU DIDN'T.  YOU ALL

7    CAME IN.  NOW, MAYBE YOU CAME IN BECAUSE YOU WANTED

8    TO BE HERE.  I HOPE THAT IS TRUE OF AT LEAST SOME OF

9    YOU.  I DOUBT THAT'S TRUE OF AT LEAST SOME OF YOU.

10   BUT YOU DID HAVE A LITERAL CHOICE.  YOU MADE THE

11   CHOICE TO COME IN.

12            BUT DID YOU HAVE A MEANINGFUL CHOICE?

13   I DON'T KNOW.  MOST PEOPLE WOULD SAY I DIDN'T HAVE A

14   MEANINGFUL CHOICE BECAUSE I HAVE A DUTY AS A CITIZEN

15   AND UNDER THE LAW TO COMPLY WITH THAT KIND OF A

16   SUMMONS, AND THAT'S WHY I'M HERE.  I DIDN'T HAVE A

17   MEANINGFUL CHOICE.  I DON'T MEAN TO DENIGRATE YOUR

18   SERVICE, I DON'T MEAN TO SUGGEST THAT YOU WERE ALL

19   FORCED TO COME IN.  I SIMPLY MEAN TO SUGGEST THAT

20   YOU NEED TO FOCUS ON THE NATURE OF CHOICE.  IF YOU

21   WENT TO YOUR BOSS AND SAID I'VE GOT TO BE AT JURY

22   DUTY, AND HE SAID TO YOU, WAIT A MINUTE, I'M NOT

23   PAYING YOU FOR THAT, YOU ARE DOING IT AS A

24   VOLUNTEER.  YOU WOULD SAY, WELL, NO, I'M NOT DOING

25   IT AS A VOLUNTEER, I WAS SUMMONED, I HAVE TO BE

```
 1    THERE.  OKAY, WELL, YOU DON'T LITERALLY, IN THE
 2    MEANINGFUL SENSE, NOT SHOWING UP FOR JURY DUTY IS
 3    NOT A MEANINGFUL CHOICE.
 4              APPLY THAT DEFINITION OF CHOICE IN THIS
 5    CASE.  IN FACT, YOU ARE REQUIRED TO DO THAT.  YOU
 6    ARE REQUIRED AS THE LAW DESCRIBED IN THE JURY
 7    INSTRUCTIONS SUGGESTS.  YOU ARE REQUIRED TO LOOK AT
 8    THE TOTALITY OF CIRCUMSTANCES AND TO ASK YOURSELVES
 9    WHETHER THE PLAINTIFFS HAD A MEANINGFUL CHOICE TO
10    NOT SIGN THE RELEASE.  THAT HAS NOTHING TO DO WITH
11    THE GREAT THINGS THEY GOT ACCORDING TO ALLSTATE.  IT
12    HAS TO DO WITH WHETHER OR NOT SIGNING THE RELEASE
13    WAS AN OPTION.
14              AND EVERY ONE OF THEM DESCRIBED FOR YOU
15    A FORK IN THE ROAD THAT THEY WERE FACING.  AND EVERY
16    ONE OF THEM WAS ABLE TO -- BELIEVED, I THOUGHT
17    PRETTY CLEARLY, THAT THE BASE SEVERANCE OPTION WAS
18    NOT AN OPTION.  LOSING MY CAREER WAS NOT A
19    MEANINGFUL OPTION.  NOT BEING ABLE TO PAY MY BILLS
20    WAS NOT A MEANINGFUL OPTION.  CALLING MY SON UP AND
21    TELLING HIM HE CAN'T GO TO COLLEGE ANYMORE WAS NOT A
22    MEANINGFUL OPTION.  WALKING AWAY FROM MY INVESTMENT
23    WAS NOT A MEANINGFUL OPTION.  I HAD TO SIGN THE
24    RELEASE IN ORDER TO GET THE THING THAT THEY HAD
25    TAKEN FROM ME.
```

1                AND THE BEST EXAMPLE OF THAT IS ONE OF

2     THE PLAINTIFFS THAT MR. GODFREY LIKES TO TALK ABOUT

3     THE MOST.

4                WOULD YOU PULL UP THE SLIDE ON

5     MR. LAWSON.

6                NOW, I DON'T THINK MR. GODFREY IS

7     TRYING TO PICK ON MR. LAWSON, BUT I THINK MR. LAWSON

8     IS SOMEONE HE FOCUSES ON BECAUSE HE LIKES TO TALK

9     ABOUT -- HE LIKES TO TALK ABOUT BIG NUMBERS LIKE A

10    MILLION DOLLARS.  NOW, AS YOU HEARD, MR. LAWSON

11    INVESTED OVER A MILLION DOLLARS OF HIS MONEY IN HIS

12    AGENCY BEFORE THE PROGRAM WAS ANNOUNCED.  A MILLION

13    DOLLARS.  THAT'S REAL MONEY.  AND WHAT MR. GODFREY

14    TALKS ABOUT IS WHAT HE GOT BY SIGNING THE RELEASE.

15    HE TALKS ABOUT THE MONKEY.  HE TALKS ABOUT HOW, BY

16    SIGNING THE RELEASE, HE WAS ABLE TO RECOVER SOME OF

17    HIS INVESTMENT WHEN HE ULTIMATELY SOLD HIS BOOK.  IT

18    WASN'T THE NUMBER THAT MR. GODFREY SUGGESTED,

19    BECAUSE HE CONTINUED TO INVEST AFTER THE CONVERSION,

20    VERY MISLEADING, BUT LET'S ASSUME HIS NUMBERS ARE

21    RIGHT.  THE ISSUE IS NOT WHAT MR. LAWSON GOT BY

22    SIGNING THE RELEASE.  THE ISSUE IS NOT THE FACT THAT

23    HE GOT SOME OF HIS INVESTMENT BACK BY SIGNING THE

24    RELEASE.  BECAUSE, OF COURSE, THAT'S WHY HE SIGNED

25    THE RELEASE.

```
 1                    THE ISSUE IS WHETHER IT WAS REASONABLE
 2    FOR MR. LAWSON TO BE EXPECTED TO NOT SIGN THE
 3    RELEASE.  THIS IS THE COMPARISON THAT MR. LAWSON WAS
 4    FORCED TO MAKE BECAUSE OF THE PROGRAM.  IF HE HAD
 5    SAID I'M NOT GOING TO SIGN THE BASE SEVERANCE
 6    OPTION -- EXCUSE ME, I'M NOT GOING TO SIGN THE
 7    RELEASE, HE WOULD HAVE BEEN STUCK WITH THE BASE
 8    SEVERANCE OPTION.  THAT WOULD HAVE GOTTEN HIM A
 9    GRAND TOTAL OF $86,000 PAID OVER SIX MONTHS.  HE
10    WOULD HAVE INVESTED A MILLION DOLLARS OF HIS OWN
11    MONEY AND A BIG CHUNK OF HIS LIFE IN BUILDING THAT
12    BOOK, AND ALLSTATE TOOK IT AWAY FROM HIM.  AND THEY
13    SAID, MR. LAWSON, IF YOU DON'T SIGN THIS RELEASE,
14    YOU ARE GETTING NOTHING, YOU'RE NOT GETTING YOUR
15    BOOK, FORGET YOUR JOB, START OVER AND WE WILL SUE
16    YOU IF YOU TRY TO COMPETE WITH ALLSTATE.  BUT WE
17    WILL GIVE YOU $86,000 ON HIS MILLION DOLLAR
18    INVESTMENT.
19                    IF MR. LAWSON HAD NOT SIGNED THE
20    RELEASE, THE RETURN ON HIS INVESTMENT WOULD BE MINUS
21    $913,000.  THAT'S JUST ONE THING AND IT MEANS NOT TO
22    FALL FOR THE TRICK, NOT TO LOOK AT THE MONKEY.  THE
23    COMPARISON IS NOT WHAT THEY HAD BEFORE THE PROGRAM
24    AND WHAT THEY GOT BY SIGNING THE RELEASE TO SALVAGE
25    WHAT THEY GOT.  THE COMPARISON IS BETWEEN WHAT THEY
```

1    WOULD HAVE GOTTEN IF THEY HAD BEEN ABLE TO STAND UP

2    TO ALLSTATE AND NOT SIGN THE RELEASE.

3              AND FOR EVERY ONE OF THEM, NOT SIGNING

4    THE RELEASE WOULD HAVE BEEN DEVASTATING AND

5    UNACCEPTABLE.  AND THAT'S WHY THEY WERE FORCED TO

6    SIGN IT AND THAT'S WHY THEY ARE HERE.

7              THANKS FOR YOUR TIME.

8              THE COURT:  ALL RIGHT.  MEMBERS OF THE

9    JURY, WE ARE GOING TO BREAK FOR OUR LUNCH NOW.  45

10   MINUTES IS ENOUGH FOR YOU, RIGHT?  WE WILL COME BACK

11   AT A QUARTER OF 2:00.  WHAT TIME IS IT?  YEAH, A

12   QUARTER OF 2:00.

13             (JURY OUT.)

14             (LUNCHEON BREAK.)

15             (JURY IN.)

16             THE CLERK:  COURT IS NOW IN SESSION.

17             THE COURT:  PLEASE REMAIN SEATED.

18             MR. GODFREY, YOU MAY PROCEED WITH YOUR

19   REBUTTAL.

20             MR. GODFREY:  IT'S GOTTEN HOT IN HERE,

21   HASN'T IT?  I HOPE YOU HAD A NICE LUNCH, BUT I THINK

22   WE ALL HAVE THE SAME AMBIENT AIR TEMPERATURE

23   FEELINGS.

24             IT HAS BEEN A LONG TIME SINCE I'VE

25   HEARD ABOUT THE GAME OF MONKEY.  I HAVE A DAUGHTER,

1    TOO, SHE IS NOW 26, ALMOST 27.  I DON'T RECALL

2    PLAYING THAT GAME, BUT I UNDERSTAND THE CONCEPT.

3                 WE JUST SAW THE GAME PLAYED WELL, VERY

4    WELL, BY MR. QUINN.  THE SECOND INSTRUCTION TELLS

5    YOU TO LOOK AT THE EVIDENCE FOR EACH INDIVIDUAL

6    PLAINTIFF.  SO DID YOU HEAR MR. QUINN DO ANY KIND OF

7    DEEP DIVE OR TALK ABOUT THE EVIDENCE OF MR. MURRAY,

8    MR. BOYD, MS. REINERIO, OR MR. PERKINS?  NO.  A

9    PASSING REFERENCE TO MR. PETERSON AND MISS CREWS

10   KELLY.  NO DISCUSSION OF THE FACTS.

11                 CAN YOU PUT UP THE BROUSSARD SLIDE,

12   PLEASE.

13                 I CREATED THIS SLIDE FOR A REASON.

14   EVEN THOUGH THESE ARE LIKE INDIVIDUAL TRIALS WITH

15   INDIVIDUAL FACTS, THIS IS THE ORDER OF SEQUENCE IN

16   WHICH EACH PLAINTIFF TESTIFIED.  THAT'S THE LENGTH

17   OF THE DIRECT TESTIMONY OF EACH PLAINTIFF WHEN THEY

18   WERE ON DIRECT WITH THEIR OWN LAWYER.  88 PAGES FOR

19   MR. CREASE, MR. HARPER, 113, CREWS KELLY 34, 19, 27,

20   24, BECAUSE THEY WANT YOU TO THINK THAT THE FACTS

21   ARE THE SAME FOR EACH ONE.  THEY DON'T WANT YOU TO

22   HEAR THE FACTS FOR EACH ONE.

23                 THAT'S WHY I SPENT THE TIME, THAT'S WHY

24   I WENT THROUGH EACH OF THE FACTS FOR EACH PLAINTIFF,

25   SO YOU COULD EVALUATE THE FACTS FOR EACH PLAINTIFF

1    AND THE MEANINGFUL CHOICES THAT THEY MADE.

2              THE FIVE BASIC FACTS.  TIME, PRETTY

3    UNDISPUTED.  CHOICES WE ARE GOING TO GET TO.

4    PAYMENT, WE APPARENTLY HAVE AGREEMENT.  THE THREE

5    OPTIONS ARE GOOD THINGS, WE WERE TOLD IN THE CLOSING

6    BY THE PLAINTIFFS.  THEY ARE VERY GOOD THINGS.  AND

7    THEY WERE SUPERIOR ECONOMICALLY TO THE CHOICE OF

8    FINDING A NEW JOB OR UNEMPLOYMENT WITH SEVERANCE

9    THAT WAS ADOPTED ESPECIALLY FOR THESE AGENTS.  IT

10   DOESN'T MEAN IT WASN'T A MEANINGFUL CHOICE, IT MEANS

11   THAT THEY WERE OFFERED MORE.

12             LET'S SAY ALLSTATE HAD DONE IT

13   DIFFERENTLY.  YOU'RE ALL TERMINATED.  BUT IF YOU

14   SIGN A RELEASE, WE WILL GIVE YOU $351,000, ROUGHLY

15   WHAT EACH ONE GOT ON AVERAGE.  ANY DOUBT THAT EACH

16   OF THESE PLAINTIFFS WOULD HAVE SIGNED THE RELEASE TO

17   TAKE THE 351,000?  THAT WAS A MEANINGFUL CHOICE TO

18   THEM.

19             MR. CREASE SAID IT BEST.  IF THE

20   RELEASE HAD NOT BEEN PART OF THE PROGRAM, HE WOULD

21   HAVE STILL SELECTED OPTION 1.  MR. PETERSON

22   CONFIRMED THAT.  HE DIDN'T EVEN THINK ABOUT SUING.

23             BY THE WAY, YOU ARE HERE, ALL OF YOU,

24   GOOD CITIZENS.  TEN PLAINTIFFS, ONE IS HERE,

25   MR. CREASE.  THIS MEANS SO MUCH TO THEM EIGHT OF THE

1    OTHERS CHOSE NOT TO ATTEND THE CLOSING ARGUMENT.

2              MR. PERKINS HAS A LEGITIMATE EXCUSE, I

3    DO NOT CRITICIZE HIM.  THINK ABOUT IT.  WE ARE HERE

4    BECAUSE ALLSTATE GOT A PIECE OF PAPER WITH A

5    PROMISE, A MEN'S AND WOMEN'S WORDS THAT ARE SUPPOSED

6    TO MEAN SOMETHING.  ALLSTATE KEPT ITS PART OF THE

7    BARGAIN.  THE PLAINTIFFS CHOSE NOT TO KEEP THEIR

8    PART OF THE BARGAIN.

9              AND AT THE END, WHILE YOU'VE BEEN HERE

10   EVERY DAY, AND I'VE BEEN HERE EVERY DAY, AND THE

11   STAFF HAS BEEN HERE EVERY DAY, THAT SPEAKS VOLUMES.

12   ACTIONS, FRIENDS, SPEAK LOUDER THAN WORDS.  THEY

13   CHOSE NOT TO BE HERE BECAUSE THIS WAS SO IMPORTANT

14   TO THEM?  THAT'S UP FOR YOU TO DECIDE.

15             SO, LET'S TALK ABOUT SOME OF THE THINGS

16   THAT WAS SAID OR NOT SAID.  AND I'M GOING TO DO A

17   SUMMARY QUICKLY OF THE DEEP DIVE, BECAUSE I THINK

18   IT'S IMPORTANT TO KEEP THE FACTS IN MIND.  LET'S

19   START WITH MR. MURRAY, WHO WE DIDN'T HEAR ABOUT.

20             JUST TURN TO PAGE 324, PLEASE.

21             HE WENT TO A LAWYER, GOT LEGAL ADVICE.

22   NOW, WE HEARD FROM MR. QUINN THAT NO LAWYER SAID YOU

23   CAN GET AN INJUNCTION, THERE WAS NO TESTIMONY ON

24   THAT.  AU CONTRAIRE.  ON ONE OF THE VERY FIRST DAYS

25   OF TRIAL, JUNE 4, TRANSCRIPT PAGE 12, TRANSCRIPT

1    PAGE 13.  I CROSS-EXAMINED MR. HARPER ABOUT LANCE

2    RAFAEL.  AND I SHOWED HIM THE DOCUMENT.  AND I READ

3    TO HIM SAYING, MR. RAFAEL SAID ONE OF THE THINGS

4    THAT HE TOLD YOU WAS HE COULD FILE INJUNCTIVE

5    RELIEF, AN ACTION FOR INJUNCTIVE RELIEF TO STALL THE

6    WAIVER, TO FORESTALL THE WAIVER OF ANY RIGHTS UNDER

7    THE WAIVER OF AN OPTION SELECTION PROCESS, I.E., WE

8    WILL ATTEMPT TO HAVE THE JUDGE RULE THAT THE AGENT

9    WILL BE ABLE TO CHOOSE, ACTUALLY HE WROTE CHOSE,

10   CHOOSE ANY OF THE ALLSTATE OPTIONS WITHOUT GIVING UP

11   THEIR RIGHTS, AND I WENT ON.  SO THAT'S WHAT RAPHAEL

12   TOLD YOU.

13            ANSWER, MR. HARPER:  THAT'S WHAT HE

14   SAID RIGHT HERE.

15            BUT IF THE LAWYERS TOLD THEM THAT THE

16   RELEASE SHOULD BE SIGNED, THAT REFLECTS LEGAL ADVICE

17   ONE WAY OR THE OTHER, BUT IT ALSO REFLECTS A

18   JUDGMENT.  THEY HAD A CHOICE.  WHAT WAS THE VALUE OF

19   THE RELEASE?  THEY TOLD YOU IT WOULD TAKE YEARS.

20   THEY DIDN'T SEE THE RELEASE AS A MATERIAL ISSUE

21   HERE.  WHAT THEY SAW AS A MATERIAL ISSUE AND A

22   MEANINGFUL CHOICE WAS ALL THE MONEY THAT ALLSTATE

23   WAS OFFERING THEM THAT IT DID NOT HAVE TO OFFER

24   THEM, BUT IT CHOSE TO DO SO AS PART OF THE BENEFIT

25   OF THE BARGAIN THAT IT OFFERED.

1          GO TO VOLUNTARY FOR MR. MURRAY.  MADE A

2     CONSCIOUS INTELLIGENT CHOICE.  CHOSE OPTION 1,

3     TURNED DOWN OPTION 3, DID NOT SUE TO AVOID SIGNING

4     THE RELEASE.  HE WANTED THE NEW JOB OPPORTUNITY.

5          LET'S GO TO MR. BOYD.  MR. BOYD WAS THE

6     PERSON, YOU RECALL MR. BOYD, MASTER'S DEGREE,

7     SOPHISTICATED, READ AND UNDERSTOOD THE RELEASE, KNEW

8     WHAT HE WAS GIVING UP, BUT HE DIDN'T WANT TO COMPETE

9     WITH A YOUNG MAN HE BROUGHT INTO THE AGENCY, GLENN

10    BANDY.  SO HE TOOK ENHANCED SEVERANCE.  THAT WAS HIS

11    CHOICE.  HE HAD A RIGHT TO MAKE THAT CHOICE.

12          BUT WHAT HE DIDN'T HAVE THE RIGHT TO

13    DO, NONE OF THEM, WAS MAKE THE CHOICE, SIGN THE

14    AGREEMENT, SIGN THE FORM, AND PUT THEIR FINGERS

15    CROSSED BEHIND THEIR BACK AND THEN SUE ALMOST TWO

16    YEARS LATER.  THAT'S WHAT THEY DIDN'T HAVE THE RIGHT

17    TO DO.  OH, THEY CAN SUE, BUT WE ARE ENTITLED ON

18    ALLSTATE'S BEHALF TO SAY, WE HAVE AN AFFIRMATIVE

19    DEFENSE.  BECAUSE YOU PROMISED THAT YOU WERE GIVING

20    UP ALL CLAIMS.

21          MS. REINERIO.  SHE IS SUCH A POIGNANT

22    CASE.  SHE DESCRIBED TO YOU IN SOME DETAIL, YOU

23    COULD SEE IT WAS HEARTFELT, UNEMPLOYED BY THE SOO

24    LINE FOR TWO YEARS, COULDN'T GET A JOB.  SHE COMES

25    AND GETS A JOB WITH ALLSTATE.  INHERITS OR TAKES

1    OVER ANOTHER AGENT'S BOOK OF BUSINESS.  REFUTING THE

2    FACT THAT IT'S THEIR TREES, THEIR FRUIT, THEIR

3    ORCHARD.  SHE SIGNS THE RELEASE BECAUSE SHE

4    INITIALLY FOCUSES UPON SELLING THE BOOK OF BUSINESS,

5    CAN'T SELL IT, SO SHE TAKES THE ENHANCED SEVERANCE,

6    BECAUSE IT GAVE HER AN OPPORTUNITY TO RETOOL.  THAT

7    WAS A MEANINGFUL ECONOMIC CHOICE.  TO SAY THAT IT

8    WASN'T A CHOICE SAYS, IF I OFFER YOU ZERO OR I OFFER

9    YOU 100 MILLION, YOU SAY, OF COURSE I'M GOING TO

10   TAKE THE 100 MILLION.  IN THIS CASE, ALLSTATE DIDN'T

11   OFFER THAT.  ALLSTATE SAID, SEVEN WEEKS OF SEVERANCE

12   ON TOP OF NEARLY SEVEN MONTHS.

13            IT IS NOT AN OUTRAGE TO SUGGEST THAT

14   THE SEVEN MONTHS SHOULD BE CONSIDERED.  ALLSTATE

15   COULD HAVE TERMINATED, WE'LL GET TO THIS,

16   IMMEDIATELY.  AND TRUE, THEY WORKED DURING THAT

17   SEVEN MONTHS, BUT THEY DIDN'T HAVE TO DO IT THAT

18   WAY.  THE FACT OF THE MATTER IS, THESE PLAINTIFFS

19   HAD TEN MONTHS OFFERED TO THEM OF INCOME AND

20   BENEFITS, BASICALLY.  SEVEN MONTHS OF INCOME AND

21   BENEFITS AND 13 WEEKS OF SEVERANCE IF THEY DON'T

22   WANT TO SIGN A RELEASE, BUT THEY MADE THE ECONOMIC

23   CHOICE THAT THE RELEASE WASN'T THAT VALUABLE TO THEM

24   AS COMPARED TO THE ECONOMIC OPPORTUNITIES THAT WERE

25   BEING OFFERED BY ALLSTATE.

1             OPTION NUMBER 4 WAS DEVASTATING.  NO

2     ONE WOULD TAKE IT.  WELL, THE EVIDENCE HERE IS QUITE

3     TO THE CONTRARY.  THE EVIDENCE HERE IS THAT THE

4     OFFERS WERE VERY GOOD OFFERS.  RATIONAL ECONOMIC

5     ACTORS WOULD TAKE THE OFFERS.  BUT IF THEY REALLY

6     FELT THAT IT WAS A DEVASTATING CHOICE, THEY COULD

7     HAVE SUED, THEY COULD HAVE REFUSED, THEY COULD HAVE

8     TRIED TO GET ANOTHER JOB, THEY COULD HAVE DONE LIKE

9     MR. PERKINS, WENT AND FORMED HIS OWN AGENCY.

10             THE ONE POINT I WANT TO MAKE CLEAR.

11     WHAT WE SAY IN THIS CLOSING, BOTH MR. QUINN AND I,

12     IS NOT THE EVIDENCE.  WE REFER YOU TO THE EVIDENCE.

13     WE ARE MAKING ARGUMENTS BASED UPON THE EVIDENCE.  IN

14     THIS CASE, IF YOU DIDN'T HEAR IT IN THE EVIDENCE,

15     THEN YOU DON'T -- IT'S NOT BEFORE YOU.

16             SO, FOR EXAMPLE, WE DIDN'T PUT IN, FOR

17     THE MOST PART, NEITHER SIDE, BECAUSE THERE'S AN

18     ORDER OF COURT, WE DIDN'T PUT IN ECONOMIC

19     PERFORMANCE, WHAT HAPPENED TO THESE PEOPLE AFTER A

20     CERTAIN POINT IN TIME, UNLESS IT CAME WITH THE BOOK

21     OF BUSINESS SALE, SO WE DIDN'T PUT IN ANY EVIDENCE

22     ABOUT MR. PERKINS OR MS. CREWS KELLY.  YOU SHOULD

23     ASSUME NOTHING ABOUT THAT ONE WAY OR THE OTHER.

24     THAT'S NOT FOR YOU.  THAT'S THE RULES OF THE GAME

25     AND WE ARE GOING TO COMPLY WITH THOSE RULES.

```
 1            BUT BASED UPON THE EVIDENCE, YOU MAKE
 2   YOUR DECISION.  BUT THE POINT ON MR. PERKINS WAS, HE
 3   MADE A CHOICE.  HE WANTED OUT, HE GOT OUT.  HE TOOK
 4   THE MONEY, HE GOT WHAT HE NEEDED TO LIVE ON, HE
 5   OPENED UP A NEW INSURANCE AGENCY.  AND THAT WAS
 6   BROUGHT OUT ON DIRECT.
 7            SO WHEN WE TALK ABOUT THE MONKEY, ABOUT
 8   WHAT WE DON'T TALK ABOUT, LET'S TALK ABOUT
 9   MR. PERKINS.  MR. PERKINS, WAS IT KNOWING?  WAS IT
10   KNOWING?  I ASKED HIM, DID HE KNOW WHAT HE WAS
11   GIVING UP.  HE SAID YES.  UNEQUIVOCAL.  PLAINTIFFS
12   DON'T WANT TO TALK ABOUT THAT TESTIMONY FROM
13   MR. PERKINS.  I UNDERSTAND WHY.
14            WAS IT VOLUNTARY?  I ASKED HIM, DID YOU
15   MAKE THE THREE ELECTIONS, YOU CHOSE WHICH ONE OF THE
16   THREE THAT YOU WANTED.  I DID.
17            OKAY.  WHY?  BECAUSE HE WANTED TO
18   LIQUIDATE THE BOOK OF BUSINESS VALUE AND START A NEW
19   INSURANCE AGENCY.
20            SO WE THEN GO TO MR. PETERSON.  WAS IT
21   KNOWING?  HE KNEW WHAT HE WAS GIVING UP.  HE
22   EVALUATED EACH OF THE OPTIONS.  MR. PETERSON,
23   FRIENDS, SIGNED THE RELEASE THREE MONTHS EARLY.  HE
24   GAVE UP THREE MONTHS' BENEFITS TO TAKE THIS CHOICE.
25   THAT WAS HIS CHOICE.  IT WAS MEANINGFUL.  AND HE
```

1    LIKED BEING AN ALLSTATE INSURANCE AGENT, HE SAID.

2    WAS IT VOLUNTARY?  YES.  THAT'S WHAT HE TESTIFIED

3    TO.  ON CROSS EXAMINATION, HE AGREED WITH ME THAT AT

4    THE TIME HE INTENDED TO BE BOUND BY THE RELEASE AND

5    BY THE ELECTION HE CHOSE.  THAT'S WHAT HE TOLD YOU

6    ON THE WITNESS STAND UNDER OATH, CROSS EXAMINATION.

7              WHAT'S THE FACT THAT'S IN DISPUTE?  HE

8    DIDN'T HAVE TO DO THIS.  HE CHOSE TO DO THIS BECAUSE

9    IT WAS A MEANINGFUL CHOICE.

10             MS. CREWS KELLY.  SHE WAS A CHARMING

11   WOMAN, COULD SELL, CLEARLY COULD SELL.  BUT THE

12   TRUTH CAME OUT IN TWO WAYS THAT WERE UNEXPECTED.

13   ONE, SHE SAID SHE WAS FORCED TO BECOME A NOA AGENT.

14   SHE HAD NO CHOICE.  RATHER CONTRARY TO THE STORY

15   THAT THE PLAINTIFFS HAVE BEEN TELLING YOU.  AND TWO,

16   SHE SIGNED THE SALE OF THE BOOK OF THE BUSINESS

17   EARLY, BEFORE SHE SIGNED THE RELEASE.  AND SHE WENT

18   INTO BUSINESS WITH A SON, REGGIE MASON, HER CLOSE

19   WEALTHY FRIEND'S SON, AND SOLD IT TO HIM FOR LESS

20   MONEY THAN IT WAS WORTH.

21             THAT WAS A RATIONAL ECONOMIC CHOICE AND

22   I RESPECT HER RIGHT TO DO THAT.  I RESPECT HER RIGHT

23   TO SUPPORT THE SON OF A WEALTHY FAMILY FRIEND.  BUT

24   THAT WAS A CHOICE SHE MADE.  I DON'T KNOW WHAT SHE

25   COULD HAVE SOLD IT FOR.  SHE SUGGESTED THREE TIMES

1       AS MUCH, WHO KNOWS.  THE POINT BEING, IT WAS

2       VALUABLE AND SHE MADE THAT CHOICE.  ALLSTATE DID NOT

3       FORCE HER TO MAKE THAT CHOICE.

4                   THEN YOU GET TO MR. KEARNEY.  WAS IT

5       KNOWING?  HE SAID IT WAS KNOWING.  HE UNDERSTOOD

6       THAT HE WAS GIVING UP HIS RIGHTS.  WAS IT VOLUNTARY?

7       YES.  HE WANTED TO CONTINUE AS AN AGENT.

8                   YOU SEE THE FALSE SYLLOGISM HERE IS AND

9       THE PREDICATE UPON PLAINTIFFS' CASE IS THAT THEY HAD

10      TO DO THIS BECAUSE THEY HAD TO KEEP THEIR JOB.  NO.

11      THEIR JOB WAS GONE.  IT WAS TERMINATED.  NO ONE HAD

12      THIS JOB.  ALL WERE TERMINATED.  AND ALLSTATE MADE

13      AN OFFER TO THEM.  DIDN'T FORCE THEM TO TAKE ANY

14      OFFER.  AND IF THE RELEASE WAS SO VALUABLE, IF THEY

15      HAD FOUND A LAWYER WHO'D TELL THEM IT WAS THAT

16      VALUABLE, THEN THEY WOULD HAVE GONE THAT WAY.  BUT

17      THE RELEASE WASN'T VALUABLE TO THESE PEOPLE.  THEY

18      WOULD RATHER HAVE THE ECONOMICS.  THEY WOULD RATHER

19      HAVE THE $3.1 MILLION OF ECONOMICS THAN NOT SIGNING

20      THE PIECE OF PAPER.  THAT WAS THEIR CHOICE.  IT WAS

21      A MEANINGFUL CHOICE AND THEY TOOK IT.

22                  MR. CREASE, HE IS STILL HERE.  HE IS IN

23      THE COURTROOM.  SO WAS IT KNOWING?  HE UNDERSTOOD

24      THE RELEASE BEFORE HE SIGNED IT.  HE KNEW WHAT HE

25      WAS GIVING UP.  HE AGREED TO IT.  WAS IT VOLUNTARY?

1    HE MADE A CONSCIOUS CHOICE.  HE MADE AN INTENTIONAL

2    CHOICE.  THAT WAS HIS RIGHT TO DO.  IT WAS NOT HIS

3    RIGHT TO PUT HIS NAME ON A PIECE OF PAPER AND MAKE A

4    PROMISE TO ALLSTATE, TAKE ALLSTATE'S MONEY AND

5    ECONOMIC CONSIDERATION AND THEN PUT HIS FINGERS

6    BEHIND HIS BACK AND SAY, IT DOESN'T COUNT.  I WANT

7    YOU, THE JURY, TO RENEGE FOR ME.

8              FINALLY, MR. LAWSON.  MR. LAWSON OR MR.

9    HARPER.  MR. LAWSON.  NOW YOU JUST SAW A SLIDE THAT

10   SAID MR. LAWSON HAD NO CHOICE BECAUSE HE WAS GOING

11   TO LOSE ALL THAT VALUE.  REMEMBER THE SLIDE

12   MR. QUINN JUST PUT UP, IT SHOWED YOU THE NEGATIVE

13   RETURN, 900,000?  WELL, THAT SKIPS THE HUNDREDS OF

14   THOUSANDS THAT MR. LAWSON WAS PAID EACH YEAR ON THIS

15   SO-CALLED INVESTMENT WHICH WERE SIMPLY EXPENSES.

16   WHEN YOU GO TO THE JURY ROOM, DEFENDANT'S TRIAL

17   EXHIBIT 348 TO DEFENDANT'S TRIAL EXHIBIT 357, 348 TO

18   357 ARE THE INCOMES THAT THESE MEN AND WOMEN WERE

19   PAID BY ALLSTATE THAT SHOWED THAT THEY WERE MAKING A

20   LOT OF MONEY ON THESE SO-CALLED INVESTMENTS BEFORE

21   THEY WERE GIVEN THE BOOK OF BUSINESS TO SELL.  THE

22   SLIDE WAS, SHALL WE SAY, ONLY PART OF THE STORY.  IT

23   WAS NOT EVEN REMOTELY CLOSE TO THE ENTIRE STORY.

24   MR. LAWSON, HE DID NOT LIKE ALLSTATE AFTER THEY MADE

25   THIS DECISION.  HE WANTED OUT.  HE WANTED TO

```
 1    LIQUIDATE AND GET HIS RETIREMENT.  THAT WAS HIS

 2    CHOICE AND THAT IS WHAT HE DID.

 3                          FINALLY, MR. HARPER,

 4    WAS IT VOLUNTARY?  WAS IT KNOWING?  HE UNDERSTOOD.

 5    HE WAS DEALING WITH LAWYERS.  HE FOUNDED RUNNING

 6    CLOCK.  HE UNDERSTOOD PRECISELY WHAT THE ISSUES

 7    WERE, AND IN THE END HE MADE A MEANINGFUL ECONOMIC

 8    CHOICE.

 9                   REMEMBER, ONE OF THE INSTRUCTIONS IS

10    GOING TO TELL YOU, FINANCIAL PRESSURE ALONE, THAT IS

11    NOT ALONE SUFFICIENT.  THE FACT THAT THEY FELT

12    FINANCIAL PRESSURE, THAT IS SOMETHING YOU CAN TAKE

13    INTO ACCOUNT.  BUT THAT IS NOT END GAME, BECAUSE

14    WHY?  THE INSTRUCTION IS GOING TO TELL YOU THERE IS

15    ALWAYS SOME FINANCIAL PRESSURE IN AN EMPLOYMENT

16    TERMINATION SITUATION.  THAT FINANCIAL PRESSURE

17    STANDING ALONE IS INSUFFICIENT TO PROVE

18    INVOLUNTARINESS.

19                   NOW I SUBMIT TO YOU THAT THEY DID NOT

20    PROVE FINANCIAL PRESSURE.  THEY ALL SAID IT OR

21    SEVERAL OF THEM SAID IT.  THEY DID NOT COME IN HERE

22    AND SAY HERE IS MY SAVINGS ACCOUNT, HERE IS WHAT I

23    HAD, HERE'S WHAT I DIDN'T HAVE.  TAKE MR. LAWSON,

24    THE MAN WITH THE PROPERTY, THE MAN WHO MADE A COUPLE

25    HUNDRED THOUSAND DOLLARS A YEAR.  CLEARLY, THOUGH,
```

1    WHEN SOMEONE IS ABOUT TO BECOME UNEMPLOYED, THERE IS

2    FINANCIAL PRESSURE.  IN OUR SOCIETY WHAT IS UNUSUAL

3    IS THAT WHEN SOMEONE IS ABOUT TO BECOME UNEMPLOYED,

4    SOMEONE WHO IS THEIR FORMER EMPLOYER OR ABOUT TO

5    BECOME THEIR FORMER EMPLOYER, SAYS, HERE, I WILL

6    MAKE THE FOLLOWING OFFERS, WHICH EVEN THE PLAINTIFFS

7    SUBMIT WERE GOOD OFFERS.

8              SO HOW MUCH MONEY DID ALLSTATE PAY

9    THEM?  NO DENIAL HERE.  D 201, 202, PLEASE.  IN THE

10   GRAND TOTAL, $3,574,509.  THE PLAINTIFFS WOULD NOT

11   HAVE THAT MONEY BUT FOR THE OFFER ALLSTATE MADE,

12   WHICH THEY ACCEPTED.

13             WHEN ONE TALKS ABOUT MEANING AND

14   MEANINGFUL CHOICES, THEY COULD HAVE CHOSEN TO KEEP

15   THEIR RIGHT TO SUE, THEY COULD HAVE CHOSEN TO TAKE

16   THE SEVEN MONTHS, CONTINUED ON THE PAYROLL.  THEY

17   COULD HAVE CHOSEN THE EXTRA 13 WEEKS.  THAT IS

18   VALUABLE.  BUT RATIONAL ECONOMIC ACTORS, GENERALLY

19   SPEAKING, WOULD CHOOSE TO TAKE MORE MONEY, WHICH

20   THEY DID.  IN EXCHANGE FOR WHAT?  A PROMISE.

21             ONE OF THE THINGS THAT WAS TOLD TO YOU

22   IN CLOSING WAS THAT PROMISES AND INTEGRITY MEAN

23   SOMETHING.  YEAH, YOU, AN AMERICAN JURY, ARE BEING

24   ASKED TO SET ASIDE EIGHT CONTRACTS THAT ACCORDING TO

25   THE PLAINTIFFS THEY NEVER INTENDED TO AGREE TO BUT

```
1    FOR WHICH THEY HAVE BEEN PAID THAT AMOUNT OF MONEY.
2    THAT IS WHAT YOU ARE BEING ASKED TO DO.  MAKE NO
3    MISTAKE ABOUT IT.  THEY DID THIS KNOWINGLY.  THEY
4    DID IT VOLUNTARILY.  THEY DID IT BECAUSE THEY HAD
5    CHOICES.
6              A COUPLE OF OTHER TOPICS.  THEY SAY
7    THAT THEY HAD FIVE THINGS TAKEN AWAY FROM THEM AND
8    ALLSTATE WAS OFFERING TO GIVE TWO BACK.  NO, THEY
9    HAD NOTHING TAKEN AWAY.  THE CONTRACTS WERE
10   TERMINABLE AT WILL.  NOW, ON THE TERMINABLE AT WILL,
11   I THOUGHT I HAD PROBABLY BORED YOU TO DEATH GOING
12   THROUGH EACH OF THESE MANUALS AND TERMS BEFORE.  I
13   WILL INDULGE YOU A LITTLE BIT LONGER.  I APOLOGIZE
14   FOR THIS, BUT THE CONTRACTS DO MATTER.
15             IT IS TRUE THAT IN OPENING I GAVE
16   ELLIPSES.  I GAVE YOU PART OF IT.  IT'S ALSO TRUE
17   THAT DURING CROSS EXAMINATION I WENT THROUGH EVERY
18   PARAGRAPH OF THE CONTRACT.
19             PUT UP PX 41, PLEASE, JASON.  THIS IS
20   THE R830 WITH MR. CREASE.  LET'S TURN TO PARAGRAPH
21   ROMAN IX -- NUMBER XI.  SORRY.  I INVERTED MY ROMAN
22   NUMERALS.  FIRST SENTENCE IS THE TERMINABLE AT WILL
23   SENTENCE.  SECOND SENTENCE, FIRST TWO SENTENCES.
24   THIRD SENTENCE IS ABOUT UNSATISFACTORY PERFORMANCE.
25   IN OTHER WORDS, IF ALLSTATE IS GOING TO FIRE YOU FOR
```

1    CAUSE, FOR CAUSE, NOT BECAUSE WE ARE GOING TO FIRE

2    YOU FOR DOWNSIZING OR REDUCTIONS IN FORCE OR A

3    REORGANIZATION, BUT FOR CAUSE, THEN WE WILL GIVE YOU

4    A REASONABLE OPPORTUNITY TO BRING YOUR PERFORMANCE

5    UP TO SPEC.  THEN IT SAYS:  IN NO EVENT.  REMEMBER

6    WHEN MR. CREASE AND I WENT THROUGH THIS AND THEN

7    MR. KAUFMAN CAME IN TO SHOW THAT ALL THE PEOPLE HAD

8    SIGNED WITHIN ALLSTATE.  IN NO EVENT SHALL AN

9    EMPLOYEE BE RELEASED FOR ANY REASON WITHOUT THE

10   FOLLOWING REVIEW AND APPROVAL PROCEDURE HAVING BEEN

11   ADHERED TO FOR EMPLOYEES LESS THAN FOUR YEARS.  DOES

12   NOT APPLY HERE.  ALL THESE WERE MORE THAN FOUR

13   YEARS.  FOR EMPLOYEES MORE THAN FOUR YEARS OR LESS

14   THAN TEN, DOES NOT APPLY HERE.  BUT THE NEXT PAGE

15   SAYS:  FOR EMPLOYEES WITH MORE THAN TEN YEARS

16   SERVICE, REVIEW AND APPROVAL IN THE HOME OFFICE BY

17   THE PERSONNEL VICE-PRESIDENT ARE REQUIRED IN

18   ADDITION TO THE ABOVE.  AND THAT IS WHAT HAPPENED.

19   MR. KAUFMAN CAME IN.  YOU SAW THE DOCUMENT WITH ALL

20   THEIR SIGNATURES.  THEY FOLLOWED THE TERMINATION

21   PROVISIONS.

22            NOW LET'S GO TO THE R1500, PLEASE,

23   JASON.  AND ON THIS CONTRACT, AGAIN, IT SAYS,

24   TERMINABLE AT WILL.  BUT IT HAS ANOTHER PROVISION.

25   JASON, CAN YOU FURTHER ON, FURTHER, FURTHER,

1   FURTHER.  TERMINATION:  SUBJECT ONLY TO SUCH

2   LIMITATIONS AND RESTRICTIONS THAT MAY BE IMPOSED BY

3   LAW AND IN ACCORDANCE WITH COMPANY'S RULES AND

4   PROCEDURES.  NOW WHERE ARE THE COMPANY'S RULES AND

5   PROCEDURES, FOLKS?  IN THE HUMAN RESOURCE MANUALS,

6   COMPANY MANUALS, THINGS THAT THEY CLAIM NOT TO HAVE

7   SEEN.  WHAT DO THOSE COMPANY RESOURCE MANUALS SAY?

8   TERMINABLE AT WILL.  NOW THEY ARE NOT THE CONTRACT,

9   BUT THEY ARE THE PROCEDURES.

10              SO FOR JOB IN JEOPARDY THAT'S FOR

11   UNSATISFACTORY PERFORMANCE.  YOU HEARD THE

12   PLAINTIFFS ADMIT THAT.  FOR AGENT REVIEW BOARD YOU

13   HAVE TO ASK FOR IT, BUT WHO GETS TO MAKE THE

14   DECISION FINALLY?  PRESIDENT OF ALLSTATE.  WHO MADE

15   THE DECISION TO ROLL OUT THE PREPARING FOR THE

16   FUTURE PROGRAM?  THE PRESIDENT OF ALLSTATE AND THE

17   CEO OF ALLSTATE.  THE DECISION WAS ALREADY MADE.

18              BUT THIS IS SOMEWHAT OF A SIDESHOW.

19   THE REALITY IS ALLSTATE TERMINATED THEIR AGREEMENT.

20   IF THEY THOUGHT THAT WAS WRONG THEY HAD THE OPTION

21   TO SUE HIM.  MR. HARPER WOULD NOT EVEN PUT $2,000

22   DOWN TO FILE A LAWSUIT.  WE HEARD THAT MS. CREWS

23   KELLY WENT TO THE EEOC AND THEY DIDN'T DO ANYTHING.

24   MR. HARPER ADMITTED A LAWYER WANTED TO TRY TO GO GET

25   AN INJUNCTION.  THEY MADE A RATIONAL ECONOMIC

1       CHOICE.  ALLSTATE BELIEVES THAT THE CONTRACTS ARE

2       TERMINABLE AT WILL.  WHEN MASSACHUSETTS THE AGENTS

3       WERE TERMINATED, ALLSTATE PULLED OUT FOR COMPETITIVE

4       REASONS.  THEY PULLED OUT FOR COMPETITIVE REASONS.

5               THEY MADE A DECISION TO TERMINATE.

6       THEY IMPLEMENTED THE DECISION.  THE PLAINTIFFS MAY

7       OR MAY NOT LIKE IT, BUT ALLSTATE DID NOT HAVE TO

8       OFFER THEM WHAT IT DID.  ALLSTATE INSTEAD OFFERED

9       THEM FOUR OPTIONS WHICH WERE MEANINGFUL ECONOMIC

10      CHOICES WHICH THE PLAINTIFFS CHOSE TO DO.

11              THE NOA PROGRAM.  SO ON THE ONE HAND

12      PLAINTIFFS ARGUE, AND YOU HEARD IT, CONTRACT IS NOT

13      IN WRITING IT DOESN'T COUNT.  IT'S GOT TO BE IN THE

14      CONTRACT.  IT'S GOT TO BE IN CONTRACT.  I JUST

15      SHOWED YOU WHAT THE CONTRACT WAS WHICH WE BELIEVE

16      SUPPORTS ALLSTATE.

17              ON THE OTHER HAND, WHEN IT COMES TO THE

18      NOA BROCHURE WHICH MR. KAUFMAN SAID HE WAS NOT

19      FAMILIAR WITH, PEOPLE USING THAT BROCHURE AND

20      MR. KAUFMAN, WHO IS AN R830 AGENT TO BEGIN WITH, WAS

21      NOT APPROACHED -- OR THAT BROCHURE WAS NOT USED WITH

22      HIM, SUDDENLY IT BECOMES THE CONTRACT.  IT BECOMES

23      PART OF THE CONTRACT IN EFFECT.

24              NOT A SINGLE AGENT COULD TESTIFY THAT

25      DESPITE WHAT THEY TOLD YOU, LIFETIME JOBS OR JOB

1    SECURITY, THINGS OF THAT TYPE, THEY COULD NOT POINT

2    TO IT IN ANY OF THE CONTRACTUAL LANGUAGE.  THAT IS

3    THE POINT.  THAT IS THE PROBLEM.

4         BUT AT BOTTOM, ALLSTATE MADE THE

5    DECISION TO TERMINATE, JUST AS IT DID IN THE STATE

6    OF MASSACHUSETTS.  ALLSTATE THEN MADE THE DECISION

7    TO OFFER THEM THINGS TO WHICH THEY WERE NOT

8    ENTITLED.  AND THEY THEN MADE THEIR CHOICES.

9         THEY SAY THAT THEY OWNED THE FRUIT OF

10   THE TREE, THEY HAD A PROPRIETARY INTEREST.  WE KNOW

11   THAT IS NOT TRUE.  MS. REINERIO INHERITED A BOOK OF

12   BUSINESS FROM SOMEONE ELSE.  EACH ONE UNDER CROSS

13   EXAMINATION SAID I ONLY HAVE A RIGHT TO THOSE

14   COMMISSIONS AS LONG AS I'M AN EMPLOYEE.  BUT THEY

15   WERE NO LONGER AN EMPLOYEE ONCE THEY WERE

16   TERMINATED.

17        THEY COMPLAINED ABOUT THEY WERE TOLD TO

18   SPEND MONEY AND THEY WILL MAKE MONEY.  WELL, THE

19   EVIDENCE SHOWS YOU THEY MADE VERY HEALTHY INCOMES,

20   VERY GOOD INCOMES WHEN THEY SPENT THE MONEY.  OF

21   COURSE THE MONEY THEY SPENT AND THE INVESTMENTS THAT

22   THEY COMPLAIN ABOUT, THOSE WERE NOT INVESTMENTS.

23   THOSE WERE EXPENSES.  AND THE FEDERAL GOVERNMENT IN

24   EFFECT PAID THEM FOR PART OF THOSE EXPENSES, AND

25   THEY OVERLOOKED THE FACT THAT ALLSTATE CAUTIONED

1    THEM, CAUTIONED THEM ABOUT MAKING SURE TO MANAGE

2    THEIR EXPENSES, AND ALSO THAT THAT WAS THEIR CHOICE.

3    ALLSTATE NEVER FORCED THEM TO MAKE EXPENSES OR MAKE

4    PAYMENTS.  ALLSTATE MADE IT.

5                    AND THEY DID IT, WHY?  WHY DID THEY DO

6    IT?  THESE ARE GOOD BUSINESS PEOPLE.  THERE IS NO

7    QUESTION ABOUT THAT.  THEY ARE GOOD BUSINESS PEOPLE.

8    AND THEY KNEW AND THEY TESTIFIED THAT IF THEY SPENT

9    THAT MONEY, THEY MADE MORE MONEY.  THAT WAS THEIR

10   CHOICE.  THAT WAS THEIR CHOICE.

11                   TWO SEVERANCE PLANS.  THE ONE SEVERANCE

12   PLAN EVERYONE IS IN AGREEMENT DOES NOT APPLY,

13   INVOLUNTARY TERMINATION.  THE OTHER SEVERANCE PLAN

14   HAS AN EXPRESS EXEMPTION.  I SHOWED IT TO YOU

15   BEFORE, AN EXPRESS EXEMPTION.  WHAT IS THE

16   EXEMPTION?  THE EXEMPTION IS IF IT IS A GROUP

17   REORGANIZATION, WHICH THIS WAS, IT DOES NOT APPLY.

18   THAT IS WHAT MS. ROSBOROUGH TESTIFIED TO.

19                   JASON, SLIDE 386 -- NO.  SLIDE 381.  I

20   THINK THIS IS ACTUALLY SUPPOSED TO BE -- I GUESS

21   IT'S G.  ALLSTATE SEVERANCE PLAN DOES NOT APPLY AND

22   THAT IS WHY ALLSTATE ADOPTED -- TWO DAYS BEFORE THE

23   GROUP REORGANIZATION PROGRAM IT ADOPTED THE SPECIAL

24   SEVERANCE PLAN CALLED THE AGENT TRANSITION PLAN.

25   OTHERWISE THERE WOULD HAVE BEEN NO SEVERANCE PLAN

1    THAT APPLIED.  THEY WOULD HAVE HAD NOTHING.  THEY

2    WOULD HAVE HAD 52 WEEKS OR UP TO 52 WEEKS.

3              THE IRS DISPUTE.  ALLSTATE DID NOT

4    START THIS DISPUTE.  MR. LIDDY TESTIFIED AT SOME

5    LENGTH.  JASON, DEFENDANT'S EXHIBIT 351.  D 351,

6    DEMONSTRATIVE.  WHAT WAS IT?  CERTAIN EMPLOYEE

7    AGENTS PUT ALL OF THEIR EMPLOYEE AGENTS AT RISK

8    BECAUSE THEY WANTED TO ACT BOTH AS EMPLOYEES AND AS

9    INDEPENDENT CONTRACTORS FOR PURPOSES OF TAX

10   PURPOSES.  THE IRS WANTED TO IMMEDIATELY RECLASSIFY

11   ALL EMPLOYEE AGENTS LIKE THIS (INDICATING).  YOU ARE

12   NO LONGER AN EMPLOYEE.  YOU ARE ALL INDEPENDENT

13   CONTRACTORS.

14             YOU HEARD MR. LIDDY EXPLAIN WHAT THE

15   QUAGMIRE LITIGATION WOULD BE, BACK TAXES FOR THE

16   AGENTS, AGENT LAWSUITS AGAINST THE IRS, LAWSUITS BY

17   THE AGENTS AND THE IRS AGAINST ALLSTATE, BECAUSE IT

18   WOULD HAVE PUT AT RISK ALLSTATE'S PENSION AND

19   BENEFIT PLANS.  THE QUAGMIRE OF LITIGATION WAS NOT

20   THAT THE AGENTS WERE SUING ALLSTATE BECAUSE ALLSTATE

21   DID NOT HAVE THE RIGHT TO TERMINATE THE AGREEMENTS.

22   THE QUAGMIRE OF LITIGATION WAS BECAUSE EVERYTHING

23   THAT THEY HAD BEEN DOING FOR YEARS ON THEIR TAXES,

24   EVERYTHING THAT ALLSTATE HAD BEEN DOING FOR YEARS ON

25   ITS TAXES, AND EVERYTHING THAT ALLSTATE HAD DONE BY

1    SETTING UP A PENSION PLAN WAS PUT AT RISK BY THESE

2    AGENTS WHO FOR PAYMENT PURPOSES WANTED TO BE

3    EMPLOYEES, BUT FOR FEDERAL INCOME TAX PURPOSES

4    WANTED TO PRETEND THAT THEY WERE NOT EMPLOYEES BUT

5    WERE INDEPENDENT CONTRACTORS.  THERE IS A WORD FOR

6    THAT, BUT I THINK YOU KNOW WHAT THAT IS.

7              MR. LIDDY TESTIFIED AT SOME LENGTH

8    ABOUT THIS, AND HE TESTIFIED THAT THE IRS -- THIS IS

9    DEFENDANT'S DEMONSTRATIVE 353 -- WE ARE GOING TO

10   TREAT ALL OF YOUR INDEPENDENT AGENTS AS IF -- ALL

11   YOUR EMPLOYEE AGENTS AS IF THEY WERE INDEPENDENT

12   CONTRACTORS.  WE WERE NOT GOING TO GET ANY CHANCE TO

13   MIGRATE THEM.  THEY WANT TO COME IN AND RECLASSIFY

14   THE AGENTS FROM EMPLOYEES TO INDEPENDENT AGENTS JUST

15   LIKE THAT, AND WHAT HE DID WAS (INDICATING) THE FLIP

16   OF A SWITCH.  I THINK MR. LIDDY HAD THE COMMENT THAT

17   THE IRS WAS A FORMIDABLE ADVERSARY.  I THINK

18   PROBABLY MOST PEOPLE KNOW AND UNDERSTAND THAT THAT

19   IS THE CASE.

20             SO THEN WE GET TO THE COVENANT NOT TO

21   COMPETE.  WELL, THERE IS A REASON PLAINTIFFS DON'T

22   WANT TO TALK ABOUT SPECIFIC FACTS.  MS. CREWS KELLY,

23   SHE SOLD HER BOOK OF BUSINESS THAT SHE GOT FROM

24   ALLSTATE AND WENT INTO BUSINESS WITH A NEW MASON

25   CREWS AGENCY SELLING ALLSTATE INSURANCE.  MR.

1    PERKINS TESTIFIED THAT HE LIQUIDATED THE ECONOMIC

2    INTEREST IN THE BOOK OF BUSINESS THAT HE HAD.  HE

3    OPENED UP A NEW INDEPENDENT INSURANCE AGENCY

4    PROMPTLY.

5              BUT ALSO FROM DAY ONE WHEN THEY SIGNED

6    THE ORIGINAL CONTRACTS, THEY KNEW THAT THERE WERE

7    RESTRICTIONS ON COMPETING.  ALLSTATE PAID FOR THE

8    PHONES, ALLSTATE PAID FOR OFFICE EXPENSE ALLOWANCE

9    OF A SIZABLE AMOUNT.  THEY COMPLAINED THAT THEY LOST

10   THAT.  THAT WAS ALLSTATE'S PAYMENTS.  THAT IS WHAT

11   ALLSTATE PAID.  THAT IS WHAT THEY AGREED TO.

12             MR. QUINN SAID THAT THERE IS SOMETHING

13   ELSE ABOUT DIGNITY.  MR. HARPER IS AN OLD FASHIONED

14   GUY.  SELF RESPECT AS A MAN.  OKAY.  I RESPECT THOSE

15   VALUES.  I THINK THOSE ARE VALUES THAT EVERY PERSON,

16   MAN OR WOMAN, SHOULD HAVE.  THAT IS WHY IF YOU SIGN

17   YOUR NAME TO AN AGREEMENT, YOU SHOULD MEAN WHAT YOU

18   SAY AND SAY WHAT YOU MEAN AND HONOR THE AGREEMENT

19   THAT YOU ENTERED INTO.  THAT IS WHAT INTEGRITY IS.

20   THAT IS WHAT DIGNITY IS.  THAT'S WHAT SELF RESPECT

21   IS.  IT'S NOT SIGNING AN AGREEMENT, TAKING THE

22   COUNTERPARTY'S MONEY AND THEN 14 MONTHS LATER SUING

23   THEM AS IF THE AGREEMENT DID NOT EXIST.

24             HOW DARE WE TAKE CREDIT FOR GIVING THEM

25   ANOTHER SEVEN MONTHS?  WELL, ALLSTATE COULD HAVE

1 BEEN LIKE MOST OTHER EMPLOYES, PARTICULARLY THOSE IN

2 THE GREAT RECESSION.  JOBS ARE LOST TODAY AND YOU'RE

3 GONE TOMORROW.  WE GAVE THEM SEVEN MONTHS TO

4 CONSIDER, TO CHOOSE.  WE GAVE THEM FOUR OPTIONS, ALL

5 OF WHICH HAD VALUE.

6    IT'S AN OUTRAGE TO SUGGEST THAT MS.

7 CREWS KELLY SUGGESTS -- AGREED VOLUNTARILY BECAUSE

8 SHE TRIED TO SEND IN A FORM THAT SAID "UNDER DURESS"

9 OR SOMETHING.  I'M NOT SURE WHAT THE FORM SAID.

10 ALLSTATE WOULD NOT ACCEPT ANYONE UNLESS IT WAS

11 VOLUNTARY.  THEY TOLD THEM THAT.  ALLSTATE SAID WE

12 WON'T ACCEPT IT.  IT'S EITHER VOLUNTARY OR NOT

13 VOLUNTARY.  IF IT'S VOLUNTARY, SIGN THE FORM.  IF

14 IT'S NOT VOLUNTARY, DON'T SIGN THE FORM.  AND THEY

15 GOT A SIGNED FORM.  ALLSTATE GAVE HER A CHANCE TO

16 RECONSIDER.  BUT CREWS KELLY, REMEMBER THIS, SHE

17 SOLD AND ENTERED INTO A CONTRACT TO SELL AN ECONOMIC

18 INTEREST IN THE BOOK OF BUSINESS BEFORE SHE SIGNED

19 THE RELEASE.  SHE COULD NOT HAVE DONE THAT, LADIES

20 AND GENTLEMEN, UNLESS SHE WAS GOING TO AGREE TO THE

21 RELEASE.

22    ON COMMISSION RATES, IT'S ONLY RELEVANT

23 IF YOU ARE ONE OF THE PLAINTIFFS WHO CHOSE OPTION 1.

24 SO THE SUGGESTION THAT THERE WAS A COMMISSION RATE

25 MISREPRESENTATION IS IRRELEVANT TO FIVE PLAINTIFFS.

1    IT'S ONLY RELEVANT IF YOU ACTUALLY CHOSE TO CONTINUE

2    ON AS AN ALLSTATE INSURANCE AGENT IN A NEW FORM OF

3    BUSINESS.  BUT THAT IS NOT WHAT -- THAT IS NOT

4    ACTUALLY SOMETHING THAT IS OF MATERIAL SIGNIFICANCE

5    HERE, AND THE REASON IS THE FOLLOWING.

6            LET'S PUT UP SLIDE DEMONSTRATIVE 374,

7    PLEASE.  I INSERTED HERE WHAT ALLSTATE SAID TO EACH

8    OF THE AGENTS OR WHAT IT SAID EN MASSE.  ON

9    OCTOBER 5TH, 1999, THE COHEN LETTER, MR. COHEN SAYS:

10   I DO NOT EXPECT ANY SIGNIFICANT CHANGES TO

11   COMMISSION RATES TO BE MADE IN THE NEAR FUTURE.

12           NOW MR. QUINN WANTS TO TALK ABOUT THIS

13   DOCUMENT, WHICH IS FROM AUGUST OF '99.  I'M GOING TO

14   COME BACK TO THIS DOCUMENT IN A MINUTE.  BUT IN

15   OCTOBER OF '99, COHEN SAYS NO NEAR TERM CHANGES.

16   THEN WE GO TO APRIL 20TH, 2000, THIS IS MR. KAUFMAN.

17   DID YOU HEAR MR. KAUFMAN SAY I TOOK OVER IN THE FALL

18   OF '99.  WE WERE NOT GOING TO CHANGE COMMISSION

19   RATES.  ARE WE PLANNING TO CHANGE THE P&C COMMISSION

20   STRUCTURE TO 8 AND 8 BY JULY 1ST.  THE ANSWER IS NO.

21   THE COMPANY IS NOT MOVING TO AN 8 AND 8 COMMISSION

22   STRUCTURE BY JULY.  THERE IS NO WORK GOING ON RIGHT

23   NOW FOCUSED ON CHANGING THE EXCLUSIVE AGENCY P&C

24   COMMISSIONS.  AND NOT A SINGLE DOCUMENT HAS BEEN

25   SHOWN TO YOU THAT SAYS IN APRIL OF 2000 ANY WORK WAS

1      GOING ON ABOUT CHANGING COMMISSIONS.

2           NOW WE GO TO THE NEXT ONE, OCTOBER 31,

3      2001, COHEN LETTER TO AGENTS:  TODAY I WOULD LIKE TO

4      ADDRESS WORK THAT WILL SOON BEGIN THAT COULD AFFECT

5      AGENCIES.  WE WILL CONDUCT A BROAD REVIEW OF AGENCY

6      REVENUE AND SUPPORT PROGRAMS.  PART OF THIS REVIEW

7      WILL BE LOOKING FOR WAYS TO BETTER ALIGN AGENCY

8      COMPENSATION WITH CRITICAL BUSINESS OBJECTIVES.

9      THEY GAVE THEM FAIR WARNING.

10          NOW, THE AGENTS TESTIFIED, HARPER IS

11     THE FIRST ONE, NO CHANGES IN COMMISSION IN '99, NO

12     CHANGES IN COMMISSION IN 2000, NO CHANGES IN

13     COMMISSION IN 2001, NO CHANGES IN COMMISSION IN

14     2002.  BUT IN OCTOBER OF 2001 THEY TELL AGENTS WE

15     ARE THINKING ABOUT IT.

16          NOW GO TO THE SEPTEMBER 25TH, 2002

17     KAUFMAN SLIDE.  WE'VE MADE THE DECISION TO REDUCE

18     NEW PROPERTY COMMISSIONS FROM 20 PERCENT TO

19     10 PERCENT, EFFECTIVE JANUARY 1, 2003.

20          NOW, LET'S TALK ABOUT THIS DOCUMENT, PX

21     345.  BEFORE WE DO THAT, I WANT TO TALK ABOUT PX

22     354, ANOTHER DOCUMENT.  REMEMBER, MR. QUINN DURING

23     CROSS EXAMINATION, MR. KAUFMAN TRIED TO SHOW THAT

24     THE COMMISSION RATES HAD BEEN DECIDED TO BE CHANGED

25     IN THE SUMMER OF '99 AND THEY JUST DID NOT TELL

1    ANYONE ABOUT IT?  HE SHOWED THEM A DOCUMENT, PX 354.

2              REMEMBER MR. JORDAN HEINZ, ONE OF MY

3    COLLEAGUES, MR. KAUFMAN ON REDIRECT POINTED OUT THE

4    FOLLOWING.  TURN TO PAGE 376, PLEASE, D 376.  AND IT

5    TURNED OUT THAT THE SO-CALLED ORIGINAL PLAN, THAT IS

6    NOT WHAT HAPPENED.  THE SUGGESTION THAT THERE HAD

7    BEEN A PLAN TO INCREASE COMMISSION RATES IN 2002,

8    THAT THAT WAS A SECRET PLAN, IT NEVER HAPPENED.

9    THAT WAS A DOCUMENT FROM THE SUMMER OF 1999 BEFORE

10   MR. KAUFMAN TOOK OVER.  IT NEVER HAPPENED.  AND WE

11   KNOW THAT BECAUSE MR. HARPER TOLD US IT DID NOT

12   HAPPEN.

13             NOW AT THE TIME THEY CHANGED RATES, IN

14   THE YEAR 2003, THEY JUST DIDN'T CHANGE -- NOW GO TO

15   D 377.  THEY DID NOT CHANGE RATES TO REDUCE THEM.  A

16   LOT OF RATES DID NOT CHANGE.  STANDARD AUTO,

17   NONSTANDARD AUTO, PROPERTY, COMMERCIAL AUTO,

18   COMMERCIAL CASUALTY.  THOSE ARE THE ONES THAT DID

19   NOT CHANGE.  THEY DID CHANGE P&C BUT THEY ALSO DID

20   SOMETHING ELSE.  THEY ADDED A BONUS.

21             THEY ADDED BONUSES.  NEXT ONE.  THEY

22   ADDED THESE BONUSES WHICH PLAINTIFFS DON'T WANT TO

23   TALK ABOUT.  BUT YOU KNOW WHAT IS PARTICULARLY

24   ILLUMINATING?  CAN YOU THINK OF ANY PLAINTIFF THAT

25   CAME BEFORE YOU AND SAID I FELT MISLED.  THEY DIDN'T

1    TELL ME.  THIS WAS MATERIAL TO ME.  THIS MATTERED TO

2    ME.  I RELIED UPON IT.  NOT A SINGLE ONE DID.  THIS

3    IS WHAT IS CALLED A LAWYERS' ARGUMENT.  THIS IS

4    WHAT'S CALLED LOOK AT THE MONKEY.  I DIDN'T PLAY

5    THAT GAME, BUT I UNDERSTAND THAT GAME ALL TOO WELL.

6              FINALLY, LET'S JUST END ON THIS TOPIC

7    BY LOOKING AT THE LAST DOCUMENT, P 345.  THIS IS THE

8    ONE THAT MR. QUINN WAS SHOWING YOU THAT SAID THERE

9    WAS A SECRET PLAN FOR FOUR YEARS, WHICH WE KNOW

10   ACTUALLY DID NOT TAKE PLACE.  BUT LET'S JUST SHOW

11   YOU SOME PAGES THAT WE DIDN'T LOOK AT.  LET'S LOOK

12   AT PAGE 763.  NOW MR. KAUFMAN WAS NOT IN CHARGE AT

13   THE TIME THIS DOCUMENT WAS CREATED AND WE KNOW WHAT

14   HE TESTIFIED TO.  HE SAID NOTHING WAS IN PLACE.  BUT

15   THIS IMPLEMENTATION TIMELINE DOES NOT HAVE 2002 ON

16   IT, 2003 ON IT.  IT'S AN EARLIER POINT IN TIME FOR A

17   DOCUMENT THAT DID NOT END UP BEING WHAT TOOK PLACE.

18             AND THEN WE GET TO THE "APPROVED,"

19   WHICH MR. KAUFMAN DID NOT KNOW ANYTHING ABOUT.

20   LET'S LOOK AT PAGE 766.  THIS WHAT IS MR. QUINN

21   SHOWED YOU.  THIS IS A DOCUMENT FROM THE SUMMER OF

22   '99.  HE SAYS:  48 OR MORE CONTRACT MONTHS.  THAT

23   MEANS WE ARE GOING TO DO IT IN 48 OR MORE CONTRACT

24   MONTHS.  REMEMBER THAT ARGUMENT?  THAT'S WHAT IT

25   SAID.  NOW A WITNESS DID NOT TESTIFY TO THAT.

1          AND JEEZ, I WONDER WHY WE DIDN'T SEE

2     THE NEXT PAGE.  LET'S TAKE A LOOK AT WHAT THE NEXT

3     PAGE SAYS:  NEW AGENCIES UNDER 48 CONTRACT MONTHS.

4     YOU CAN READ THE DOCUMENT YOURSELVES, BUT I THINK

5     THE ONLY FAIR READING, AND I SUBMIT TO YOU YOU WILL

6     HAVE TO DECIDE THIS, THAT THE FAIR READING IS THEY

7     ARE TALKING ABOUT THE TENURE, PEOPLE WHO WERE UNDER

8     48 MONTHS AS INDEPENDENT AGENTS AND PEOPLE WHO WERE

9     OVER 48 MONTHS AS INDEPENDENT AGENTS, NOT THAT THERE

10    WAS SOME SECRET COMMISSION PLAN WHICH WE KNOW FROM

11    THE TESTIMONY DID NOT TAKE PLACE ALONG THE LINES

12    THAT WAS ARGUED.

13          BUT MORE IMPORTANTLY, SET THAT ASIDE.

14    WHAT WITNESS CAME IN AND SAID TO YOU, I WAS MISLED.

15    I WAS NOT KNOWING WHEN I SIGNED THE CONTRACT BECAUSE

16    I BELIEVED THAT COMMISSION RATES WOULD NOT CHANGE,

17    EVEN THOUGH THE CONTRACT ITSELF SAYS COMMISSION

18    RATES CAN BE CHANGED ON NOTICE.  EVEN THOUGH MR. --

19    ONE OF THEM, MR. HARPER OR MR. LAWSON, TESTIFIED

20    THAT ALLSTATE COULD REDUCE THE COMMISSION RATES,

21    REMEMBER 50 PERCENT, 75 PERCENT, 90 PERCENT.  THAT

22    IS, TO SAY THE LEAST, A BIT OF A RED HERRING.

23          THE REHIRING MORATORIUM, NOT APPLIED.

24    IT WAS NOT MATERIAL TO THEM.  AND IT'S CONTRARY TO

25    EVERYTHING ELSE THEY HAVE ARGUED.  THEY DID NOT WANT

1    TO WORK FOR ALLSTATE.  ACCORDING TO THEM ON THE

2    WITNESS STAND THEY WANTED TO RECOVER THEIR

3    INVESTMENT.  ACCORDING TO THEM THEY WANTED TO

4    CONTINUE DOING WHAT THEY WERE DOING OR AT LEAST SOME

5    OF THEM.  IT'S CONTRADICTORY ARGUMENT.

6              FINALLY ON SOLICITATION.  COVENANT NOT

7    TO COMPETE.  WE'VE ALREADY TALKED ABOUT MS. CREWS

8    KELLY.  WE'VE ALREADY TALKED ABOUT MR. PERKINS.  BUT

9    THE REALITY IS EACH ONE OF THESE PLAINTIFFS HAD AN

10   AGREEMENT, HAD AN AGREEMENT FROM DAY ONE ABOUT THE

11   COVENANT NOT TO COMPETE IN THE EVENT THAT THEY WERE

12   TERMINATED.

13             IN TERMS OF WHAT IT MEANT OR DIDN'T

14   MEAN ON THIS TOPIC, I WANT TO END WITH DEMONSTRATIVE

15   D 347, WHICH IS MR. KEARNEY'S TESTIMONY ON JUNE 9TH,

16   PAGE 51.

17             THE COURT:  OKAY.  I'M JUST TRYING TO

18   FIND OUT WHERE YOU GOT THIS THAT YOU COULDN'T EVER

19   TALK TO ANY OF YOUR CUSTOMERS.  IT'S A LEGITIMATE

20   QUESTION.

21             THE WITNESS:  I THINK IT WAS PROBABLY

22   WITH RESPECT TO TALKING WITH OTHER AGENTS AND

23   MISUNDERSTANDING.  YOU KNOW, I MEAN, AGAIN, BEING AN

24   INSURANCE AGENT, I'M NOT A LAWYER.  BUT THE

25   UNDERSTANDING WAS THAT IF YOU DIDN'T SIGN, YOU TOOK

1    ONE OF THOSE OTHER OPTIONS OR DIDN'T SIGN AT ALL,

2    YOU WEREN'T GOING TO BE ABLE TO SOLICIT YOUR

3    CUSTOMERS AGAIN.  YOU WEREN'T GOING TO BE ABLE TO

4    TALK TO THEM.  THAT MAY BE AN ERROR, THEN.

5              THE COURT:  THAT'S NOT IN WRITING

6    ANYPLACE.  I'M TRYING TO FIND OUT WHERE YOU GOT THAT

7    IDEA BECAUSE I'M NOT SAYING YOU DIDN'T GET THE IDEA,

8    BUT I'M TRYING TO FIND OUT HOW.

9              THE WITNESS:  IT SOUNDS LIKE I'M BEING

10   SHOWN THAT THAT WAS WRONG AGAIN ON MY PART.

11             THAT, LADIES AND GENTLEMEN, IS AN

12   ADMISSION THAT THE CHARGE BEING MADE WAS A CHARGE

13   MADE UP IN THE WITNESS'S MIND AND THAT HE WAS SIMPLY

14   WRONG OR IN HIS OWN WORDS, WRONG AGAIN ON MY PART.

15             SO WE ARE NOW AT THE END, YOU AND I.

16   IT'S BEEN A PRIVILEGE, IT'S AN AWFULLY HOT DAY IN

17   HERE.  AND THANK HEAVENS WE DON'T HAVE, LIKE

18   CLARENCE DARROW, TO STAY IN HERE FOR EIGHT HOURS

19   BECAUSE I THINK WE WOULD HAVE ALL DIED.  I HAVE

20   PROBABLY OVERSTAYED MY WELCOME, BUT THERE'S A FEW

21   MORE THINGS I HAVE TO SAY.

22             THE EVIDENCE SHOWED THAT EACH PLAINTIFF

23   KNOWINGLY ENTERED INTO THE RELEASE.  THEY KNEW

24   PRECISELY WHAT THEY WERE GIVING UP.  THEY KNEW

25   PRECISELY WHAT IT WAS WORTH OR NOT WORTH.  THEY MADE

1    CONSCIOUS ECONOMIC DECISIONS AND THEY DECIDED WHAT

2    WAS IN THE BEST INTEREST OF THEMSELVES WITH THE

3    ADVICE OF COUNSEL OR WITH THE ADVICE OF THEIR

4    ACCOUNTANTS OR WITH THE ADVICE OF BOTH, OR IN

5    MR. KEARNEY'S CASE THE ADVICE OF HIS FATHER, THE

6    VERY BRIGHT CPA.

7               THE EVIDENCE LIKEWISE ESTABLISHES THAT

8    EACH PLAINTIFF CHOSE VOLUNTARILY.  THEY EACH HAD A

9    MEANINGFUL CHOICE THAT ALLSTATE OFFERED THEM.

10              MR. PERKINS CHOSE OPTION 2, CASHED OUT,

11   TOOK -- GOT THE AMOUNT OF MONEY HE WANTED AND

12   NEEDED, OPENED UP A NEW AGENCY.

13              MR. LAWSON DID NOT WANT TO WORK FOR

14   ALLSTATE ANYMORE, CASHED OUT, GOT A MILLION 2, GOT

15   HIS RETURN ON HIS INVESTMENT.

16              MR. PETERSON, HE TESTIFIED HE NEVER

17   THOUGHT ABOUT SUING ALLSTATE, NEVER THOUGHT ABOUT

18   THE RELEASE.  IT WAS NOT MATERIAL TO HIM.  HE LIKED

19   SELLING ALLSTATE INSURANCE.  HE SELECTED OPTION 1,

20   SOLD OUT LATER.

21              MR. BOYD, HE TOOK ENHANCED SEVERANCE.

22   HE DID NOT WANT TO COMPETE AGAINST HIS FRIEND, HIS

23   YOUNG FRIEND GLENN BANDY.

24              MS. REINERIO, SHE FOCUSED INITIALLY AND

25   SOLELY ON SELLING THE BOOK OF BUSINESS.  IT FELL

1    THROUGH, NOT CLEAR WHY BUT IT FELL THROUGH, NOT

2    FAULTING HER.  BUT IN THE END SHE SAID SHE TOOK THE

3    OPPORTUNITY TO RETOOL.  SHE GOT 50-SOME THOUSAND

4    DOLLARS A YEAR, UNLIKE THE SOO LINE WHEN SHE WAS

5    LAID OFF WITH NOTHING.

6                MR. MURRAY, HE WANTED TO BE AN ALLSTATE

7    AGENT.  HE SELECTED OPTION 1.  HE SOLD OUT

8    EVENTUALLY EVEN AFTER HE WAS TERMINATED FOR REASONS

9    SEVERAL YEARS LATER HE CAN'T RECALL.

10               MR. KEARNEY SAID HE HAD NO CHOICE.  HE

11   HAD LOTS OF CHOICES.  HE JUST DID NOT CHOOSE TO

12   PURSUE THEM.

13               THEY CONFUSED CHOICE AND CONSEQUENCE.

14   THERE WERE MEANINGFUL CHOICES.  THEY DIDN'T LIKE THE

15   CONSEQUENCE.  REMEMBER WHAT MS. CREWS KELLY SAID,

16   ANY TIME THAT SHE DID NOT LIKE SOMETHING ENTIRELY,

17   IT'S FORCED UPON HER.  THIS IS A VERY ODD SITUATION

18   WHERE SHE IS SUING BECAUSE SHE SAYS SHE HAD A RIGHT

19   TO BE A NOA AGENT, AND YET SHE TESTIFIES SHE WAS

20   FORCED TO BECOME A NOA AGENT.  SHE HAD NO CHOICE.

21               MR. HARPER, HE DIDN'T LIKE THE RELEASE.

22   HE SAID HE WOULD EVEN GO THE POINT OF FIGHTING A

23   DUEL TO PREVENT HAVING TO SIGN IT, BUT HE WOULD NOT

24   PUT UP $2,000 TO DO ANYTHING TO TRY TO STOP IT.

25               MS. CREWS KELLY SOLD OUT TO HER BEST

1    FRIEND'S SON, REGGIE, GOT A BOATLOAD OF MONEY AND

2    WENT TO WORK WITH THE NEW MASON CREWS AGENCY.

3              THESE WERE MEANINGFUL CHOICES.  THEY

4    WERE ABOUT TO BECOME UNEMPLOYED.  ALLSTATE OFFERED

5    THEM MEANINGFUL CHOICES, THEY COULD CHOOSE AND THEY

6    HAD OPTIONS WHICH MOST AMERICANS, AS YOU WELL KNOW,

7    DO NOT HAVE AND HAVE NEVER HAD.  THEY HAD REAL

8    CHOICES.  THEY WERE MEANINGFUL ONES.  AND THE

9    UNDENIABLE FACT IS THAT THE CHOICES WERE SO GOOD AND

10   SO LUCRATIVE THAT THEY MADE A RATIONAL ECONOMIC

11   DECISION, PARTICULARLY WHEN THEY DIDN'T VALUE THE

12   RELEASE, AS MR. CREASE AND MR. PETERSON SAID.

13             WE TALKED ABOUT COMMON SENSE.  WE

14   TALKED A LOT ABOUT COMMON SENSE.  THE GREAT OLIVER

15   WENDELL HOLMES, THE LIFE OF THE LAW IS NOT LOGIC.

16   IT IS EXPERIENCE.  USE YOUR EXPERIENCE, USE YOUR

17   JUDGMENT, USE YOUR CREDIBILITY.  ASSESS THE

18   WITNESSES.  DO YOU BELIEVE WHAT THEY SAID IN

19   DEPOSITION?  DO YOU BELIEVE WHAT THEY SAID AT THE

20   TIME?

21             WE TALKED ABOUT TERMINABLE AT WILL.

22   MR. HARPER HAD THAT 1998 NOTE IN HIS OWN HANDWRITING

23   THAT HE SIGNED AN ACKNOWLEDGMENT UNDERSTANDING FOR

24   FEAR OF TERMINATION, A DOCUMENT THAT CANNOT EXIST,

25   THAT SHOULD NOT EXIST IF WHAT HE WAS TELLING YOU HE

1    REALLY BELIEVED WAS THE TRUTH.

2              IN THE END THE CHOICES THAT THEY MADE,

3    RESULTED IN EARNING OVER 3.5 -- OR BEING PAID OVER

4    $3.5 MILLION BY ALLSTATE, DEFENDANT'S EXHIBIT 201 --

5    202, PLEASE.

6              WAS IT A MEANINGFUL CHOICE?  $3,574,509

7    OF MEANING VERSUS A CHOICE TO SUE.  AND ALL THAT

8    ALLSTATE ASKED IN RETURN WAS A PIECE OF PAPER WITH

9    THEIR NAME SIGNED ON IT AND A PROMISE THAT THEY

10   MADE.

11             DIGNITY, SELF RESPECT, INTEGRITY.  THEY

12   ARE ASKING YOU, MAKE NO MISTAKE, TO SET THAT ASIDE

13   AND SAY WHEN A MAN OR WOMAN SIGNS HIS NAME ON A

14   PIECE OF PAPER IN EXCHANGE FOR A BOATLOAD OF MONEY,

15   IT COUNTS FOR NOTHING.

16             IN OPENING, PLAINTIFFS' COUNSEL

17   REFERRED TO THE RELEASE AS GAME OVER.  THIS IS NOT A

18   GAME.  THIS IS A REAL DISPUTE.  ALLSTATE PURCHASED A

19   RELEASE THAT MEANT SOMETHING, AND IT'S NOW UP TO YOU

20   TO SAY WHETHER IT MEANT WHAT ALLSTATE PAID

21   $3,574,509 FOR, IN EITHER CASH OR ECONOMIC VALUE.

22             WE HAVE GONE THROUGH THE EVIDENCE WITH

23   RESPECT TO EACH AND EVERY PLAINTIFF.  WE DID A DEEP

24   DIVE.  PLAINTIFFS DID NOT DO THAT.  THEY PREFER YOU

25   TO LUMP THEM ALL TOGETHER.  BUT YOUR OBLIGATION

1    UNDER THE INSTRUCTIONS IS TO EVALUATE EACH PLAINTIFF

2    AND THE EVIDENCE FOR EACH PLAINTIFF INDIVIDUALLY.  I

3    SUBMIT TO YOU THAT ALLSTATE HAS PROVEN BY A

4    PREPONDERANCE OF THE EVIDENCE THAT EACH PLAINTIFF

5    SIGNED THE RELEASE KNOWINGLY AND THEY SIGNED IT

6    VOLUNTARILY BECAUSE THEY KNEW WHAT IT WAS WORTH AND

7    THEY KNEW WHAT THE OPTIONS WERE WORTH, AND THEY MADE

8    A MEANINGFUL CHOICE.

9             ALLSTATE DID RIGHT BY THESE PEOPLE.  IT

10   JUST DID NOT TERMINATE AND HANG THEM OUT THERE.  IT

11   DID RIGHT BY THESE PEOPLE AND IT PAID THEM FOR DOING

12   RIGHT BY THESE PEOPLE.  THE QUESTION IS --

13            THE COURT:  MR. QUINN IS STANDING YOU

14   UP HERE.

15            MR. GODFREY:  I'M ALMOST DONE, YOUR

16   HONOR.

17            THE COURT:  I THOUGHT YOU WERE RIGHT AT

18   THE END.

19            MR. GODFREY:  I AM.

20            MR. QUINN:  THAT IS WHAT I WANTED TO

21   FIND OUT.

22            THE COURT:  YOU ARE BEING SOMEWHAT

23   REPETITIVE.

24            MR. GODFREY:  LONG DAY.  I WAS GOING TO

25   BE DONE IN 15 SECONDS.

1          WE SUBMIT THAT ALLSTATE DID RIGHT BY

2     THESE PEOPLE IN MAKING THESE OFFERS.  ALLSTATE DID

3     RIGHT BY FULFILLING ITS PART OF THE BARGAIN.  NOW WE

4     ASK YOU TO DO RIGHT BY ALLSTATE AND MAKE THESE

5     PEOPLE FULFILL THEIR PART OF THE BARGAIN.

6          THANK YOU VERY MUCH AND WE ASK FOR A

7     VERDICT ON BEHALF OF ALLSTATE ON EACH AND EVERY

8     PLAINTIFF.  THANK YOU.

9          THE COURT:  MEMBERS OF THE JURY, LIKE

10    MOST TRIAL JUDGES, I USED TO BE A TRIAL LAWYER FOR

11    MANY YEARS.  AND I STILL PREFER TO TALK TO YOU AT

12    THIS LEVEL THAN UP THERE.  AND BESIDES, IT'S

13    ACTUALLY JUST A LITTLE BIT COOLER HERE.  THEY SAY

14    THAT HOT AIR RISES, AND THERE HAS BEEN A LOT OF HOT

15    AIR IN THE COURT TODAY, NOT SUGGESTING FROM THE

16    LAWYERS.  BECAUSE I WANT TO TELL YOU QUITE FRANKLY,

17    THOSE LAWYERS' CLOSINGS AND PRESENTATIONS HERE WERE

18    AMONG THE FINEST, FINEST I HAVE EVER SEEN IN

19    35 YEARS OF BEING A JUDGE.  SO THEY DID A GREAT JOB

20    WITH RESPECT TO THEIR -- IN REPRESENTING THEIR

21    CLIENTS.

22          YOU, OF COURSE, SHOULD CONSIDER WHAT

23    THEY HAVE SAID.  IT'S PART OF YOUR DUTY TO CONSIDER

24    WHAT THEY SAID, BUT ULTIMATELY YOU HAVE TO DECIDE

25    YOURSELF, WHICH IS OBVIOUS, RIGHT?  YOU EIGHT GUYS

1     HAVE TO DECIDE WITH RESPECT TO EACH PLAINTIFF

2     WHETHER HE KNOWINGLY AND WILLINGLY SIGNED THE

3     RELEASE.

4               NOW, HERE IS THE GOOD NEWS.  THIS IS MY

5     CLOSING.  YOU'VE SPENT A LOT OF TIME BEING TALKED TO

6     TODAY.  AND I GUESS THE BAD NEWS IS YOU ARE GOING TO

7     BE TALKED TO JUST A LITTLE BIT MORE.  THE GOOD NEWS

8     IS IT WILL BE VERY BRIEF.  SO THIS IS THE CLOSING AS

9     BRIEF AND YOU'RE GOING TO GET A COPY OF MY

10    INSTRUCTIONS ON THE LAW, SO YOU DON'T HAVE TO TAKE

11    ANY NOTES.

12              FIRST OF ALL, YOUR DUTY AS JURORS, TO

13    BE FAIR AND IMPARTIAL AND TO MAKE THE DECISION IN

14    THAT RESPECT WITHOUT ANY BIAS, WITHOUT ANY

15    PREJUDICE, WITHOUT ANY SYMPATHY.  IF YOU DO THAT,

16    YOU HAVE DONE YOUR DUTY AS JURORS.

17              HOW DO YOU DO THAT?  WELL, YOU DO IT

18    BASED ON THE EVIDENCE THAT HAS BEEN PRESENTED THESE

19    PAST TEN DAYS.  AND THAT EVIDENCE, AS YOU KNOW,

20    CONSISTS OF THE TESTIMONY OF THE MANY WITNESSES

21    YOU'VE HEARD.  I DON'T THINK THERE WERE MORE THAN

22    MAYBE 19 INCLUDING THOSE THAT TESTIFIED AT

23    DEPOSITION.  NEVERTHELESS, THERE WERE A LOT OF

24    WITNESSES.  YOU HAVE TO CONSIDER ALL THEIR

25    TESTIMONY.  THERE ARE LOTS OF EXHIBITS THAT ARE

1    GOING TO GO OUT WITH YOU AND YOU HAVE TO CONSIDER

2    THEM.  YOU ALSO HAVE THE STATEMENT OF FACTS WHICH

3    WERE SUBMITTED TO YOU AT THE BEGINNING OF THE TRIAL.

4    AND YOU ALSO HAVE THE READING IN OF SOME ADMISSIONS.

5    NOW THAT IS THE EVIDENCE UPON WHICH YOU ARE GOING TO

6    HAVE TO DECIDE WHAT THE FACTS ARE AND APPLY THOSE

7    FACTS TO THE VERY SIMPLE LAW THAT I'M GOING TO GIVE

8    TO YOU.

9              OF COURSE, AS IN EVERY CASE, THE

10   EVIDENCE WAS EITHER CIRCUMSTANTIAL OR DIRECT.  THAT

11   IS NOT UNUSUAL.  DIRECT EVIDENCE IS WHAT SOMEBODY

12   TELLS YOU HE ACTUALLY OBSERVED, SAW, OBSERVED FROM

13   THEIR SENSES IN SOME WAY.  CIRCUMSTANTIAL EVIDENCE

14   IS PROOF OF A FACT BY MAKING AN INFERENCE -- AN

15   INFERENCE FROM ANOTHER FACT THAT YOU BELIEVE.  FOR

16   EXAMPLE, SUPPOSE THE QUESTION POSED TO YOU TODAY WAS

17   DID THE G.S.A. TURN ON THE AIR CONDITIONING?  NOW WE

18   HAVE NO IDEA IF THEY DID OR NOT.  BUT I THINK WE CAN

19   TELL, AT LEAST I CAN, FROM THE TEMPERATURE IN THIS

20   COURTROOM THAT THEY DIDN'T GET IT ON EARLY ENOUGH.

21   BUT THAT IS CIRCUMSTANTIAL EVIDENCE.  AND

22   CIRCUMSTANTIAL EVIDENCE IS EVERY BIT AS GOOD AS

23   DIRECT EVIDENCE, PROVIDED THAT THE INFERENCE YOU

24   DRAW FROM FACTS IS A REASONABLE ONE.

25              THE NEXT MATTER I WANT TO DISCUSS WITH

1    YOU IS THE BURDEN OF PROOF.  THE DEFENDANT IN THIS

2    CASE HAS THE BURDEN OF PROVING HIS CASE BY A

3    PREPONDERANCE OF THE EVIDENCE.  NOW RAISE YOUR HAND,

4    HOW MANY HAVE HEARD OF BEYOND A REASONABLE DOUBT?

5    HAVE ANY OF YOU HEARD THAT?  I THOUGHT SO.  THAT

6    TERM SOMEHOW IS JUST PART OF OUR CULTURE, I THINK,

7    BEYOND A REASONABLE DOUBT.  THAT HAS NO APPLICATION

8    TO THIS CASE.  THAT IS PROOF IN A CRIMINAL CASE,

9    BEYOND A REASONABLE DOUBT.

10           HERE IT'S BY A PREPONDERANCE OF THE

11   EVIDENCE, AND THAT MEANS PUT ALL THE EVIDENCE IN

12   FAVOR OF THE DEFENDANT ON ONE SIDE, ALL THE EVIDENCE

13   IN FAVOR OF THE PLAINTIFF ON THE OTHER.  NOW IF THAT

14   EVIDENCE IS EQUAL OR IF IT TIPS IN FAVOR OF THE

15   PLAINTIFF, THEN THE DEFENDANT HAS NOT MET ITS BURDEN

16   OF PROOF.  ON THE OTHER HAND, IF THAT EVIDENCE TILTS

17   EVER SO SLIGHTLY IN FAVOR OF THE DEFENDANT, HE IS

18   SAID THEN TO HAVE MET HIS BURDEN OF PROOF BY A

19   PREPONDERANCE OF THE EVIDENCE.  PREPONDERANCE OF THE

20   EVIDENCE ARE THE FACTS MORE LIKELY TRUE THAN NOT,

21   THAT SUPPORT THE DEFENDANT'S POSITION.  AND IT'S

22   IMPORTANT FOR YOU TO UNDERSTAND THAT THERE IS A

23   BURDEN OF PROOF HERE, AND IN THIS CASE IT'S ON THE

24   DEFENDANT.

25           NOW, I'M GOING TO GET RIGHT INTO THE

1    INSTRUCTIONS OF LAW.  ARE YOU HAVING TROUBLE HEARING

2    ME?  I USED TO HAVE A LOUD VOICE.  MAYBE I'M NOT

3    QUITE AS LOUD.

4              FIRST THING BEFORE GETTING RIGHT INTO

5    THE LAW ITSELF IS, WE HAVE ASKED YOU NOT TO

6    SPECULATE ON THE DELAY THAT HAS TAKEN PLACE FROM THE

7    DATE OF THE EVENTS AT ISSUE HERE.  YOU HAVE HEARD

8    THIS CASE STEMS FROM THE TERMINATION OF PLAINTIFFS'

9    EMPLOYMENT AGREEMENTS WITH ALLSTATE IN 2000.  THE

10   PLAINTIFFS BROUGHT THIS LAWSUIT AGAINST ALLSTATE IN

11   AUGUST OF 2001.  AND I ASK YOU AGAIN NOT TO

12   SPECULATE AS TO THE REASONS FOR THE DELAY.  THE

13   DELAY WAS NOT THE FAULT OF ANY OF THE PLAINTIFFS OR

14   ANY OF THE DEFENDANTS.  SO FORGET ABOUT THAT.  IT IS

15   NOW 15 YEARS LATER AND WE ARE FINALLY AT TRIAL.

16              AND, AS YOU HAVE BEEN TOLD BEFORE, THIS

17   IS A UNIQUE CASE, PROBABLY MORE UNIQUE THAN ANY CASE

18   I HAVE EVER HAD, BECAUSE WE ARE TRYING TEN CASES AT

19   ONE TIME.  FRANKLY, I HAVE NEVER DONE THAT MANY

20   BEFORE.  BUT CONSOLIDATION WE ALL THOUGHT WAS

21   APPROPRIATE, RATHER THAN HAVE INDIVIDUAL TRIALS.

22   AND WE ARE ASKING YOU HOWEVER TO MAKE AN INDIVIDUAL

23   DECISION.  AND YOU WILL GET A VERDICT SLIP, SEPARATE

24   VERDICT SLIP WITH RESPECT TO EACH PLAINTIFF IN THIS

25   CASE.

1              NOW, AS YOU HAVE HEARD FOREVER AND

2    EVER, REPEAT AGAIN, IN ORDER FOR A RELEASE TO BE

3    VALID, IT MUST HAVE BEEN SIGNED KNOWINGLY AND

4    VOLUNTARILY.  AND THE DEFENDANT MUST PROVE BY A

5    PREPONDERANCE OF THE EVIDENCE THAT THE RELEASE WAS

6    SIGNED KNOWINGLY AND VOLUNTARILY.

7              I WILL DEFINE KNOWINGLY FOR YOU.  A

8    PERSON ACTS KNOWINGLY IF HE OR SHE ACTS WITH FULL

9    AWARENESS OF THE FACTS UPON WHICH HE OR SHE IS

10   BASING HIS OR HER DECISION.  IN THIS CASE PLAINTIFFS

11   ALLEGE THAT CERTAIN FACTS WERE MISREPRESENTED AND

12   OTHERS WERE OMITTED BY ALLSTATE IN CONNECTION WITH

13   THE RELEASE AND THE PROGRAM.

14             IF YOU FIND MISREPRESENTATIONS WERE

15   MADE OR FACTS WERE OMITTED BY ALLSTATE, THEN YOU

16   MUST DETERMINE WHETHER THEY WERE MATERIAL.  A FACT

17   OR OMISSION IS MATERIAL IF A REASONABLE PERSON IN

18   PLAINTIFFS' POSITION WOULD HAVE CONSIDERED IT TO BE

19   IMPORTANT IN MAKING HIS OR HER DECISION.  MINOR OR

20   INCONSEQUENTIAL MISREPRESENTATIONS OR OMISSIONS MAY

21   OCCUR AND DO NOT AFFECT THE VALIDITY OF THE RELEASE.

22   ONLY IF SUCH MISREPRESENTATION OF MATERIAL FACTS

23   WERE MADE BY DEFENDANT AND THE PARTICULAR PLAINTIFF

24   WAS AWARE OF THE MISREPRESENTATIONS OR MATERIAL

25   OMISSION OCCURRED, THEN PLAINTIFF'S DECISION ABOUT

1    WHETHER TO SIGN THE RELEASE WAS NOT KNOWING.

2                DEFENDANT DENIES IT MADE OR OMITTED ANY

3    MATERIAL FACT.  DEFENDANT OF COURSE BEARS THE BURDEN

4    OF PROVING THAT THE RELEASE WAS KNOWINGLY SIGNED.

5                NEXT, THE DEFINITION OF VOLUNTARILY.

6    AN ACT IS DONE VOLUNTARILY WHEN IT IS SOMETHING YOU

7    WANT TO DO AND NOT BECAUSE YOU ARE FORCED TO DO.  IT

8    IS AN ACT DONE BY CHOICE.  IN THIS CASE, PLAINTIFFS

9    ARGUES THAT THEY HAD NO CHOICE AND WERE THUS FORCED

10   TO SIGN THE RELEASE, THAT IS TO SAY THAT WHILE THERE

11   WAS AN APPEARANCE OF A CHOICE, NO MEANINGFUL CHOICE

12   IN FACT EXISTED.  DEFENDANT ARGUES THAT PLAINTIFFS

13   WERE NOT FORCED INTO SIGNING THE RELEASE BUT RATHER

14   MADE A VOLUNTARY CHOICE TO SIGN THE RELEASE IN ORDER

15   TO GET WHAT WAS BEING OFFERED TO THEM IN OPTIONS 1,

16   2 OR 3.  DEFENDANT BEARS THE BURDEN OF PROVING THAT

17   THE RELEASE WAS VOLUNTARILY SIGNED.

18               NOW HOW DO YOU DETERMINE THESE ISSUES?

19   WELL, IT'S NOT EASY.  BUT WE ASK YOU TO CONSIDER IN

20   MAKING YOUR DECISION AS TO WHETHER IT WAS VOLUNTARY

21   AND KNOWING THE TOTALITY OF THE CIRCUMSTANCES.  WHAT

22   ARE WE TALKING ABOUT?  I WILL GIVE YOU A FEW

23   EXAMPLES OF SOME THINGS THAT ARE INCLUDED IN THE

24   TOTALITY OF CIRCUMSTANCES.

25               FIRST OF ALL, IN DETERMINING WHETHER AN

1     INDIVIDUAL VOLUNTARILY SIGNED A RELEASE, HERE ARE

2     SOME OF THE FACTORS:

3                    FIRST, THE CLARITY AND SPECIFICITY OF

4     THE RELEASE LANGUAGE.

5                    SECOND, THE PLAINTIFF'S EDUCATION AND

6     BUSINESS EXPERIENCE.

7                    THIRD, THE AMOUNT OF TIME THE PLAINTIFF

8     HAD FOR DELIBERATION ABOUT THE RELEASE BEFORE

9     SIGNING IT.

10                   FOURTH, WHETHER THE PLAINTIFF KNEW OR

11    SHOULD HAVE KNOWN HIS RIGHTS UPON EXECUTION OF THE

12    RELEASE.

13                   FIFTH, WHETHER PLAINTIFF WAS ENCOURAGED

14    TO SEEK OR IN FACT RECEIVED THE BENEFIT OF COUNSEL.

15                   SIXTH, WHETHER THERE WAS AN OPPORTUNITY

16    FOR NEGOTIATION OF THE TERMS OF THE AGREEMENT.

17                   AND SEVENTH, WHETHER THE CONSIDERATION

18    GIVEN IN EXCHANGE FOR THE WAIVER AND ACCEPTED BY THE

19    EMPLOYEE EXCEED THE BENEFITS TO WHICH THE EMPLOYEE

20    WAS ALREADY ENTITLED BY CONTRACT OR LAW.

21                   NOW, THIS LIST IS NOT EXHAUSTIVE.  AND

22    YOU MAY CONSIDER OTHER FACTORS THAT BEAR ON THE

23    QUESTION OF KNOWING AND VOLUNTARINESS.  THAT IS JUST

24    A SUGGESTION THAT SOME OF YOU OUGHT TO CONSIDER.

25                   FOR EXAMPLE, PLAINTIFFS HAVE ARGUED

1   THAT THEY WERE PLACED IN A TAKE IT OR LEAVE IT

2   PREDICAMENT THAT REQUIRED THEM TO EITHER SIGN THE

3   RELEASE OR FACE FINANCIAL RUIN.  NOW, THERE IS

4   ALWAYS SOME FINANCIAL PRESSURE IN AN EMPLOYMENT

5   TERMINATION SITUATION AND THAT FINANCIAL PRESSURE

6   STANDING ALONE IS INSUFFICIENT TO PROVE

7   INVOLUNTARINESS.  HOWEVER, IT IS AMONG THE FACTORS

8   THAT MAY BE CONSIDERED BY YOU IN DETERMINING WHETHER

9   BASED ON ALL THE CIRCUMSTANCES NO MEANINGFUL CHOICE

10   IN FACT EXISTED.

11          AGAIN, AS I HAVE TOLD YOU, IN THE FINAL

12   ANALYSIS YOU HAVE TO LOOK AT EVERYTHING.  AND YOU

13   MUST CONSIDER ALL THE FACTORS THAT I HAVE LISTED FOR

14   YOU IN LIGHT OF THE EVIDENCE PRESENTED TO YOU BY THE

15   PARTIES AS WELL AS OTHER FACTORS YOU FEEL BEAR ON

16   THIS ISSUE AND DETERMINE, BASED ON YOUR WEIGHING OF

17   THE VARIOUS FACTORS AND CIRCUMSTANCES, WHETHER EACH

18   INDIVIDUAL PLAINTIFF KNOWINGLY AND VOLUNTARILY

19   SIGNED THE RELEASE.  AGAIN, AS I'LL REMIND YOU ONE

20   MORE TIME, CONSIDER THE PLAINTIFFS INDIVIDUALLY.

21          THE OTHER MATTER NOW -- THAT IS THE

22   LAW.  IT IS REALLY NOT THAT COMPLICATED.  YOU GUYS

23   HAVE THE TOUGH JOB IN DECIDING WHAT THE FACTS ARE

24   AND THEN PUTTING THAT INTO WHAT THE LAW IS WITH

25   REGARD TO KNOWING AND VOLUNTARY.

1            PART OF THE THING YOU HAVE DO IS ASSESS

2   WITNESSES AND THEIR CREDIBILITY.  SOME OF THE

3   FACTORS THOUGH THAT WE HAVE SUGGESTED THAT YOU

4   CONSIDER, THIS LIST IS NOT EXHAUSTIVE EITHER, IS:

5            FIRST OF ALL, WHAT WAS THE

6   WITNESS' ABILITY TO KNOW THE THINGS ABOUT WHICH HE

7   OR SHE TESTIFIED?

8            HOW WELL WAS THE WITNESS ABLE TO RECALL

9   AND DESCRIBE THOSE THINGS?

10           WHAT WAS THE WITNESS' MANNER WHILE

11  TESTIFYING?

12           DID THE WITNESS HAVE AN INTEREST IN THE

13  OUTCOME OF THIS CASE OR ANY BIAS OR PREJUDICE

14  CONCERNING ANY PARTY OR ANY MATTER INVOLVED IN THE

15  CASE?

16           HOW REASONABLE WAS THE WITNESS'

17  TESTIMONY CONSIDERED IN LIGHT OF ALL THE EVIDENCE IN

18  THE CASE?

19           WAS THE WITNESS' TESTIMONY CONTRADICTED

20  BY WHAT THAT WITNESS HAS SAID OR DONE AT ANOTHER

21  TIME OR BY TESTIMONY OF OTHER WITNESSES OR BY OTHER

22  EVIDENCE?

23           NOW, I WOULD REMIND YOU THAT IN

24  DECIDING ON BELIEVABILITY YOU NEED TO CONSIDER THAT

25  SOMETIMES THERE ARE CONTRADICTIONS IN TESTIMONY.

1    AND THE QUESTION IS, IS IT INNOCENT LAPSE OF MEMORY

2    ABOUT SOMETHING, SOME SMALL DETAIL, OR IS IT AN

3    INTENTIONAL FALSEHOOD ABOUT SOMETHING OF GREAT

4    IMPORTANCE.

5            THESE FACTORS ALONG WITH ANY FACTORS

6    YOU IN YOUR OWN LIFE TAKE INTO CONSIDERATION WHEN

7    SOMEBODY IS TALKING TO YOU ARE THE THINGS YOU WILL

8    HAVE TO TAKE INTO CONSIDERATION IN WEIGHING THE

9    CREDIBILITY OF THE WITNESSES.

10           I'M GOING TO -- THE VERDICT SLIP HERE

11   IS QUITE SIMPLE.  I'M NOT GOING TO PASS IT OUT TO

12   YOU NOW.  MR. HIGGINS WILL GIVE IT TO YOU WHEN YOU

13   GET OUT THERE.  YOU ALREADY SAW WHAT IT IS.  HE WILL

14   BE TAKING IT OUT TO YOU.

15           BEFORE YOU LEAVE, HOWEVER, I HAVE TO

16   ASK THE ATTORNEYS IF THEY HAVE ANY ADDITION OR

17   CORRECTIONS TO WHAT I JUST TOLD YOU.  AND SOMETIMES

18   I MAKE A GROSS ERROR AND I LIKE THEM TO INFORM ME

19   BEFORE YOU GO OUT.

20           COUNSEL?

21           (SIDE-BAR.)

22           MR. QUINN:  WE HAD UNDERSTOOD THAT YOUR

23   HONOR WAS GOING TO INSTRUCT THE JURY THAT IT SHOULD

24   NOT DRAW ANY INFERENCE ONE WAY OR THE OTHER FROM THE

25   NUMBER OF PLAINTIFFS THAT HAVE BROUGHT CLAIMS.

1          MR. GODFREY:  I THOUGHT YOU SAID YOU

2     WEREN'T.

3          THE COURT:  I DO UNDERSTAND THAT.  I

4     WANT YOU TO -- I CAN MAKE THAT PART OF THE RECORD.

5     I DECIDED THAT IT WOULD BE MORE CONFUSING THAN

6     HELPFUL.  I HAD PREPARED ONE OF MY OWN INSTRUCTIONS.

7          MR. QUINN:  I UNDERSTAND.

8          THE COURT:  I WAS AFRAID BECAUSE IT IS

9     NOT QUITE EASY TO GIVE THAT SO.

10          MR. QUINN:  UNDERSTOOD.  JUST FOR THE

11     RECORD BUT I UNDERSTAND.

12          THE COURT:  I DON'T MIND.

13          (WHEREUPON THE SIDE-BAR CONFERENCE

14     ENDED.)

15          THE COURT:  I PROMISED YOU IT WILL BE

16     SHORT, GUYS, AND IT WAS.  WHEN YOU READ THE

17     INSTRUCTIONS, YOU WILL UNDERSTAND THAT IS WHAT YOU

18     HAVE TO TRY.  THAT IS THE LAW YOU HAVE TO APPLY TO

19     THE FACTS.  SO NOW YOU ARE GOING TO GO OUT AND THEN

20     YOU WILL BE INUNDATED WITH EXHIBITS AT SOME TIME OR

21     ANOTHER.

22          FIRST THING YOU SHOULD DO THOUGH AS A

23     JURY IS TO SELECT A FOREPERSON.  THAT PERSON HAS

24     WHATEVER DUTIES YOU WISH TO GIVE TO HIM OR HER.  BUT

25     HIS OR HER PRIMARY RESPONSIBILITY TO THE COURT IS TO

```
1    ANNOUNCE THE VERDICT WHEN YOU ARRIVE AT THE VERDICT.

2    THE VERDICT MUST BE UNANIMOUS AS TO EACH AND EVERY

3    PLAINTIFF.  AGAIN, THE MANNER IN WHICH YOU

4    DELIBERATE IS TOTALLY UP TO YOU AND I WON'T OFFER

5    ANY SUGGESTIONS TO YOU OTHER THAN TRY TO GET AN

6    ORDERLY PROCESS ORGANIZED WHILE YOU ARE DOING IT.

7    BUT THERE IS A LOT FOR YOU TO DO, A LOT OF PEOPLE TO

8    CONSIDER AND YOU GUYS HAVE BEEN GREAT HERE AS

9    JURORS.  YOU HAVE BEEN EVEN BETTER THAN THE LAWYERS.

10   YOU HAVE BEEN WELL BEHAVED AND PAID ATTENTION.  I

11   OBSERVE THOSE THINGS.  THAT IS PART OF THE THING I'M

12   LOOKING AT, LOOKING AT THE EIGHT OF YOU AND IT HAS

13   BEEN A LONG TRIAL IN SOME RESPECTS.

14            BUT THANK YOU FOR YOUR ATTENTION.  NOW

15   MR. HIGGINS WILL DEAL WITH THAT.

16            MS. SMYLIE:  YOUR HONOR, WE DO HAVE

17   EXHIBITS TO INTRODUCE.  BOTH SIDES HAVE TAKEN YOUR

18   RULINGS YESTERDAY, AND DISCUSSED THE EXHIBIT LIST.

19   SO WE DO HAVE THEM READY TO SUBMIT AND WE HAVE

20   BINDERS OF THE EXHIBITS FOR YOUR HONOR.

21            MR. QUINN:  ON THE SUBJECT OF

22   COMPLIMENTS, NEEDLESS TO SAY NEITHER SIDE AGREES

23   100 PERCENT WITH YOUR RULINGS.  BUT I DO WANT TO SAY

24   ONE THING, AND I KNOW MR. GODFREY AGREES WITH ME IS

25   THAT THERE HAS NEVER BEEN A TIME IN THE TIME I HAVE
```

1    BEEN INVOLVED IN A CASE THAT I DIDN'T THINK THAT

2    YOUR PARAMOUNT OBJECTIVE WAS TO BE FAIR.

3                    MR. GODFREY:  I AGREE.

4                    MR. QUINN:  THAT IS NOT ALWAYS THE

5    CASE.

6                    I SEE THAT YOU HAVE YOUR EYE ON THAT

7    BALL AND --

8                    THE COURT:  THAT IS THE HARD PART ABOUT

9    BEING A JUDGE, HARD TO BALANCE, ESPECIALLY CASES

10   LIKE THIS.

11                   IS THERE ANYTHING THAT WE HAVE TO --

12                   MR. MARSTON:  NO, NO OBJECTION.

13                   THE COURT:  OKAY, GOOD.  SEE YOU LATER.

14                   (JURY OUT. )

15                   (COURT ADJOURNED AT 3:00 P.M.)

16

17                   I CERTIFY THAT THE FOREGOING IS A

18   CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN

19   THE ABOVE-ENTITLED MATTER.

20

21   DATE                        SUZANNE R. WHITE

22                               OFFICIAL COURT

23   REPORTER

24

25

1                    I N D E X

2     CLOSING STATEMENTS                PAGE

3       BY MR. GODFREY                    3

4       BY MR. QUINN                     93

5       BY MR. GODFREY (REBUTTAL)       152

6

7     JURY CHARGE                       188

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 45:18
**$148,000** [1] - 33:5
**$150,000** [1] - 83:14
**$153,000** [1] - 37:5
**$155,000** [1] - 85:15
**$2,000** [8] - 11:12,
11:16, 17:9, 40:20,
79:14, 83:3, 168:21,
184:24
**$250,000** [2] - 46:22,
50:21
**$3,574,509** [3] -
165:10, 186:6,
186:21
**$325,000** [2] - 43:9,
45:15
**$345,093** [1] - 52:3
**$351,000** [1] - 154:14
**$4,100** [1] - 13:9
**$425,000** [1] - 71:20
**$435,000** [1] - 75:10
**$489,758** [1] - 60:15
**$5,000** [3] - 33:4, 38:9,
43:15
**$500,000** [1] - 38:4
**$503,497** [1] - 40:23
**$550,009** [1] - 36:24
**$588** [1] - 123:10
**$68,000** [1] - 60:17
**$75,000** [1] - 70:22
**$86,000** [2] - 151:9,
151:17
**$88** [1] - 123:11
**$913,000** [1] - 151:21
**$92** [1] - 127:24
**$922,000** [1] - 40:8
**$98** [1] - 123:14

## '

**'82** [1] - 49:7
**'94** [2] - 24:21, 36:24
**'95** [1] - 55:15
**'99** [8] - 55:15, 75:22,
176:13, 176:15,
176:18, 177:11,
177:25, 179:22

## 0

**01-3894** [1] - 1:6
**01-6764** [1] - 1:6

## 1

**1** [30] - 9:11, 44:14,
45:16, 45:17, 48:10,
48:12, 48:14, 49:1,
55:11, 60:13, 63:19,
69:2, 71:2, 73:9,
75:20, 79:9, 96:16,
102:10, 124:8,
124:12, 129:15,
154:21, 157:2,
175:23, 177:19,
183:19, 184:7,
194:15
**1,199,300** [1] - 56:20
**1.2** [6] - 13:6, 13:8,
27:2, 52:21, 55:4,
79:13
**1.276** [1] - 55:15
**10** [9] - 1:9, 5:19,
10:13, 12:22, 16:21,
106:24, 142:19,
142:20, 177:19
**100** [12] - 10:25, 109:2,
109:3, 109:5, 109:9,
109:12, 109:21,
109:24, 139:1,
158:9, 158:10,
200:23
**103,000** [1] - 42:23
**104** [1] - 17:14
**106** [1] - 29:18
**107** [1] - 41:3
**110** [1] - 56:22
**113** [1] - 153:19
**114,000** [1] - 57:9
**12** [5] - 16:21, 50:12,
92:13, 92:14, 155:25
**120,000** [1] - 50:12
**12TH** [1] - 14:6
**13** [15] - 12:21, 24:6,
32:12, 62:5, 76:18,
77:19, 101:17,
101:18, 101:21,
126:5, 126:6,
128:22, 156:1,
158:21, 165:17
**1354** [1] - 20:12
**14** [1] - 174:22
**1400** [1] - 2:3
**141,000** [1] - 82:17
**148** [1] - 36:21
**148,000** [1] - 36:17
**15** [4] - 39:8, 135:14,
187:25, 192:15
**150** [1] - 10:25
**150,000** [1] - 35:4
**152** [1] - 202:5
**15TH** [2] - 94:7, 100:6
**16** [2] - 1:8, 23:12
**160** [1] - 23:11
**161** [1] - 23:12
**16TH** [1] - 100:13
**17,000** [6] - 35:20,
35:25, 36:5, 36:11,
36:15, 36:20
**1701** [1] - 1:16
**1735** [1] - 2:19
**175** [1] - 123:11
**18** [2] - 41:16, 41:18
**180,000** [1] - 40:5
**1800S** [1] - 20:25
**185** [1] - 109:8
**1864** [1] - 20:21
**1865** [1] - 20:21
**188** [1] - 202:7
**19** [4] - 19:6, 19:8,
153:19, 189:22
**19103** [3] - 1:17, 2:14,
2:19
**19106** [1] - 1:21
**192** [1] - 19:6
**193** [1] - 19:6
**1980** [1] - 39:12
**1986** [1] - 36:24
**1989** [1] - 23:16
**1990** [2] - 17:24, 40:8
**1990S** [1] - 121:8
**1997** [1] - 45:18
**1998** [2] - 84:25,
185:22
**1999** [12] - 5:19, 15:16,
29:8, 40:9, 69:9,
124:2, 133:8,
142:14, 142:23,
143:7, 176:9, 178:9
**1ST** [2] - 63:7, 176:20

## 2

**2** [11] - 33:6, 42:22,
52:14, 63:22, 96:16,
124:14, 125:2,
129:15, 183:10,
183:14, 194:16
**20** [5] - 24:23, 25:10,
81:18, 107:2, 177:18
**200** [1] - 37:10
**2000** [13] - 11:12, 14:6,
15:17, 15:19, 19:12,
69:9, 75:22, 133:8,
141:15, 176:16,
176:25, 177:12,
192:9
**20005** [1] - 2:4
**2001** [12] - 2:13, 15:21,
31:21, 44:12, 63:3,
63:5, 63:7, 75:22,
177:3, 177:13,
177:14, 192:11
**2002** [7] - 70:3, 75:22,
141:23, 177:14,
177:16, 178:7,
179:15
**2003** [7] - 75:23,
143:2, 143:7,
143:10, 177:19,
178:14, 179:16
**2008** [1] - 74:20
**201** [3] - 66:18, 165:9,
186:4
**2015** [1] - 1:8
**202** [3] - 66:22, 165:9,
186:5
**207** [1] - 5:20
**208** [1] - 29:8
**209** [1] - 42:6
**20TH** [1] - 176:16
**211** [1] - 24:6
**211:22** [1] - 24:4
**213** [1] - 14:2
**213:6** [1] - 24:4
**215)627-1882** [1] -
1:22
**22** [1] - 24:7
**23RD** [1] - 84:10
**24** [1] - 153:20
**25** [2] - 23:12, 81:19
**25,000** [1] - 57:5
**250** [1] - 46:23
**256,250** [1] - 51:2
**25TH** [1] - 177:16
**26** [1] - 153:1
**262** [1] - 48:17
**263** [1] - 48:19
**264** [1] - 49:5
**265** [1] - 49:6
**266** [1] - 49:11
**267** [1] - 49:16
**27** [2] - 153:1, 153:19
**28,000** [1] - 82:9
**2:00** [2] - 152:11,
152:12

## 3

**3** [10] - 57:12, 73:10,
80:24, 81:1, 96:16,
125:3, 129:15,
157:3, 194:16, 202:3
**3,419,797** [1] - 42:7
**3,574,509** [1] - 66:22
**3.1** [1] - 162:19
**3.4** [1] - 42:10
**3.5** [9] - 6:9, 66:16,
77:13, 78:17, 78:20,
79:2, 88:1, 186:3,
186:4
**3.574** [1] - 66:25
**30** [2] - 40:14, 53:11
**300** [1] - 2:9
**308** [1] - 68:6
**31** [1] - 177:2
**319** [1] - 109:17

## 3 (cont.)

**31ST** [1] - 31:21
**324** [1] - 155:20
**330,000** [2] - 45:21,
45:22
**34** [1] - 153:19
**345** [2] - 177:21, 179:7
**345,093** [1] - 52:2,
57:2
**347** [1] - 181:15
**348** [2] - 163:17
**35** [1] - 188:19
**351** [2] - 172:5
**351,000** [1] - 154:17
**353** [1] - 173:9
**354** [2] - 177:22, 178:1
**357** [2] - 163:17,
163:18
**371** [1] - 109:19
**374** [1] - 176:6
**376** [2] - 178:4
**377** [1] - 178:15
**381** [1] - 171:19
**386** [1] - 171:19
**3:00** [1] - 201:15
**3RD** [2] - 10:14, 14:1

## 4

**4** [8] - 14:18, 42:22,
45:16, 45:17, 61:19,
125:9, 155:25, 159:1
**40,000** [1] - 45:16
**400** [1] - 45:17
**401(K** [1] - 53:4
**401(K)** [1] - 58:24
**41** [1] - 166:19
**4100** [1] - 2:14
**415** [1] - 109:23
**419** [1] - 38:4
**42,000** [1] - 82:16
**42,462** [2] - 82:12,
82:13
**425,700** [1] - 68:16
**430** [1] - 75:7
**430,000** [1] - 72:25
**432** [1] - 72:5
**438,603** [1] - 71:6
**44:7** [1] - 10:13
**45** [1] - 152:9
**47,000** [1] - 74:23
**48** [8] - 61:13, 143:6,
143:9, 179:22,
179:23, 180:3,
180:8, 180:9
**4951** [1] - 61:19

## 5

**5** [2] - 64:8, 76:8
**5,000** [3] - 46:23, 73:1,

83:15
**50** [2] - 85:9, 180:21
**50-SOME** [1] - 184:3
**500,000** [3] - 19:18, 39:9, 57:10
**507** [1] - 11:10
**51** [1] - 181:16
**51ST** [1] - 2:18
**52** [3] - 127:5, 172:2
**55** [1] - 27:1
**55-ACRE** [1] - 56:7
**56,000** [1] - 59:17
**5TH** [1] - 176:9

## 6

**6** [3] - 64:8, 71:2, 76:8
**6,200** [3] - 11:1, 65:12, 127:18
**6/4** [1] - 23:11
**6/4/15** [1] - 19:5
**60** [1] - 10:5
**60,000** [1] - 60:13
**601** [1] - 1:21
**60654** [1] - 2:10
**648,000** [1] - 74:25
**649** [1] - 22:13
**65,000** [1] - 57:6
**68,000** [1] - 58:22

## 7

**7** [1] - 10:13
**71,696** [1] - 55:9
**74** [2] - 62:14, 62:17
**75** [4] - 62:14, 62:17, 85:9, 180:21
**75,000** [1] - 57:6
**763** [1] - 179:12
**766** [1] - 179:20

## 8

**8** [5] - 144:18, 176:20, 176:21
**8-AND-A-HALF** [1] - 38:5
**80** [1] - 145:16
**81** [1] - 145:24
**85** [2] - 109:6, 109:13
**85,000** [2] - 67:17, 67:20
**870** [2] - 36:18, 36:22
**88** [1] - 153:18

## 9

**9** [1] - 19:7
**90** [4] - 40:11, 40:12, 85:9, 180:21

**900,000** [1] - 163:13
**910,000** [1] - 52:20
**93** [1] - 202:4
**9TH** [1] - 181:15

## A

**ABILITY** [4] - 15:23, 38:6, 43:9, 46:22, 66:3, 72:25, 83:14, 197:6
**ABLE** [19] - 26:19, 51:6, 56:3, 58:1, 59:21, 102:25, 111:22, 125:20, 130:15, 135:19, 144:3, 149:16, 149:19, 150:16, 152:1, 156:9, 182:2, 182:3, 197:8
**ABOLITIONIST** [1] - 20:20
**ABOVE-ENTITLED** [1] - 201:19
**ABRAHAM** [3] - 20:21, 88:15, 93:21
**ABSOLUTE** [1] - 30:15
**ABSOLUTELY** [1] - 32:15
**ACCEPT** [14] - 44:1, 59:8, 59:25, 74:12, 96:12, 97:25, 103:7, 126:3, 131:22, 138:8, 144:23, 175:10, 175:12
**ACCEPTED** [4] - 35:9, 132:11, 165:12, 195:18
**ACCEPTING** [3] - 59:16, 97:6, 122:24
**ACCOMPLISHING** [1] - 136:13
**ACCORDANCE** [2] - 118:1, 168:3
**ACCORDING** [9] - 36:7, 36:23, 37:8, 60:14, 82:16, 149:11, 165:24, 181:1, 181:3
**ACCOUNT** [3] - 32:9, 164:13, 164:22
**ACCOUNTANT** [3] - 37:19, 37:21, 38:19
**ACCOUNTANTS** [3] - 78:3, 78:13, 183:4
**ACCRUALS** [1] - 122:17
**ACCRUING** [1] - 38:12
**ACCURATE** [1] - 16:6

**ACKNOWLEDGED** [6] - 53:17, 53:18, 105:9, 105:10, 105:11, 139:23
**ACKNOWLEDGMEN T** [2] - 22:16, 84:23, 185:23
**ACRES** [1] - 27:1
**ACT** [7] - 62:21, 64:12, 93:22, 99:19, 172:8, 194:6, 194:8
**ACTING** [1] - 137:18
**ACTION** [3] - 1:3, 28:17, 156:5
**ACTIONS** [3] - 22:21, 74:7, 155:12
**ACTORS** [2] - 159:5, 165:18
**ACTS** [2] - 193:8
**ACTUAL** [2] - 91:10, 108:9
**ADD** [2] - 66:20, 75:5
**ADDED** [3] - 178:20, 178:21, 178:22
**ADDITION** [4] - 63:1, 131:3, 167:18, 198:16
**ADDITIONAL** [1] - 62:5
**ADDRESS** [3] - 114:21, 132:22, 177:4
**ADHERED** [2] - 115:11, 167:11
**ADJOURNED** [1] - 201:15
**ADJUST** [1] - 30:11
**ADMINISTERED** [1] - 5:4
**ADMISSION** [1] - 182:12
**ADMISSIONS** [2] - 15:15, 190:4
**ADMIT** [6] - 26:20, 33:2, 56:1, 71:14, 144:9, 168:12
**ADMITS** [12] - 35:17, 39:4, 39:13, 39:15, 49:13, 49:17, 50:9, 54:8, 54:24, 81:12, 82:3
**ADMITTED** [22] - 14:15, 13:3, 33:3, 35:21, 41:12, 45:13, 53:22, 54:11, 69:20, 70:3, 70:22, 70:23, 71:18, 74:2, 74:3, 75:1, 75:3, 79:23, 82:4, 85:9, 85:12, 168:24

**ADOPTED** [5] - 62:1, 128:16, 154:9, 171:22, 171:23
**ADVERSARY** [1] - 173:17
**ADVERTISING** [2] - 55:8, 108:6
**ADVICE** [22] - 9:19, 10:10, 46:11, 46:14, 46:15, 46:16, 48:16, 72:19, 78:2, 78:3, 78:5, 78:12, 78:13, 78:14, 155:21, 156:16, 183:3, 183:4, 183:5
**ADVISED** [1] - 80:10
**ADVISOR** [1] - 78:14
**ADVOCATE** [1] - 16:6
**AFFECT** [2] - 177:4, 193:21
**AFFORD** [1] - 135:18
**AFRAID** [1] - 199:8
**AFTERWARDS** [2] - 83:8, 84:11
**AGENCIES** [3] - 5:22, 177:5, 180:3
**AGENCY** [41] - 5:14, 6:3, 20:5, 31:19, 33:6, 33:13, 33:19, 35:7, 38:8, 52:8, 57:11, 74:15, 74:19, 75:2, 75:25, 90:10, 90:16, 91:19, 91:24, 92:11, 102:4, 102:5, 102:19, 102:20, 108:21, 108:23, 113:4, 141:20, 142:18, 150:12, 157:9, 159:9, 160:5, 160:19, 173:25, 174:3, 176:23, 177:5, 177:7, 183:12, 185:2
**AGENT** [51] - 5:22, 11:21, 11:23, 15:24, 23:2, 23:5, 23:7, 23:8, 23:15, 24:13, 24:15, 33:2, 33:17, 34:24, 34:25, 35:5, 40:11, 41:15, 44:17, 45:2, 70:19, 74:2, 74:4, 74:14, 85:10, 91:4, 107:10, 108:4, 110:15, 111:9, 111:13, 111:14, 115:16, 118:12, 118:15, 128:14, 156:8, 161:1, 161:13, 162:7, 168:12, 169:20,

**169:24, 171:24, 172:16, 176:2, 181:24, 184:7, 184:19, 184:20
**AGENT'S** [5] - 43:9, 46:22, 83:15, 111:5, 158:1
**AGENTS** [59] - 5:15, 5:24, 5:25, 10:25, 19:11, 21:7, 25:10, 25:12, 29:9, 29:12, 36:3, 43:11, 45:7, 51:14, 77:3, 102:14, 106:5, 106:6, 106:9, 106:10, 107:16, 107:25, 108:18, 110:8, 111:11, 111:16, 112:7, 112:12, 120:4, 121:16, 123:10, 123:17, 127:22, 128:2, 128:12, 141:14, 143:14, 145:18, 145:20, 154:9, 169:2, 172:7, 172:11, 172:16, 172:17, 172:20, 173:2, 173:10, 173:11, 173:14, 176:8, 177:3, 177:10, 177:14, 180:8, 180:9, 181:22
**AGENTS'** [3] - 43:12, 68:16, 73:1
**AGO** [1] - 16:21
**AGONY** [1] - 19:1
**AGREE** [20] - 8:15, 36:16, 44:1, 44:2, 44:3, 47:14, 47:15, 63:4, 93:17, 93:23, 94:21, 95:9, 99:14, 119:7, 119:16, 143:15, 144:14, 165:25, 175:20, 201:3
**AGREED** [11] - 35:10, 35:11, 44:4, 44:5, 45:4, 70:8, 161:3, 162:25, 174:11, 175:7
**AGREEMENT** [17] - 17:18, 59:7, 60:5, 84:16, 114:19, 117:23, 154:4, 157:14, 168:19, 171:12, 174:17, 174:18, 174:21, 174:23, 181:10, 195:16
**AGREEMENTS** [4] -

21:20, 77:8, 172:21,
192:9
**AGREES** [3] - 120:25,
200:22, 200:24
**AHEAD** [1] - 147:19
**AIR** [4] - 152:22,
188:14, 188:15,
190:17
**AKIN** [1] - 2:13
**AL** [2] - 1:3, 1:6
**ALIGN** [1] - 177:7
**ALLEGE** [1] - 193:11
**ALLOW** [4] - 118:19,
125:1, 126:20, 129:1
**ALLOWANCE** [4] -
61:14, 126:23,
126:24, 174:8
**ALLOWED** [3] - 23:7,
69:20, 144:4
**ALLOWS** [1] - 116:15
**ALLSTATE** [334] - 1:6,
4:13, 4:17, 5:13,
5:14, 5:17, 6:8, 7:19,
7:20, 7:22, 7:23, 8:3,
8:7, 9:11, 9:20, 13:7,
13:22, 14:6, 14:9,
15:18, 15:20, 15:24,
18:22, 20:5, 23:21,
23:23, 24:14, 25:19,
26:3, 26:8, 27:14,
28:17, 28:23, 28:24,
29:9, 29:17, 31:4,
31:16, 31:24, 32:1,
32:12, 32:17, 33:20,
33:21, 34:11, 37:5,
37:11, 37:18, 38:7,
38:16, 38:21, 39:4,
39:13, 39:14, 39:23,
40:20, 40:25, 41:11,
41:25, 42:19, 42:24,
43:6, 44:22, 45:3,
45:4, 45:6, 46:6,
46:9, 49:17, 49:21,
49:23, 50:3, 50:9,
51:2, 51:11, 51:12,
51:20, 51:22, 51:23,
52:10, 52:12, 52:16,
52:18, 52:22, 53:6,
53:10, 53:15, 53:20,
53:24, 54:2, 54:8,
54:11, 54:14, 54:25,
55:10, 56:13, 56:18,
56:21, 56:24, 57:1,
57:21, 58:9, 58:10,
58:17, 59:1, 60:11,
60:25, 61:14, 62:1,
62:4, 62:22, 63:9,
63:20, 66:19, 67:1,
67:13, 67:24, 68:14,
68:19, 69:15, 71:9,

72:9, 72:14, 72:21,
73:2, 73:15, 73:17,
73:20, 73:24, 74:10,
75:7, 75:21, 76:12,
76:15, 77:1, 77:2,
78:25, 79:1, 79:12,
80:4, 80:11, 80:17,
81:11, 83:6, 83:16,
84:19, 85:8, 85:13,
86:14, 86:16, 86:17,
89:5, 90:3, 90:11,
94:24, 96:15, 99:12,
99:20, 100:14,
100:18, 101:7,
102:1, 102:13,
103:21, 104:1,
106:1, 106:2,
106:10, 106:14,
107:2, 107:3, 107:5,
107:11, 107:15,
107:16, 107:21,
108:18, 108:22,
110:6, 110:10,
110:11, 111:4,
111:8, 111:11,
112:11, 112:15,
113:8, 113:13,
114:19, 116:15,
119:19, 119:21,
120:2, 120:4, 121:4,
121:8, 121:22,
122:15, 122:20,
123:1, 123:3,
123:10, 123:21,
124:20, 125:11,
127:21, 129:22,
129:24, 130:4,
130:16, 131:2,
132:18, 133:21,
133:22, 133:25,
134:5, 134:16,
134:23, 134:24,
135:12, 135:16,
137:2, 137:14,
137:16, 137:20,
137:25, 138:4,
138:5, 138:14,
138:17, 139:8,
139:9, 139:10,
139:25, 140:8,
140:25, 141:4,
141:10, 143:3,
144:4, 145:17,
145:18, 146:1,
146:11, 146:16,
146:21, 147:8,
149:11, 151:12,
151:16, 152:2,
154:12, 155:4,
155:6, 156:10,
156:22, 157:25,

158:10, 158:11,
158:14, 158:25,
161:1, 162:2,
162:12, 163:4,
163:19, 163:24,
165:8, 165:11,
166:8, 166:25,
167:8, 168:14,
168:16, 168:17,
168:19, 169:1,
169:3, 169:7, 169:8,
169:16, 170:4,
170:6, 170:25,
171:3, 171:4,
171:21, 171:22,
172:3, 172:17,
172:20, 172:24,
172:25, 173:24,
173:25, 174:7,
174:8, 174:11,
174:25, 175:10,
175:11, 175:15,
176:2, 176:7,
180:20, 181:1,
183:9, 183:14,
183:17, 183:19,
184:6, 185:4, 186:4,
186:8, 186:18,
186:20, 187:3,
187:9, 188:1, 188:2,
188:4, 188:7, 192:9,
192:10, 193:12,
193:15
**ALLSTATE'S** [19] -
35:22, 35:25, 44:8,
48:21, 61:20, 74:3,
81:8, 103:16,
113:23, 121:24,
132:9, 132:10,
134:4, 137:7,
138:17, 157:18,
163:4, 172:18,
174:10
**ALMOST** [16] - 7:25,
8:1, 9:15, 10:18,
30:1, 30:5, 30:13,
60:7, 60:13, 62:10,
98:18, 105:21,
105:23, 153:1,
157:15, 187:15
**ALONE** [6] - 64:3,
65:22, 164:10,
164:11, 164:17,
196:6
**ALTERNATIVE** [13] -
15:12, 19:22, 64:19,
64:20, 64:21, 66:23,
72:5, 73:14, 90:19,
92:10, 97:22, 98:6,
98:13

**ALTERNATIVES** [2] -
62:11, 66:8
**AMBIENT** [1] - 152:22
**AMENDMENT** [1] -
115:14
**AMERICAN** [2] -
36:13, 165:23
**AMERICANS** [2] -
48:3, 185:6
**AMOUNT** [14] - 42:4,
55:6, 56:19, 60:17,
65:4, 82:18, 87:3,
104:10, 113:2,
143:12, 166:1,
174:9, 183:11, 195:7
**AMOUNTS** [1] - 42:7
**AMUSING** [1] - 12:19
**ANALOGY** [1] - 41:8
**ANALYSIS** [5] - 95:14,
103:12, 119:12,
123:6, 196:12
**ANALYZED** [1] - 17:16
**ANGRY** [5] - 20:7,
39:25, 40:3, 40:16,
40:17
**ANNIVERSARY** [1] -
145:21
**ANNOUNCE** [1] -
200:1
**ANNOUNCED** [9] -
5:18, 100:7, 128:17,
133:5, 141:23,
142:24, 145:13,
146:12, 150:12
**ANNOUNCEMENT** [2]
- 142:5, 145:6
**ANNOUNCING** [1] -
142:3
**ANSWER** [13] - 14:13,
19:14, 19:20, 21:11,
22:2, 26:4, 47:14,
56:4, 106:13,
145:10, 146:20,
156:13, 176:20
**ANSWERS** [3] - 22:10,
25:24, 29:18
**ANYPLACE** [1] -
182:6
**ANYWAY** [6] - 42:12,
47:16, 48:12, 49:2,
83:10, 92:25
**APART** [1] - 99:25
**APOLOGIZE** [2] -
132:20, 166:13
**APPEAR** [1] - 4:3
**APPEARANCE** [1] -
194:11
**APPEARANCES** [2] -
1:12, 2:1
**APPLE** [1] - 41:7

**APPLICATION** [2] -
67:13, 191:7
**APPLIED** [5] - 61:11,
70:19, 76:5, 172:1,
180:23
**APPLIES** [2] - 120:2,
126:24
**APPLY** [17] - 21:24,
22:1, 28:5, 28:6,
28:12, 75:20, 82:5,
128:6, 128:14,
149:4, 167:12,
167:14, 171:12,
171:17, 171:21,
190:6, 199:18
**APPOINTED** [1] - 18:8
**APPRECIATE** [2] -
4:21, 86:2
**APPROACH** [1] -
106:11
**APPROACHED** [1] -
169:21
**APPROPRIATE** [1] -
192:21
**APPROVAL** [3] -
115:11, 167:10,
167:16
**APPROVED** [4] -
120:15, 120:25,
142:22, 179:18
**APPROVES** [1] -
120:20
**APRIL** [3] - 141:14,
176:16, 176:25
**AREA** [1] - 25:9
**ARGUE** [4] - 71:3,
81:14, 85:16, 169:12
**ARGUED** [3] - 180:12,
180:25, 195:25
**ARGUES** [2] - 194:9,
194:12
**ARGUING** [1] - 135:15
**ARGUMENT** [18] - 3:7,
33:15, 90:13, 91:7,
93:12, 96:10, 96:11,
98:16, 105:1, 105:2,
134:6, 135:13,
135:20, 139:13,
155:1, 179:3,
179:24, 181:5
**ARGUMENTS** [4] -
3:6, 61:6, 61:9,
159:13
**ARRIVE** [1] - 200:1
**ASIDE** [8] - 15:14,
121:3, 127:19,
127:24, 165:24,
180:13, 186:12
**ASSESS** [2] - 185:17,
197:1

**ASSESSMENT** [1] - 16:4

**ASSIGNED** [1] - 48:15

**ASSUME** [6] - 71:5, 109:2, 109:11, 141:8, 150:20, 159:23

**ASSUMED** [1] - 56:24

**ASSUMES** [2] - 99:20, 99:21

**ASSUMING** [1] - 135:17

**ASSUMPTIONS** [1] - 109:18

**ASSUREDLY** [1] - 89:5

**AT-WILL** [17] - 98:17, 98:25, 99:2, 99:3, 99:5, 99:9, 99:13, 99:22, 99:23, 103:17, 114:22, 115:20, 119:1, 119:10, 119:17, 121:2, 121:6

**ATTEMPT** [2] - 29:20, 156:8

**ATTEMPTS** [1] - 33:25

**ATTEND** [1] - 155:1

**ATTENTION** [2] - 200:10, 200:14

**ATTORNEYS** [1] - 198:16

**ATTRACTIVE** [1] - 6:1

**AU** [1] - 155:24

**AUGUST** [8] - 15:21, 44:11, 63:3, 63:5, 63:7, 142:14, 176:13, 192:11

**AUTO** [3] - 178:16, 178:17

**AVAILABLE** [4] - 97:12, 145:10, 146:10, 146:19

**AVERAGE** [4] - 57:3, 57:4, 67:21, 154:15

**AVOID** [6] - 73:10, 98:11, 101:13, 102:25, 139:5, 157:3

**AWARE** [1] - 193:24

**AWARENESS** [1] - 193:9

**AWFULLY** [1] - 182:16

# B

**BACKDATED** [1] - 74:7

**BACKDATING** [1] - 74:6

**BACKWARDS** [1] -
18:16

**BAD** [5] - 42:8, 71:22, 71:25, 101:12, 189:6

**BALANCE** [2] - 15:19, 201:9

**BALL** [2] - 116:8, 201:7

**BALLARD** [1] - 2:18

**BANDY** [4] - 79:17, 81:5, 157:10, 183:23

**BANK** [1] - 32:9

**BAR** [2] - 198:21, 199:13

**BARGAIN** [14] - 33:21, 49:24, 54:12, 60:11, 85:13, 86:14, 86:15, 104:19, 105:20, 155:7, 155:8, 156:25, 188:3, 188:5

**BARRIER** [1] - 94:6

**BASE** [34] - 10:4, 30:4, 32:5, 32:13, 41:4, 60:19, 60:20, 60:21, 62:3, 69:19, 69:20, 97:22, 97:23, 98:5, 98:10, 101:10, 122:24, 126:4, 126:5, 126:9, 126:20, 129:16, 129:25, 130:24, 131:23, 132:11, 138:7, 139:6, 144:23, 147:4, 149:17, 151:5, 151:7

**BASED** [12] - 10:15, 16:4, 66:20, 92:18, 94:16, 94:17, 94:18, 159:13, 160:1, 189:18, 196:9, 196:16

**BASIC** [9] - 40:24, 51:9, 66:18, 69:21, 75:13, 76:9, 86:21, 112:16, 154:2

**BASING** [1] - 193:10

**BEAR** [2] - 195:22, 196:15

**BEARS** [2] - 194:3, 194:16

**BEAT** [1] - 135:12

**BEATEN** [2] - 138:23, 138:25

**BEATING** [1] - 139:3

**BEAUTY** [1] - 56:6

**BECAME** [3] - 20:16, 23:5, 24:3

**BECOME** [17] - 5:24, 23:9, 23:14, 23:17, 23:19, 23:24, 24:13, 24:15, 40:10, 133:6,
143:15, 161:13, 165:1, 165:3, 165:5, 184:20, 185:4

**BECOMES** [2] - 169:22

**BED** [2] - 95:22, 95:23

**BEDROOM** [1] - 95:21

**BEEF** [1] - 14:8

**BEGIN** [3] - 3:6, 169:20, 177:4

**BEGINNING** [1] - 143:2, 190:3

**BEGUN** [1] - 142:4

**BEHALF** [2] - 157:18, 188:7

**BEHAVED** [1] - 200:10

**BEHIND** [5] - 39:1, 67:5, 69:16, 157:15, 163:6

**BELICHICK** [1] - 12:2

**BELIEF** [1] - 114:10

**BELIEVABILITY** [1] - 197:24

**BELIEVES** [2] - 60:8, 169:1

**BELONGED** [2] - 41:11, 41:25

**BELONGING** [1] - 111:7

**BENCH** [1] - 18:11

**BENEFICIAL** [1] - 77:15

**BENEFIT** [9] - 33:23, 56:23, 62:20, 121:10, 122:17, 128:8, 156:24, 172:19, 195:14

**BENEFITS** [42] - 9:23, 38:10, 38:13, 42:17, 44:20, 44:22, 52:22, 53:1, 53:18, 57:17, 58:24, 67:19, 69:3, 77:18, 78:8, 80:15, 81:9, 86:8, 86:9, 86:13, 100:8, 100:19, 101:15, 101:21, 102:4, 104:4, 122:15, 122:21, 124:11, 124:18, 129:21, 131:4, 132:9, 140:16, 140:22, 145:8, 146:8, 158:20, 158:21, 160:24, 195:19

**BEST** [12] - 34:9, 34:12, 47:25, 64:16, 78:2, 81:2, 84:4, 114:7, 150:1, 154:19, 183:2,
184:25

**BET** [2] - 11:24, 11:25

**BETTER** [4] - 116:23, 124:19, 177:7, 200:9

**BETWEEN** [10] - 40:8, 96:20, 97:1, 125:21, 133:5, 133:7, 143:4, 146:25, 147:12, 151:25

**BEYOND** [3] - 191:4, 191:7, 191:9

**BIAS** [2] - 189:14, 197:13

**BIG** [10] - 14:17, 20:11, 29:14, 44:9, 99:17, 100:11, 104:5, 126:17, 150:9, 151:11

**BILL** [1] - 12:1

**BILLS** [3] - 69:21, 126:2, 149:19

**BIND** [1] - 123:18

**BINDERS** [1] - 200:20

**BIT** [9] - 107:22, 108:10, 115:23, 137:9, 166:13, 180:22, 188:13, 189:7, 190:22

**BLACK** [1] - 112:13

**BLOCK** [2] - 20:11

**BLOW** [2] - 96:3, 104:25

**BOARD** [10] - 4:19, 45:2, 74:2, 74:4, 85:11, 115:17, 118:15, 123:6, 123:7, 168:12

**BOATLOAD** [2] - 185:1, 186:14

**BOCKIUS** [1] - 1:16

**BODY** [1] - 16:12

**BOLD** [2] - 14:17, 14:19

**BOND** [1] - 68:21

**BONUS** [5] - 43:7, 46:20, 72:24, 83:13, 178:20

**BONUSES** [2] - 178:21, 178:22

**BOOK** [78] - 12:6, 12:8, 18:14, 19:12, 19:24, 21:1, 32:21, 32:23, 33:1, 33:4, 34:10, 34:23, 35:1, 35:6, 36:17, 36:20, 36:21, 37:22, 37:24, 39:7, 39:21, 41:5, 41:14, 41:24, 42:6, 43:8, 43:10, 45:14, 46:21, 46:22, 50:9,
50:10, 50:21, 52:5, 52:15, 52:19, 54:23, 55:13, 58:10, 58:15, 58:18, 59:10, 71:3, 71:19, 71:20, 72:25, 75:6, 83:14, 83:15, 100:9, 100:21, 101:16, 108:16, 108:17, 108:25, 110:1, 111:15, 112:10, 124:22, 130:8, 130:11, 130:12, 130:13, 150:17, 151:12, 151:15, 158:1, 158:4, 159:20, 160:18, 161:16, 163:21, 170:11, 173:23, 174:2, 175:18, 183:25

**BOOKLET** [2] - 8:24, 13:25

**BOOKLETS** [1] - 29:16

**BOOKS** [7] - 41:25, 42:3, 42:5, 43:12, 68:16, 73:1, 110:10

**BORED** [2] - 85:19, 166:11

**BOSS** [1] - 148:21

**BOTHER** [1] - 70:14

**BOTTOM** [3] - 19:7, 142:21, 170:4

**BOUND** [6] - 35:10, 44:2, 47:13, 54:13, 54:16, 64:4, 67:6, 67:7, 161:4

**BOX** [14] - 29:14, 29:15, 29:20, 100:13, 100:14, 100:15, 101:9, 101:13, 101:20, 102:13, 127:8, 129:5, 129:10

**BOY** [2] - 13:5, 25:17

**BOYD** [11] - 28:18, 28:25, 57:13, 79:16, 79:25, 80:1, 153:8, 157:5, 157:6, 183:21

**BOYD'S** [1] - 82:18

**BOZEMAN** [1] - 4:20

**BRAKEMAN** [1] - 58:3

**BRAKES** [1] - 70:25

**BREACH** [1] - 105:11

**BREADWINNER** [1] - 132:7

**BREAK** [4] - 89:15, 89:17, 152:9, 152:14

**BREATH** [1] - 60:7

**BRIAN** [1] - 1:14

**BRIDGE** [2] - 50:6, 146:7

**BRIEF** [2] - 189:8, 189:9

**BRIEFLY** [3] - 89:22, 139:20, 145:3

**BRIGHT** [3] - 68:9, 68:11, 183:6

**BRIGHTER** [1] - 96:4

**BRILLIANT** [1] - 124:7

**BRING** [8] - 32:7, 50:23, 50:24, 71:23, 95:7, 107:5, 115:6, 167:4

**BRITISH** [1] - 22:4

**BROAD** [1] - 177:5

**BROCHURE** [3] - 169:18, 169:19, 169:21

**BROCHURES** [1] - 24:22

**BROOKLYN** [1] - 50:6

**BROUGHT** [7] - 10:17, 63:2, 81:4, 157:9, 160:6, 192:10, 198:25

**BROUSSARD** [1] - 153:11

**BUCKET** [5] - 17:19, 27:9, 29:23, 30:21, 30:23

**BUCKETS** [3] - 17:14, 17:17, 29:7

**BUCKWALTER** [6] - 1:11, 16:3, 27:13, 41:21, 94:1, 105:6

**BUCKWALTER'S** [1] - 5:6

**BUFFETT** [3] - 36:2, 36:23, 92:16

**BUILD** [3] - 102:5, 108:16, 110:1

**BUILDING** [5] - 25:4, 25:11, 56:6, 111:15, 151:11

**BURDEN** [15] - 3:9, 25:6, 27:15, 27:17, 27:23, 27:25, 63:12, 94:24, 191:1, 191:2, 191:15, 191:18, 191:23, 194:3, 194:16

**BUS** [2] - 147:20, 147:24

**BUSINESS** [108] - 12:6, 12:8, 18:14, 18:23, 19:12, 19:19, 19:24, 21:15, 31:23, 32:21, 32:23, 33:1, 33:4, 33:10, 33:18,

34:10, 34:23, 35:6, 36:17, 36:21, 37:7, 37:15, 37:23, 37:24, 39:7, 39:21, 41:6, 41:15, 41:18, 41:25, 42:3, 42:5, 42:7, 43:5, 43:8, 43:10, 43:12, 45:3, 45:15, 46:5, 46:21, 46:23, 50:9, 50:21, 51:23, 52:6, 52:15, 54:23, 55:13, 57:18, 57:24, 58:2, 58:10, 58:15, 58:19, 59:11, 59:12, 65:3, 67:12, 68:17, 69:5, 71:3, 71:19, 71:20, 72:10, 72:22, 72:25, 73:1, 75:7, 76:24, 81:4, 83:1, 83:14, 83:15, 83:24, 90:11, 100:9, 100:21, 108:16, 108:17, 112:18, 113:5, 113:21, 114:1, 114:2, 114:3, 130:2, 130:11, 142:20, 158:1, 158:4, 159:21, 160:18, 161:16, 161:18, 163:21, 170:12, 171:6, 171:7, 173:23, 173:24, 174:2, 175:18, 176:3, 177:8, 183:25, 195:6

**BUSINESSES** [2] - 42:1, 43:14

**BUSINESSMAN** [2] - 13:4, 78:5

**BUY** [4] - 43:9, 46:22, 72:25, 83:14

**BUYING** [2] - 43:12, 54:17

# C

**C.A.T** [1] - 1:23

**CANCELLED** [2] - 84:14, 84:15

**CANNOT** [8] - 19:21, 25:22, 84:24, 85:3, 118:11, 120:14, 143:22, 185:24

**CAPTURE** [2] - 88:18, 88:23

**CAPTURES** [1] - 50:7

**CARD** [2] - 8:2, 8:16

**CARE** [2] - 48:13, 48:25

**CAREER** [9] - 34:24,

39:13, 44:25, 54:5, 70:7, 102:24, 129:21, 129:24, 149:18

**CAREERS** [2] - 122:20, 122:23

**CAREFUL** [1] - 106:14

**CAREFULLY** [1] - 59:15

**CAROLINA** [4] - 51:15, 53:9, 56:8, 57:5

**CAROLINE** [1] - 2:24

**CARS** [1] - 147:17

**CASE** [55] - 3:9, 4:13, 5:13, 7:15, 7:19, 7:23, 8:1, 8:2, 8:3, 15:21, 16:16, 27:16, 57:2, 60:20, 62:19, 62:21, 62:24, 63:17, 91:5, 96:13, 96:17, 97:1, 99:4, 106:2, 116:12, 129:11, 129:13, 132:3, 139:21, 146:23, 149:5, 157:22, 158:10, 159:14, 162:9, 173:19, 183:5, 190:9, 191:2, 191:8, 191:23, 192:8, 192:17, 192:25, 193:10, 194:8, 197:13, 197:15, 197:18, 201:1, 201:5

**CASES** [7] - 7:16, 94:20, 94:23, 106:25, 131:16, 192:18, 201:9

**CASH** [15] - 27:2, 33:4, 38:9, 43:15, 46:23, 49:25, 68:16, 73:1, 79:13, 79:16, 83:15, 113:19, 113:21, 186:21

**CASHED** [8] - 13:8, 33:11, 51:17, 52:15, 57:10, 183:10, 183:14

**CASUALTY** [1] - 178:18

**CATASTROPHE** [1] - 56:12

**CATCH** [4] - 18:17, 23:3, 100:24

**CAUTIONED** [2] - 170:25, 171:1

**CEASING** [1] - 122:22

**CENTERS** [1] - 10:1

**CENTRAL** [1] - 17:23

**CENTURY** [2] - 88:6, 88:15

**CEO** [1] - 168:17

**CERTAIN** [7] - 4:9, 104:10, 124:10, 127:14, 159:20, 172:6, 193:11

**CERTAINLY** [1] - 86:20

**CERTAINTY** [1] - 32:24

**CERTIFY** [1] - 201:17

**CETERA** [7] - 18:1, 22:12, 31:10, 70:12

**CHAIRMAN** [1] - 4:19

**CHALLENGE** [1] - 83:3

**CHALLENGING** [1] - 17:7

**CHANCE** [4] - 3:10, 59:18, 173:12, 175:15

**CHANCES** [1] - 130:1

**CHANGE** [22] - 3:20, 53:20, 54:6, 54:9, 58:22, 119:5, 126:16, 128:18, 138:9, 141:1, 141:9, 142:5, 143:1, 147:20, 176:18, 176:19, 178:14, 178:15, 178:16, 178:19, 180:16

**CHANGED** [5] - 3:18, 44:6, 177:24, 178:13, 180:18

**CHANGES** [7] - 3:16, 176:10, 176:15, 177:11, 177:12, 177:13

**CHANGING** [6] - 57:25, 102:7, 139:6, 141:20, 176:23, 177:1

**CHARGE** [6] - 6:19, 102:17, 179:12, 182:12, 202:7

**CHARMING** [2] - 17:3, 161:10

**CHEAT** [1] - 104:20

**CHEATED** [1] - 21:19

**CHECK** [7] - 28:20, 28:21, 28:24, 50:3, 101:9, 101:10, 101:13

**CHECKED** [1] - 101:20

**CHECKING** [1] - 29:5

**CHERRY** [1] - 117:15

**CHERRY-PICKED** [1]

- 117:15

**CHICAGO** [1] - 2:10

**CHINESE** [1] - 140:1

**CHOICE** [140] - 15:10, 15:11, 19:22, 21:14, 23:10, 25:16, 27:4, 31:17, 34:2, 34:9, 34:16, 34:21, 39:7, 39:17, 42:17, 47:24, 48:7, 48:9, 52:13, 53:17, 57:10, 59:14, 60:18, 60:23, 61:5, 63:15, 63:17, 63:18, 66:4, 66:7, 66:15, 66:23, 66:24, 68:10, 69:2, 69:7, 69:25, 72:5, 72:17, 72:18, 73:17, 76:14, 76:15, 76:17, 76:19, 77:4, 77:13, 77:14, 77:16, 77:25, 78:18, 78:19, 81:1, 81:7, 81:8, 84:4, 84:17, 87:19, 96:13, 96:20, 96:24, 97:1, 97:3, 97:9, 97:11, 97:13, 98:1, 102:23, 102:24, 103:13, 138:20, 146:23, 146:25, 147:1, 147:3, 147:5, 147:12, 147:18, 147:22, 147:23, 148:5, 148:10, 148:11, 148:12, 148:14, 148:17, 148:20, 149:3, 149:4, 149:9, 154:7, 154:10, 154:17, 156:18, 156:22, 157:2, 157:11, 157:13, 158:7, 158:8, 158:23, 159:6, 160:3, 160:24, 160:25, 161:9, 161:14, 161:21, 161:24, 162:2, 162:3, 162:20, 162:21, 163:1, 163:2, 163:10, 164:2, 164:8, 169:1, 171:2, 171:10, 183:9, 184:10, 184:13, 184:20, 186:6, 186:7, 187:8, 194:8, 194:9, 194:11, 194:14, 196:9

**CHOICES** [51] - 9:2, 17:17, 27:4, 27:6, 27:7, 31:21, 40:25, 42:14, 46:8, 56:14,

56:16, 61:1, 63:14, 63:16, 64:18, 64:23, 66:12, 66:17, 66:25, 67:23, 72:11, 72:12, 76:20, 77:11, 77:16, 79:7, 87:20, 87:21, 87:25, 89:3, 96:23, 97:4, 98:8, 98:9, 154:1, 154:3, 165:14, 166:5, 169:10, 170:8, 184:11, 184:14, 185:3, 185:5, 185:8, 185:9, 186:2

CHOOSE [18] - 5:24, 23:24, 25:13, 46:14, 61:3, 75:20, 78:12, 78:15, 84:9, 96:14, 147:7, 147:10, 156:9, 156:10, 165:19, 175:4, 184:11, 185:5

CHOSE [39] - 9:2, 9:3, 25:15, 31:18, 42:24, 46:9, 52:9, 57:12, 59:25, 63:19, 63:22, 69:2, 69:5, 72:12, 73:9, 78:1, 80:11, 80:24, 81:1, 83:9, 84:5, 86:5, 87:21, 96:18, 104:2, 155:1, 155:7, 155:13, 156:9, 156:24, 157:2, 160:15, 161:5, 161:8, 169:10, 175:23, 176:1, 183:8, 183:10

CHOSEN [7] - 31:25, 44:14, 76:17, 77:25, 165:14, 165:15, 165:17

CHRIS [1] - 90:15

CHRISTMAS [1] - 86:12

CHRISTOPHER [1] - 2:17

CHUNK [2] - 100:11, 151:11

CHURCHILL [2] - 22:4, 85:5

CIRCUMSTANCE [1] - 125:19

CIRCUMSTANCES [10] - 64:25, 81:3, 97:24, 119:20, 127:14, 149:8, 194:21, 194:24, 196:9, 196:17

CIRCUMSTANTIAL [4] - 190:10, 190:13,

190:21, 190:22

CITIZEN [1] - 148:14

CITIZENS [1] - 154:24

CITY [1] - 25:9

CIVIL [4] - 1:3, 7:7, 7:8, 20:18

CLAD [1] - 48:18

CLAIM [5] - 15:6, 15:9, 15:10, 122:5, 168:6

CLAIMED [15] - 35:14, 39:20, 44:24, 45:9, 45:15, 50:8, 60:11, 70:6, 70:12, 70:21, 71:11, 74:22, 81:11, 84:19, 85:6

CLAIMS [32] - 8:11, 10:1, 13:22, 14:7, 14:10, 14:20, 26:3, 27:21, 35:19, 35:25, 36:4, 36:11, 38:21, 39:23, 40:9, 46:23, 47:11, 47:16, 47:17, 49:6, 49:16, 50:11, 54:5, 55:1, 57:1, 74:10, 82:8, 83:3, 98:25, 139:24, 157:20, 198:25

CLAM [1] - 102:9

CLARENCE [5] - 88:6, 88:7, 88:9, 93:21, 182:18

CLARITY [2] - 65:1, 195:3

CLAUSE [3] - 119:5, 144:9

CLEANERS [1] - 131:1

CLEAR [18] - 26:7, 26:10, 53:11, 65:2, 81:15, 99:5, 104:8, 123:5, 127:19, 132:16, 133:4, 134:24, 139:12, 140:5, 140:7, 159:10, 184:1

CLEARINGHOUSE [1] - 102:14

CLEARLY [4] - 123:21, 149:17, 161:11, 164:25

CLERK [5] - 3:1, 7:3, 7:6, 89:18, 152:16

CLIENT [4] - 4:16, 7:20, 74:8

CLIENT'S [2] - 4:13, 74:7

CLIENTS [2] - 5:2, 188:21

CLIMBING [1] - 94:5

CLINTON [1] - 69:11

CLOCK [3] - 102:15, 164:6

CLOSE [6] - 19:3, 21:16, 39:24, 54:19, 161:18, 163:23

CLOSING [14] - 3:6, 3:7, 4:9, 89:15, 89:24, 93:4, 136:5, 154:5, 155:1, 159:11, 165:22, 189:5, 189:8, 202:2

CLOSINGS [2] - 88:7, 88:17

CM [1] - 1:19

COGNATO [1] - 2:17

COHEN [4] - 176:9, 176:15, 177:3

COIN [1] - 99:11

COINCIDENCE [1] - 106:18

COKE [4] - 130:25, 144:3, 144:25, 145:2

COLEEN [1] - 1:13

COLLEAGUE [1] - 79:17

COLLEAGUES [2] - 79:4, 178:3

COLLECTIVE [6] - 11:17, 16:12, 16:25, 29:3, 78:20, 87:4

COLLEGE [8] - 34:3, 43:19, 71:12, 71:14, 71:17, 73:7, 126:3, 149:21

COMING [1] - 141:9

COMMENT [1] - 173:16

COMMERCIAL [2] - 178:17, 178:18

COMMISSION [37] - 53:20, 53:21, 53:23, 54:9, 75:19, 75:22, 75:23, 102:18, 107:25, 108:1, 108:2, 108:10, 109:3, 109:8, 109:17, 109:20, 109:23, 140:13, 140:17, 141:25, 143:1, 175:22, 175:24, 176:11, 176:18, 176:19, 176:21, 177:11, 177:12, 177:13, 177:24, 178:7, 180:10, 180:16, 180:17, 180:20

COMMISSIONS [28] - 43:7, 46:20, 68:18, 72:23, 83:13, 85:8,

107:24, 109:1, 110:18, 133:19, 134:3, 140:14, 140:23, 140:24, 140:25, 141:8, 141:18, 141:21, 141:24, 142:10, 142:16, 142:18, 143:8, 143:17, 170:14, 176:24, 177:1, 177:18

COMMITMENT [1] - 6:2

COMMON [15] - 9:8, 16:14, 20:2, 20:8, 21:5, 21:7, 30:2, 30:6, 68:12, 77:12, 114:5, 185:13, 185:14

COMPANY [18] - 1:6, 20:6, 40:2, 41:18, 44:9, 81:19, 81:20, 104:3, 115:2, 118:1, 118:6, 118:9, 127:23, 130:6, 145:7, 168:6, 168:7, 176:21

COMPANY'S [2] - 168:3, 168:4

COMPARED [4] - 16:24, 17:21, 59:15, 158:24

COMPARISON [3] - 151:3, 151:23, 151:25

COMPENSATED [1] - 122:14

COMPENSATION [6] - 110:14, 110:25, 111:5, 111:6, 111:9, 177:8

COMPETE [15] - 33:9, 33:16, 75:24, 77:5, 77:8, 79:17, 81:3, 81:6, 86:18, 151:16, 157:8, 173:21, 181:7, 181:11, 183:22

COMPETING [4] - 90:10, 90:16, 91:3, 174:7

COMPETITIVE [3] - 5:15, 169:3, 169:4

COMPETITOR [2] - 90:12, 131:7

COMPLAIN [3] - 46:9, 46:15, 170:22

COMPLAINED [11] - 32:16, 37:17, 42:24, 58:16, 67:24, 72:13,

75:23, 83:6, 83:7, 170:17, 174:9

COMPLAINTS [1] - 14:8

COMPLETELY [3] - 48:13, 94:21, 125:24

COMPLETION [1] - 5:21

COMPLICATED [1] - 196:22

COMPLIED [4] - 49:17, 49:21, 62:19, 62:22

COMPLIMENTS [1] - 200:22

COMPLY [3] - 76:1, 148:15, 159:25

COMPONENT [1] - 111:20

COMPOUND [1] - 109:10

CONCEPT [3] - 108:14, 112:16, 153:2

CONCERN [1] - 53:21

CONCERNED [3] - 59:9, 80:8, 141:17

CONCERNING [2] - 74:5, 197:14

CONCLUDE [1] - 100:1

CONDITION [1] - 91:10

CONDITIONING [1] - 190:17

CONDITIONS [2] - 120:7, 120:9

CONDUCT [3] - 22:21, 88:25, 177:5

CONDUCTED [1] - 7:3

CONFERENCE [1] - 199:13

CONFESS [1] - 139:1

CONFESSION [1] - 138:23

CONFIDENT [1] - 7:10

CONFIDENTIALITY [1] - 144:8

CONFIRMED [2] - 41:13, 154:22

CONFRONTED [4] - 21:19, 21:21, 21:22, 70:11

CONFUSED [3] - 27:6, 63:16, 184:13

CONFUSING [1] - 199:5

CONNECTION [2] - 143:3, 193:12

CONSCIOUS [13] -

34:9, 39:6, 47:24,
53:16, 59:14, 64:15,
69:2, 72:20, 81:1,
84:4, 157:2, 163:1,
183:1
**CONSEQUENCE** [6] -
48:7, 61:4, 63:15,
122:24, 184:13,
184:15
**CONSEQUENCES**
[11] - 27:5, 27:7,
63:14, 63:16, 63:21,
63:22, 77:14, 97:6,
122:24, 138:9, 139:6
**CONSIDER** [18] - 9:21,
24:24, 81:22,
127:20, 142:4,
175:4, 188:22,
188:23, 189:24,
190:1, 194:19,
195:22, 195:24,
196:13, 196:20,
197:4, 197:24, 200:8
**CONSIDERATION** [8]
- 8:4, 37:6, 65:17,
92:2, 163:5, 195:17,
198:6, 198:8
**CONSIDERED** [8] -
10:9, 32:15, 75:17,
79:13, 158:14,
193:18, 196:8,
197:17
**CONSIDERING** [1] -
111:16
**CONSISTS** [1] -
189:20
**CONSOLIDATION** [1]
- 192:20
**CONSULT** [4] - 9:12,
42:25, 70:4, 80:11
**CONSULTED** [3] -
12:11, 37:19, 68:8
**CONTAINED** [1] -
53:19
**CONTEMPLATING** [1]
- 3:16
**CONTEMPORANEO
US** [1] - 85:23
**CONTENTION** [1] -
24:23
**CONTEXT** [3] -
119:14, 121:19,
121:21
**CONTEXTS** [1] - 121:5
**CONTINUE** [9] -
15:24, 34:24, 34:25,
38:6, 63:19, 102:25,
162:7, 176:1, 181:4
**CONTINUED** [6] - 2:1,
75:5, 77:2, 133:3,

150:19, 165:16
**CONTINUES** [1] -
109:16
**CONTINUING** [2] -
134:1, 134:2
**CONTINUOUS** [1] -
146:2
**CONTRACT** [74] - 8:6,
12:7, 12:9, 13:9,
18:5, 21:25, 27:17,
35:18, 37:24, 39:15,
39:17, 40:14, 41:12,
45:1, 49:8, 49:12,
49:21, 53:19, 53:22,
54:7, 54:10, 54:24,
70:7, 74:11, 81:12,
81:21, 82:3, 84:10,
84:14, 84:21, 84:22,
85:2, 85:7, 85:9,
85:21, 110:17,
114:18, 114:22,
114:25, 115:1,
115:13, 115:21,
116:14, 117:7,
118:11, 118:22,
118:25, 119:4,
119:6, 119:11,
120:17, 143:6,
143:10, 143:24,
144:8, 166:18,
167:23, 168:8,
169:12, 169:14,
169:15, 169:22,
169:23, 175:17,
179:22, 179:23,
180:3, 180:15,
180:17, 195:20
**CONTRACTOR** [9] -
40:10, 46:19, 72:23,
74:14, 100:19,
104:3, 124:17,
140:15, 145:9
**CONTRACTORS** [10] -
5:16, 121:18,
122:19, 140:21,
142:17, 143:16,
172:9, 172:13,
173:5, 173:12
**CONTRACTS** [24] -
25:21, 49:13, 76:1,
84:15, 85:17, 99:22,
99:24, 110:19,
114:13, 114:14,
114:15, 115:15,
116:1, 117:2,
117:12, 118:17,
121:2, 121:3, 121:6,
165:24, 166:9,
166:14, 169:1, 174:6
**CONTRACTUAL** [1] -

170:2
**CONTRADICT** [1] -
113:14
**CONTRADICTED** [1] -
197:19
**CONTRADICTIONS**
[1] - 197:25
**CONTRADICTORY** [1]
- 181:5
**CONTRAIRE** [1] -
155:24
**CONTRARY** [7] -
16:23, 60:5, 66:5,
136:15, 159:3,
161:14, 180:24
**CONTRAST** [2] -
57:20, 58:9
**CONTRIBUTIONS** [2]
- 122:17, 123:13
**CONTROL** [1] - 55:7
**CONTROLLED** [1] -
106:1
**CONTROLLING** [1] -
106:15
**CONVERSATION** [2] -
39:12, 82:2
**CONVERSION** [7] -
6:2, 41:3, 41:4,
51:10, 123:9, 141:3,
150:19
**CONVERT** [7] - 51:11,
51:13, 122:3,
123:18, 123:22,
124:4, 124:17
**CONVERTED** [1] -
122:18
**CONVERTING** [3] -
98:7, 121:16, 121:17
**CONVEY** [1] - 24:12
**COOLER** [1] - 188:13
**COPY** [2] - 64:7, 189:9
**CORNER** [1] - 147:15
**CORPORATE** [1] -
99:17
**CORRECT** [3] - 14:10,
35:8, 201:18
**CORRECTIONS** [1] -
198:17
**COST** [1] - 55:8
**COSTS** [1] - 127:25
**COUNSEL** [7] - 78:3,
78:12, 124:1, 183:3,
186:16, 195:14,
198:20
**COUNT** [4] - 49:10,
69:17, 163:6, 169:13
**COUNTERPARTY'S**
[1] - 174:22
**COUNTRY** [9] - 5:3,
5:5, 6:14, 32:10,

55:23, 59:23, 67:22,
77:22
**COUNTS** [1] - 186:15
**COUPLE** [14] - 12:15,
30:22, 50:3, 68:2,
68:5, 76:9, 84:13,
93:16, 95:10, 119:3,
141:22, 146:15,
164:24, 166:6
**COURSE** [25] - 6:19,
22:2, 30:16, 32:1,
32:7, 34:15, 40:6,
40:12, 41:19, 47:13,
60:23, 61:9, 69:24,
80:10, 82:9, 98:8,
101:6, 116:11,
121:13, 150:24,
158:9, 170:21,
188:22, 190:9, 194:3
**COURSES** [2] - 71:13,
71:15
**COURT** [57] - 1:1,
1:20, 3:1, 3:3, 3:14,
3:19, 3:23, 6:17,
6:19, 20:17, 21:1,
24:17, 24:25, 26:5,
26:12, 27:12, 55:24,
56:3, 62:17, 62:23,
66:6, 89:14, 89:18,
89:19, 90:4, 91:6,
91:15, 91:18, 91:22,
92:1, 92:5, 92:17,
92:20, 93:1, 93:3,
93:25, 148:4, 152:8,
152:16, 152:17,
159:18, 181:17,
182:5, 187:13,
187:17, 187:22,
188:9, 188:15,
199:3, 199:8,
199:12, 199:15,
199:25, 201:8,
201:13, 201:15,
201:22
**COURTHOUSE** [2] -
1:20, 20:10
**COURTROOM** [5] -
6:15, 8:5, 50:2,
162:23, 190:20
**COURTS** [1] - 6:14
**COVENANT** [9] - 33:9,
33:15, 75:24, 77:5,
77:8, 86:18, 173:20,
181:6, 181:11
**COVER** [2] - 29:21,
111:12
**COVERAGE** [1] -
111:3
**COVERED** [4] - 35:23,
35:24, 48:17, 49:5

**COVERS** [1] - 124:5
**CPA** [3] - 68:9, 68:12,
183:6
**CRAIG** [1] - 108:22
**CREASE** [23] - 8:8,
10:10, 10:17, 10:18,
13:23, 42:14, 45:20,
46:2, 50:23, 76:4,
79:8, 108:22,
108:23, 119:18,
119:19, 119:24,
153:19, 154:19,
154:25, 162:22,
166:20, 167:6,
185:12
**CREASE'S** [2] - 8:9,
108:21
**CREATE** [2] - 125:21,
128:10
**CREATED** [2] -
153:13, 179:13
**CREDIBILITY** [15] -
17:20, 27:9, 35:14,
39:11, 44:16, 54:4,
60:1, 73:25, 81:10,
94:22, 95:3, 103:16,
185:17, 197:2, 198:9
**CREDIT** [3] - 133:9,
133:13, 174:24
**CREDITED** [1] - 58:4
**CREWS** [30] - 11:20,
18:13, 19:6, 20:5,
21:13, 22:25, 30:25,
33:17, 33:19, 37:9,
38:8, 42:2, 51:15,
57:8, 79:18, 153:9,
153:19, 159:22,
161:10, 168:22,
173:22, 173:25,
175:7, 175:16,
181:7, 184:15,
184:25, 185:2
**CRICKET** [1] - 132:8
**CRIMINAL** [1] - 191:8
**CRITICAL** [4] - 11:14,
99:12, 146:24, 177:8
**CRITICALLY** [2] -
95:5, 99:4
**CRITICIZE** [1] - 155:3
**CROP** [1] - 41:10
**CROPS** [1] - 41:7
**CROSS** [19] - 15:2,
16:19, 18:10, 34:18,
35:11, 35:20, 43:24,
67:5, 71:24, 79:23,
144:1, 144:6,
147:21, 156:1,
161:3, 161:6,
166:17, 170:12,
177:23

**CROSS-EXAMINED**
[3] - 18:10, 144:6,
156:1
**CROSSED** [3] - 38:25,
69:16, 157:15
**CROSSWORD** [1] -
133:18
**CRUISE** [1] - 78:23
**CULTURE** [1] - 191:6
**CURE** [1] - 118:14
**CURRENT** [1] - 4:17
**CUSTOMERS** [13] -
25:8, 130:7, 130:15,
130:25, 131:1,
143:24, 144:3,
144:5, 144:21,
144:25, 181:19,
182:3
**CUT** [4] - 124:8,
141:25, 142:1,
143:18

# D

**DAMAGES** [2] - 14:7,
136:22
**DARE** [2] - 133:13,
174:24
**DARROW** [7] - 88:6,
88:7, 88:9, 88:20,
88:22, 93:21, 182:18
**DATE** [7] - 124:10,
133:5, 133:6,
145:13, 146:13,
192:7, 201:21
**DATED** [2] - 142:14,
142:23
**DAUGHTER** [2] -
95:19, 152:25
**DAVID** [1] - 1:15
**DAYS** [16] - 10:5,
30:16, 31:4, 37:10,
39:8, 40:11, 40:12,
40:14, 46:3, 80:2,
82:24, 88:4, 128:16,
155:24, 171:22,
189:19
**DC** [1] - 2:4
**DEADLINE** [1] -
102:23
**DEAL** [23] - 4:4, 17:17,
19:24, 46:2, 47:14,
47:15, 60:9, 60:14,
62:11, 65:15, 68:13,
71:22, 71:25, 72:7,
73:13, 86:21, 86:22,
95:11, 106:6,
142:10, 200:15
**DEALING** [1] - 164:5
**DEALS** [1] - 139:21

**DEALT** [1] - 10:24
**DEATH** [1] - 166:11
**DEBT** [5] - 38:8, 43:5,
46:19, 58:23, 83:12
**DECIDE** [36] - 5:5, 5:7,
5:9, 15:4, 15:6, 16:1,
16:2, 16:3, 16:4,
34:16, 47:1, 47:2,
48:22, 48:24, 49:4,
50:5, 50:17, 51:19,
55:22, 57:17, 65:15,
68:4, 70:5, 74:21,
81:16, 83:21, 86:25,
94:18, 129:14,
132:14, 141:2,
155:14, 180:6,
188:24, 189:1, 190:6
**DECIDED** [4] - 18:13,
34:22, 37:22, 42:15,
44:18, 75:17, 79:14,
79:16, 142:18,
143:7, 143:9,
177:24, 183:1, 199:5
**DECIDING** [3] -
131:10, 196:23,
197:24
**DECISION** [25] - 27:2,
31:3, 37:10, 72:20,
82:23, 86:22, 141:7,
142:8, 160:2,
163:25, 168:14,
168:15, 168:17,
169:5, 169:6, 170:5,
170:6, 177:17,
185:11, 189:13,
192:23, 193:10,
193:19, 193:25,
194:20
**DECISIONS** [4] -
64:15, 140:11,
141:16, 183:1
**DECISIVE** [1] - 94:23
**DECLARED** [1] -
113:25
**DECLARES** [1] -
99:22
**DEDUCTED** [1] - 55:5
**DEDUCTIBLE** [3] -
55:10, 71:2, 74:24
**DEDUCTION** [4] -
36:6, 70:24, 74:24,
82:11
**DEDUCTIONS** [4] -
40:7, 50:14, 76:25,
82:10
**DEEP** [13] - 30:25,
37:9, 42:13, 45:20,
51:18, 58:13, 67:8,
79:5, 79:8, 79:25,
153:7, 155:17,

186:23
**DEFEND** [1] - 7:21
**DEFENDANT** [17] -
3:7, 3:9, 3:10, 7:20,
27:14, 87:8, 191:1,
191:12, 191:15,
191:17, 191:24,
193:4, 193:23,
194:2, 194:3,
194:12, 194:16
**DEFENDANT'S** [7] -
5:20, 163:16,
163:17, 172:5,
173:9, 186:4, 191:21
**DEFENDANTS** [3] -
2:11, 2:15, 192:14
**DEFENDED** [1] - 74:5
**DEFENSE** [3] - 27:18,
27:22, 157:19
**DEFINE** [1] - 193:7
**DEFINITION** [5] -
55:20, 64:8, 108:24,
149:4, 194:5
**DEGREE** [4] - 34:3,
43:19, 45:2, 157:6
**DEGREES** [1] - 80:21
**DELAY** [5] - 63:5,
63:6, 192:6, 192:12,
192:13
**DELIBERATE** [2] -
126:12, 200:4
**DELIBERATION** [2] -
65:5, 195:8
**DEM** [2] - 14:2, 61:19
**DEMANDED** [1] - 75:2
**DEMONSTRATIVE** [4]
- 172:6, 173:9,
176:6, 181:14
**DENIAL** [1] - 165:9
**DENIES** [1] - 194:2
**DENIGRATE** [2] -
22:6, 148:17
**DENTAL** [1] - 81:9
**DENY** [3] - 22:5,
74:12, 107:4
**DENYING** [3] - 107:7,
125:7, 139:25
**DEPART** [1] - 119:22
**DEPARTED** [1] - 33:2
**DEPARTING** [1] -
41:15
**DEPARTURE** [1] -
119:24
**DEPENDENT** [1] -
143:16
**DEPOSITION** [16] -
12:17, 12:22, 12:25,
35:21, 35:23, 42:25,
47:9, 48:19, 48:23,
70:3, 71:13, 71:14,

75:4, 185:19, 189:23
**DESCRIBE** [1] - 197:9
**DESCRIBED** [5] -
62:16, 133:2, 149:6,
149:14, 157:22
**DESCRIBING** [1] -
8:23
**DESIRABLE** [1] -
23:25
**DESIRED** [1] - 144:22
**DESK** [1] - 133:18
**DESPERATE** [2] -
17:23, 19:1
**DESPITE** [2] - 43:25,
169:25
**DESTRUCTION** [1] -
97:8
**DETAIL** [2] - 157:22,
198:2
**DETERMINATION** [1]
- 74:2
**DETERMINATIONS**
[1] - 85:11
**DETERMINE** [5] -
34:1, 119:20,
193:16, 194:18,
196:16
**DETERMINING** [3] -
120:9, 194:25, 196:8
**DEVASTATING** [5] -
97:7, 125:18, 152:4,
159:1, 159:6
**DEVELOPING** [1] -
129:23
**DICTATE** [1] - 18:3
**DIED** [2] - 20:19,
182:19
**DIFFERENCE** [4] -
27:6, 77:23, 138:21,
147:6
**DIFFERENT** [15] -
4:10, 7:19, 10:10,
12:23, 21:23, 24:2,
27:11, 27:16, 41:20,
46:18, 63:14, 85:18,
99:10, 125:19,
135:18
**DIFFERENTLY** [1] -
154:13
**DIGNITY** [4] - 132:5,
174:13, 174:20,
186:11
**DIRE** [1] - 7:3
**DIRECT** [19] - 16:18,
20:18, 20:21, 23:12,
24:10, 32:3, 34:16,
34:22, 43:25, 50:23,
75:8, 92:9, 136:3,
153:17, 153:18,
160:6, 190:10,

190:11, 190:23
**DIRECTORS** [2] -
123:7, 123:8
**DISADVANTAGES** [1]
- 93:8
**DISAGREE** [1] - 16:10
**DISAGREED** [1] - 74:6
**DISAGREES** [2] -
74:8, 74:9
**DISCIPLINARY** [1] -
119:23
**DISCLOSED** [1] -
140:10
**DISCRETION** [1] -
119:23
**DISCUSS** [3] - 12:16,
89:21, 190:25
**DISCUSSED** [7] -
3:18, 3:20, 58:19,
69:4, 86:18, 97:15,
200:18
**DISCUSSION** [2] -
55:19, 153:10
**DISPOSED** [1] -
103:18
**DISPROVEN** [1] -
92:11
**DISPUTE** [7] - 9:10,
60:10, 110:20,
161:7, 172:3, 172:4,
186:18
**DISPUTED** [1] - 5:8
**DISRUPTIVE** [1] - 4:24
**DISSENTER** [1] -
20:15
**DISSENTS** [1] - 20:15
**DISTANCE** [2] - 4:9,
125:21
**DISTINCTION** [2] -
146:25, 147:11
**DISTRACT** [1] -
132:18
**DISTRACTION** [1] -
137:1
**DISTRICT** [2] - 1:1, 1:1
**DIVE** [13] - 30:25,
37:9, 42:13, 45:20,
51:18, 58:13, 67:8,
79:5, 79:8, 79:25,
153:7, 155:17,
186:24
**DOCUMENT** [31] -
4:16, 8:2, 8:3, 18:2,
22:14, 26:18, 65:25,
84:25, 85:1, 85:3,
118:23, 119:6,
137:11, 138:19,
142:13, 142:14,
156:2, 167:19,
176:13, 176:14,

176:24, 177:20,
177:22, 178:1,
178:9, 179:7,
179:13, 179:17,
179:21, 180:4,
185:24
**DOCUMENTS** [7] -
75:21, 85:24, 106:3,
118:9, 118:21,
119:8, 119:14
**DOLLAR** [2] - 111:17,
151:17
**DOLLARS** [11] - 6:5,
6:7, 50:4, 55:2,
113:4, 150:10,
150:11, 150:13,
151:10, 164:25,
184:4
**DONALD** [1] - 2:24
**DONE** [23] - 17:8,
48:11, 58:4, 59:6,
60:24, 63:9, 64:12,
87:7, 87:11, 113:8,
123:6, 136:18,
154:12, 159:8,
172:25, 175:19,
187:15, 187:25,
189:16, 192:19,
194:6, 194:8, 197:20
**DOOR** [2] - 97:16,
108:8
**DOORS** [1] - 97:7
**DOORWAY** [1] - 95:25
**DOUBLE** [1] - 111:17
**DOUBLED** [1] -
107:11
**DOUBT** [5] - 148:9,
154:15, 191:4,
191:7, 191:9
**DOWN** [28] - 18:20,
19:2, 19:13, 19:17,
19:25, 20:10, 20:23,
21:15, 24:11, 39:8,
42:23, 45:5, 52:1,
52:3, 52:5, 54:18,
57:7, 65:13, 67:17,
73:10, 83:3, 103:2,
105:3, 107:11,
141:9, 148:3, 157:3,
168:22
**DOWNSIZED** [1] -
45:4
**DOWNSIZING** [1] -
167:2
**DRAFT** [1] - 64:9
**DRAW** [2] - 190:24,
198:24
**DRAWING** [1] - 133:16
**DROP** [1] - 103:18
**DROPPING** [1] - 116:8

**DTX** [3] - 11:10, 14:18,
41:3
**DUE** [1] - 61:16
**DUEL** [2] - 17:7,
184:23
**DURESS** [6] - 15:9,
18:25, 26:15, 103:6,
138:3, 175:8
**DURING** [11] - 89:23,
90:13, 133:9,
133:19, 136:5,
141:15, 144:1,
145:6, 158:16,
166:17, 177:22
**DUTIES** [1] - 199:24
**DUTY** [6] - 148:14,
148:22, 149:2,
188:23, 189:12,
189:16

## E

**E-MAIL** [1] - 29:11
**EA** [1] - 40:10
**EARLY** [6] - 42:16,
44:18, 146:3,
160:23, 161:17,
190:20
**EARN** [1] - 109:1
**EARNED** [6] - 36:23,
40:8, 60:15, 71:6,
74:25, 82:17
**EARNING** [2] - 45:18,
186:3
**EARS** [1] - 94:19
**EARTH** [1] - 88:17
**EASTERN** [1] - 1:1
**EASY** [2] - 194:19,
199:9
**ECONOMIC** [49] - 8:4,
9:4, 18:13, 18:22,
32:21, 32:23, 33:24,
36:21, 37:6, 42:10,
43:8, 46:21, 48:8,
51:7, 51:12, 52:14,
54:25, 56:12, 57:8,
57:9, 58:18, 64:15,
64:16, 65:18, 66:4,
68:15, 69:11, 71:18,
72:24, 78:2, 83:13,
122:23, 158:7,
158:22, 158:24,
159:4, 159:18,
161:21, 163:5,
164:7, 165:18,
168:25, 169:9,
174:1, 175:17,
183:1, 185:10,
186:21
**ECONOMICALLY** [4] -

66:13, 68:12, 88:25,
154:7
**ECONOMICS** [2] -
162:18, 162:19
**ED** [1] - 4:19
**EDUCATED** [5] -
14:25, 34:4, 38:18,
59:5, 73:6
**EDUCATION** [2] -
65:3, 195:5
**EDWARD** [1] - 2:20
**EEOC** [1] - 168:23
**EFFECT** [9] - 90:2,
109:15, 137:18,
140:6, 144:22,
145:25, 169:23,
170:24
**EFFECTIVE** [5] -
133:6, 143:1,
145:12, 146:13,
177:19
**EFFECTIVELY** [1] -
77:12
**EFFORT** [2] - 31:11,
132:23
**EIGHT** [8] - 29:1, 88:7,
88:12, 154:25,
165:24, 182:18,
188:25, 200:12
**EITHER** [15] - 14:22,
25:13, 47:14, 50:14,
55:11, 71:5, 72:19,
114:18, 117:24,
135:9, 175:12,
186:21, 190:10,
196:2, 197:4
**EKES** [1] - 85:4
**ELECT** [1] - 90:16
**ELECTED** [1] - 35:6
**ELECTION** [5] - 8:25,
34:13, 34:15,
137:19, 161:5
**ELECTIONS** [1] -
160:15
**ELEVATED** [1] - 18:11
**ELIGIBLE** [4] - 61:15,
61:22, 61:24, 145:20
**ELIMINATING** [1] -
5:21
**ELLIPSES** [1] - 166:16
**ELLIS** [1] - 2:9
**ELOQUENT** [1] -
93:19
**ELSEWHERE** [1] -
145:7
**EMERGED** [2] - 9:7,
17:19
**EMERGES** [1] - 22:7
**EMPANELED** [1] -
28:16

**EMPLOYEE** [25] -
5:22, 5:24, 23:8,
44:17, 51:14, 77:3,
99:6, 112:9, 119:2,
119:17, 122:22,
128:12, 145:18,
145:20, 145:25,
167:9, 170:14,
170:15, 172:6,
172:7, 172:11,
172:12, 173:11,
195:19
**EMPLOYEES** [28] -
4:18, 4:19, 61:22,
98:18, 98:25, 99:2,
99:3, 99:13, 103:17,
112:13, 115:15,
119:10, 120:2,
122:13, 122:14,
127:18, 128:6,
133:9, 133:11,
134:2, 146:9,
167:11, 167:13,
167:15, 172:8,
173:3, 173:4, 173:14
**EMPLOYEES'** [1] -
102:21
**EMPLOYER** [7] - 18:4,
40:1, 42:8, 107:20,
128:9, 165:4, 165:5
**EMPLOYERS** [2] -
59:22, 89:10
**EMPLOYES** [1] -
175:1
**EMPLOYMENT** [15] -
54:6, 65:20, 70:17,
75:5, 77:7, 84:16,
102:18, 115:2,
117:23, 119:21,
120:7, 120:10,
164:15, 192:9, 196:4
**EN** [1] - 176:8
**ENCAPSULATE** [1] -
88:19
**ENCOUNTER** [1] -
147:13
**ENCOURAGED** [2] -
65:6, 195:13
**END** [31] - 5:25, 6:8,
10:20, 10:21, 11:3,
13:19, 22:7, 41:24,
48:20, 49:24, 60:11,
75:17, 82:19, 85:13,
89:1, 91:5, 91:7,
94:25, 104:19,
105:19, 114:23,
155:9, 164:7,
164:13, 179:6,
179:17, 181:14,
182:15, 184:2,

186:2, 187:18
**ENDED** [4] - 56:19,
121:20, 122:9,
199:14
**ENDS** [3] - 17:25,
58:8, 78:19
**ENGLAND** [2] - 12:2,
20:20
**ENHANCED** [18] -
41:4, 42:23, 52:1,
56:15, 56:16, 56:22,
56:23, 58:12, 58:22,
59:17, 67:17, 79:21,
80:14, 124:23,
145:22, 157:10,
158:5, 183:21
**ENLARGE** [2] - 8:19,
19:7
**ENTERED** [8] - 8:12,
12:8, 37:24, 59:7,
77:7, 174:19,
175:17, 182:23
**ENTERTAINMENT** [1]
- 50:18
**ENTIRE** [3] - 6:3,
130:16, 163:23
**ENTIRELY** [2] - 140:8,
184:16
**ENTITLE** [1] - 146:3
**ENTITLED** [10] -
28:16, 61:8, 64:22,
82:11, 89:8, 128:3,
157:17, 170:8,
195:20, 201:19
**EQUAL** [2] - 102:17,
191:14
**EQUALLY** [1] - 13:12
**EQUIPMENT** [1] -
56:25
**EQUIVALENT** [1] -
82:20
**ERCOLE** [1] - 1:14
**ERICA** [1] - 2:7
**ERISA** [1] - 83:7
**ERROR** [2] - 182:4,
198:18
**ESCAPE** [1] - 126:20
**ESPECIALLY** [2] -
154:9, 201:9
**ESQUIRE** [14] - 1:13,
1:14, 1:14, 1:15,
1:15, 2:2, 2:6, 2:7,
2:7, 2:8, 2:8, 2:12,
2:17, 2:17
**ESSENCE** [2] - 10:20,
88:19
**ESSENTIAL** [1] -
108:17
**ESSENTIALLY** [2] -
11:8, 104:9

**ESTABLISH** [2] - 4:14, 90:9

**ESTABLISHED** [10] - 41:16, 41:17, 41:19, 41:21, 41:22, 62:14, 62:16, 62:17, 126:22, 145:16

**ESTABLISHES** [3] - 28:22, 28:23, 183:7

**ESTIMATED** [1] - 35:3

**ET** [9] - 1:3, 1:6, 18:1, 22:11, 22:12, 31:10, 70:12

**EVALUATE** [5] - 17:13, 21:9, 96:24, 153:25, 187:1

**EVALUATED** [2] - 43:21, 160:22

**EVALUATING** [1] - 141:10

**EVENT** [5] - 102:7, 115:9, 167:5, 167:8, 181:11

**EVENTS** [2] - 135:15, 192:7

**EVENTUALLY** [4] - 14:15, 20:16, 95:24, 184:8

**EVIDENCE** [65] - 4:12, 4:14, 17:13, 28:2, 28:6, 28:12, 28:18, 28:22, 28:23, 28:25, 29:4, 41:20, 66:4, 66:20, 71:5, 87:14, 87:15, 87:19, 90:23, 91:9, 103:14, 106:23, 114:8, 127:19, 135:22, 140:8, 153:5, 153:7, 159:2, 159:3, 159:12, 159:13, 159:14, 159:21, 160:1, 170:19, 182:22, 183:7, 186:22, 187:2, 187:4, 189:18, 189:19, 190:5, 190:10, 190:11, 190:13, 190:21, 190:22, 190:23, 191:3, 191:11, 191:12, 191:14, 191:16, 191:19, 191:20, 193:5, 196:14, 197:17, 197:22

**EXACT** [2] - 6:9, 143:12

**EXACTLY** [15] - 30:3, 32:9, 91:1, 94:12,

101:3, 108:15, 121:20, 122:9, 125:11, 129:4, 139:7, 140:6, 143:11, 144:13, 144:18

**EXAMINATION** [14] - 15:2, 16:19, 34:18, 35:11, 35:20, 43:24, 71:24, 79:23, 144:1, 161:3, 161:6, 166:17, 170:13, 177:23

**EXAMINED** [3] - 18:10, 144:6, 156:1

**EXAMPLE** [14] - 10:24, 29:18, 90:15, 106:8, 108:22, 119:17, 138:22, 141:13, 147:14, 147:25, 150:1, 159:16, 190:16, 195:25

**EXAMPLES** [2] - 18:12, 194:23

**EXCEED** [1] - 195:19

**EXCEEDED** [1] - 45:13

**EXCEPT** [4] - 31:15, 76:3, 84:20, 85:7

**EXCEPTION** [1] - 128:5

**EXCHANGE** [20] - 8:7, 22:24, 32:19, 37:4, 38:3, 40:22, 42:10, 47:5, 54:14, 65:19, 67:2, 70:1, 80:13, 85:15, 99:15, 99:19, 143:25, 165:20, 186:14, 195:18

**EXCLUSIVE** [3] - 5:24, 141:20, 176:23

**EXCUSE** [3] - 25:6, 151:6, 155:2

**EXECUTED** [1] - 138:16

**EXECUTION** [1] - 195:11

**EXEMPTION** [4] - 171:14, 171:15, 171:16

**EXHAUSTIVE** [2] - 195:21, 197:4

**EXHIBIT** [6] - 8:18, 163:17, 172:5, 186:4, 200:18

**EXHIBITS** [4] - 189:25, 199:20, 200:17, 200:20

**EXIST** [6] - 25:21,

84:25, 85:3, 174:23, 185:24, 185:25

**EXISTED** [2] - 194:12, 196:10

**EXISTING** [4] - 5:22, 33:14, 53:22, 111:6

**EXPECT** [1] - 176:10

**EXPECTED** [5] - 74:13, 97:25, 122:14, 127:22, 151:2

**EXPENSE** [6] - 71:1, 100:20, 114:2, 124:18, 140:22, 174:8

**EXPENSES** [33] - 25:14, 35:2, 35:23, 35:24, 36:6, 36:9, 40:8, 50:13, 50:17, 50:19, 55:5, 55:11, 70:24, 71:2, 71:4, 74:24, 75:1, 76:22, 76:23, 76:25, 86:5, 100:11, 107:15, 111:12, 113:25, 114:1, 114:3, 140:16, 163:15, 170:23, 170:24, 171:2, 171:3

**EXPERIENCE** [10] - 4:4, 16:14, 16:15, 21:4, 30:2, 65:4, 87:9, 185:16, 195:6

**EXPERIENCED** [1] - 75:16

**EXPERIENCES** [1] - 30:7

**EXPLAIN** [8] - 19:21, 24:18, 28:1, 33:11, 108:15, 112:12, 134:17, 172:14

**EXPLAINED** [7] - 26:13, 26:14, 29:13, 44:7, 44:10, 61:10, 101:23

**EXPLAINING** [1] - 126:18

**EXPLAINS** [2] - 64:25, 106:17

**EXPLORE** [1] - 115:23

**EXPRESS** [2] - 171:14, 171:15

**EXPRESSION** [1] - 50:5

**EXPRESSLY** [1] - 120:5

**EXTENSION** [1] - 52:18

**EXTENT** [1] - 93:11

**EXTRA** [2] - 25:6,

165:17

**EXTREME** [1] - 138:22

**EYE** [5] - 2:3, 44:5, 86:25, 132:24, 201:6

# F

**FACE** [10] - 120:10, 137:25, 196:3

**FACED** [4] - 65:24, 129:13, 129:17, 131:4

**FACES** [1] - 64:1

**FACING** [8] - 11:9, 32:4, 47:25, 48:6, 55:17, 56:12, 67:18, 149:15

**FACT** [57] - 5:9, 11:24, 17:15, 28:11, 29:7, 30:21, 30:23, 40:25, 41:1, 41:2, 41:16, 41:18, 41:19, 41:22, 51:9, 51:21, 61:2, 62:16, 62:17, 66:12, 66:18, 70:14, 77:13, 86:9, 86:21, 90:15, 91:18, 97:10, 103:5, 106:14, 118:8, 118:17, 121:8, 127:24, 133:13, 135:21, 135:24, 136:15, 136:24, 140:19, 143:21, 148:2, 149:5, 150:22, 158:2, 158:18, 161:7, 164:11, 170:25, 185:9, 190:14, 190:15, 193:16, 194:3, 194:12, 195:14, 196:10

**FACT-SPECIFIC** [1] - 28:11

**FACTOR** [1] - 95:13

**FACTORS** [9] - 195:2, 195:22, 196:7, 196:13, 196:15, 196:17, 197:3, 198:5

**FACTS** [40] - 5:8, 9:6, 15:5, 16:4, 27:9, 27:10, 30:22, 30:24, 31:1, 37:2, 41:17, 41:21, 62:14, 75:13, 126:22, 140:9, 140:10, 140:11, 145:16, 153:10, 153:15, 153:20, 153:22, 153:24, 153:25, 154:2, 155:18, 173:22,

190:2, 190:6, 190:7, 190:24, 191:20, 193:9, 193:11, 193:15, 193:22, 196:23, 199:19

**FAIL** [1] - 116:5

**FAILURE** [1] - 74:13

**FAIR** [7] - 95:4, 106:15, 177:9, 180:5, 180:6, 189:13, 201:2

**FAIREST** [1] - 65:14

**FAIRLY** [1] - 77:19

**FAIRNESS** [1] - 9:7

**FALL** [3] - 103:2, 151:22, 176:17

**FALLS** [1] - 99:25

**FALSE** [5] - 73:18, 73:19, 78:9, 144:15, 162:8

**FALSEHOOD** [1] - 198:3

**FAMILIAR** [2] - 25:17, 169:19

**FAMILY** [15] - 18:18, 18:24, 19:3, 19:13, 19:19, 20:19, 20:20, 21:16, 40:16, 79:20, 81:5, 98:2, 102:25, 103:2, 161:23

**FANS** [1] - 11:25

**FARED** [1] - 90:24

**FARM** [2] - 27:1, 132:8

**FASHIONED** [2] - 132:6, 174:13

**FAST** [1] - 54:3

**FATHER** [6] - 68:9, 68:10, 68:11, 69:4, 183:5

**FAULT** [7] - 24:8, 63:6, 135:3, 135:5, 135:6, 136:23, 192:13

**FAULTING** [1] - 184:2

**FAVOR** [5] - 99:1, 191:12, 191:13, 191:14, 191:17

**FBI** [1] - 18:9

**FCRR** [1] - 1:19

**FEAR** [5] - 22:18, 22:20, 84:23, 85:1, 185:24

**FEARED** [1] - 91:1

**FEATURES** [2] - 107:12, 112:19

**FEBRUARY** [1] - 11:11

**FEDERAL** [6] - 36:6, 62:15, 102:19, 148:3, 170:23, 173:3

FEELINGS [1] - 152:23

FEET [3] - 124:16, 125:2, 133:17

FELD [1] - 2:13

FELL [3] - 58:16, 183:25, 184:1

FELT [4] - 103:3, 159:6, 164:11, 178:25

FENCE [1] - 94:25

FERRETING [1] - 34:19

FEW [9] - 9:6, 18:12, 59:22, 67:14, 143:18, 146:12, 146:22, 182:20, 194:22

FIFTH [3] - 17:19, 195:13

FIGHTING [1] - 184:22

FIGURE [4] - 59:21, 60:6, 64:10, 107:1

FIGURED [2] - 33:12, 124:3

FILE [17] - 11:1, 11:13, 11:16, 17:9, 31:20, 37:15, 42:20, 44:7, 44:11, 46:7, 57:19, 67:14, 80:5, 83:1, 136:9, 156:4, 168:22

FILED [5] - 11:5, 15:17, 15:19, 44:9, 102:17

FILING [1] - 84:5

FILLED [1] - 67:12

FINAL [9] - 5:4, 45:15, 60:16, 60:19, 75:10, 79:8, 85:10, 86:21, 196:11

FINALLY [12] - 13:12, 30:14, 50:20, 55:24, 82:22, 95:9, 163:8, 164:3, 168:14, 179:6, 181:6, 192:15

FINANCIAL [29] - 11:9, 32:4, 47:25, 48:6, 55:17, 55:19, 64:1, 64:2, 65:20, 65:21, 65:24, 65:25, 67:18, 91:10, 101:24, 103:1, 111:23, 123:5, 131:13, 164:10, 164:12, 164:15, 164:16, 164:20, 165:2, 196:3, 196:4, 196:5

FINANCIALS [1] - 32:8

FINE [2] - 24:3, 90:17

FINEST [2] - 188:18

FINGERS [5] - 39:1, 67:5, 69:16, 157:14, 163:5

FIRE [8] - 112:3, 112:20, 116:10, 116:20, 120:18, 120:23, 166:25, 167:1

FIRED [13] - 21:18, 61:7, 81:12, 105:12, 105:15, 116:13, 116:21, 117:4, 117:8, 117:9, 120:14, 121:17, 129:8

FIRING [3] - 116:22, 120:15, 120:19

FIRST [29] - 1:20, 3:8, 23:3, 29:24, 33:22, 57:14, 76:10, 84:16, 93:12, 93:16, 93:18, 94:8, 104:11, 108:25, 109:7, 116:3, 119:3, 120:1, 123:11, 155:24, 166:22, 166:23, 177:11, 189:12, 192:4, 194:25, 195:3, 197:5, 199:22

FISCAL [1] - 55:18

FIVE [11] - 38:5, 69:21, 95:20, 100:8, 100:12, 100:14, 100:23, 109:19, 154:2, 166:7, 175:25

FIX [5] - 116:5, 116:9, 116:13

FIXED [1] - 136:22

FLIP [1] - 173:15

FLOOR [3] - 1:20, 2:18, 109:4

FLUFF [1] - 70:11

FOCUS [3] - 57:20, 97:19, 148:20

FOCUSED [5] - 59:9, 59:11, 141:20, 176:23, 183:24

FOCUSES [2] - 150:8, 158:4

FOLKS [21] - 18:6, 52:5, 93:6, 99:16, 112:21, 114:8, 115:18, 123:22, 124:4, 128:20, 129:22, 130:5, 133:11, 133:16, 133:25, 135:24, 140:9, 141:23,

143:22, 144:22, 168:5

FOLLOW [4] - 46:14, 46:16, 63:15, 93:22

FOLLOW-ON [1] - 63:15

FOLLOWED [4] - 3:8, 48:16, 49:20, 167:20

FOLLOWING [13] - 8:25, 34:13, 69:13, 98:16, 115:10, 121:13, 129:13, 129:17, 137:19, 165:6, 167:10, 176:5, 178:4

FOLLOWS [1] - 28:17

FOOL [1] - 20:23

FOOLISH [1] - 66:13

FOOTBALL [1] - 11:25

FOOTBALLS [1] - 12:1

FORCE [8] - 6:3, 123:17, 123:21, 124:4, 127:4, 162:3, 162:13, 167:2

FORCED [26] - 23:9, 23:17, 23:19, 24:13, 24:14, 24:15, 30:9, 39:18, 39:20, 49:3, 61:4, 63:23, 64:14, 64:17, 66:2, 76:21, 148:19, 151:4, 152:5, 161:13, 171:3, 184:17, 184:20, 194:7, 194:9, 194:13

FORCIBLY [1] - 122:2

FORCING [3] - 25:20, 61:2, 123:9

FORECLOSURE [1] - 131:19

FOREGO [1] - 42:16

FOREGOING [1] - 201:17

FOREPERSON [1] - 199:23

FORESHADOWING [1] - 27:13

FORESTALL [1] - 156:6

FOREVER [1] - 193:1

FORGET [3] - 100:22, 151:15, 192:14

FORGIVENESS [5] - 38:8, 43:5, 46:19, 58:23, 83:12

FORGOT [1] - 70:4

FORK [1] - 149:15

FORM [14] - 22:16, 28:12, 28:13, 28:15,

67:13, 108:9, 108:12, 157:14, 175:8, 175:9, 175:13, 175:14, 175:15, 176:2

FORMED [1] - 159:9

FORMER [11] - 4:18, 4:19, 61:25, 130:25, 131:1, 143:24, 144:3, 145:18, 145:19, 165:4, 165:5

FORMIDABLE [1] - 173:17

FORTUNES [1] - 91:10

FORWARD [1] - 76:2

FOUNDED [1] - 164:5

FOUR [24] - 9:16, 17:14, 17:16, 29:6, 31:22, 32:15, 41:1, 69:21, 74:12, 75:13, 78:11, 83:9, 83:25, 87:7, 93:17, 93:18, 109:16, 143:2, 167:11, 167:12, 167:13, 169:9, 175:4, 179:9

FOURTH [3] - 12:15, 77:10, 195:10

FRACTION [1] - 101:22

FRANKLY [2] - 188:16, 192:19

FREE [5] - 35:15, 78:15, 111:4, 111:8, 137:18

FRIEND [12] - 18:19, 18:24, 19:3, 19:13, 19:19, 39:25, 40:4, 40:16, 79:20, 161:23, 183:22, 183:23

FRIEND'S [5] - 18:24, 21:16, 39:22, 161:19, 185:1

FRIENDS [5] - 70:25, 78:4, 78:14, 155:12, 160:23

FRINGE [1] - 122:15

FRONT [3] - 18:2, 20:22, 147:24

FRUIT [11] - 41:10, 110:5, 110:7, 110:11, 110:20, 111:10, 112:4, 158:2, 170:9

FRUSTRATED [1] - 55:25

FUDGE [1] - 95:8

FULFILL [2] - 67:4,

188:5

FULFILLED [1] - 33:21

FULFILLING [1] - 188:3

FULL [12] - 9:22, 30:13, 56:24, 62:10, 66:9, 67:19, 77:18, 82:15, 127:5, 193:8

FULLY [4] - 12:1, 75:15, 127:21

FULLY-INFLATED [1] - 12:1

FUNDAMENTAL [1] - 103:12

FUNDAMENTALLY [1] - 48:24

FUTURE [11] - 5:19, 22:15, 29:10, 29:14, 108:5, 111:24, 112:1, 114:7, 122:17, 129:6, 129:7, 129:9, 168:16, 176:11

FUTURES [1] - 89:9

G

G.S.A [1] - 190:17

GAME [13] - 8:15, 33:7, 54:17, 95:18, 152:25, 153:2, 153:3, 159:24, 164:13, 179:5, 186:17, 186:18

GAMECOCK [1] - 53:8

GAP [1] - 146:7

GAS [1] - 70:24

GENE [1] - 1:3

GENERAL [1] - 124:1

GENERALLY [1] - 165:18

GENERATED [1] - 142:19

GENTLEMAN [1] - 17:3

GENTLEMEN [8] - 11:18, 22:19, 54:17, 62:7, 84:13, 137:13, 175:20, 182:11

GEORGIA [3] - 17:4, 82:23

GETAWAY [1] - 56:7

GIVEN [21] - 10:2, 10:3, 10:5, 15:4, 30:14, 31:4, 31:8, 34:11, 45:12, 55:17, 62:11, 64:7, 65:18, 87:3, 101:6, 115:5, 116:4, 116:8,

128:20, 163:21,
195:18
**GLASS** [2] - 20:11
**GLENN** [5] - 79:17,
81:4, 81:5, 157:9,
183:23
**GLORY** [1] - 22:8
**GODFREY** [42] - 2:6,
3:13, 3:15, 3:22,
3:24, 4:2, 91:14,
91:25, 92:3, 92:7,
92:18, 93:18, 93:22,
94:10, 95:18, 96:8,
97:15, 99:22, 105:4,
110:3, 114:14,
116:17, 117:14,
118:19, 125:7,
133:2, 135:23,
135:24, 150:2,
150:6, 150:13,
150:18, 152:18,
152:20, 187:15,
187:19, 187:24,
199:1, 200:24,
201:3, 202:3, 202:5
**GODFREY'S** [5] -
89:24, 90:13, 91:12,
94:22, 95:9
**GODS** [1] - 134:12
**GORBEY** [1] - 1:14
**GOVERNMENT** [2] -
102:19, 170:23
**GRABBED** [2] -
107:21, 147:9
**GRACED** [1] - 88:17
**GRAND** [2] - 151:9,
165:10
**GRANTED** [2] - 7:13,
7:14
**GRATEFUL** [2] -
93:24, 93:25
**GREAT** [22] - 4:4,
7:14, 20:13, 20:15,
22:4, 22:5, 30:1,
48:4, 78:22, 88:5,
88:14, 89:10, 94:11,
97:10, 116:22,
149:11, 175:2,
185:14, 188:19,
198:3, 200:8
**GREATER** [3] - 5:23,
18:21, 117:4
**GREATEST** [2] -
20:14, 88:17
**GREG** [1] - 2:23
**GROSS** [1] - 198:18
**GROUND** [2] - 9:8,
109:4
**GROUP** [7] - 61:11,
61:25, 78:20, 128:7,

135:9, 171:16,
171:23
**GROW** [3] - 43:13,
43:14, 113:5
**GROWTH** [1] - 5:23
**GUARANTEE** [2] -
40:13, 136:10
**GUARANTEED** [3] -
18:6, 18:7, 22:19
**GUESS** [10] - 40:19,
55:19, 109:6, 120:1,
132:6, 144:11,
144:16, 146:13,
171:20, 189:6
**GUESSING** [1] -
126:14
**GUIDANCE** [2] -
106:3, 106:5
**GUIDE** [2] - 16:9,
120:8
**GUIDEPOSTS** [1] -
16:11
**GUIDES** [1] - 16:15
**GUMP** [1] - 2:13
**GUY** [8] - 36:2, 38:25,
54:20, 69:23, 80:7,
92:13, 132:6, 174:14
**GUYS** [4] - 188:25,
196:22, 199:16,
200:8

## H

**HAIRDRESSER** [1] -
57:5
**HALF** [2] - 141:25,
142:2
**HALL** [1] - 4:6
**HALLWAY** [1] - 95:21
**HAND** [5] - 87:13,
169:11, 169:17,
191:3, 191:16
**HANDLE** [1] - 13:4
**HANDS** [3] - 38:25,
134:5, 147:9
**HANDWRITING** [2] -
22:17, 185:22
**HANG** [3] - 21:8,
36:10, 187:10
**HAPPY** [2] - 102:8,
102:9
**HARD** [5] - 36:19,
59:3, 127:17, 201:8,
201:9
**HARIKLIA** [1] - 2:8
**HARM** [1] - 136:20
**HARPER** [41] - 9:16,
10:23, 11:4, 11:7,
11:12, 17:3, 22:10,
22:16, 26:1, 26:19,

41:5, 45:23, 79:13,
80:1, 82:22, 85:14,
100:5, 100:16,
101:8, 101:12,
101:19, 101:23,
102:6, 102:12,
132:1, 132:5,
132:16, 153:19,
156:1, 156:13,
163:9, 164:3,
168:21, 168:24,
174:13, 177:10,
178:11, 180:19,
184:21, 185:22
**HARPER'S** [1] - 132:3
**HARRISON** [1] - 2:23
**HARSH** [1] - 22:8
**HAT** [1] - 103:18
**HAUER** [1] - 2:13
**HE/SHE** [1] - 111:24
**HEADS** [1] - 29:11
**HEADS-UP** [1] - 29:11
**HEALTHY** [3] - 56:2,
170:19
**HEAR** [12] - 28:8,
43:10, 63:25, 92:20,
103:7, 106:24,
145:11, 153:6,
153:22, 155:19,
159:14, 176:17
**HEARD** [49] - 11:6,
15:8, 16:5, 17:16,
17:21, 19:22, 21:17,
22:12, 27:10, 40:11,
57:4, 94:17, 94:19,
100:5, 102:11,
103:5, 103:15,
103:19, 103:21,
104:7, 105:16,
107:10, 112:10,
113:14, 121:7,
121:23, 123:3,
126:13, 131:12,
132:1, 134:8,
141:13, 144:15,
145:3, 145:4, 145:5,
146:17, 150:10,
152:25, 155:22,
168:11, 168:22,
169:12, 172:14,
189:21, 191:4,
191:5, 192:7, 193:1
**HEARING** [4] - 105:24,
106:18, 106:19,
192:1
**HEART** [2] - 99:17,
132:13
**HEARTFELT** [1] -
157:23
**HEAVENS** [2] - 11:8,

182:17
**HECK** [1] - 9:15
**HEINZ** [2] - 2:8, 178:2
**HELD** [1] - 104:19
**HELLO** [1] - 4:6
**HELP** [9] - 17:13,
19:3, 19:13, 19:18,
52:24, 102:1, 102:2,
102:4, 134:15
**HELPFUL** [1] - 199:6
**HELPING** [1] - 89:8
**HERO** [1] - 20:18
**HERRING** [1] - 180:22
**HIDE** [2] - 22:6, 29:21
**HIGGINS** [4] - 7:2, 7:4,
198:12, 200:15
**HIGH** [1] - 147:18
**HIGHER** [7] - 43:6,
46:20, 68:17, 72:23,
83:12, 140:24
**HIGHLY** [2] - 14:23,
14:24
**HIMSELF** [4] - 13:5,
70:14, 102:23, 113:3
**HIRE** [1] - 136:25
**HIRING** [3] - 134:22,
145:4, 145:14, 146:5
**HOLD** [1] - 33:7
**HOLMES** [4] - 20:13,
20:14, 20:23, 185:15
**HOME** [4] - 6:21,
35:15, 113:20,
167:16
**HOMES** [1] - 136:25
**HONEST** [1] - 137:20
**HONEY** [1] - 44:21
**HONOR** [16] - 3:13,
3:15, 26:11, 38:20,
67:3, 89:4, 90:1,
90:21, 92:4, 92:25,
134:2, 174:18,
187:16, 198:23,
200:16, 200:20
**HONORABLE** [1] -
1:11
**HONORED** [1] - 89:6
**HOOKED** [1] - 143:15
**HOPE** [4] - 4:25, 5:23,
95:13, 148:8, 152:21
**HOPED** [2] - 102:19,
122:20
**HOPEFULLY** [1] -
47:5
**HORSE** [2] - 27:1,
56:7
**HORSES** [2] - 40:18,
40:19
**HOT** [5] - 121:9,
152:20, 182:16,
188:14

**HOURS** [3] - 88:8,
88:12, 182:18
**HOUSE** [4] - 54:18,
54:19, 54:21, 113:19
**HR** [6] - 21:22, 70:11,
85:21, 118:22,
119:18, 120:5
**HUGE** [1] - 94:4
**HUMAN** [3] - 21:21,
85:22, 168:5
**HUNDRED** [2] - 50:3,
164:25
**HUNDREDS** [2] - 7:15,
163:13
**HURDLE** [1] - 104:8
**HURRY** [1] - 147:16
**HURT** [1] - 101:14

## I

**I.E** [1] - 156:7
**IDEA** [8] - 104:12,
124:2, 126:14,
126:15, 129:7,
182:7, 190:18
**IDENTIFY** [2] - 49:11,
84:22
**IGNORE** [2] - 114:7,
118:20
**IGNORING** [1] - 107:8
**IL** [1] - 2:10
**ILLUMINATING** [1] -
178:24
**ILLUSTRATE** [2] -
30:21, 30:23
**IMMATERIAL** [1] -
48:13
**IMMEDIATELY** [4] -
52:19, 111:22,
158:16, 172:10
**IMPARTIAL** [1] -
189:13
**IMPLEMENTATION**
[1] - 179:15
**IMPLEMENTED** [1] -
169:6
**IMPLIED** [1] - 91:2
**IMPLYING** [1] - 90:18
**IMPORTANCE** [1] -
198:4
**IMPORTANT** [34] -
5:1, 5:12, 5:13, 5:14,
5:15, 7:12, 16:16,
27:3, 29:23, 49:3,
84:12, 93:18, 94:20,
95:5, 95:12, 99:4,
103:23, 106:23,
108:14, 110:24,
125:15, 127:1,
132:3, 132:16,

140:10, 140:11,
140:17, 146:24,
147:13, 155:13,
155:18, 191:22,
193:19

**IMPORTANTLY** [4] -
18:17, 77:6, 140:7,
180:13

**IMPOSE** [1] - 4:24

**IMPOSED** [2] -
117:25, 168:2

**IMPOSITION** [1] - 94:4

**IMPRESSIVE** [1] -
77:20

**IMPROVE** [1] - 117:9

**INCENTIVES** [2] - 6:2,
9:4

**INCLUDED** [1] -
194:23

**INCLUDING** [6] - 8:23,
13:24, 46:11,
116:23, 120:2,
189:22

**INCOME** [22] - 26:23,
35:3, 48:2, 48:5,
48:6, 53:25, 55:23,
56:2, 57:3, 59:20,
60:6, 67:21, 69:23,
70:23, 74:25, 77:24,
82:20, 101:21,
102:6, 158:19,
158:20, 173:3

**INCOMES** [4] - 57:4,
163:18, 170:19,
170:20

**INCONSEQUENTIAL**
[1] - 193:20

**INCONSISTENCIES**
[1] - 21:10

**INCONSISTENT** [1] -
25:20

**INCREASE** [1] - 178:7

**INCREDIBLY** [1] -
48:9

**INDEPENDENT** [28] -
5:16, 31:19, 33:6,
35:7, 40:10, 46:19,
72:23, 74:14, 91:19,
100:19, 104:3,
121:18, 122:18,
124:17, 140:15,
140:21, 142:17,
143:16, 145:9,
172:9, 172:12,
173:5, 173:10,
173:11, 173:14,
174:3, 180:8, 180:9

**INDICATING** [1] -
173:15

**INDICATING)** [1] -

172:11

**INDIVIDUAL** [8] -
28:9, 153:5, 153:14,
153:15, 192:21,
192:22, 195:1,
196:18

**INDIVIDUALLY** [4] -
28:7, 135:10, 187:2,
196:20

**INDIVIDUALS** [2] -
122:16, 122:19

**INDULGE** [2] - 108:15,
166:13

**INFERENCE** [4] -
190:14, 190:15,
190:23, 198:24

**INFLATED** [1] - 12:1

**INFORM** [1] - 198:18

**INFORMATION** [7] -
8:24, 10:15, 13:25,
14:16, 29:16, 29:17,
102:15

**INFORMS** [1] - 29:9

**INHERITED** [2] - 33:1,
170:11

**INHERITS** [1] - 157:25

**INJUNCTION** [3] -
136:21, 155:23,
168:25

**INJUNCTIVE** [2] -
156:4, 156:5

**INNOCENT** [2] -
138:24, 198:1

**INQUIRE** [1] - 3:16

**INSERTED** [1] - 176:7

**INSISTED** [1] - 139:10

**INSTALLMENTS** [1] -
38:5

**INSTEAD** [3] - 78:9,
113:23, 169:8

**INSTRUCT** [2] - 63:1,
198:23

**INSTRUCTION** [6] -
64:4, 64:5, 64:8,
92:6, 153:4, 164:14

**INSTRUCTIONS** [17] -
3:17, 15:12, 28:3,
28:7, 63:24, 64:6,
65:19, 76:8, 91:8,
147:1, 149:7, 164:9,
187:1, 189:10,
192:1, 199:6, 199:17

**INSUFFICIENT** [3] -
65:22, 164:17, 196:6

**INSURANCE** [50] -
1:6, 5:14, 5:17,
11:21, 11:23, 20:6,
21:6, 31:19, 31:20,
33:6, 33:10, 33:13,
33:14, 33:17, 34:24,

34:25, 35:5, 36:3,
37:7, 38:7, 43:6,
57:11, 74:8, 75:25,
76:2, 86:20, 90:10,
90:11, 91:4, 100:18,
104:3, 104:11,
104:14, 107:24,
108:17, 108:23,
130:3, 130:6,
130:11, 131:7,
142:19, 145:1,
160:5, 160:19,
161:1, 173:25,
174:3, 176:2,
181:24, 183:19

**INSUREDS** [1] - 111:7

**INTANGIBLE** [1] -
132:2

**INTEGRATE** [1] - 58:2

**INTEGRATION** [1] -
119:5

**INTEGRITY** [5] - 67:4,
95:14, 165:22,
174:19, 186:11

**INTELLIGENT** [21] -
14:23, 34:4, 34:9,
38:18, 39:7, 43:19,
47:20, 47:24, 53:8,
53:17, 59:5, 59:14,
68:24, 69:2, 72:20,
73:6, 81:1, 83:23,
84:4, 157:2

**INTEND** [4] - 38:20,
47:11, 47:13, 89:4

**INTENDED** [5] - 54:13,
120:6, 127:21,
161:4, 165:25

**INTENDS** [1] - 54:16

**INTENTION** [2] -
52:15, 90:18

**INTENTIONAL** [2] -
163:1, 198:3

**INTERACT** [1] - 4:5

**INTEREST** [34] -
18:14, 18:22, 32:21,
32:23, 33:24, 36:21,
38:6, 43:8, 46:21,
50:8, 51:7, 51:12,
52:14, 52:20, 54:23,
54:25, 57:8, 58:18,
68:15, 71:18, 72:24,
78:2, 83:13, 110:9,
110:14, 110:25,
111:5, 111:6,
112:18, 170:10,
174:2, 175:18,
183:2, 197:12

**INTERESTED** [2] -
18:21, 19:2

**INTERESTING** [6] -

4:25, 11:6, 15:8,
55:18, 126:11,
143:25

**INTERESTS** [2] - 9:18,
64:16

**INTERJECTS** [1] -
49:24

**INTERNAL** [1] -
142:13

**INTERVIEW** [1] -
106:10

**INTERVIEWED** [1] -
106:21

**INTERVIEWING** [1] -
103:21

**INTOLERABLE** [1] -
125:24

**INTRODUCE** [2] -
91:9, 200:17

**INUNDATED** [1] -
199:20

**INVERTED** [1] -
166:21

**INVEST** [12] - 35:2,
111:12, 111:22,
112:22, 113:13,
113:16, 113:18,
113:21, 113:25,
114:9, 150:19

**INVESTED** [7] - 100:9,
101:22, 113:1,
113:3, 129:20,
150:11, 151:10

**INVESTIGATED** [1] -
18:8

**INVESTING** [1] -
131:17

**INVESTMENT** [19] -
53:25, 71:1, 75:2,
97:18, 108:12,
110:23, 111:18,
112:1, 112:5, 114:2,
130:12, 149:22,
150:17, 150:23,
151:18, 151:20,
163:15, 181:3,
183:15

**INVESTMENTS** [31] -
23:2, 35:20, 36:5,
36:8, 36:11, 36:14,
36:15, 36:20, 36:25,
37:2, 40:6, 40:7,
45:10, 46:25, 47:1,
50:12, 50:19, 55:2,
60:12, 70:22, 74:23,
76:23, 82:9, 86:4,
86:6, 114:4, 114:5,
163:20, 170:21,
170:22

**INVESTS** [1] - 108:5

**INVITED** [1] - 29:12

**INVOLUNTARILY** [2] -
61:15, 127:4

**INVOLUNTARINESS**
[3] - 65:23, 164:18,
196:7

**INVOLUNTARY** [2] -
115:16, 171:13

**INVOLVED** [2] -
197:14, 201:1

**IRON** [1] - 48:18

**IRONCLAD** [2] -
10:18, 46:11

**IRRELEVANT** [2] -
79:11, 175:25

**IRREPARABLE** [1] -
136:20

**IRS** [17] - 22:16, 36:9,
50:15, 121:9,
121:14, 122:1,
122:9, 122:12,
123:1, 123:22,
172:3, 172:10,
172:16, 172:17,
173:8, 173:17

**ISSUE** [15] - 62:18,
89:24, 96:20, 97:21,
98:13, 98:16,
121:12, 136:19,
150:21, 150:22,
151:1, 156:20,
156:21, 192:7,
196:16

**ISSUES** [3] - 87:13,
164:6, 194:18

**ITSELF** [3] - 121:4,
180:17, 192:5

**IX** [1] - 166:21

---

**J**

**JACQUELINE** [1] -
1:14

**JANUARY** [1] - 177:19

**JASON** [31] - 5:19,
8:20, 11:10, 14:18,
17:15, 19:5, 19:8,
19:16, 22:13, 23:11,
24:4, 24:6, 24:8,
28:14, 29:8, 29:18,
38:17, 41:17, 42:6,
56:23, 60:16, 61:20,
61:23, 73:2, 73:9,
85:15, 166:19,
167:23, 167:25,
171:19, 172:5

**JEESH** [1] - 132:25

**JEEZ** [1] - 180:1

**JEFF** [1] - 4:20

**JENNIFER** [1] - 7:6

**JEOPARDY** [7] - 70:19, 74:5, 74:9, 105:13, 115:5, 118:13, 168:10
**JERRY** [1] - 78:22
**JOB** [134] - 7:15, 9:17, 9:18, 15:24, 18:7, 22:11, 22:18, 22:20, 31:6, 31:12, 31:17, 31:24, 32:6, 35:17, 37:12, 38:12, 39:14, 42:19, 42:20, 43:3, 43:4, 43:5, 46:4, 46:6, 46:18, 49:7, 49:12, 49:14, 49:16, 51:20, 53:11, 59:6, 60:2, 60:25, 62:8, 63:21, 64:20, 66:10, 67:11, 67:13, 68:17, 69:25, 70:19, 72:9, 72:10, 72:22, 73:11, 73:15, 73:18, 73:19, 73:23, 73:24, 74:5, 74:9, 76:15, 78:1, 78:8, 80:9, 81:15, 81:22, 81:25, 82:6, 82:25, 83:12, 84:22, 99:8, 99:10, 100:2, 100:8, 100:10, 100:17, 100:20, 101:15, 101:20, 102:3, 102:5, 103:10, 103:15, 103:24, 104:5, 104:13, 104:17, 104:20, 105:13, 105:14, 105:17, 105:18, 106:22, 107:6, 107:11, 110:23, 112:2, 112:4, 112:8, 112:14, 112:23, 112:24, 114:10, 115:4, 115:21, 116:4, 118:13, 124:11, 124:20, 126:1, 126:8, 129:18, 129:21, 131:6, 132:8, 132:11, 133:3, 144:25, 151:15, 154:8, 157:4, 157:24, 157:25, 159:8, 162:10, 162:11, 162:12, 168:10, 169:25, 188:19, 196:23
**JOBS** [22] - 21:18, 38:13, 76:10, 76:13, 77:22, 78:10, 80:3, 80:4, 85:16, 108:18, 108:19, 116:21, 117:3, 117:6, 131:3, 135:11, 145:7, 145:9, 146:9, 146:19, 169:25, 175:2
**JOHN** [1] - 2:17
**JOIN** [1] - 102:4
**JOKE** [1] - 129:6
**JORDAN** [2] - 2:8, 178:2
**JR** [1] - 1:15
**JUDGE** [17] - 5:6, 6:18, 13:18, 16:3, 27:12, 28:1, 28:4, 41:21, 52:24, 63:1, 64:3, 94:1, 105:6, 156:8, 188:19, 201:9
**JUDGE'S** [1] - 28:3
**JUDGES** [1] - 188:10
**JUDGMENT** [8] - 11:18, 17:1, 17:12, 29:4, 87:5, 94:15, 156:18, 185:17
**JULY** [4] - 31:21, 86:12, 176:20, 176:22
**JUNCTURE** [1] - 122:22
**JUNE** [8] - 1:8, 10:14, 14:1, 19:12, 53:11, 133:8, 155:25, 181:15
**JURISDICTIONS** [1] - 6:16
**JURORS** [3] - 189:12, 189:16, 200:9
**JURY** [39] - 1:9, 3:2, 3:5, 3:17, 4:1, 15:12, 16:2, 26:14, 28:16, 50:16, 67:7, 71:15, 71:19, 72:3, 75:6, 89:14, 89:16, 90:17, 91:8, 91:12, 92:23, 93:2, 93:7, 147:1, 148:4, 148:21, 149:2, 149:6, 152:9, 152:13, 152:15, 163:7, 163:16, 165:23, 188:9, 198:23, 199:23, 201:14, 202:7
**JUSTICE** [3] - 5:3, 5:5
**JUSTIFIES** [1] - 29:4

**K**

**KANSAS** [2] - 71:7, 71:8
**KARIS** [1] - 2:8
**KATCHEN** [1] - 2:12
**KATHERINE** [1] - 2:12
**KAUFMAN** [19] - 4:20, 45:6, 49:18, 105:25, 115:25, 116:7, 141:14, 167:7, 167:19, 169:18, 169:20, 176:16, 176:17, 177:17, 177:23, 178:3, 178:10, 179:12, 179:19
**KEARNEY** [16] - 10:19, 31:15, 67:9, 67:10, 68:13, 68:15, 76:3, 76:4, 113:16, 136:15, 144:1, 144:2, 144:19, 145:5, 162:4, 184:10
**KEARNEY'S** [2] - 181:15, 183:5
**KEEP** [15] - 23:7, 38:12, 45:24, 47:11, 73:16, 73:18, 73:23, 76:14, 100:18, 121:25, 132:24, 155:7, 155:18, 162:10, 165:14
**KEEPS** [1] - 81:20
**KELLY** [30] - 11:20, 18:13, 19:6, 21:14, 22:25, 23:1, 30:25, 33:18, 37:9, 42:2, 51:15, 57:9, 79:18, 137:10, 137:23, 138:1, 146:18, 153:10, 153:19, 159:22, 161:10, 168:23, 173:22, 175:7, 175:16, 181:8, 184:15, 184:25
**KEPT** [14] - 33:9, 37:6, 38:9, 38:10, 49:23, 53:4, 54:11, 58:23, 60:11, 80:14, 80:15, 85:13, 86:14, 155:6
**KEY** [1] - 107:12
**KICKED** [1] - 52:25
**KICKER** [1] - 127:6
**KIDDING** [1] - 134:25
**KIDS** [1] - 38:23
**KIND** [11] - 29:11, 47:13, 104:5, 104:12, 104:14, 130:10, 132:5, 134:17, 135:13, 148:15, 153:6
**KINDS** [1] - 59:23
**KIRKLAND** [1] - 2:9
**KNEECAPPING** [1] - 98:2
**KNEES** [1] - 124:10
**KNOCK** [1] - 105:2
**KNOWING** [27] - 34:3, 38:17, 47:19, 48:20, 53:7, 62:25, 63:13, 73:5, 75:11, 75:13, 87:14, 87:16, 88:24, 140:5, 160:9, 160:10, 160:21, 162:5, 162:23, 164:4, 180:15, 194:1, 194:21, 195:23, 196:25
**KNOWINGLY** [21] - 4:15, 8:13, 13:15, 15:7, 27:23, 28:19, 79:24, 125:13, 137:3, 139:22, 143:20, 166:3, 182:23, 187:5, 189:2, 193:3, 193:6, 193:7, 193:8, 194:4, 196:18
**KNOWN** [4] - 22:15, 114:20, 119:4, 195:11
**KNOWS** [9] - 40:19, 48:8, 68:2, 71:16, 90:1, 90:22, 131:8, 138:17, 162:1

**L**

**LADIES** [8] - 11:18, 22:19, 54:17, 62:6, 84:13, 137:13, 175:19, 182:11
**LAID** [7] - 12:4, 29:21, 29:25, 31:12, 32:10, 48:3, 52:4, 67:20, 184:5
**LANCE** [2] - 10:24, 156:1
**LAND** [4] - 20:16, 41:9, 110:6, 110:10
**LANG** [1] - 2:3
**LANGEL** [1] - 2:17
**LANGUAGE** [15] - 26:16, 35:17, 49:13, 53:19, 65:2, 81:14, 81:16, 85:21, 85:22, 85:23, 118:11, 134:19, 170:2, 195:4
**LAPSE** [1] - 198:1
**LARGE** [2] - 25:9, 51:16
**LARGEST** [2] - 13:10, 55:12
**LASALLE** [1] - 2:9
**LAST** [9] - 3:17, 8:18, 8:19, 64:9, 97:21, 109:14, 114:20, 131:18, 179:7
**LATE** [2] - 20:25, 121:8
**LAW** [24] - 5:6, 5:7, 7:6, 16:3, 20:16, 21:3, 28:5, 36:7, 62:15, 62:18, 118:1, 118:4, 148:15, 149:6, 168:3, 185:15, 189:10, 190:7, 192:1, 192:5, 195:20, 196:22, 196:24, 199:18
**LAWSON** [26] - 13:3, 26:22, 51:15, 51:18, 56:19, 79:11, 113:3, 150:5, 150:7, 150:10, 150:21, 151:2, 151:3, 151:13, 151:19, 163:8, 163:9, 163:10, 163:14, 163:24, 164:23, 180:19, 183:13
**LAWSON'S** [2] - 57:1, 78:4
**LAWSUIT** [25] - 11:1, 11:5, 11:13, 11:16, 15:17, 15:20, 17:10, 31:20, 31:22, 37:15, 42:20, 44:8, 46:7, 57:19, 63:3, 67:14, 79:15, 80:5, 83:2, 84:5, 84:7, 84:8, 136:9, 168:22, 192:10
**LAWSUITS** [2] - 172:16
**LAWYER** [44] - 9:15, 9:17, 10:16, 12:4, 12:24, 13:3, 16:5, 32:18, 37:22, 38:19, 39:10, 42:25, 46:13, 52:9, 57:6, 58:17, 68:6, 68:8, 69:4, 70:2, 70:4, 72:14, 72:15, 72:16, 72:17, 73:7, 73:8, 80:11, 88:14, 134:9, 134:13, 134:20, 134:22, 135:1, 136:1, 136:12, 136:17, 153:18, 155:21, 155:22, 162:15, 168:24, 181:24, 188:10

**LAWYER'S** [2] - 10:9, 48:16

**LAWYERS** [44] - 4:23, 9:12, 9:16, 10:9, 10:11, 10:21, 12:11, 12:13, 12:14, 12:16, 12:17, 12:18, 12:19, 38:2, 43:1, 46:10, 46:13, 65:7, 65:16, 75:16, 83:9, 83:25, 88:5, 88:17, 94:13, 94:16, 94:17, 104:23, 113:23, 114:16, 134:11, 135:22, 135:25, 136:5, 136:6, 136:7, 136:8, 136:9, 136:25, 156:15, 164:5, 188:16, 200:9

**LAWYERS'** [2] - 179:3, 188:17

**LEADING** [1] - 20:20

**LEAGUE** [1] - 108:7

**LEASES** [1] - 56:25

**LEAST** [15] - 32:10, 38:23, 56:3, 64:9, 90:8, 99:2, 122:4, 124:25, 125:1, 137:1, 148:8, 148:9, 180:22, 181:4, 190:19

**LEAVE** [16] - 11:17, 12:25, 16:25, 46:25, 51:21, 51:22, 52:10, 52:16, 54:2, 69:10, 74:21, 87:4, 124:5, 127:23, 196:1, 198:15

**LED** [1] - 60:3

**LEFT** [3] - 76:23, 145:18, 145:25

**LEGAL** [16] - 9:18, 38:22, 39:3, 46:11, 46:14, 46:16, 47:12, 62:15, 62:22, 72:19, 110:17, 136:18, 140:6, 155:21, 156:16

**LEGITIMATE** [2] - 155:2, 181:19

**LEGS** [1] - 124:9

**LENGTH** [3] - 153:16, 172:5, 173:7

**LEPPERT** [1] - 2:24

**LESS** [11] - 18:19, 23:17, 23:19, 23:24, 36:9, 37:14, 39:22, 117:5, 161:19, 167:11, 167:13

**LETTER** [6] - 7:18,

29:12, 81:24, 141:13, 176:9, 177:3

**LEVEL** [3] - 71:12, 71:14, 188:12

**LEVELED** [1] - 146:17

**LEWIS** [1] - 1:16

**LIDDY** [10] - 2:20, 4:20, 5:17, 43:13, 123:5, 123:25, 172:4, 172:14, 173:7, 173:16

**LIE** [1] - 104:20

**LIED** [1] - 21:19

**LIEDER** [1] - 2:2

**LIES** [1] - 16:12

**LIFE** [37] - 6:13, 13:11, 16:14, 16:15, 18:5, 18:6, 18:7, 21:2, 21:18, 22:11, 22:19, 30:6, 35:15, 35:17, 39:14, 49:13, 49:16, 55:13, 58:1, 59:22, 60:3, 70:7, 81:15, 81:22, 81:25, 85:17, 102:7, 104:9, 104:10, 104:15, 105:14, 105:17, 122:21, 139:6, 151:11, 185:15, 198:6

**LIFE-CHANGING** [2] - 102:7, 139:6

**LIFELINE** [2] - 124:14, 125:3

**LIFETIME** [3] - 44:25, 54:6, 169:25

**LIGHT** [9] - 15:8, 16:19, 22:8, 147:16, 147:17, 147:20, 147:21, 196:14, 197:17

**LIKELY** [1] - 191:20

**LIKEWISE** [1] - 183:7

**LIMITATIONS** [3] - 5:21, 117:25, 168:2

**LINCOLN** [7] - 20:21, 88:15, 88:16, 88:18, 88:20, 88:21, 93:21

**LINE** [23] - 10:13, 17:24, 19:6, 19:7, 19:8, 22:5, 23:12, 24:6, 24:7, 57:22, 59:2, 59:7, 59:16, 79:22, 111:3, 111:4, 111:7, 111:8, 123:25, 157:24, 184:4

**LINEAR** [1] - 93:13

**LINEMAN** [1] - 58:3

**LINES** [3] - 19:6,

20:22, 180:11

**LIQUIDATE** [2] - 160:18, 164:1

**LIQUIDATED** [1] - 174:1

**LIST** [3] - 195:21, 197:4, 200:18

**LISTED** [1] - 196:13

**LISTEN** [1] - 135:22

**LISTENED** [1] - 96:8

**LISTENING** [2] - 95:17, 105:20

**LITERAL** [9] - 146:25, 147:5, 147:8, 147:10, 147:12, 147:19, 147:22, 148:4, 148:10

**LITERALLY** [4] - 101:24, 102:6, 128:16, 149:1

**LITIGATION** [5] - 122:11, 123:24, 172:15, 172:19, 172:22

**LIVE** [4] - 105:17, 105:19, 125:20, 160:4

**LIVED** [2] - 89:9, 104:18

**LIVELIHOOD** [1] - 11:8

**LIVES** [4] - 4:24, 90:24, 94:4, 116:23

**LIVINGSTON** [1] - 2:24

**LLP** [3] - 2:9, 2:13, 2:18

**LOBBY** [1] - 20:10

**LOCATION** [2] - 23:25, 43:15

**LOGIC** [2] - 21:3, 185:15

**LOGICAL** [7] - 16:18, 16:20, 16:22, 17:2, 17:11, 20:3, 21:8

**LONG-SERVICE** [1] - 122:13

**LOOK** [37] - 6:23, 31:13, 32:6, 36:6, 41:16, 50:14, 55:12, 56:1, 65:1, 65:3, 65:4, 65:6, 65:8, 86:24, 96:1, 97:17, 97:18, 99:14, 106:12, 108:18, 108:19, 110:13, 113:18, 117:17, 121:4, 139:15, 143:5, 145:24, 149:7, 151:22,

153:5, 179:4, 179:11, 179:20, 180:2, 196:12

**LOOKED** [6] - 23:3, 44:4, 56:9, 73:12, 80:3, 80:4

**LOOKING** [7] - 102:7, 131:10, 131:12, 177:7, 179:7, 200:12

**LOOKS** [2] - 108:21, 117:18

**LOOPHOLE** [3] - 126:19, 128:18, 129:3

**LOSE** [10] - 31:10, 38:12, 38:14, 62:8, 78:7, 86:8, 122:17, 132:11, 163:11

**LOSING** [3] - 19:23, 131:3, 149:18

**LOST** [12] - 35:3, 38:11, 38:13, 59:6, 73:19, 73:23, 74:19, 130:12, 135:11, 174:9, 175:2

**LOUD** [2] - 192:2, 192:3

**LOUDER** [2] - 22:21, 155:12

**LOVE** [2] - 17:4, 134:12

**LOVED** [1] - 86:10

**LOWER** [1] - 108:10

**LUCKY** [2] - 6:13, 37:13

**LUCRATIVE** [3] - 77:14, 142:1, 185:10

**LUMP** [1] - 186:25

**LUNCH** [3] - 134:18, 152:9, 152:21

**LUNCHEON** [1] - 152:14

# M

**MA'AM** [1] - 24:10

**MACHINE** [1] - 1:23

**MAGIC** [2] - 107:24, 110:2

**MAGNETS** [1] - 108:6

**MAGNIFICENT** [1] - 22:8

**MAIL** [2] - 7:18, 29:11

**MAILED** [1] - 74:7

**MAILING** [1] - 114:20

**MAIN** [1] - 115:13

**MAINTAIN** [2] - 4:8, 23:22

**MAJESTY** [2] - 85:5, 94:12

**MAJOR** [3] - 111:2, 111:3, 111:4

**MAJORITY** [1] - 108:3

**MAN** [36] - 26:23, 32:10, 43:19, 44:15, 44:19, 48:25, 50:1, 55:16, 55:22, 55:25, 56:11, 56:12, 67:17, 71:6, 71:8, 74:7, 74:18, 80:20, 81:5, 82:22, 83:23, 88:15, 92:8, 92:12, 104:24, 104:25, 105:15, 132:13, 157:9, 164:24, 174:14, 174:16, 186:13

**MAN'S** [8] - 51:3, 57:23, 57:24, 68:20, 73:3, 83:17, 83:18

**MANAGE** [1] - 171:1

**MANAGEMENT** [3] - 23:21, 71:12, 71:15

**MANAGER** [5] - 35:14, 60:2, 74:1, 107:5, 113:17

**MANAGERS** [11] - 44:24, 49:6, 104:1, 106:4, 106:8, 106:20, 107:1, 107:2, 107:3, 107:4, 146:16

**MANNER** [2] - 197:10, 200:3

**MANUAL** [7] - 85:21, 85:22, 118:10, 118:22, 119:18, 120:2, 120:5

**MANUALS** [9] - 21:21, 21:22, 70:11, 70:12, 106:3, 166:12, 168:5, 168:6, 168:7

**MARKET** [7] - 1:16, 1:21, 2:13, 2:19, 43:11, 45:7, 69:8

**MARKETS** [1] - 45:5

**MARSTON** [2] - 1:15, 201:12

**MASON** [8] - 18:24, 20:4, 33:19, 38:7, 79:19, 161:18, 173:24, 185:2

**MASSACHUSETTS** [3] - 45:7, 169:2, 170:6

**MASSE** [1] - 176:8

**MASTER'S** [1] - 157:6

**MASTERS** [1] - 80:21

**MATCH** [1] - 50:16

**MATERIAL** [13] - 39:5, 44:15, 156:20,

156:21, 176:4,
179:1, 180:24,
183:18, 193:16,
193:17, 193:22,
193:24, 194:3
**MATERIALS** [3] -
8:23, 12:13, 13:24
**MATES** [1] - 45:13
**MATTER** [18] - 62:18,
95:11, 96:17, 97:9,
105:7, 115:20,
129:19, 129:20,
138:20, 138:25,
140:14, 158:18,
166:14, 190:25,
196:21, 197:14,
201:19
**MATTERED** [3] -
129:22, 132:7, 179:1
**MATTERS** [3] - 94:22,
121:11, 131:9
**MCGUIRE** [1] - 78:22
**MEALS** [3] - 36:12,
36:14, 50:18
**MEAN** [39] - 6:18,
6:19, 6:21, 23:20,
24:14, 24:25, 38:22,
39:24, 40:2, 47:6,
51:4, 57:2, 57:3,
61:4, 66:14, 68:21,
77:15, 83:19, 95:15,
110:1, 115:19,
119:16, 120:16,
120:20, 120:21,
123:2, 136:2,
137:13, 140:4,
148:17, 148:18,
148:19, 154:10,
155:6, 165:22,
174:17, 174:18,
181:14, 181:23
**MEANING** [4] -
102:15, 129:16,
165:13, 186:7
**MEANINGFUL** [65] -
15:11, 64:18, 64:23,
66:7, 66:12, 66:14,
66:15, 66:16, 66:17,
66:23, 67:23, 69:24,
72:5, 72:11, 76:20,
77:10, 77:16, 78:18,
87:20, 87:21, 97:3,
97:13, 98:6, 98:8,
98:9, 146:25, 147:3,
147:5, 147:11,
147:12, 147:22,
147:23, 148:12,
148:14, 148:17,
149:2, 149:3, 149:9,
149:19, 149:20,

149:22, 149:23,
154:1, 154:10,
154:17, 156:22,
158:7, 160:25,
161:9, 162:21,
164:7, 165:14,
169:9, 183:9,
184:14, 185:3,
185:5, 185:8, 186:6,
187:8, 194:11, 196:9
**MEANS** [20] - 47:5,
47:7, 47:8, 56:11,
94:25, 99:6, 100:19,
101:19, 108:4,
108:16, 110:1,
110:15, 112:19,
120:21, 143:7,
151:21, 154:10,
154:25, 179:23,
191:11
**MEANT** [10] - 26:2,
36:17, 40:18,
101:24, 104:9,
137:12, 137:13,
181:13, 186:19,
186:20
**MEANTIME** [1] - 39:4
**MEASLY** [1] - 101:21
**MEASURE** [2] - 88:24,
88:25
**MEDICAL** [7] - 38:10,
44:20, 44:22, 52:22,
81:8, 86:13, 122:21
**MEDICARE** [2] -
52:25, 53:3
**MEEHAN** [1] - 1:13
**MEET** [1] - 74:13
**MEETING** [5] - 38:2,
68:3, 68:7, 72:15,
145:6
**MEETINGS** [1] - 29:12
**MEMBERS** [4] - 3:5,
89:14, 152:8, 188:9
**MEMORY** [1] - 198:1
**MEN** [4] - 4:17, 67:2,
104:24, 163:18
**MEN'S** [1] - 155:5
**MENAPACE** [1] - 2:12
**MENTION** [1] - 97:20
**MENU** [1] - 140:1
**MERELY** [1] - 123:13
**MESSAGE** [2] - 106:1,
106:15
**MET** [8] - 32:18, 37:21,
46:10, 68:6, 72:14,
83:9, 191:15, 191:18
**MICHAEL** [1] - 2:2
**MIDDLE** [1] - 57:15
**MIDWEST** [1] - 38:24
**MIGHT** [6] - 3:15,

65:23, 80:9, 93:14,
132:2, 148:1
**MIGRATE** [1] - 173:13
**MILEAGE** [1] - 50:18
**MILES** [1] - 88:8
**MILLION** [33] - 6:9,
13:6, 13:8, 27:2,
42:10, 52:21, 55:2,
55:4, 55:15, 66:16,
66:25, 77:13, 78:17,
78:20, 79:2, 79:13,
88:1, 113:3, 123:10,
123:11, 123:12,
123:14, 127:24,
150:10, 150:11,
150:12, 151:10,
151:17, 158:9,
158:10, 162:19,
183:14, 186:4
**MILLIONS** [2] - 6:5,
6:7
**MIND** [6] - 131:21,
134:18, 144:17,
155:18, 182:13,
199:12
**MINDS** [1] - 140:5
**MINIMUM** [4] - 30:5,
62:15, 62:19, 62:22
**MINOR** [1] - 193:19
**MINUS** [1] - 151:20
**MINUTE** [6] - 36:2,
104:22, 115:1,
116:18, 148:22,
176:14
**MINUTES** [4] - 68:2,
68:5, 87:7, 152:10
**MISLEAD** [2] - 29:21,
142:7
**MISLEADING** [1] -
150:20
**MISLED** [4] - 75:19,
91:12, 178:25,
180:14
**MISREPRESENTATI
ON** [2] - 175:25,
193:22
**MISREPRESENTATI
ONS** [4] - 3:21,
193:14, 193:20,
193:24
**MISREPRESENTED**
[1] - 193:11
**MISS** [5] - 6:22, 7:6,
21:13, 137:9, 153:9
**MISSED** [1] - 81:13
**MISTAKE** [3] - 27:24,
166:3, 186:12
**MISTAKEN** [1] -
144:12
**MISTREATED** [1] -

20:8
**MISUNDERSTANDIN
G** [1] - 181:23
**MOCK** [1] - 114:11
**MOCKING** [1] - 113:24
**MOMENT** [1] - 30:10
**MOMENT'S** [1] -
113:10
**MONEY** [89] - 8:4, 8:7,
8:13, 11:13, 15:22,
15:23, 18:21, 19:2,
19:3, 19:10, 19:23,
19:25, 21:15, 22:24,
33:5, 33:12, 33:24,
37:6, 39:4, 39:22,
45:25, 47:5, 52:4,
52:7, 52:8, 52:11,
54:18, 54:20, 55:6,
56:19, 57:2, 57:7,
60:17, 63:22, 63:23,
65:18, 67:23, 78:22,
78:23, 78:25, 83:18,
100:10, 101:21,
107:17, 107:19,
108:5, 111:15,
111:21, 111:22,
111:24, 111:25,
112:22, 113:2,
113:4, 113:5, 114:6,
114:10, 123:4,
123:16, 124:22,
124:25, 131:18,
133:22, 134:23,
136:22, 150:11,
150:13, 151:11,
156:22, 160:4,
161:20, 163:4,
163:20, 165:8,
165:11, 165:19,
166:1, 170:18,
170:20, 170:21,
171:9, 174:22,
183:11, 185:1,
186:14
**MONKEY** [8] - 96:2,
96:5, 98:14, 150:15,
151:22, 152:25,
160:7, 179:4
**MONKEYS** [2] - 97:14,
132:24
**MONTANA** [1] - 4:21
**MONTH** [1] - 13:9
**MONTHLY** [1] - 69:21
**MONTHS** [83] - 9:21,
10:2, 10:3, 10:4,
15:17, 29:24, 30:3,
30:4, 30:5, 30:13,
31:3, 31:4, 31:8,
32:11, 37:10, 42:9,
42:15, 42:16, 44:18,

46:3, 48:2, 48:5,
51:19, 57:16, 57:17,
62:6, 62:10, 64:21,
66:9, 67:10, 67:19,
69:22, 72:8, 76:18,
77:17, 77:18, 77:23,
80:1, 80:2, 82:14,
82:15, 82:23, 82:24,
101:19, 126:6,
128:23, 132:25,
133:1, 133:4, 133:7,
133:19, 135:12,
142:5, 143:6,
143:10, 145:12,
146:12, 151:9,
158:12, 158:14,
158:17, 158:19,
158:20, 160:23,
165:16, 174:22,
174:25, 175:3,
179:22, 179:24,
180:3, 180:8, 180:9
**MONTHS'** [1] - 160:24
**MORATORIUM** [4] -
145:4, 145:14,
145:15, 146:5,
180:23
**MORGAN** [1] - 1:16
**MORNING** [7] - 3:3,
3:13, 3:14, 3:25, 4:1,
93:6, 93:7
**MORTGAGE** [1] -
136:25
**MOST** [25] - 6:16,
20:15, 29:25, 35:22,
35:24, 47:7, 48:3,
55:20, 75:16, 78:21,
87:21, 88:15, 89:10,
106:23, 114:11,
125:14, 141:25,
148:13, 150:3,
159:17, 173:18,
175:1, 185:6, 188:10
**MOVE** [2] - 23:25,
76:19
**MOVIE** [1] - 78:22
**MOVING** [1] - 176:21
**MULTIPLE** [1] -
106:25
**MURDER** [2] - 138:23,
139:1
**MURRAY** [9] - 12:12,
67:9, 72:7, 72:22,
75:9, 153:7, 155:19,
157:1, 184:6
**MUST** [10] - 85:19,
95:1, 125:12, 136:1,
193:3, 193:4,
193:16, 196:13,
200:2

# N

**N.W** [1] - 2:3
**NAME** [8] - 44:1, 47:4, 88:6, 110:16, 163:3, 174:17, 186:9, 186:13
**NAMED** [1] - 88:15
**NAMES** [1] - 89:3
**NATURE** [1] - 148:20
**NEAR** [2] - 176:11, 176:15
**NEARLY** [6] - 31:8, 32:11, 62:5, 71:2, 77:18, 158:12
**NECESSARILY** [3] - 48:8, 93:10, 140:4
**NEED** [15] - 46:25, 78:5, 93:11, 94:15, 94:18, 96:24, 102:1, 102:2, 111:20, 111:21, 111:22, 121:12, 121:13, 148:20, 197:24
**NEEDED** [7] - 33:12, 53:2, 111:11, 111:13, 111:14, 160:4, 183:12
**NEEDLESS** [1] - 200:22
**NEGATIVE** [1] - 163:12
**NEGOTIATE** [4] - 65:11, 65:13, 134:15, 134:22
**NEGOTIATING** [1] - 134:24
**NEGOTIATION** [2] - 65:9, 195:16
**NEGOTIATIONS** [1] - 121:14
**NEIGHBORHOOD** [3] - 24:13, 24:15, 107:9
**NETTING** [1] - 56:19
**NEVER** [58] - 7:2, 7:16, 8:5, 19:14, 21:25, 31:5, 32:16, 37:11, 37:17, 39:14, 39:16, 40:10, 42:19, 42:23, 45:1, 46:4, 51:19, 55:5, 57:18, 58:16, 58:19, 59:1, 59:2, 67:11, 67:12, 67:24, 72:9, 72:10, 72:13, 74:4, 76:5, 79:22, 80:3, 80:4, 82:25, 83:6, 105:1, 105:2, 105:7, 105:15, 107:6, 113:7, 113:24,

165:25, 171:3, 178:8, 178:10, 183:16, 183:17, 185:7, 192:19, 200:25
**NEVERTHELESS** [2] - 92:15, 189:23
**NEW** [49] - 12:2, 15:24, 20:4, 20:20, 25:12, 27:9, 31:19, 33:13, 33:19, 35:7, 43:3, 43:4, 43:5, 46:18, 57:11, 63:20, 63:21, 68:17, 69:25, 72:22, 73:11, 75:25, 77:9, 83:12, 106:9, 106:10, 108:1, 108:7, 108:8, 108:12, 109:1, 109:12, 111:2, 128:10, 142:1, 142:6, 142:19, 154:8, 157:4, 160:5, 160:18, 173:24, 174:3, 176:2, 177:18, 180:3, 183:12, 185:2
**NEWS** [6] - 100:16, 101:7, 101:12, 189:4, 189:6, 189:7
**NEXT** [114] - 8:17, 19:16, 25:12, 31:21, 32:19, 33:19, 34:2, 34:8, 34:21, 35:9, 35:13, 35:19, 36:4, 36:25, 37:3, 37:16, 38:1, 38:3, 38:15, 38:17, 39:6, 39:11, 39:23, 40:15, 40:21, 42:21, 43:2, 43:16, 43:18, 43:23, 44:16, 44:24, 45:9, 46:2, 46:8, 46:17, 47:3, 47:9, 47:19, 47:23, 48:15, 49:23, 50:11, 51:1, 51:25, 52:10, 52:17, 53:5, 53:7, 53:16, 54:1, 54:4, 54:22, 55:1, 55:14, 55:21, 56:5, 58:21, 58:25, 59:4, 59:13, 60:1, 60:10, 61:23, 67:16, 68:6, 68:14, 68:19, 68:23, 69:1, 69:12, 69:18, 70:6, 70:16, 70:21, 71:11, 72:4, 72:13, 72:21, 73:5, 73:9, 73:25, 74:10, 74:22, 75:3, 80:6, 80:13, 80:16, 80:19, 80:24, 80:25,

81:10, 82:8, 83:5, 83:11, 83:16, 83:22, 84:1, 84:3, 84:19, 85:6, 85:12, 87:6, 89:15, 92:13, 93:4, 125:14, 167:14, 177:2, 178:21, 180:2, 190:25, 194:5
**NICE** [2] - 17:4, 152:21
**NICKEL** [2] - 133:20, 133:21
**NIGHT** [3] - 3:17, 6:22, 64:9
**NINE** [2] - 88:8, 88:12
**NOA** [26] - 23:2, 23:5, 23:7, 23:14, 23:24, 24:3, 25:3, 25:5, 25:10, 25:13, 25:19, 39:19, 107:10, 107:13, 110:8, 111:16, 112:7, 112:17, 121:25, 161:13, 169:11, 169:18, 184:19, 184:20
**NOA'S** [4] - 23:18, 23:20, 25:16, 122:22
**NOBLE** [1] - 81:6
**NOBODY** [11] - 112:20, 113:12, 113:14, 113:21, 125:18, 125:25, 126:1, 126:2, 147:8, 147:23
**NONCOMPETE** [2] - 130:9, 144:9
**NONE** [7] - 15:16, 15:19, 15:20, 30:17, 45:10, 105:8, 157:13
**NONINSURANCE** [4] - 143:23, 144:5, 144:11, 144:20
**NONSENSE** [2] - 105:8, 116:16
**NONSTANDARD** [1] - 178:17
**NORTH** [1] - 56:8
**NOTE** [2] - 92:2, 185:22
**NOTED** [1] - 142:25
**NOTES** [2] - 136:10, 189:11
**NOTHING** [22] - 17:25, 22:20, 47:8, 58:7, 62:3, 72:1, 76:11, 99:8, 120:10, 124:12, 136:10, 136:17, 137:12, 149:10, 151:14,

159:23, 166:9, 172:1, 179:14, 184:5, 186:15
**NOTICE** [13] - 14:16, 29:17, 31:7, 31:8, 40:11, 70:19, 74:5, 113:10, 114:21, 116:3, 116:9, 118:13, 180:18
**NOTICES** [1] - 74:12
**NOTIFIED** [1] - 115:3
**NOTION** [3] - 55:17, 92:9, 134:4
**NOTWITHSTANDING** [1] - 81:16
**NOVEL** [2] - 87:9, 87:11
**NOVEMBER** [4] - 5:19, 29:8, 100:6, 133:7
**NUMBER** [18] - 9:2, 9:11, 40:25, 41:16, 48:2, 49:1, 51:9, 66:18, 83:5, 127:22, 130:19, 141:17, 144:18, 150:18, 159:1, 166:21, 198:25
**NUMBERS** [6] - 6:10, 130:18, 131:14, 141:7, 150:9, 150:20
**NUMERALS** [1] - 166:22

# O

**OATH** [2] - 16:21, 161:6
**OBJECT** [1] - 89:23
**OBJECTION** [1] - 201:12
**OBJECTIONS** [1] - 92:20
**OBJECTIVE** [1] - 201:2
**OBJECTIVES** [1] - 177:8
**OBLIGATED** [1] - 45:24
**OBLIGATION** [3] - 76:16, 134:2, 186:25
**OBLIGATIONS** [1] - 105:12
**OBSERVE** [1] - 200:11
**OBSERVED** [2] - 190:12
**OBSTACLES** [1] - 131:5
**OBTAIN** [1] - 69:3

**OBVIOUS** [7] - 14:15, 15:3, 25:24, 26:20, 36:16, 188:25
**OCCUR** [1] - 193:21
**OCCURRED** [1] - 193:25
**OCTOBER** [5] - 29:10, 176:9, 176:15, 177:2, 177:14
**ODD** [2] - 4:3, 184:17
**ODDS** [2] - 17:25, 58:8
**OEA** [4] - 35:22, 35:25, 45:12, 55:9
**OEA'S** [1] - 45:14
**OFFENSE** [1] - 12:19
**OFFER** [19] - 3:11, 9:4, 10:3, 30:4, 52:2, 66:12, 73:21, 73:22, 145:17, 156:23, 158:8, 158:11, 162:13, 162:14, 165:11, 169:8, 170:7, 200:4
**OFFERED** [17] - 18:21, 19:11, 53:15, 57:9, 58:7, 58:10, 59:2, 69:3, 154:11, 156:25, 158:19, 158:25, 169:8, 183:9, 185:4, 194:15
**OFFERING** [3] - 18:23, 156:23, 166:8
**OFFERS** [11] - 39:9, 59:24, 61:1, 76:12, 77:12, 159:4, 159:5, 165:6, 165:7, 188:2
**OFFICE** [11] - 24:13, 24:15, 25:9, 45:13, 56:5, 56:25, 70:10, 75:1, 107:10, 167:16, 174:8
**OFFICES** [2] - 23:23, 133:17
**OFFICIAL** [2] - 1:20, 201:22
**OLATHE** [1] - 71:8
**OLD** [5] - 78:24, 88:4, 132:6, 144:25, 174:13
**OLDER** [1] - 62:20
**OLIVER** [3] - 20:13, 185:14
**OMISSION** [2] - 193:17, 193:25
**OMISSIONS** [1] - 193:20
**OMITTED** [3] - 193:12, 193:15, 194:2
**ONCE** [9] - 22:4, 35:1, 87:9, 87:10, 96:5,

96:6, 129:3, 170:15
**ONE** [138] - 3:19, 3:23, 4:15, 6:11, 6:16, 9:16, 9:23, 10:16, 14:14, 18:7, 20:14, 23:9, 28:7, 28:9, 28:21, 31:11, 31:14, 44:9, 44:10, 48:18, 54:5, 55:14, 56:9, 56:24, 60:19, 60:20, 61:6, 61:8, 62:13, 63:19, 63:23, 63:24, 64:17, 66:22, 69:13, 70:16, 75:2, 76:3, 77:7, 79:4, 82:2, 88:5, 88:6, 88:16, 90:1, 90:15, 93:8, 94:10, 95:5, 95:13, 95:16, 96:9, 96:18, 96:21, 97:4, 97:7, 97:11, 97:21, 98:1, 103:22, 104:8, 104:23, 105:16, 107:3, 107:12, 112:19, 113:1, 115:8, 115:25, 125:16, 126:24, 127:2, 127:14, 128:18, 129:10, 129:13, 130:6, 130:7, 130:13, 130:22, 131:23, 132:2, 132:4, 132:19, 134:14, 134:20, 136:16, 139:1, 139:25, 140:13, 140:19, 145:21, 147:13, 149:14, 149:16, 150:1, 151:21, 152:3, 153:21, 153:22, 154:15, 154:24, 155:24, 156:3, 156:17, 159:2, 159:10, 159:23, 160:15, 161:13, 162:11, 164:9, 165:13, 165:21, 169:11, 170:12, 171:11, 174:5, 175:23, 177:2, 177:11, 178:2, 178:21, 179:2, 179:8, 180:19, 181:9, 181:10, 182:1, 190:24, 191:12, 192:19, 196:19, 198:24, 199:6, 200:24
**ONE-YEAR** [1] -

145:21
**ONEROUS** [1] - 26:18
**ONES** [2] - 178:18, 185:8
**ONLINE** [1] - 102:14
**OPEN** [3] - 31:19, 33:6, 91:18
**OPENED** [6] - 33:12, 75:25, 91:24, 160:5, 174:3, 183:12
**OPENING** [12] - 8:14, 29:15, 30:19, 50:22, 52:2, 63:2, 63:8, 92:10, 107:23, 137:8, 166:15, 186:16
**OPENS** [1] - 3:1
**OPERATE** [1] - 5:16
**OPERATING** [1] - 33:16
**OPINION** [1] - 37:20
**OPINIONS** [2] - 10:12, 10:13
**OPPORTUNITIES** [4] - 10:6, 66:25, 69:6, 158:24
**OPPORTUNITY** [30] - 5:23, 6:1, 15:25, 46:5, 51:24, 57:18, 59:18, 59:21, 59:24, 65:9, 65:11, 67:12, 72:10, 73:12, 76:16, 83:1, 102:18, 115:6, 116:5, 116:9, 118:13, 118:14, 124:15, 124:17, 124:21, 157:4, 158:6, 167:4, 184:3, 195:15
**OPPOSITE** [2] - 99:10, 112:9
**OPTION** [84] - 24:1, 31:23, 31:24, 31:25, 33:6, 34:12, 44:14, 48:10, 48:12, 48:14, 49:1, 51:10, 51:14, 52:14, 56:16, 57:12, 63:19, 63:22, 69:2, 73:9, 73:10, 75:20, 78:1, 79:9, 79:11, 80:24, 81:1, 81:2, 90:9, 96:15, 96:16, 96:22, 97:9, 97:10, 97:23, 98:1, 98:5, 98:11, 101:6, 101:10, 102:10, 122:25, 124:23, 125:16, 125:21, 126:4, 126:5, 126:10, 126:20,

128:25, 129:17, 129:25, 130:24, 131:23, 132:12, 138:8, 139:7, 141:3, 144:24, 147:4, 147:24, 149:13, 149:17, 149:18, 149:19, 149:20, 149:22, 149:23, 151:6, 151:8, 154:21, 156:7, 157:2, 157:3, 159:1, 168:20, 175:23, 183:10, 183:19, 184:7
**OPTIONS** [37] - 9:14, 31:22, 32:16, 34:11, 37:17, 41:2, 42:22, 43:21, 51:9, 52:1, 58:15, 67:16, 68:9, 73:14, 78:11, 80:7, 83:5, 84:18, 86:5, 96:14, 96:16, 96:19, 96:21, 98:7, 129:15, 131:24, 154:5, 156:10, 160:22, 169:9, 175:4, 182:1, 185:6, 187:7, 194:15
**ORALLY** [1] - 114:9
**ORCHARD** [3] - 110:4, 110:5, 158:3
**ORCHARDS** [1] - 41:6
**ORDER** [10] - 35:5, 98:11, 110:24, 113:20, 139:5, 149:24, 153:15, 159:18, 193:2, 194:14
**ORDERLY** [1] - 200:6
**ORDINARILY** [1] - 9:24
**ORGANIZED** [2] - 17:14, 200:6
**ORIGINAL** [3] - 29:6, 174:6, 178:5
**OTHERWISE** [6] - 20:1, 29:20, 43:4, 64:22, 91:12, 171:25
**OUGHT** [1] - 195:24
**OURSELVES** [2] - 7:21, 122:10
**OUT-OF-POCKET** [3] - 36:15, 50:12, 55:2
**OUTCOME** [1] - 197:13
**OUTRAGE** [4] - 138:13, 138:14, 158:13, 175:6
**OUTRAGEOUS** [2] - 11:15, 133:15

**OUTSIDE** [2] - 95:21, 118:25
**OVERLOOKED** [1] - 170:25
**OVERSTAYED** [1] - 182:20
**OWBPA** [1] - 62:23
**OWN** [26] - 11:12, 22:17, 30:2, 30:6, 32:22, 64:16, 78:2, 107:17, 107:19, 110:6, 110:7, 110:10, 111:10, 111:15, 112:22, 113:2, 137:18, 144:21, 151:10, 153:18, 159:9, 182:14, 185:22, 198:6, 199:6
**OWNED** [2] - 110:11, 170:9
**OWNER** [1] - 43:6
**OWNERSHIP** [2] - 112:19, 112:20
**OWNS** [4] - 41:18, 50:9, 54:25, 110:6

---

**P**

**P&C** [5] - 141:20, 142:19, 176:19, 176:23, 178:19
**P.M** [1] - 201:15
**PACKAGE** [1] - 103:23
**PAGE** [22] - 8:19, 10:13, 14:16, 14:19, 19:16, 31:21, 32:19, 34:21, 58:14, 67:16, 155:20, 155:25, 156:1, 167:14, 178:4, 179:12, 179:20, 180:2, 180:3, 181:16, 202:2
**PAGES** [3] - 14:17, 153:18, 179:11
**PAID** [51] - 6:5, 6:7, 8:3, 8:4, 8:7, 9:22, 13:9, 23:23, 36:9, 36:19, 38:4, 40:9, 42:4, 51:8, 53:6, 55:5, 55:16, 56:23, 66:19, 66:21, 67:1, 67:5, 68:14, 68:22, 72:21, 78:20, 83:17, 83:18, 85:14, 86:24, 87:3, 107:25, 110:18, 132:25, 133:1, 133:9, 133:18, 133:20,

151:9, 163:14, 163:19, 166:1, 170:24, 174:7, 174:8, 174:11, 186:3, 186:20, 187:11, 200:10
**PAID-FOR** [1] - 23:23
**PAINFUL** [1] - 129:2
**PAPER** [16] - 37:4, 42:11, 45:11, 45:22, 51:3, 56:21, 67:2, 73:3, 85:15, 89:4, 139:5, 155:4, 162:20, 163:3, 186:8, 186:14
**PARAGRAPH** [4] - 145:16, 145:24, 166:18, 166:20
**PARAMOUNT** [1] - 201:2
**PARLOR** [1] - 119:12
**PART** [39] - 5:2, 17:5, 33:21, 35:22, 54:11, 79:10, 86:14, 86:15, 91:7, 95:14, 104:5, 114:25, 117:16, 118:22, 119:10, 126:17, 128:2, 128:10, 139:20, 154:20, 155:8, 156:24, 159:17, 163:22, 166:16, 169:23, 170:24, 177:6, 182:10, 182:14, 188:3, 188:5, 188:23, 191:6, 197:1, 199:4, 200:11, 201:8
**PARTICIPATE** [1] - 58:24
**PARTICIPATION** [3] - 43:7, 46:20, 72:24
**PARTICULAR** [3] - 96:9, 134:12, 193:23
**PARTICULARLY** [6] - 40:3, 68:22, 69:9, 175:1, 178:23, 185:11
**PARTIES** [3] - 91:9, 119:7, 196:15
**PARTNER** [1] - 25:7
**PARTS** [3] - 72:1, 103:22, 103:23
**PARTY** [4] - 63:6, 117:19, 117:24, 197:14
**PASS** [1] - 198:11
**PASSING** [1] - 153:9
**PAST** [1] - 189:19

**PATIENCE** [1] - 88:3
**PATIENTLY** [1] - 61:9
**PATRIOTS** [1] - 12:2
**PAUSE** [1] - 104:22
**PAY** [46] - 9:22, 25:14,
31:4, 32:11, 37:11,
46:3, 51:19, 56:24,
57:16, 61:20, 62:6,
62:10, 66:9, 67:10,
67:19, 69:21, 72:8,
76:18, 77:18, 80:2,
82:14, 82:24,
101:18, 101:22,
107:15, 108:8,
124:24, 126:1,
126:5, 126:6,
126:23, 127:2,
127:5, 127:6,
127:11, 128:4,
128:13, 128:19,
128:20, 133:3,
134:1, 134:3,
140:16, 141:8,
149:19, 165:8
**PAYDAY** [3] - 13:11,
51:16, 55:12
**PAYING** [6] - 32:12,
54:14, 89:6, 133:14,
148:23
**PAYMENT** [2] - 154:4,
173:2
**PAYMENTS** [5] -
17:17, 64:21,
145:23, 171:4,
174:10
**PAYROLL** [1] - 165:16
**PAYS** [1] - 55:9
**PEACH** [1] - 41:7
**PEARSON** [1] -
146:18
**PEN** [2] - 89:2, 128:19
**PENNSYLVANIA** [1] -
1:1
**PENSION** [6] - 38:10,
38:12, 80:15,
123:14, 172:18,
173:1
**PEOPLE** [56] - 9:25,
10:1, 11:3, 14:24,
29:25, 30:8, 31:12,
31:13, 31:14, 33:8,
33:9, 41:1, 42:4,
44:23, 47:7, 49:20,
53:13, 53:15, 55:20,
57:4, 59:24, 62:2,
65:12, 67:3, 69:14,
78:21, 79:5, 85:24,
86:23, 88:8, 88:16,
106:21, 117:3,
117:6, 130:19,

135:9, 135:10,
141:15, 148:13,
159:19, 162:17,
167:7, 169:19,
171:6, 171:7,
173:18, 180:7,
180:8, 187:9,
187:11, 187:12,
188:2, 188:5, 200:7
**PER** [1] - 26:25
**PERCEIVED** [3] -
90:9, 99:3, 100:6
**PERCENT** [15] -
36:18, 36:22, 38:5,
45:17, 85:9, 109:6,
109:13, 142:19,
142:20, 177:18,
177:19, 180:21,
200:23
**PERCEPTION** [1] -
60:5
**PERFECT** [1] - 101:25
**PERFECTLY** [1] -
138:24
**PERFORMANCE** [14]
- 49:15, 61:16,
70:18, 70:20, 82:7,
115:6, 116:2,
116:19, 117:4,
127:1, 159:19,
166:24, 167:4,
168:11
**PERFORMING** [2] -
117:8, 117:10
**PERIOD** [5] - 59:19,
94:2, 117:19,
133:10, 141:15
**PERKINS** [34] - 12:11,
14:2, 30:24, 31:2,
31:18, 32:20, 33:11,
33:20, 33:22, 37:4,
42:2, 43:24, 51:16,
57:10, 75:25, 77:5,
79:22, 86:20, 90:16,
90:25, 91:3, 91:15,
91:16, 153:8, 155:2,
159:9, 159:22,
160:2, 160:9,
160:13, 174:1,
181:8, 183:10
**PERKINS'** [1] - 35:13
**PERMITTED** [2] -
91:6, 91:9
**PERSON** [14] - 7:4,
20:18, 57:6, 77:21,
83:24, 97:24,
105:22, 131:22,
157:6, 174:15,
193:8, 193:17,
199:23

**PERSONABLE** [1] -
11:21
**PERSONALLY** [2] -
111:2, 111:3
**PERSONNEL** [3] -
6:18, 6:20, 167:17
**PERSUADE** [2] -
99:12, 107:18
**PERSUADING** [1] -
99:14
**PEST** [1] - 55:7
**PETERSON** [15] -
12:16, 12:20, 42:14,
43:10, 45:19, 45:21,
79:22, 86:11, 86:14,
153:9, 154:21,
160:20, 160:22,
183:16, 185:12
**PETERSON'S** [2] -
8:21, 42:15
**PHILADELPHIA** [4] -
1:17, 1:21, 2:14,
2:19
**PHONE** [5] - 67:14,
81:23, 130:18,
130:19
**PHONES** [1] - 174:8
**PHYSICALLY** [1] -
147:9
**PICK** [3] - 81:23,
123:14, 150:7
**PICKED** [1] - 117:15
**PICKING** [1] - 97:16
**PIECE** [16] - 37:4,
42:11, 45:11, 45:22,
51:2, 56:20, 67:2,
73:3, 85:15, 89:3,
139:5, 155:4,
162:20, 163:3,
186:8, 186:14
**PIKE** [1] - 141:10
**PINK** [2] - 44:19,
86:11
**PITCH** [3] - 104:6,
106:20, 111:18
**PITCHED** [1] - 103:24
**PITHY** [1] - 88:18
**PLACE** [11] - 78:15,
87:2, 87:3, 122:1,
126:22, 132:15,
179:10, 179:14,
179:17, 180:11,
192:6
**PLACED** [2] - 120:8,
196:1
**PLAIN** [2] - 26:15,
128:23
**PLAINTIFF** [47] - 3:8,
9:20, 10:7, 10:8,
11:7, 13:15, 13:20,

14:14, 26:21, 27:16,
28:7, 28:9, 28:10,
28:11, 28:13, 30:14,
30:20, 44:7, 85:20,
153:6, 153:16,
153:17, 153:24,
153:25, 178:24,
182:22, 183:8,
186:23, 187:1,
187:2, 187:4, 188:8,
189:1, 191:13,
191:15, 192:24,
193:23, 195:7,
195:10, 195:13,
196:18, 200:3
**PLAINTIFF'S** [4] -
17:20, 54:22,
193:25, 195:5
**PLAINTIFFS** [89] -
1:18, 2:5, 4:15, 6:6,
6:8, 8:9, 9:12, 12:15,
15:6, 16:18, 16:20,
16:22, 21:17, 25:25,
29:1, 30:22, 30:24,
31:1, 41:23, 50:21,
57:12, 63:2, 63:11,
63:16, 66:19, 66:24,
67:9, 71:20, 73:16,
78:6, 78:14, 85:16,
86:3, 86:7, 90:8,
90:15, 90:24, 91:11,
95:2, 97:16, 98:17,
98:24, 100:1,
103:10, 103:20,
105:5, 106:24,
112:25, 113:24,
129:5, 129:14,
131:9, 133:23,
136:7, 139:4,
139:22, 146:17,
147:3, 149:9, 150:2,
154:6, 154:16,
154:24, 155:7,
158:18, 160:11,
161:15, 165:6,
165:10, 165:25,
168:12, 169:6,
169:10, 169:12,
173:21, 175:23,
175:25, 178:22,
181:9, 186:24,
192:10, 192:13,
193:10, 194:8,
194:12, 195:25,
196:20, 198:25
**PLAINTIFFS'** [6] -
76:10, 90:18, 162:9,
186:16, 192:8,
193:18
**PLAN** [48] - 29:24,
30:11, 43:7, 46:21,

52:6, 53:4, 61:8,
61:10, 61:11, 61:14,
61:20, 62:1, 81:9,
83:8, 83:13, 122:17,
123:14, 124:7,
126:9, 126:16,
126:23, 126:24,
127:3, 127:10,
127:13, 128:5,
128:8, 128:10,
128:13, 128:15,
128:19, 128:21,
171:12, 171:13,
171:21, 171:24,
171:25, 173:1,
178:5, 178:7, 178:8,
179:9, 180:10
**PLANNING** [1] -
95:17, 126:19,
141:6, 141:11,
142:7, 142:9,
142:15, 142:16,
142:25, 146:14,
176:19
**PLANS** [6] - 121:10,
126:13, 126:15,
126:21, 171:11,
172:19
**PLANTING** [1] - 41:6
**PLAY** [2] - 95:19,
179:4
**PLAYED** [3] - 67:25,
145:5, 153:3
**PLAYER** [1] - 80:20
**PLAYING** [1] - 153:2
**PLEASANT** [1] - 18:9
**PLEASURE** [1] - 4:2
**PLOW** [1] - 147:19
**PLOWING** [1] - 58:9
**PLUGGED** [2] -
128:17, 129:3
**PLUS** [3] - 11:1, 30:3,
79:3
**POCKET** [10] - 36:15,
40:5, 45:16, 50:12,
55:2, 60:12, 74:23,
107:14, 111:14,
133:23
**POCKETS** [1] - 113:3
**POIGNANT** [1] -
157:21
**POINT** [24] - 15:14,
21:10, 23:14, 56:11,
62:13, 81:18, 85:19,
92:9, 93:17, 109:25,
118:25, 123:15,
135:21, 143:13,
144:13, 146:5,
159:10, 159:20,
160:2, 162:1, 170:1,

170:3, 179:16, 184:22

**POINTED** [3] - 144:8, 144:14, 178:3

**POINTING** [1] - 85:21

**POINTS** [4] - 76:9, 91:14, 92:8, 140:19

**POLICIES** [16] - 108:1, 108:3, 109:2, 109:3, 109:6, 109:7, 109:8, 109:12, 109:13, 109:14, 109:17, 109:19, 109:23, 110:13, 134:3

**POLICY** [19] - 21:22, 70:12, 74:6, 74:8, 76:3, 108:2, 108:7, 108:8, 108:12, 110:16, 110:17, 110:18, 111:2, 111:7, 130:13, 133:20, 133:21, 142:1, 145:24

**POLISHED** [1] - 93:13

**PONY** [3] - 40:17, 40:18, 40:19

**POOR** [2] - 61:16, 117:4

**POORLY** [1] - 117:8

**PORTRAY** [1] - 78:7

**POSED** [1] - 190:16

**POSITION** [7] - 56:3, 59:9, 103:17, 135:11, 139:14, 191:21, 193:18

**POSSIBILITIES** [1] - 97:4

**POSSIBILITY** [7] - 90:19, 121:15, 127:20, 131:13, 136:13, 141:11, 141:18

**POSSIBLE** [4] - 6:1, 54:3, 129:2, 145:7

**POWER** [1] - 58:6

**POWERFUL** [1] - 6:2

**PRECISELY** [7] - 14:12, 34:7, 47:21, 87:24, 164:6, 182:24, 182:25

**PREDICAMENT** [2] - 135:7, 196:2

**PREDICATE** [2] - 73:19, 162:9

**PREFER** [2] - 186:24, 188:11

**PREJUDICE** [2] - 189:15, 197:13

**PREMISE** [1] - 99:25

**PREPARE** [2] - 93:9,

106:3

**PREPARED** [2] - 93:15, 199:6

**PREPARING** [8] - 5:18, 22:15, 29:9, 29:14, 129:5, 129:7, 129:8, 168:15

**PREPONDERANCE** [12] - 4:14, 27:25, 28:2, 28:18, 28:25, 87:15, 187:4, 191:3, 191:10, 191:19, 193:5

**PRESENT** [1] - 2:21

**PRESENTATION** [1] - 114:17

**PRESENTATIONS** [1] - 188:17

**PRESENTED** [5] - 96:25, 123:6, 123:7, 189:18, 196:14

**PRESENTING** [1] - 90:22

**PRESERVE** [1] - 121:25

**PRESIDENT** [8] - 18:8, 20:24, 69:11, 74:3, 85:10, 167:17, 168:14, 168:16

**PRESIDENTS** [1] - 49:20

**PRESSES** [1] - 33:7

**PRESSURE** [15] - 64:1, 64:2, 64:3, 65:20, 65:21, 102:1, 132:10, 164:10, 164:12, 164:15, 164:16, 164:20, 165:2, 196:4, 196:5

**PRESSURED** [2] - 30:9, 114:9

**PRETEND** [4] - 67:6, 104:25, 138:11, 173:4

**PRETTY** [19] - 32:14, 62:10, 71:8, 71:9, 87:11, 106:14, 124:7, 126:17, 127:19, 130:3, 132:16, 134:24, 136:4, 139:12, 140:7, 140:17, 149:17, 154:2

**PREVENT** [1] - 184:23

**PREVENTED** [3] - 33:16, 90:22, 143:24

**PREVENTING** [1] - 145:25

**PREVENTS** [1] - 124:6

**PREVIOUSLY** [1] -

35:21

**PRICE** [2] - 50:6, 52:20

**PRIMARY** [1] - 199:25

**PRISM** [1] - 17:16

**PRIVILEGE** [1] - 182:16

**PRIVILEGED** [2] - 6:12, 6:13

**PROBLEM** [9] - 41:8, 90:21, 101:9, 121:15, 126:13, 127:7, 127:12, 146:15, 170:3

**PROBLEMS** [2] - 119:3, 132:19

**PROCEDURE** [3] - 115:11, 118:10, 167:10

**PROCEDURES** [8] - 49:21, 82:5, 118:2, 118:6, 119:23, 168:4, 168:5, 168:9

**PROCEED** [1] - 152:18

**PROCEEDINGS** [1] - 201:18

**PROCEEDS** [1] - 35:7

**PROCESS** [3] - 105:13, 156:7, 200:6

**PRODUCED** [1] - 1:23

**PRODUCT** [1] - 144:11

**PRODUCTS** [5] - 143:23, 144:5, 144:20, 145:1

**PROFESSOR** [1] - 80:8

**PROGRAM** [57] - 5:18, 5:19, 8:23, 8:24, 12:13, 13:24, 13:25, 18:15, 23:17, 25:14, 29:10, 29:13, 31:22, 35:10, 39:5, 44:2, 44:8, 53:18, 100:7, 107:10, 107:13, 110:9, 111:16, 112:7, 112:17, 116:18, 116:19, 121:21, 121:23, 122:1, 122:10, 123:8, 123:19, 123:20, 127:23, 128:2, 128:8, 128:17, 129:9, 133:5, 140:20, 142:15, 142:24, 143:6, 145:13, 145:19, 146:1, 146:13, 150:12,

151:4, 151:23, 154:20, 168:16, 169:11, 171:23, 193:13

**PROGRAMS** [3] - 5:22, 24:2, 177:6

**PROJECTED** [1] - 123:12

**PROJECTING** [1] - 123:9

**PROMINENT** [1] - 103:22

**PROMISE** [34] - 8:8, 8:9, 13:21, 17:17, 33:20, 33:25, 38:15, 38:20, 43:17, 45:23, 45:24, 47:3, 47:5, 47:12, 51:3, 51:8, 53:5, 53:6, 54:15, 59:1, 73:3, 79:1, 80:17, 82:19, 83:17, 83:18, 85:16, 86:23, 89:4, 89:6, 155:5, 163:4, 165:20, 186:9

**PROMISED** [6] - 8:10, 27:20, 47:10, 107:6, 157:19, 199:15

**PROMISES** [10] - 15:23, 22:23, 45:23, 51:4, 67:3, 67:4, 95:11, 95:15, 107:11, 165:22

**PROMOTE** [1] - 110:24

**PROMPTLY** [1] - 174:4

**PROOF** [12] - 3:9, 27:15, 27:17, 27:25, 63:12, 94:24, 190:14, 191:1, 191:8, 191:16, 191:18, 191:23

**PROPERTIES** [3] - 26:24, 55:18, 56:6

**PROPERTY** [4] - 56:8, 164:24, 177:18, 178:17

**PROPOSITION** [1] - 95:12

**PROPRIETARY** [5] - 50:8, 54:23, 112:17, 112:19, 170:10

**PROSPECT** [1] - 18:9

**PROTECT** [1] - 9:17

**PROTECTING** [1] - 102:21

**PROTECTION** [8] - 4:8, 62:21, 99:9, 115:8, 117:5, 118:18, 120:12

**PROTECTIONS** [5] - 98:20, 103:11, 115:18, 118:9, 118:17

**PROUD** [2] - 57:23, 58:5

**PROVE** [8] - 27:22, 63:12, 65:22, 98:24, 164:17, 164:20, 193:4, 196:6

**PROVED** [1] - 77:6

**PROVEN** [3] - 28:17, 28:24, 187:3

**PROVES** [1] - 126:12

**PROVIDED** [10] - 29:19, 39:5, 40:14, 41:12, 59:19, 61:21, 122:16, 127:13, 190:23

**PROVIDING** [1] - 118:12

**PROVING** [4] - 48:12, 191:2, 194:4, 194:16

**PROVISION** [10] - 39:16, 110:25, 114:25, 115:25, 116:11, 116:25, 120:5, 120:13, 130:9, 167:24

**PROVISIONS** [7] - 49:18, 110:14, 115:19, 116:1, 118:5, 118:20, 167:21

**PULL** [2] - 126:2, 150:4

**PULLED** [4] - 114:17, 117:15, 169:3, 169:4

**PUNCH** [1] - 22:12

**PURCHASE** [1] - 52:20

**PURCHASED** [1] - 186:18

**PURPOSE** [1] - 145:15

**PURPOSES** [6] - 58:17, 120:8, 172:9, 172:10, 173:2, 173:3

**PURSUE** [3] - 51:23, 69:5, 184:12

**PURSUED** [6] - 46:4, 57:18, 67:12, 82:25, 84:8, 84:18

**PURVIEW** [1] - 5:6

**PUSH** [3] - 119:15, 119:16

**PUT** [46] - 5:17, 8:17, 11:10, 14:2, 17:9, 18:2, 19:5, 19:19, 24:21, 25:8, 25:12,

28:13, 41:17, 54:18, 62:13, 83:2, 83:20, 89:2, 94:1, 94:10, 111:25, 113:4, 114:6, 121:3, 127:8, 133:22, 135:6, 139:2, 153:11, 157:14, 159:16, 159:18, 159:21, 163:3, 163:5, 163:12, 166:19, 168:21, 172:7, 172:18, 173:1, 176:6, 184:24, 191:11

**PUTS** [2] - 99:23, 143:10

**PUTTING** [4] - 85:20, 85:22, 102:13, 196:24

**PUZZLED** [1] - 24:9

**PUZZLES** [1] - 133:18

**PX** [5] - 22:13, 166:19, 177:20, 177:21, 178:1

## Q

**QUADRUPLE** [1] - 111:18

**QUAGMIRE** [5] - 122:11, 123:24, 172:15, 172:19, 172:22

**QUANTIFY** [1] - 87:23

**QUARTER** [2] - 152:11, 152:12

**QUESTIONS** [10] - 5:8, 16:17, 23:13, 24:5, 25:24, 29:17, 75:12, 95:6, 131:21, 143:19

**QUIBBLE** [1] - 25:25

**QUICK** [1] - 52:16

**QUICKLY** [1] - 155:17

**QUINN** [33] - 1:15, 7:11, 8:14, 63:3, 89:20, 89:22, 90:7, 91:17, 91:20, 92:15, 92:22, 92:24, 93:5, 93:6, 93:8, 153:4, 153:6, 155:22, 159:11, 163:12, 174:12, 176:12, 177:22, 179:8, 179:20, 187:13, 187:20, 198:22, 199:7, 199:10, 200:21, 201:4, 202:4

**QUIT** [1] - 132:8

**QUITE** [8] - 24:11, 85:18, 87:11, 159:2, 188:16, 192:3, 198:11, 199:9

**QUITTING** [1] - 102:3

**QUOTE** [5] - 10:19, 10:20, 17:7, 20:13, 21:2

**QUOTED** [1] - 92:8

**QUOTES** [1] - 20:12

## R

**R1500** [10] - 53:19, 54:7, 59:7, 81:13, 82:3, 117:13, 117:14, 118:9, 118:12, 167:22

**R3001** [3] - 84:9, 84:14, 143:6

**R830** [8] - 35:16, 39:15, 114:18, 115:15, 117:13, 119:4, 166:20, 169:20

**RAFAEL** [2] - 156:2, 156:3

**RAILROAD** [2] - 57:24, 58:2

**RAISE** [5] - 75:21, 75:23, 89:25, 94:15, 191:3

**RAISED** [1] - 121:14

**RAISES** [2] - 131:20, 143:19

**RAN** [2] - 78:25, 126:12

**RAPHAEL** [3] - 10:24, 10:25, 156:11

**RASHID** [1] - 2:23

**RATE** [2] - 140:17, 175:24

**RATES** [15] - 53:20, 53:21, 53:23, 54:9, 75:19, 75:22, 75:23, 140:14, 175:22, 176:11, 176:19, 177:24, 178:7, 178:13, 178:15, 178:16, 180:16, 180:18, 180:20

**RATHER** [8] - 84:5, 131:23, 135:22, 161:14, 162:18, 192:21, 194:13

**RATIONAL** [6] - 66:4, 159:4, 161:21, 165:18, 168:25, 185:10

**REACH** [1] - 130:20

**REACHED** [1] - 145:21

**READ** [23] - 8:21, 13:23, 14:25, 21:25, 26:15, 34:4, 43:20, 47:20, 48:21, 59:14, 64:4, 68:24, 70:9, 80:21, 84:1, 115:20, 122:7, 122:8, 137:17, 156:2, 157:7, 180:4, 199:16

**READING** [4] - 26:6, 180:5, 180:6, 190:4

**READJUST** [1] - 77:24

**READY** [3] - 92:22, 93:4, 200:19

**REAL** [21] - 15:10, 57:2, 66:23, 66:24, 66:25, 72:12, 77:11, 77:15, 78:18, 78:21, 87:18, 87:20, 87:22, 97:3, 103:13, 114:14, 131:13, 145:3, 150:13, 185:7, 186:18

**REALITY** [2] - 168:19, 181:9

**REALIZE** [1] - 52:24

**REALIZED** [2] - 26:16, 126:18

**REALLY** [20] - 17:10, 20:8, 28:8, 39:4, 49:25, 57:25, 81:22, 97:12, 97:13, 99:16, 105:1, 113:10, 133:25, 135:11, 138:19, 138:25, 140:9, 159:5, 186:1, 196:22

**REASON** [26] - 84:12, 96:7, 98:4, 98:21, 98:22, 99:7, 103:24, 107:18, 115:10, 116:16, 120:14, 120:17, 120:18, 120:19, 120:21, 120:22, 120:24, 121:1, 139:9, 139:10, 153:13, 167:9, 173:21, 176:5

**REASONABLE** [14] - 97:24, 98:12, 115:6, 118:14, 131:21, 131:22, 151:1, 167:4, 190:24, 191:4, 191:7, 191:9, 193:17, 197:16

**REASONS** [9] - 63:5, 91:21, 96:9, 114:3, 116:22, 169:4,

184:8, 192:12

**REBUTTAL** [5] - 3:11, 87:12, 152:19, 202:5

**RECEIVE** [4] - 111:5, 118:13, 122:15, 147:1

**RECEIVED** [18] - 31:3, 32:20, 33:3, 33:5, 33:23, 33:24, 38:6, 38:8, 38:9, 52:22, 53:17, 55:9, 58:21, 58:23, 74:12, 148:2, 195:14

**RECEIVING** [1] - 145:22

**RECESSION** [4] - 30:2, 48:4, 89:10, 175:2

**RECLASSIFY** [2] - 172:10, 173:13

**RECOGNIZED** [1] - 111:19

**RECONSIDER** [1] - 175:16

**RECORD** [7] - 16:7, 55:4, 92:7, 92:21, 199:4, 199:11, 201:18

**RECORDED** [2] - 68:2, 68:4

**RECORDING** [4] - 68:1, 68:3, 68:5

**RECORDS** [2] - 45:10, 65:25

**RECOUP** [6] - 76:22, 76:24, 77:2, 86:4, 111:24

**RECOUPED** [10] - 37:1, 37:2, 45:16, 45:17, 55:10, 60:13, 71:1, 74:24, 82:12, 86:6

**RECOVER** [3] - 131:5, 150:16, 181:2

**RECREATE** [1] - 59:22

**RECRUIT** [1] - 106:9

**RED** [1] - 180:22

**REDIRECT** [2] - 10:17, 178:3

**REDUCE** [8] - 85:8, 141:24, 142:9, 142:16, 143:8, 177:17, 178:15, 180:20

**REDUCED** [2] - 53:23, 141:18

**REDUCTION** [5] - 127:4, 127:15, 127:16, 127:18,

127:25

**REDUCTIONS** [1] - 167:2

**REEMPLOYMENT** [2] - 145:17, 145:20

**REFER** [1] - 159:12

**REFERENCE** [1] - 153:9

**REFERRED** [3] - 76:8, 107:23, 186:17

**REFINANCE** [2] - 113:19, 113:20

**REFLECTS** [2] - 156:16, 156:17

**REFRIGERATOR** [1] - 108:6

**REFUSED** [1] - 159:7

**REFUTING** [1] - 158:1

**REGARD** [2] - 3:20, 196:25

**REGARDLESS** [1] - 118:10

**REGGIE** [7] - 18:24, 37:13, 79:18, 79:19, 161:18, 185:1

**REGIONAL** [2] - 49:20, 70:10

**REHEARSED** [1] - 105:23

**REHIRE** [1] - 76:3

**REHIRED** [1] - 146:2

**REHIRING** [1] - 180:23

**REIMBURSED** [2] - 100:12, 113:6

**REIMBURSEMENT** [3] - 100:20, 124:19, 140:23

**REINERIO** [14] - 17:22, 32:25, 33:3, 41:13, 57:13, 57:14, 57:15, 57:21, 58:14, 79:20, 153:8, 157:21, 170:11, 183:24

**REJECT** [1] - 41:20

**RELATED** [2] - 111:7, 140:13

**RELATIONSHIP** [2] - 46:18, 63:20

**RELEASE** [237] - 4:16, 8:6, 8:18, 8:22, 9:13, 9:14, 9:19, 9:21, 10:8, 10:11, 10:12, 10:14, 10:18, 10:22, 11:2, 11:4, 12:5, 12:7, 12:9, 12:10, 12:12, 12:14, 13:16, 13:21, 14:5, 14:12, 14:19, 15:7, 16:23,

17:6, 18:16, 19:25,
27:17, 27:19, 27:22,
28:19, 29:16, 32:14,
32:17, 32:18, 32:20,
34:5, 34:6, 35:10,
37:18, 37:20, 37:23,
37:25, 38:4, 39:2,
39:8, 39:10, 39:21,
40:20, 40:22, 42:16,
43:3, 43:20, 44:1,
44:3, 44:11, 44:14,
44:15, 44:18, 46:10,
46:12, 47:10, 47:12,
48:1, 48:10, 48:12,
48:16, 49:1, 49:2,
52:14, 54:13, 57:1,
58:19, 59:10, 59:16,
60:22, 62:4, 62:9,
62:15, 62:18, 65:1,
65:9, 65:11, 65:14,
66:10, 67:25, 68:7,
68:8, 68:25, 69:19,
69:24, 70:1, 70:3,
72:16, 72:17, 72:18,
73:7, 73:8, 73:11,
75:4, 77:17, 78:7,
79:10, 79:19, 80:14,
80:22, 83:7, 83:8,
83:10, 83:25, 84:2,
84:6, 84:10, 84:17,
87:17, 90:25, 91:11,
96:20, 96:22, 97:2,
97:17, 98:12, 99:16,
99:19, 100:25,
101:1, 101:2, 101:7,
101:8, 101:13,
103:1, 103:3, 124:3,
125:4, 125:10,
125:12, 125:16,
125:17, 125:22,
125:23, 127:7,
127:10, 127:11,
128:4, 128:21,
128:22, 129:1,
129:11, 129:12,
129:15, 129:16,
131:11, 131:24,
134:19, 136:1,
136:18, 137:5,
137:11, 137:17,
137:22, 138:10,
139:11, 139:21,
140:2, 140:3,
140:21, 143:20,
147:4, 147:7,
149:10, 149:12,
149:24, 150:14,
150:16, 150:22,
150:24, 150:25,
151:3, 151:7,
151:13, 151:20,

151:24, 152:2,
152:4, 154:14,
154:16, 154:20,
156:16, 156:19,
156:20, 157:4,
157:7, 158:3,
158:22, 158:23,
160:23, 161:4,
161:17, 162:14,
162:17, 162:24,
175:19, 175:21,
182:23, 183:18,
184:21, 185:12,
186:17, 186:19,
187:5, 189:3, 193:2,
193:5, 193:13,
193:21, 194:1,
194:4, 194:10,
194:13, 194:14,
194:17, 195:1,
195:4, 195:8,
195:12, 196:3,
196:19
**RELEASED** [2] -
115:10, 167:9
**RELEASES** [1] - 137:3
**RELEASING** [2] -
47:16, 47:18
**RELEVANT** [5] -
96:15, 116:25,
148:1, 175:22, 176:1
**RELIANCE** [1] - 120:7
**RELIED** [1] - 179:2
**RELIEF** [2] - 156:5
**REMAIN** [2] - 44:17,
152:17
**REMAINING** [1] - 67:9
**REMAINS** [1] - 97:11
**REMARKS** [3] - 91:13,
93:15, 136:5
**REMEMBER** [33] -
16:7, 23:4, 23:6,
23:8, 41:8, 44:19,
45:5, 45:23, 49:18,
52:3, 52:25, 53:21,
69:10, 74:15, 74:20,
78:23, 78:24, 81:4,
82:13, 86:10, 94:9,
107:12, 137:7,
163:11, 164:9,
167:5, 175:16,
177:22, 178:2,
179:24, 180:21,
184:15
**REMIND** [3] - 16:8,
196:19, 197:23
**REMINDED** [1] - 95:18
**REMISS** [1] - 6:11
**REMOTELY** [1] -
163:23

**REMOVED** [1] - 105:7
**RENDERED** [1] -
128:19
**RENEGE** [1] - 163:7
**RENEW** [1] - 108:3
**RENEWAL** [2] - 70:23,
107:24
**RENEWALS** [7] -
108:9, 108:10,
108:13, 108:24,
109:13, 110:2,
142:20
**RENEWED** [4] - 80:9,
80:10, 109:7, 134:4
**RENEWS** [1] - 108:2
**RENTAL** [1] - 56:6
**REORGANIZATION**
[7] - 61:11, 61:25,
128:7, 128:11,
167:3, 171:17,
171:23
**REORGANIZED** [1] -
45:3
**REPAID** [1] - 70:23
**REPEAT** [2] - 85:25,
193:2
**REPEATEDLY** [1] -
40:12
**REPETITIVE** [1] -
187:23
**REPHRASE** [1] -
74:17
**REPLACE** [1] - 35:3
**REPORTER** [2] - 1:20,
201:23
**REPOSITORIES** [1] -
5:4
**REPRESENT** [1] -
87:8
**REPRESENTING** [6] -
1:18, 2:5, 2:11, 2:15,
2:20, 188:20
**REQUESTED** [1] -
45:1
**REQUIRE** [2] - 48:10,
131:24
**REQUIRED** [8] -
96:19, 96:21,
133:12, 149:5,
149:6, 149:7,
167:17, 196:2
**REQUIREMENT** [1] -
146:3
**REQUIREMENTS** [4] -
62:15, 62:16, 62:20,
62:23
**RESCIND** [7] - 31:5,
42:18, 46:4, 67:11,
72:8, 80:2, 82:24
**RESERVE** [1] - 141:1

**RESERVES** [2] -
119:20, 119:22
**RESOLVES** [1] -
99:24
**RESOURCE** [4] -
21:21, 85:22, 168:5,
168:7
**RESPECT** [15] - 5:10,
16:10, 132:13,
161:22, 174:14,
174:20, 181:22,
186:11, 186:23,
188:20, 189:1,
189:14, 192:24
**RESPECTS** [1] -
200:13
**RESPOND** [5] - 92:3,
93:11, 116:13,
116:17, 132:19
**RESPONSE** [1] -
130:22
**RESPONSES** [1] -
21:24
**RESPONSIBILITIES**
[3] - 104:18, 105:9,
105:18
**RESPONSIBILITY** [3]
- 56:25, 106:9,
199:25
**RESPONSIBLE** [1] -
102:20
**REST** [6] - 39:13, 70:7,
114:24, 117:20,
117:21, 117:22
**RESTRICTIONS** [4] -
117:25, 131:8,
168:2, 174:7
**RESULT** [7] - 46:24,
78:17, 93:13, 127:4,
127:23, 145:19,
146:1
**RESULTED** [1] - 186:3
**RESULTS** [2] - 74:13,
97:8
**RETAINED** [1] - 58:17
**RETIRE** [1] - 122:21
**RETIREE** [2] - 52:22,
122:21
**RETIREMENT** [5] -
52:7, 52:8, 53:25,
146:4, 164:1
**RETOOL** [4] - 59:18,
77:24, 158:6, 184:3
**RETURN** [14] - 36:18,
36:22, 36:23, 45:18,
53:25, 92:19, 97:18,
111:25, 112:5,
114:6, 151:20,
163:13, 183:15,
186:8

**RETURNS** [4] - 50:14,
60:14, 82:17, 114:1
**REVENUE** [1] - 177:6
**REVIEW** [13] - 42:3,
74:2, 74:4, 85:10,
115:11, 115:17,
118:14, 118:15,
167:10, 167:16,
168:12, 177:5, 177:6
**REVIEWED** [3] -
115:16, 120:15,
120:24
**REVIEWING** [2] -
58:18, 120:18
**REVOKE** [6] - 30:15,
30:16, 37:11, 57:17,
80:3, 82:25
**RHONDA** [1] - 2:23
**RICHARD** [1] - 2:6
**RICHES** [2] - 99:18,
116:24
**RICK** [1] - 93:22
**RIDICULOUS** [1] -
135:20
**RIGHTS** [8] - 14:20,
26:8, 99:9, 102:21,
156:6, 156:11,
162:6, 195:11
**RING** [3] - 11:18, 21:8,
40:4
**RINGS** [2] - 47:2,
59:15
**RISES** [1] - 188:14
**RISK** [5] - 11:15,
111:23, 172:7,
172:18, 173:1
**ROAD** [1] - 149:15
**ROBERT** [1] - 10:16
**ROGER** [2] - 28:18,
28:25
**ROHLFING** [1] - 2:23
**ROLE** [1] - 46:12
**ROLL** [1] - 168:15
**ROMAN** [2] - 166:21
**ROMERO** [1] - 1:3
**RONALD** [1] - 1:11
**ROOM** [2] - 95:23,
163:16
**ROOT** [2] - 96:10,
96:11
**ROSBOROUGH** [3] -
4:18, 61:9, 171:18
**ROUGHHOUSING** [1]
- 95:21
**ROUGHLY** [3] - 13:6,
82:20, 154:14
**RPR** [1] - 1:19
**RUIN** [12] - 11:9, 32:4,
47:25, 48:6, 55:17,
55:19, 65:24, 67:18,

101:24, 103:1,
131:14, 196:3
**RUINED** [1] - 69:19
**RULE** [1] - 156:8
**RULES** [6] - 36:7,
118:1, 159:24,
159:25, 168:3, 168:4
**RULINGS** [2] - 200:18,
200:23
**RUN** [3] - 45:25,
95:24, 147:19
**RUNNING** [4] -
102:15, 102:16,
141:7, 164:5

## S

**SALARY** [3] - 42:17,
128:14, 133:16
**SALE** [11] - 12:9,
18:15, 41:4, 50:21,
53:24, 58:15, 58:19,
71:20, 75:7, 159:21,
161:16
**SALES** [2] - 42:7,
142:19
**SALLIE** [1] - 2:7
**SALVAGE** [1] - 151:24
**SATELLITE** [1] - 43:14
**SATISFACTORY** [1] -
115:7
**SATISFYING** [1] -
146:2
**SAVE** [3] - 102:24,
123:4, 123:10
**SAVINGS** [3] - 123:16,
131:15, 164:22
**SAW** [36] - 9:16, 9:17,
10:20, 13:14, 13:18,
16:8, 16:19, 17:21,
20:24, 25:23, 26:20,
26:23, 26:24, 26:25,
27:1, 27:10, 29:10,
30:1, 47:20, 50:7,
53:24, 59:24, 65:2,
75:21, 75:24, 82:21,
83:23, 84:24, 85:17,
153:3, 156:21,
163:9, 167:19,
190:12, 198:13
**SCREEN** [1] - 99:23
**SCRIPT** [2] - 93:10,
132:20
**SEATED** [5] - 3:4,
89:19, 90:4, 93:4,
152:17
**SECOND** [16] - 9:20,
14:19, 22:25, 24:7,
37:9, 58:14, 59:13,
76:21, 93:9, 94:9,

109:5, 116:4,
123:12, 153:4,
166:23, 195:5
**SECONDLY** [1] - 30:8
**SECONDS** [1] -
187:25
**SECRET** [3] - 178:8,
179:9, 180:10
**SECRETE** [1] - 22:7
**SECRETLY** [1] - 69:14
**SECURE** [1] - 89:8
**SECURED** [2] - 111:2,
111:3
**SECURITY** [27] -
49:12, 84:22, 98:20,
99:8, 99:10, 100:2,
100:10, 103:10,
103:15, 103:24,
104:5, 104:13,
104:17, 105:17,
106:22, 107:7,
107:12, 110:23,
112:2, 112:8,
112:14, 112:23,
114:11, 115:22,
170:1
**SEE** [31] - 4:5, 4:6,
6:7, 6:13, 6:24, 6:25,
7:16, 8:8, 9:12, 9:14,
11:22, 15:12, 36:1,
60:7, 63:25, 69:8,
70:13, 89:12, 99:25,
107:24, 118:3,
130:4, 142:21,
156:20, 157:23,
162:8, 180:1, 201:6,
201:13
**SEEK** [8] - 46:5, 46:7,
65:6, 78:12, 78:13,
78:14, 195:14
**SEEKING** [2] - 25:24,
102:14
**SEEM** [2] - 93:13,
119:9
**SELECT** [3] - 97:9,
98:11, 199:23
**SELECTED** [4] - 79:9,
154:21, 183:19,
184:7
**SELECTION** [2] -
69:13, 156:7
**SELF** [4] - 132:13,
174:14, 174:20,
186:11
**SELF-RESPECT** [1] -
132:13
**SELL** [42] - 5:16,
11:24, 12:1, 18:13,
19:24, 21:7, 34:10,
34:22, 35:6, 37:22,

40:4, 45:23, 45:24,
52:7, 52:18, 52:19,
54:19, 56:10, 58:11,
59:10, 72:2, 86:19,
104:10, 104:13,
110:16, 124:21,
130:6, 130:25,
131:1, 143:23,
144:3, 144:5,
144:11, 144:20,
144:25, 145:1,
145:2, 158:5,
161:11, 163:21,
175:17
**SELLING** [19] - 20:5,
31:19, 33:13, 36:16,
38:7, 43:6, 59:11,
76:2, 90:11, 98:7,
100:18, 130:2,
130:5, 131:7,
140:19, 158:4,
173:25, 183:19,
183:25
**SELLS** [2] - 109:2,
109:5
**SENATE** [1] - 18:10
**SEND** [1] - 175:8
**SENDING** [1] - 81:20
**SENSE** [37] - 11:14,
16:14, 17:11, 17:21,
17:22, 18:1, 18:4,
19:4, 20:2, 20:8,
20:9, 21:5, 21:7,
21:13, 48:25, 68:12,
74:18, 74:20, 77:12,
81:17, 88:9, 105:14,
110:8, 114:4, 114:5,
116:12, 117:2,
117:11, 147:8,
147:10, 147:19,
147:23, 148:4,
149:2, 185:13,
185:14
**SENSES** [1] - 190:13
**SENT** [3] - 138:6,
141:14
**SENTENCE** [10] -
114:17, 117:16,
117:20, 117:21,
117:22, 166:22,
166:23, 166:24
**SENTENCES** [2] -
119:14, 166:23
**SEPARATE** [3] -
130:23, 130:25,
192:23
**SEPARATION** [1] -
127:24
**SEPTEMBER** [3] -
141:23, 145:13,

177:16
**SEQUENCE** [1] -
153:15
**SERIOUS** [3] - 57:7,
131:21, 143:19
**SERIOUSLY** [2] -
40:1, 54:21
**SERVANTS** [1] - 7:7
**SERVE** [2] - 7:8, 148:4
**SERVICE** [11] - 5:12,
41:15, 61:14, 93:20,
93:24, 122:13,
122:22, 128:15,
146:3, 148:18,
167:16
**SESSION** [2] - 89:18,
152:16
**SET** [6] - 104:23,
109:17, 127:24,
165:24, 180:13,
186:12
**SETTING** [1] - 173:1
**SEVEN** [59] - 9:21,
10:2, 10:3, 15:17,
29:24, 30:3, 30:12,
30:13, 30:16, 31:3,
31:4, 31:8, 32:11,
37:9, 37:10, 42:9,
42:15, 46:3, 51:19,
57:16, 57:17, 62:5,
67:10, 67:19, 69:22,
72:8, 76:18, 77:17,
77:18, 80:1, 80:2,
82:14, 82:15, 82:23,
82:24, 132:25,
133:1, 133:4, 133:7,
133:19, 135:12,
158:11, 158:12,
158:14, 158:17,
158:20, 165:16,
174:25, 175:3
**SEVENTH** [1] - 195:17
**SEVERAL** [8] - 31:9,
56:9, 96:9, 122:7,
124:8, 142:5,
164:21, 184:9
**SEVERANCE** [80] -
10:4, 30:4, 32:5,
32:13, 41:4, 41:5,
42:23, 52:1, 56:15,
56:17, 56:22, 56:23,
58:12, 58:22, 59:17,
60:19, 60:20, 60:21,
61:8, 61:10, 61:11,
61:15, 61:20, 62:1,
62:3, 66:9, 67:17,
69:19, 69:20, 76:19,
79:21, 80:14, 82:12,
97:22, 97:23, 98:5,
98:10, 101:10,

122:25, 124:23,
126:4, 126:5, 126:9,
126:13, 126:15,
126:20, 126:21,
126:23, 126:24,
127:2, 128:15,
128:19, 129:16,
129:25, 130:24,
131:23, 132:12,
138:7, 139:6,
144:23, 145:23,
147:4, 149:17,
151:5, 151:8, 154:8,
157:10, 158:5,
158:11, 158:21,
171:11, 171:13,
171:21, 171:24,
171:25, 183:21
**SEVERE** [1] - 122:23
**SEVERED** [2] - 9:25
**SHAKE** [1] - 38:25
**SHALL** [3] - 115:9,
163:22, 167:8
**SHARED** [1] - 74:25
**SHOP** [1] - 56:6
**SHORT** [3] - 17:7,
87:12, 199:16
**SHORTER** [2] - 88:13,
88:21
**SHORTHAND** [1] -
1:23
**SHORTLY** [1] - 33:13
**SHOT** [3] - 20:22,
130:3, 130:4
**SHOW** [11] - 7:21,
32:8, 66:1, 104:13,
117:20, 118:23,
120:4, 133:12,
167:7, 177:23,
179:10
**SHOWED** [16] - 4:12,
24:22, 29:15, 32:9,
117:18, 119:17,
144:14, 144:16,
156:2, 163:12,
163:19, 169:15,
171:14, 178:1,
179:21, 182:22
**SHOWING** [3] - 119:8,
149:2, 179:8
**SHOWN** [3] - 114:24,
176:25, 182:10
**SHOWS** [5] - 87:14,
87:19, 142:15,
142:17, 170:19
**SHUT** [1] - 45:4
**SIDE** [9] - 95:6, 95:7,
95:8, 147:21,
159:17, 191:12,
198:21, 199:13,

200:22

**SIDE-BAR** [2] - 198:21, 199:13

**SIDES** [2] - 99:11, 200:17

**SIDESHOW** [1] - 168:18

**SIGN** [81] - 14:19, 18:2, 22:18, 30:15, 32:13, 37:23, 39:20, 42:15, 44:18, 47:4, 47:7, 48:1, 49:3, 60:22, 62:4, 62:9, 63:18, 63:23, 70:1, 72:16, 72:18, 76:22, 77:16, 78:7, 83:9, 84:5, 96:23, 100:24, 101:1, 101:7, 101:8, 102:10, 103:1, 120:17, 125:4, 125:10, 125:12, 125:15, 125:17, 125:23, 127:6, 127:9, 128:22, 129:1, 129:11, 129:12, 129:15, 129:16, 131:11, 131:24, 138:24, 139:3, 139:4, 140:21, 147:3, 147:7, 147:9, 149:10, 149:23, 151:2, 151:5, 151:6, 151:13, 152:2, 152:6, 154:14, 157:13, 157:14, 158:22, 174:16, 175:13, 175:14, 181:25, 182:1, 184:23, 194:1, 194:10, 194:14, 196:2

**SIGNATURE** [2] - 51:3, 137:11

**SIGNATURES** [2] - 49:19, 167:20

**SIGNED** [86] - 4:16, 9:19, 10:7, 10:14, 10:21, 12:5, 12:7, 12:9, 12:10, 12:12, 12:14, 13:16, 13:20, 14:5, 14:11, 15:7, 18:5, 18:15, 18:16, 19:23, 26:12, 26:13, 26:14, 27:23, 28:18, 32:18, 34:6, 37:25, 39:2, 39:9, 43:25, 44:10, 46:12, 47:10, 48:11, 51:4, 52:13, 66:9, 68:8, 69:14,

72:15, 73:7, 79:19, 79:24, 84:9, 84:10, 84:16, 84:17, 84:23, 85:1, 89:3, 90:25, 91:11, 103:3, 115:14, 136:1, 137:3, 137:12, 138:22, 139:22, 143:19, 150:24, 151:19, 154:16, 156:16, 160:23, 161:16, 161:17, 162:24, 167:8, 174:5, 175:15, 175:18, 180:15, 185:23, 186:9, 187:5, 189:2, 193:3, 193:6, 194:4, 194:17, 195:1, 196:19

**SIGNIFICANCE** [1] - 176:4

**SIGNIFICANT** [3] - 66:5, 127:22, 176:10

**SIGNING** [46] - 32:17, 32:20, 37:18, 37:19, 39:8, 40:22, 43:3, 45:22, 46:10, 59:16, 67:25, 68:7, 69:24, 73:11, 75:4, 80:13, 83:7, 83:25, 87:17, 96:19, 97:2, 97:17, 98:12, 99:16, 99:19, 101:13, 125:22, 127:11, 128:21, 137:5, 138:19, 139:24, 140:1, 149:12, 150:14, 150:16, 150:22, 150:23, 151:24, 152:3, 157:3, 162:19, 174:21, 194:13, 195:9

**SIGNS** [2] - 158:3, 186:13

**SILLY** [1] - 147:14

**SIMILAR** [1] - 105:21

**SIMPLE** [6] - 28:15, 89:1, 99:19, 114:15, 190:7, 198:11

**SIMPLY** [7] - 91:4, 97:4, 99:6, 122:13, 148:19, 163:15, 182:13

**SINCERE** [2] - 94:2, 137:21

**SINGLE** [16] - 8:1, 8:3, 13:10, 17:15, 44:6, 44:10, 45:11, 55:12, 96:4, 107:5, 112:11,

133:12, 169:24, 176:24, 179:2

**SIT** [1] - 65:13

**SITTING** [4] - 25:11, 90:6, 129:14, 133:17

**SITUATION** [6] - 7:3, 95:2, 117:9, 164:16, 184:17, 196:5

**SITUATIONS** [1] - 65:21

**SIX** [6] - 60:6, 101:19, 109:22, 126:6, 128:23, 151:9

**SIXTH** [2] - 17:19, 195:15

**SIZABLE** [1] - 174:9

**SJ** [1] - 1:11

**SKILLED** [1] - 14:24

**SKIPPED** [1] - 79:5

**SKIPS** [1] - 163:13

**SLIDE** [110] - 34:2, 34:8, 35:9, 35:13, 35:19, 36:4, 36:25, 37:3, 37:16, 38:1, 38:3, 38:15, 38:17, 39:6, 39:11, 39:23, 40:15, 40:21, 42:21, 43:2, 43:16, 43:18, 43:23, 44:16, 44:24, 45:9, 45:15, 46:2, 46:8, 46:17, 47:3, 47:9, 47:19, 47:23, 48:15, 49:23, 50:11, 51:1, 51:25, 52:10, 52:17, 53:5, 53:7, 53:16, 54:1, 54:4, 54:22, 55:1, 55:14, 55:21, 56:5, 56:22, 58:21, 58:25, 59:4, 59:13, 60:1, 60:10, 60:16, 61:13, 61:19, 61:23, 68:6, 68:14, 68:19, 68:23, 69:1, 69:12, 69:18, 70:6, 70:16, 70:21, 71:11, 72:4, 72:13, 72:21, 73:5, 73:9, 73:25, 74:10, 74:22, 75:3, 75:10, 80:6, 80:13, 80:16, 80:19, 80:24, 80:25, 81:10, 82:8, 83:5, 83:11, 83:16, 83:22, 84:1, 84:3, 84:19, 85:6, 85:12, 150:4, 153:11, 153:13, 163:9, 163:11, 163:22, 171:19, 176:6, 177:17

**SLIDES** [1] - 97:21

**SLIGHTLY** [1] - 191:17

**SLIP** [3] - 192:23, 192:24, 198:10

**SLIPPED** [1] - 111:1

**SMALL** [1] - 198:2

**SMART** [1] - 75:15

**SMYLIE** [6] - 2:7, 137:8, 137:24, 144:6, 144:13, 200:16

**SNEAKS** [1] - 22:3

**SNOW** [1] - 58:8

**SNOWPLOWING** [1] - 18:1

**SO-CALLED** [4] - 128:11, 163:15, 163:20, 178:5

**SOCIETY** [13] - 18:6, 31:12, 34:20, 46:13, 51:5, 62:11, 67:20, 68:20, 77:20, 78:21, 83:20, 87:2, 165:2

**SOLD** [38] - 12:6, 12:8, 18:18, 18:19, 33:4, 35:1, 36:20, 37:13, 37:23, 39:7, 39:21, 40:16, 45:14, 55:13, 56:10, 71:2, 74:25, 79:18, 109:7, 109:9, 109:12, 109:13, 109:21, 109:23, 112:6, 133:20, 133:22, 134:3, 150:17, 161:19, 161:25, 173:23, 175:17, 183:20, 184:7, 184:25

**SOLELY** [2] - 143:16, 183:25

**SOLICIT** [1] - 182:2

**SOLICITATION** [1] - 181:6

**SOLUTION** [1] - 124:3

**SOLVING** [1] - 121:15

**SOMEONE** [13] - 27:19, 46:15, 69:25, 71:25, 78:18, 78:19, 82:1, 124:2, 150:8, 165:1, 165:3, 165:4, 170:12

**SOMETIMES** [7] - 9:10, 13:18, 34:20, 106:22, 110:4, 197:25, 198:17

**SOMEWHAT** [3] - 4:3, 168:18, 187:22

**SOMEWHERE** [2] - 10:19, 123:24

**SON** [12] - 18:18,

18:24, 21:16, 39:22, 39:25, 79:19, 126:2, 149:20, 161:18, 161:19, 161:23, 185:1

**SOO** [6] - 17:24, 57:21, 57:22, 59:2, 59:7, 59:16, 79:21, 157:23, 184:4

**SOON** [1] - 177:4

**SOPHISTICATED** [13] - 34:3, 38:18, 43:19, 47:20, 53:8, 59:4, 60:8, 68:24, 73:6, 80:19, 80:20, 83:23, 157:7

**SORRY** [5] - 91:7, 117:5, 123:4, 123:11, 166:21

**SORT** [4] - 16:2, 106:3, 106:12, 107:23

**SOUGHT** [12] - 31:6, 37:12, 42:19, 46:4, 51:20, 67:11, 72:9, 72:10, 82:25

**SOUND** [1] - 25:17

**SOUNDED** [1] - 105:21

**SOUNDS** [1] - 182:9

**SOUTH** [3] - 51:15, 53:9, 57:5

**SPACE** [1] - 75:1

**SPAHR** [1] - 2:18

**SPEAKING** [3] - 39:10, 73:8, 165:19

**SPEAKS** [2] - 22:21, 155:11

**SPEC** [1] - 167:5

**SPECIAL** [2] - 7:14, 171:23

**SPECIFIC** [5] - 22:10, 28:11, 30:22, 30:24, 173:22

**SPECIFICITY** [1] - 195:3

**SPECULATE** [3] - 63:4, 192:6, 192:12

**SPEED** [1] - 147:18

**SPEND** [7] - 11:12, 11:16, 107:17, 107:19, 111:14, 111:17, 170:18

**SPENDING** [3] - 79:14, 108:5, 131:15

**SPENT** [9] - 4:22, 113:5, 122:19, 129:23, 153:23, 170:20, 170:21, 171:8, 189:5

**SPONSORED** [1] - 128:8

**SPONSORING** [1] - 108:6

**SPREAD** [1] - 101:18

**SPRENGER** [1] - 2:3

**SQUARE** [3] - 12:25, 78:19, 84:25

**SQUARED** [1] - 25:22

**STABLE** [2] - 26:25, 56:7

**STAFF** [2] - 94:1, 155:11

**STAKE** [1] - 131:25

**STALL** [1] - 156:5

**STAND** [14] - 17:2, 17:5, 19:22, 22:22, 25:18, 34:14, 50:2, 50:8, 53:23, 90:5, 135:14, 152:1, 161:6, 181:2

**STANDARD** [4] - 8:22, 82:11, 119:22, 178:16

**STANDARDS** [1] - 115:7

**STANDING** [7] - 65:22, 90:5, 147:15, 147:24, 164:17, 187:13, 196:6

**STANDOFF** [1] - 95:24

**START** [15] - 3:12, 6:5, 29:7, 31:2, 35:2, 35:7, 57:11, 87:24, 90:16, 130:11, 130:13, 151:15, 155:19, 160:18, 172:4

**START-UP** [1] - 35:2

**STARTED** [4] - 21:2, 23:16, 66:10, 102:13

**STARTING** [4] - 19:8, 59:5, 108:23, 130:10

**STARTS** [1] - 109:10

**STATE** [1] - 170:5

**STATEMENT** [12] - 24:20, 24:21, 48:18, 49:19, 95:10, 110:11, 120:6, 137:8, 144:15, 144:16, 144:21, 190:2

**STATEMENTS** [3] - 60:3, 60:6, 202:2

**STATES** [4] - 1:1, 6:16, 20:17, 120:5

**STATESMAN** [1] - 22:4

**STATUS** [1] - 121:10

**STATUTE** [1] - 20:12

**STAY** [8] - 35:5, 39:13, 51:11, 51:22, 56:18, 124:20, 124:25, 182:18

**STAYED** [1] - 77:1

**STAYING** [1] - 130:2

**STAYS** [1] - 6:22

**STEADY** [1] - 59:20

**STEAL** [1] - 104:20

**STEINBERG** [1] - 10:16

**STEMS** [1] - 192:8

**STEP** [9] - 102:19, 124:8, 124:12, 124:14, 125:2, 125:3, 125:9, 125:14, 125:15

**STEPS** [2] - 5:25, 124:8

**STICK** [1] - 93:10

**STILL** [10] - 13:9, 83:21, 109:14, 127:10, 133:11, 134:1, 135:15, 154:21, 162:22, 188:11

**STIPULATED** [1] - 65:10

**STOCK** [4] - 43:7, 46:20, 72:24, 83:13

**STOLE** [1] - 21:19

**STOOD** [1] - 123:3

**STOP** [16] - 11:2, 11:13, 11:17, 15:18, 17:6, 17:10, 33:7, 40:20, 66:11, 102:12, 135:19, 136:6, 136:8, 136:9, 136:25, 139:3, 184:24

**STOPPING** [2] - 0:11, 11:4

**STORIES** [3] - 27:11, 36:10, 85:24

**STORM** [1] - 101:25

**STORY** [15] - 11:24, 15:1, 17:21, 19:21, 21:6, 25:17, 25:18, 27:3, 32:4, 33:14, 86:12, 126:17, 161:14, 163:22, 163:23

**STRAIGHT** [4] - 95:7, 140:8, 143:14, 146:21

**STRAITS** [1] - 19:1

**STRANGE** [1] - 135:13

**STRANGLING** [1] - 94:6

**STRAUSS** [1] - 2:13

**STRAW** [4] - 104:24, 105:15

**STREAM** [1] - 59:20

**STREET** [7] - 1:16, 1:21, 2:3, 2:13, 2:19, 25:13, 147:15

**STRIKE** [2] - 74:16

**STROKE** [1] - 128:18

**STRONG** [1] - 69:11

**STRUCTURE** [2] - 176:20, 176:22

**STRUCTURED** [2] - 90:3, 129:9

**STRUCTURING** [1] - 128:8, 128:24

**STUCK** [1] - 151:7

**STUDY** [1] - 9:21

**STUFF** [2] - 29:19, 81:20

**SUBJECT** [3] - 117:24, 168:1, 200:21

**SUBMIT** [13] - 29:4, 51:5, 66:1, 75:13, 75:14, 87:14, 87:19, 164:19, 165:7, 180:5, 187:3, 188:1, 200:19

**SUBMITS** [1] - 28:23

**SUBMITTED** [1] - 190:3

**SUBSEQUENT** [2] - 46:24

**SUBSIDIZE** [1] - 107:20

**SUBSTANTIAL** [2] - 9:5, 113:2

**SUCCEEDED** [2] - 91:3, 131:7

**SUCCESSFULLY** [2] - 58:2, 130:2

**SUCKERS** [1] - 135:5

**SUDDENLY** [2] - 49:2, 169:22

**SUE** [20] - 4:18, 14:7, 16:23, 40:20, 42:11, 42:12, 47:16, 72:11, 73:10, 130:8, 134:10, 135:2, 135:6, 151:15, 157:3, 157:15, 157:17, 165:15, 168:21, 186:7

**SUED** [14] - 7:20, 15:20, 33:25, 66:11, 122:3, 123:23, 134:9, 135:3, 135:5, 135:17, 136:24, 159:7

**SUES** [1] - 27:19

**SUFFICIENT** [3] - 64:3, 66:1, 164:11

**SUGGEST** [14] - 14:21, 14:22, 121:1, 131:20, 133:24, 135:16, 136:23, 136:24, 138:13, 138:14, 148:18, 148:19, 158:13, 175:6

**SUGGESTED** [7] - 90:14, 124:1, 136:12, 137:25, 150:18, 161:25, 197:3

**SUGGESTING** [3] - 91:5, 135:9, 188:15

**SUGGESTION** [5] - 94:22, 132:10, 175:24, 178:6, 195:24

**SUGGESTIONS** [3] - 9:23, 75:18, 200:5

**SUGGESTS** [4] - 90:17, 105:4, 149:7, 175:7

**SUING** [9] - 75:17, 79:14, 124:6, 136:14, 154:22, 172:20, 174:22, 183:17, 184:18

**SUIT** [1] - 44:11

**SUITE** [1] - 2:14

**SUM** [1] - 79:7

**SUMMARY** [1] - 155:17

**SUMMER** [3] - 177:25, 178:9, 179:21

**SUMMONED** [2] - 7:18, 148:25

**SUMMONS** [2] - 148:3, 148:16

**SUPERIOR** [1] - 154:7

**SUPERSEDES** [1] - 82:4

**SUPPORT** [6] - 11:3, 102:5, 136:3, 161:23, 177:6, 191:21

**SUPPORTING** [1] - 102:25

**SUPPORTS** [1] - 169:16

**SUPPOSE** [1] - 190:16

**SUPPOSED** [5] - 16:1, 16:2, 69:6, 155:5, 171:20

**SUPPOSEDLY** [1] - 39:19

**SUPREME** [2] - 20:17,

21:1

**SURPRISED** [1] - 9:9

**SURRENDER** [1] - 14:10

**SURRENDERING** [2] - 26:2, 27:20

**SURVIVE** [1] - 11:9

**SURVIVED** [1] - 60:23

**SUSPECT** [1] - 93:1

**SUZANNE** [3] - 1:19, 6:21, 201:21

**SWITCH** [1] - 173:16

**SWORE** [1] - 12:17

**SWORN** [1] - 28:16

**SYLLOGISM** [3] - 73:18, 78:9, 162:8

**SYMPATHY** [1] - 189:15

**SYSTEM** [3] - 5:2, 6:17, 7:7

---

**T**

**TABLE** [1] - 100:23

**TAKING** [7] - 5:25, 71:14, 96:21, 133:8, 147:4, 174:21, 198:14

**TALKS** [6] - 38:1, 96:15, 150:14, 150:15, 165:13

**TAMPA** [1] - 11:22

**TAPE** [4] - 67:25, 68:1, 145:5, 145:11

**TAX** [23] - 36:5, 36:23, 37:19, 40:6, 50:13, 50:14, 55:10, 60:14, 70:23, 71:1, 74:23, 74:24, 76:25, 78:13, 82:16, 92:18, 113:25, 114:3, 114:4, 121:10, 121:15, 172:9, 173:3

**TAXES** [6] - 36:6, 36:10, 55:7, 172:15, 172:23, 172:25

**TEAM** [2] - 7:11, 108:7

**TEARS** [1] - 85:20

**TEASE** [1] - 5:21

**TECHNICAL** [1] - 110:8

**TEMPERATURE** [2] - 152:22, 190:19

**TEN** [20] - 10:4, 28:8, 28:20, 30:4, 32:11, 48:2, 48:5, 62:10, 63:10, 63:11, 64:21, 66:9, 77:23, 82:2, 154:24, 158:19, 167:14, 167:15,

**TENDENCY** [1] - 70:9
**TENURE** [1] - 180:7
**TERM** [2] - 176:15, 191:6
**TERMINABLE** [23] - 21:23, 25:22, 39:15, 40:13, 45:1, 45:8, 49:8, 54:8, 70:8, 70:15, 81:13, 81:20, 81:21, 81:25, 84:21, 85:3, 166:10, 166:22, 167:24, 168:8, 169:2, 185:21
**TERMINATE** [19] - 22:11, 42:8, 74:1, 74:11, 74:15, 84:20, 85:7, 114:19, 115:2, 116:6, 116:15, 118:11, 121:7, 121:23, 124:4, 169:5, 170:5, 172:21, 187:10
**TERMINATED** [47] - 38:14, 40:25, 43:11, 49:14, 49:22, 53:12, 58:7, 61:16, 61:18, 61:24, 62:2, 62:7, 64:2, 70:17, 73:15, 73:24, 74:19, 76:14, 76:13, 77:22, 78:9, 78:10, 82:6, 98:19, 99:6, 100:3, 116:2, 117:17, 117:23, 118:4, 118:6, 119:21, 126:8, 126:25, 127:3, 127:14, 128:3, 128:6, 154:13, 158:15, 162:11, 162:12, 168:19, 169:3, 170:16, 181:12, 184:8
**TERMINATES** [1] - 82:3
**TERMINATING** [4] - 65:12, 121:1, 123:13, 127:17
**TERMINATION** [25] - 22:18, 39:16, 49:17, 65:21, 82:5, 84:24, 85:1, 99:9, 103:11, 114:21, 115:9, 115:16, 115:19, 118:15, 118:18, 120:13, 133:6, 145:22, 164:16, 167:20, 168:1, 171:13, 185:24, 192:8, 196:5

**TERMS** [18] - 18:4, 21:20, 44:2, 44:3, 54:7, 54:9, 61:24, 65:11, 65:13, 81:11, 119:6, 120:6, 120:9, 123:16, 128:7, 166:12, 181:13, 195:16
**TEST** [1] - 104:14
**TESTAMENT** [1] - 58:6
**TESTIFIED** [47] - 11:5, 18:20, 31:5, 31:14, 31:18, 32:16, 32:25, 35:22, 37:12, 37:17, 41:5, 41:23, 43:22, 52:21, 58:16, 60:3, 61:12, 67:24, 69:18, 70:1, 70:9, 71:21, 71:22, 80:3, 92:8, 103:20, 107:2, 113:7, 113:17, 123:5, 123:25, 136:16, 145:10, 153:16, 161:2, 171:8, 171:18, 172:4, 173:7, 173:8, 174:1, 177:10, 179:14, 180:19, 183:16, 189:22, 197:7
**TESTIFIES** [2] - 54:15, 184:19
**TESTIFY** [4] - 17:2, 103:5, 169:24, 179:25
**TESTIFYING** [1] - 197:11
**TESTIMONY** [31] - 10:14, 13:1, 13:25, 15:8, 15:15, 19:6, 25:20, 34:18, 37:8, 56:9, 65:3, 90:2, 94:18, 98:16, 113:14, 121:4, 121:24, 136:11, 145:3, 146:17, 153:17, 155:23, 160:12, 180:11, 181:15, 189:20, 189:25, 197:17, 197:19, 197:21, 197:25
**THANKING** [1] - 93:20
**THEMSELVES** [4] - 69:15, 111:13, 114:13, 183:2
**THERE** [137] - 3:12, 3:19, 8:1, 8:16, 9:6, 9:9, 9:10, 13:17,

14:15, 18:6, 19:8, 24:1, 24:20, 25:3, 25:11, 25:16, 26:9, 27:8, 29:20, 29:22, 30:1, 30:10, 30:11, 35:17, 38:23, 43:11, 50:5, 54:6, 62:14, 63:12, 64:7, 65:8, 65:9, 65:17, 65:19, 76:11, 77:8, 79:6, 88:5, 89:24, 90:1, 94:4, 94:6, 95:2, 95:3, 95:24, 96:5, 96:8, 96:9, 96:13, 96:22, 97:25, 98:1, 98:15, 98:21, 99:8, 103:9, 103:16, 103:24, 104:22, 105:12, 110:20, 111:1, 111:19, 112:20, 114:22, 115:12, 115:13, 116:22, 117:12, 117:18, 118:5, 118:8, 118:16, 120:12, 120:16, 120:20, 120:22, 120:25, 123:15, 126:19, 126:21, 126:22, 127:25, 128:5, 129:10, 129:20, 131:25, 132:4, 134:6, 136:3, 136:10, 136:11, 136:12, 136:17, 137:4, 139:17, 140:7, 141:19, 143:3, 143:25, 146:9, 147:5, 147:17, 149:1, 155:23, 164:14, 165:1, 171:6, 171:25, 173:5, 173:21, 174:6, 174:12, 175:24, 176:22, 178:6, 179:8, 180:9, 184:14, 187:10, 188:12, 188:14, 189:21, 189:23, 189:25, 191:22, 194:10, 195:15, 196:3, 197:25, 198:13, 200:7, 200:25, 201:11
**THERE'S** [13] - 20:11, 27:6, 30:11, 78:22, 98:22, 100:24, 117:13, 128:1, 134:13, 146:15, 159:17, 182:20

**THEREAFTER** [2] - 33:13, 146:2
**THEREFORE** [3] - 27:22, 78:6, 128:1
**THEY'RE** [6] - 7:14, 9:7, 48:3, 77:23, 122:4, 125:5
**THINKING** [2] - 96:7, 177:15
**THIRD** [8] - 10:7, 77:4, 94:21, 109:10, 109:11, 116:5, 166:24, 195:7
**THOMSON** [2] - 17:4, 82:23
**THOUSAND** [3] - 50:4, 164:25, 184:3
**THOUSANDS** [1] - 163:14
**THREE** [20] - 19:14, 20:19, 30:4, 42:16, 44:18, 46:10, 51:13, 56:10, 66:18, 96:21, 100:22, 104:11, 131:23, 154:4, 160:15, 160:16, 160:23, 160:24, 161:25
**THROUGHOUT** [3] - 25:23, 27:7, 63:17
**THROW** [1] - 124:14
**THROWN** [1] - 148:5
**TICKLED** [2] - 44:19, 86:11
**TIEBREAKER** [1] - 95:3
**TILTS** [1] - 191:16
**TIMELINE** [1] - 179:15
**TIMING** [1] - 136:19
**TIPS** [1] - 191:14
**TIRE** [1] - 70:25
**TIRED** [1] - 90:6
**TIRES** [1] - 70:25
**TITLE** [1] - 143:5
**TODAY** [14] - 3:5, 5:15, 16:20, 16:22, 63:6, 63:7, 87:4, 89:13, 111:25, 175:2, 177:3, 188:15, 189:6, 190:16
**TOGETHER** [5] - 11:1, 21:8, 36:10, 135:10, 186:25
**TOM** [1] - 78:23
**TOMORROW** [1] - 175:3
**TONS** [2] - 39:5, 65:5
**TOOK** [39] - 12:12, 32:4, 33:1, 35:23,

36:5, 40:6, 41:14, 50:13, 51:14, 52:14, 58:11, 60:14, 60:19, 60:20, 60:21, 66:17, 70:23, 71:17, 73:7, 73:13, 73:17, 74:23, 78:15, 78:24, 130:17, 137:9, 137:25, 144:7, 151:12, 157:10, 160:3, 162:21, 176:17, 178:10, 179:17, 181:25, 183:11, 183:21, 184:2
**TOP** [5] - 62:5, 69:22, 82:16, 106:20, 158:12
**TOPIC** [2] - 179:6, 181:14
**TOPICS** [1] - 166:6
**TOTAL** [11] - 6:6, 10:4, 42:3, 42:4, 75:10, 82:18, 85:14, 151:9, 165:10
**TOTALITY** [4] - 64:24, 149:8, 194:21, 194:24
**TOTALLY** [1] - 200:4
**TOUCHING** [1] - 134:7
**TOUGH** [2] - 130:10, 196:23
**TRADITIONALLY** [1] - 122:16
**TRANSCRIPT** [7] - 1:23, 10:13, 23:4, 23:11, 155:25, 201:18
**TRANSCRIPTS** [2] - 6:23, 6:24
**TRANSFER** [2] - 42:9, 51:12
**TRANSFERRED** [2] - 18:14, 37:5
**TRANSITION** [3] - 62:1, 128:14, 171:24
**TRANSLATION** [1] - 21:5
**TRASH** [1] - 148:6
**TREAT** [1] - 173:10
**TREATED** [1] - 57:21
**TREE** [1] - 170:10
**TREES** [8] - 41:7, 41:9, 110:5, 110:6, 110:10, 112:24, 158:2
**TREMENDOUS** [1] - 131:4
**TRIAL** [29] - 1:9, 9:23, 12:21, 17:18, 22:3,

**TERMINABLE** [18] - 18:4,

25:23, 30:20, 31:7,
70:2, 70:5, 71:11,
75:5, 87:24, 88:5,
88:14, 88:17, 88:19,
98:18, 98:22,
106:23, 139:14,
155:25, 163:16,
163:17, 188:10,
190:3, 192:15,
200:13

**TRIALS** [4] - 28:9,
94:11, 153:14,
192:21

**TRICK** [2] - 119:12,
151:22

**TRIED** [13] - 58:11,
66:11, 78:7, 103:5,
118:20, 118:24,
127:15, 138:2,
138:3, 138:4, 159:8,
175:8, 177:23

**TRIPLE** [1] - 111:17

**TROUBLE** [3] - 13:14,
192:1

**TRUCKS** [1] - 147:17

**TRUE** [30] - 11:19,
21:8, 28:9, 28:10,
29:1, 29:2, 32:3,
33:15, 39:18, 40:4,
45:17, 47:2, 59:15,
72:2, 84:13, 90:19,
91:1, 102:11, 110:7,
142:12, 143:25,
144:7, 148:8, 148:9,
158:16, 166:15,
166:16, 170:11,
191:20

**TRUMP** [2] - 8:2, 8:16

**TRUST** [2] - 52:11,
54:2

**TRUTH** [25] - 16:12,
16:13, 22:3, 22:5,
34:17, 34:19, 48:23,
48:24, 50:15, 50:16,
72:1, 85:2, 85:4,
94:11, 94:13, 94:14,
94:16, 94:18, 95:8,
137:15, 137:16,
146:20, 161:12,
186:1

**TRUTHFUL** [1] - 56:4

**TRY** [14] - 16:6, 16:11,
17:10, 31:17, 45:25,
69:6, 69:8, 130:6,
134:15, 151:16,
168:24, 184:24,
199:18, 200:5

**TRYING** [17] - 24:12,
59:10, 95:7, 95:8,
119:9, 121:22,

121:25, 125:20,
127:8, 129:14,
132:18, 141:2,
150:7, 181:17,
182:6, 182:8, 192:18

**TUESDAY** [1] - 1:8

**TURN** [9] - 29:6,
42:12, 96:2, 132:17,
147:16, 155:20,
166:20, 178:4,
190:17

**TURNED** [15] - 18:20,
19:2, 19:12, 19:17,
19:25, 21:15, 39:8,
42:22, 52:1, 57:7,
67:16, 73:10,
147:17, 157:3, 178:5

**TURNS** [2] - 52:3, 52:5

**TV** [1] - 88:4

**TWICE** [2] - 86:12,
87:10

**TWO** [49] - 12:11,
14:17, 17:25, 22:10,
29:2, 30:24, 31:1,
36:10, 40:25, 50:16,
51:9, 56:6, 56:10,
57:12, 58:7, 59:3,
59:19, 67:8, 67:22,
75:12, 79:5, 80:21,
88:5, 91:14, 92:7,
96:14, 96:18, 96:23,
97:1, 97:4, 97:7,
97:11, 99:10,
100:16, 100:23,
117:12, 126:21,
128:16, 129:10,
134:13, 143:4,
157:15, 157:24,
161:12, 161:15,
166:8, 166:23,
171:11, 171:22

**TWO-YEAR** [1] - 59:19

**TYPE** [1] - 170:1

**TYPICAL** [1] - 14:3

**TYPICALLY** [4] -
27:12, 27:14, 27:15,
30:9

**TYPING** [1] - 6:23

---

## U

**U.S** [1] - 1:20

**ULTIMATELY** [5] -
19:17, 74:3, 86:22,
150:17, 188:24

**UNABLE** [1] - 66:3

**UNACCEPTABLE** [1] -
152:5

**UNANIMOUS** [1] -
200:2

**UNCLEAR** [2] - 55:4,
56:8

**UNCONTESTED** [2] -
103:25, 114:8

**UNDENIABLE** [1] -
185:9

**UNDER** [42] - 16:19,
16:21, 22:18, 26:15,
33:5, 42:14, 43:24,
54:9, 60:7, 61:13,
61:20, 61:24, 62:20,
62:23, 64:24, 69:11,
79:23, 81:2, 84:23,
85:1, 85:8, 97:24,
102:1, 103:6, 110:8,
110:17, 110:18,
117:2, 126:9,
127:10, 127:14,
128:7, 132:10,
138:3, 148:15,
156:6, 161:6,
170:12, 175:8,
180:3, 180:7, 187:1

**UNDERCUT** [1] -
142:10

**UNDERNEATH** [1] -
124:9

**UNDERSTATED** [1] -
82:13

**UNDERSTOOD** [35] -
8:22, 13:15, 13:20,
13:23, 14:5, 15:3,
34:4, 41:24, 43:20,
47:21, 53:9, 53:10,
59:5, 60:9, 68:24,
70:18, 75:14, 76:6,
80:21, 84:1, 85:8,
87:16, 104:1, 104:2,
140:2, 140:3, 157:7,
162:5, 162:23,
164:4, 164:6,
198:22, 199:10

**UNDISPUTED** [9] -
9:6, 9:8, 13:13, 15:5,
32:22, 41:2, 51:13,
154:3

**UNEMPLOYED** [11] -
53:13, 53:14, 58:8,
64:19, 69:7, 73:20,
77:21, 157:23,
165:1, 165:3, 185:4

**UNEMPLOYMENT** [1]
- 154:8

**UNEQUIVOCAL** [1] -
160:11

**UNEXPECTED** [1] -
161:12

**UNFAIR** [5] - 19:23,
23:1, 57:24, 90:20,
122:13

**UNFORTUNATELY**
[3] - 31:12, 53:14,
88:20

**UNHEARD** [1] - 30:6

**UNIQUE** [3] - 87:9,
192:17

**UNIQUELY** [1] - 7:23

**UNITED** [2] - 1:1,
20:17

**UNIVERSITY** [2] -
53:9, 80:8

**UNLESS** [14] - 21:18,
99:1, 115:3, 115:5,
116:3, 116:12,
119:7, 120:14,
120:24, 125:19,
141:9, 159:20,
175:10, 175:20

**UNLIKE** [4] - 8:1,
17:18, 133:2, 184:4

**UNREASONABLE** [1]
- 134:18

**UNRELATED** [1] -
143:4

**UNREPRESENTED**
[1] - 111:6

**UNSATISFACTORY**
[11] - 49:14, 70:18,
70:20, 82:6, 115:3,
115:4, 116:2,
116:19, 126:25,
166:24, 168:11

**UNSUCCESSFULLY**
[1] - 58:11

**UNTRUE** [2] - 90:14,
91:4

**UNUSUAL** [3] - 32:14,
165:2, 190:11

**UP** [109] - 6:6, 6:22,
7:21, 8:11, 8:17,
11:10, 13:21, 14:2,
14:12, 16:9, 17:9,
19:5, 22:13, 26:16,
28:13, 29:5, 29:11,
33:6, 33:13, 33:25,
34:5, 34:7, 35:2,
35:7, 40:18, 40:20,
41:17, 43:21, 47:22,
50:4, 50:16, 56:19,
66:20, 68:25, 75:25,
78:19, 79:7, 80:22,
81:23, 83:20, 84:2,
85:21, 85:22, 85:23,
87:6, 87:17, 92:10,
94:25, 99:23,
101:17, 104:18,
104:19, 104:23,
105:17, 105:19,
109:17, 109:19,
114:12, 114:17,

115:6, 121:20,
122:10, 123:14,
124:2, 126:5, 127:5,
127:10, 128:3,
128:13, 128:20,
133:12, 133:17,
139:24, 144:6,
149:2, 149:20,
150:4, 152:1,
153:11, 155:14,
156:10, 157:8,
157:20, 160:5,
160:11, 160:21,
160:24, 162:6,
162:25, 163:12,
166:19, 167:5,
172:2, 173:1, 174:3,
176:6, 179:17,
182:13, 182:24,
183:12, 184:24,
186:19, 187:14,
188:12, 200:4

**UPPER** [1] - 38:24

**UPSET** [1] - 51:21

**UTILITIES** [2] - 36:12,
36:14

---

## V

**VACATION** [1] - 56:7

**VACUUM** [1] - 131:1

**VALERIE** [1] - 2:22

**VALID** [2] - 120:25,
193:3

**VALIDATION** [3] -
35:16, 104:9, 104:15

**VALIDITY** [1] - 193:21

**VALUABLE** [12] -
42:1, 52:6, 61:1,
61:3, 66:13, 84:8,
158:23, 162:2,
162:14, 162:16,
162:17, 165:18

**VALUE** [20] - 19:11,
42:10, 48:15, 50:24,
51:7, 57:8, 65:18,
69:3, 83:17, 84:6,
84:7, 87:25, 132:15,
137:25, 156:18,
160:18, 163:11,
175:5, 185:11,
186:21

**VALUES** [3] - 18:21,
174:15

**VARIOUS** [4] - 49:19,
79:7, 80:6, 196:17

**VAST** [1] - 108:3

**VEHICLE** [1] - 36:13

**VEHICLES** [2] - 36:12,
55:8

**VERBAL** [1] - 39:12
**VERBALLY** [2] - 35:14, 49:6
**VERDICT** [10] - 28:12, 28:13, 28:15, 188:7, 192:23, 192:24, 198:10, 200:1, 200:2
**VERSUS** [3] - 13:1, 16:20, 186:7
**VESTED** [7] - 38:9, 38:10, 58:23, 71:18, 80:15, 86:9, 110:9
**VIA** [1] - 1:23
**VIABLE** [2] - 90:8, 90:9
**VICE** [2] - 49:20, 167:17
**VICE-PRESIDENT** [1] - 167:17
**VIEW** [1] - 78:4
**VIOLATED** [1] - 81:11
**VIOLATION** [1] - 130:9
**VIRTUALLY** [1] - 97:14
**VISITED** [1] - 20:22
**VOICE** [1] - 192:2
**VOIR** [1] - 7:3
**VOLUMES** [1] - 155:11
**VOLUNTARILY** [34] - 4:16, 8:13, 8:24, 15:9, 27:23, 28:19, 34:12, 34:15, 49:25, 64:12, 69:12, 79:24, 101:5, 103:4, 125:13, 137:5, 137:18, 137:19, 137:24, 138:5, 138:11, 138:15, 139:16, 166:4, 175:7, 183:8, 187:6, 193:4, 193:6, 194:5, 194:6, 194:17, 195:1, 196:18
**VOLUNTARINESS** [2] - 76:7, 195:23
**VOLUNTARY** [29] - 34:21, 44:13, 47:23, 48:20, 61:5, 62:24, 63:13, 64:8, 64:12, 84:3, 87:18, 88:24, 134:20, 139:12, 139:18, 157:1, 160:14, 161:2, 162:6, 162:25, 164:4, 175:11, 175:12, 175:13, 175:14, 194:14, 194:20, 196:25
**VOLUNTEER** [2] -

148:24, 148:25
**VS** [1] - 1:5

# W

**WAGES** [1] - 55:24
**WAIT** [5] - 115:1, 116:18, 143:9, 147:20, 148:22
**WAITING** [1] - 147:16
**WAIVE** [3] - 8:10, 14:6, 14:9
**WAIVER** [4] - 156:6, 156:7, 195:18
**WAIVING** [7] - 14:20, 26:2, 26:6, 26:8, 27:20, 38:20, 47:11
**WALK** [4] - 22:23, 50:1, 51:6, 86:23
**WALKING** [1] - 149:22
**WALL** [1] - 25:11
**WANTS** [10] - 36:8, 38:16, 43:17, 66:22, 80:17, 97:19, 125:11, 126:1, 176:12
**WAR** [1] - 20:18
**WARNING** [2] - 29:11, 177:9
**WARRANTED** [1] - 119:24
**WARREN** [3] - 36:2, 36:22, 92:16
**WASHINGTON** [1] - 2:4
**WASTE** [1] - 134:23
**WATER** [1] - 121:9
**WAYS** [4] - 86:19, 129:10, 161:12, 177:7
**WEALTH** [1] - 55:22
**WEALTHY** [9] - 18:18, 26:23, 51:14, 55:16, 55:22, 55:25, 79:20, 161:19, 161:23
**WEEKS** [16] - 32:12, 62:5, 76:18, 77:19, 101:17, 101:18, 101:21, 126:5, 126:6, 127:5, 128:22, 158:11, 158:21, 165:17, 172:2
**WEIGH** [1] - 5:9
**WEIGHING** [2] - 196:16, 198:8
**WELCOME** [1] - 182:20
**WELL-PAID** [1] - 55:16

**WENDELL** [3] - 20:13, 20:14, 185:15
**WESTMINSTER** [1] - 20:12
**WHATSOEVER** [1] - 45:11
**WHICHEVER** [1] - 145:23
**WHITE** [9] - 1:19, 6:21, 6:22, 29:13, 29:14, 29:15, 29:20, 112:14, 201:21
**WHITFIELD** [1] - 2:22
**WHO'D** [1] - 162:15
**WHOLE** [2] - 68:1, 71:25
**WIFE** [6] - 44:20, 52:9, 80:7, 101:25, 102:2, 132:8
**WIFE'S** [1] - 81:8
**WILLIAM** [1] - 1:15
**WILLING** [5] - 17:6, 83:2, 111:21, 111:23, 138:8
**WILLINGLY** [1] - 189:2
**WISCONSIN** [2] - 17:23, 57:16
**WISDOM** [4] - 11:17, 17:1, 29:3, 87:4
**WISE** [1] - 57:9
**WISH** [1] - 199:24
**WITHDRAW** [1] - 45:5
**WITHDREW** [1] - 45:6
**WITNESS** [26] - 6:24, 6:25, 22:22, 24:19, 25:2, 25:18, 26:11, 26:17, 34:14, 50:2, 50:7, 53:23, 112:11, 113:15, 118:24, 119:15, 161:6, 179:25, 180:14, 181:2, 181:21, 182:9, 197:8, 197:12, 197:20
**WITNESS'** [4] - 197:6, 197:10, 197:16, 197:19
**WITNESS'S** [1] - 182:13
**WITNESSES** [11] - 94:14, 94:19, 118:19, 119:9, 121:24, 185:18, 189:20, 189:24, 197:2, 197:21, 198:9
**WOMAN** [7] - 11:22, 57:15, 57:23, 60:8, 161:11, 174:16, 186:13

**WOMAN'S** [1] - 83:19
**WOMEN** [2] - 4:17, 163:18
**WOMEN'S** [2] - 67:2, 155:5
**WONDER** [1] - 180:1
**WONDERFUL** [5] - 7:4, 21:1, 97:17, 99:15, 129:12
**WORD** [13] - 24:14, 68:20, 71:7, 71:8, 73:3, 79:1, 83:17, 83:18, 83:19, 88:10, 117:19, 173:5
**WORDS** [20] - 8:14, 22:22, 48:21, 90:10, 101:4, 103:8, 121:20, 137:8, 138:2, 138:9, 138:10, 138:17, 139:7, 139:10, 139:17, 146:22, 155:5, 155:12, 166:25, 182:14
**WORKERS** [1] - 62:20
**WORKFORCE** [4] - 127:15, 127:16, 127:18, 128:1
**WORKS** [1] - 30:3
**WORLD** [2] - 17:5, 101:14
**WORRIED** [2] - 79:4, 131:18
**WORSE** [1] - 130:17
**WORTH** [14] - 18:19, 37:14, 42:3, 42:5, 42:10, 43:9, 66:16, 79:15, 134:7, 161:20, 182:25, 187:6, 187:7
**WOUNDED** [1] - 20:18
**WOW** [1] - 133:24
**WRAP** [1] - 87:6
**WRITE** [7] - 50:3, 81:23, 93:10, 103:5, 111:2, 111:3, 138:3
**WRITING** [15] - 16:25, 17:22, 32:17, 34:17, 37:18, 42:24, 46:9, 49:9, 67:24, 72:14, 83:6, 83:20, 114:9, 169:13, 182:5
**WRITTEN** [2] - 22:14, 114:21
**WRONGED** [2] - 39:24, 40:1
**WRONGFULLY** [1] - 98:19
**WROTE** [4] - 21:1, 22:17, 24:10, 156:9

# X

**XI** [1] - 166:21

# Y

**YARD** [1] - 55:7
**YEAR** [28] - 22:14, 26:25, 33:22, 45:12, 45:18, 59:19, 69:23, 108:25, 109:5, 109:7, 109:10, 109:11, 109:14, 109:15, 109:16, 109:19, 109:22, 110:19, 123:11, 123:12, 127:5, 145:21, 163:14, 164:25, 178:14, 184:4
**YEAR'S** [6] - 56:24, 124:24, 127:11, 128:4, 128:13, 128:20
**YEARS** [35] - 12:21, 12:22, 16:21, 17:25, 24:23, 38:5, 50:12, 58:8, 59:3, 67:22, 74:13, 81:19, 92:14, 94:2, 100:9, 104:11, 108:11, 135:14, 141:22, 143:2, 143:18, 156:19, 157:16, 157:24, 167:11, 167:13, 167:15, 172:23, 172:24, 179:9, 184:9, 188:11, 188:19, 192:15
**YESTERDAY** [3] - 3:18, 123:3, 200:18
**YOUNG** [6] - 79:17, 81:5, 95:20, 157:9, 183:23
**YOURSELF** [4] - 16:17, 132:14, 135:6, 188:25
**YOURSELVES** [4] - 86:25, 95:6, 149:8, 180:4

# Z

**ZERO** [2] - 99:8, 158:8
**ZOLNER** [1] - 2:7