**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| GENE R. ROMERO, et al., | : | |
| | : | CIVIL ACTION |
| Plaintiffs, | : | |
| | : | NO. 01-3894 |
| v. | : | |
| | : | CONSOLIDATED WITH |
| | : | |
| ALLSTATE INSURANCE COMPANY, et al. | : | NO. 01-6764 |
| | : | NO. 01-7042 |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

RONALD L. BUCKWALTER, S.J.                                   January 26, 2016

        From June 1, 2015 to June 17, 2015, the first of multiple jury trials was held in this case
on the singular issue of whether ten of the Plaintiffs—Roger Boyd, Craig Crease, Ronald Harper,
Mike Kearney, Sylvia Kelly, David Lawson, Ed Murray, Christopher Perkins, Rick Peterson, and
Paula Reinerio—knowingly and voluntarily signed the Release of claims Allstate used in
connection with the termination of Plaintiffs' employment contracts as part of the Preparing for
the Future Group Reorganization Program.  The jury found that, as to eight of the Plaintiffs, the
Release was not knowingly and voluntarily signed, but, as to the remaining two Plaintiffs,[1] the
Release had been knowingly and voluntarily signed.

        Plaintiffs also posed two other Release defenses: unclean hands and unconscionability.
These equitable defenses, however, were reserved for ruling by the Court and were not submitted
to the jury.  Following the trial, the parties submitted hundreds of pages of proposed findings of

_____

        [1]  The jury concluded that Plaintiffs Perkins and Murray knowingly and voluntarily signed
the Release.

fact and conclusions of law, together with thousands of pages of exhibits, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.  The Court now issues the following Memorandum on the remaining issues.

## I.      FINDINGS OF FACT

By way of brief review, this case revolves around Allstate's announcement and implementation of its Preparing for the Future Group Reorganization Program ("the Program"). Prior to November 1999, the majority of Allstate's captive agency force acted as employee agents, under either an R830 or an R1500 contract, and was entitled to a wide range of company-sponsored health, welfare, and retirement benefits.  On November 10, 1999, Allstate announced the Program by noting that, as part of a new business model, it was reorganizing its entire captive agency force into a single exclusive agency independent contractor program.  With few exceptions, Allstate terminated the employment contracts of the 6,200-plus R830 and R1500 employee agents effective no later than June 30, 2000.

In connection with the termination of the R830 and R1500 employment contracts, Allstate offered the agents working under those contracts four options.  The first three options were conditioned upon the agents' agreement to execute a release of claims (the "Release"), while the fourth option was not.  The first "Release-based" option was the "EA Option." According to the Program Information Booklet, this option would allow the agent to enter into an R3001C or R3001S Agreement, thereby converting the agent from an employee to an Exclusive Agent ("EA") independent contractor.  The second option was the "Sale Option."  This option also permitted an agent to enter into an R3001C/S Agreement with Allstate, thus converting the agent to an EA independent contractor.  In turn, the agent would receive a "conversion bonus"

and Allstate would forgive any advances owed, assume certain lease and advertising obligations

the agent incurred as an employee agent, and permit the agent, after thirty days' service as an EA,

to sell his or her book of business written while an R830 or R1500 agent.  The third option was

the "Enhanced Severance Option."  Under this option, Allstate would pay the agent "enhanced"

severance equal to one year's pay based on the greater of 1997 or 1998 total compensation,

forgive debt and/or expenses that Allstate had advanced to the agent, and relieve the agent of

certain lease and advertising obligations incurred as an R830 or R1500 agent.  The final option

was the "Base Severance Option."  If an agent elected this option, then Allstate paid him or her

up to thirteen weeks of pay.  The agent electing this option did not need to enter into the Release.

      As to the remaining findings of fact, the Court remarks that this case has been in litigation

for over fourteen years.  The facts have been enumerated at length on multiple occasions and in

numerous, extensive opinions from this Court.  None of the trial evidence or testimony varied

materially from these previous discussions.[2]  For the most part, the parties' Proposed Findings of

Fact and Conclusions of Law agree on the salient factual points that bear on the remaining issues

in this case.  The proposed findings on which the parties disagree concern, for the most part,

matters of legal interpretation rather than factual determination.  In lieu of prolonging this matter

further by engaging in yet another excruciatingly detailed discussion of the facts—a discussion

which will have little bearing on the future of this case or the multitude of other trials through

---

[2]  The Court acknowledges that the ten individual trial Plaintiffs offered testimony about their unique circumstances, which has not previously been discussed in detail.  Notably, however, Plaintiffs' Proposed Findings of Fact and Conclusions of Law, in large part, disregard the nuances in their testimony and argue for the application of both unclean hands and unconscionability generally.  As Plaintiffs are the proponents of these two defenses, the Court follows their lead and analyzes these issues without detailed consideration of their individual circumstances.

which the parties must proceed—the Court, for purposes of this Opinion only, accepts the

Plaintiffs' Findings of Fact as true, except as noted in the Conclusions of Law below, and

engages in a discussion of the remaining legal issues.

## II.    CONCLUSIONS OF LAW[3]

### A.    Whether the Release is Invalid Based on Unclean Hands

As a general principle, unclean hands is "a self-imposed ordinance that closes the doors

of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which

he seeks relief, however improper may have been the behavior of the defendant." Precision

Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945).  It is an equitable

doctrine which applies "when a party seeking relief has committed an unconscionable act

immediately related to the equity the party seeks in respect to the litigation." Highmark, Inc. v.

UPMC Health Plan, Inc., 276 F.3d 160, 174 (3d Cir. 2001).  As a general rule, a claim is barred

under the doctrine of unclean hands when "(1) a party seeking affirmative relief (2) is guilty of

conduct involving fraud, deceit, unconscionability, or bad faith (3) directly related to the matter

in issue (4) that injures the other party and (5) affects the balance of equities between the

litigants." Imprisoned Citizens Union v. Shapp, 11 F. Supp. 2d 586, 608 (E.D. Pa. 1998)

(citation and internal quotation marks omitted), aff'd, 169 F.3d 178 (3d Cir. 1999); see also

Lucey v. Workmen's Comp. Appeal Bd., 732 A.2d 1201, 1204 (Pa. 1999) (stating the doctrine of

unclean heads "closes the doors of a court of equity to one tainted with inequity or bad faith

---

[3] The ten trial Plaintiffs in this case come from seven different states: Pennsylvania, South Carolina, Kansas, Washington, Wisconsin, Georgia, and Florida.  The Court attempts to draw a sampling of cases from these states when discussing a particular point of law.  To the extent the law is the same among the states, however, the Court will not cite to a case from each jurisdiction on each legal proposition.

relative to the matter in which he seeks relief"). The doctrine is to be applied "'only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation.'" Ne. Women's Ctr., Inc. v. McMonagle, 868 F.2d 1342, 1354 (3d Cir. 1989) (quoting Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245–46 (1933)).

Plaintiffs now contend that the doctrine of unclean hands precludes Allstate from enforcing the Release. Allstate, on the other hand, argues that Plaintiffs have failed to prove that the Release is invalid based on unclean hands because: (1) the unclean hands doctrine does not apply to this case where Allstate is not asserting an equitable defense; and (2) Plaintiffs have failed to prove the unclean hands theory on its merits. The Court addresses each assertion individually.

### 1.    Whether the Unclean Hands Theory Applies to this Case

Allstate first argues that the unclean hands doctrine is a defense that is available only to a party opposing a request for equitable relief. Allstate, however, does not request equitable relief, but rather only seeks to enforce a contract as an affirmative defense to Plaintiffs' federal and state law claims. Thus, according to Allstate, the unclean hands doctrine cannot apply.

The Court previously addressed this argument in detail in the Memorandum Opinion of October 6, 2014. Romero v. Allstate Ins. Co., 52 F. Supp. 2d 715 (E.D. Pa. 2014). Specifically, in response to this precise argument, the Court held as follows:

> This argument, however, disregards prevailing Third Circuit law. In Mente v. Chevrolet Oldsmobile, Inc. v. GMAC, 451 F. App'x 214 (3d Cir. 2011), a jury awarded $4 million to the plaintiffs for the defendant's breach of contract. Id. at 217. The defendant asserted at trial that the plaintiffs had waived their rights to sue the defendant in a Forbearance Agreement. Id. at 216–17. The jury found enforcement

of the Forbearance Agreement was barred by the equitable doctrine of unclean hands. Id. at 217.  On appeal, the defendant argued that the unclean hands doctrine did not apply because the plaintiff's claim was contractual and not equitable.  Id.  The Third Circuit disagreed and held that "the doctrine is being invoked to defend against GMAC's request to enforce the waiver of [the plaintiff's] breach of contract claim in the Forbearance Agreement.  Under Pennsylvania law, a request to enforce a contractual waiver is a request for specific performance of the contract containing the waiver."  Id. at 217–18 (citing Griest v. Pa. State Univ. & Dickinson Sch. of Law, 897 A.2d 1186, 1186 (Pa. Super. Ct. 2006)).  As specific performance is an equitable remedy, the Third Circuit found that it could be barred by the doctrine of unclean hands.  Id. at 218.  The court further rejected the argument that the doctrine of unclean hands can only be invoked by a defendant seeking to defeat a plaintiff's claim for affirmative equitable relief.  Id. at 218 n.4.

In the present case, Plaintiffs bring multiple federal and state law claims in connection with the enactment of the Program and Release.  Allstate has responded with the defense that the claims were waived by the Plaintiffs' signature of the Release.  By doing so, Allstate now seeks specific performance of the Release to enforce the waiver of Plaintiffs' claims, which is a request that sound in equity.  In response, Plaintiffs may now properly assert the doctrine of unclean hands.

Id. at 735.

Allstate now attempts to argue that, notwithstanding this previous ruling, Mente is distinguishable and should not apply here.  Allstate's argument, however, is nothing more than a belated effort to seek reconsideration of a prior ruling.  Local Rule of Civil Procedure 7.1(g) provides that a motion for reconsideration shall be filed within fourteen days of the order at issue. The Court's prior opinion, in this case, was filed on October 6, 2014, almost a year prior to Allstate's brief seeking reconsideration of that ruling.  Accordingly, the Court declines to reconsider whether Mente is, in fact distinguishable.

Allstate raises the additional argument that Mente involved only the application of Pennsylvania law and, in this matter, the law of each Plaintiff's home state governs his or her unclean hands argument.  Thus, according to Allstate, if Mente has any application here at all, it

6

applies only to Pennsylvania Plaintiff Murray.

This argument also fails.  Allstate seeks specific performance of the Release at issue—*i.e.*, to enforce the Release which bars suit for claims identical to those raised by Plaintiffs.  Under the applicable state laws, it is well-established that any request for specific performance is a request for equitable relief to which a defense of unclean hands could apply. See, e.g., Matrix Fin. Servs., Inc. v. Dean, 655 S.E.2d 290, 294 (Ga. Ct. App. 2007) (applying the law Georgia—the home state of Plaintiffs Harper, Perkins, and Peterson—and holding that specific performance of a waiver clause in a settlement agreement is equitable in nature, and the doctrine of unclean hands may bar such equitable relief); Pepsi Cola Bottling Co. of Pittsburg Inc. v. Bottling Grp., LLC, No. Civ.A.07-2315, 2009 WL 873020, at *10 (D. Kan. Mar. 30, 2009) (applying the law of Kansas—the home state of Plaintiffs Crease and Kearney—to hold that enforcement of a settlement agreement is a request for equitable relief to which the unclean hands doctrine applies); Crafts v. Pitts, 162 P.3d 382, 386 n.4 (Wash. 2007) (applying the law of Washington—the home state of Plaintiff Boyd—and holding that the defense of unclean hands is available to any party against whom specific performance is sought); Busch v. Baker, 83 So. 704, 705 (Fla. 1920) (applying the law of Florida—the home state of Plaintiff Kelly—and holding that a request for specific performance of a contract is decided by a court of equity and is subject to consideration of an unclean hands defense).  Allstate has not identified for this Court any case from any relevant jurisdiction, which would suggest that a Release asserted as an affirmative defense is legal, not equitable in nature.  Accordingly, the Court rejects Allstate's argument and turns to a substantive consideration of whether the facts of this case support invalidating the Release on an unclean hands theory.

### 2.    Whether the Unclean Hands Doctrine Bars Enforcement of the Release

As stated above, the United States Supreme Court has remarked that the unclean hands doctrine is a "self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief[.]"  Precision Instrument, 324 U.S. at 814.  Although the various states' laws at issue differ somewhat in their definitions of what constitutes "unclean hands," there remains a general agreement that unclean hands applies not only to fraudulent and illegal transactions, but also to unscrupulous practices, oppressive conduct, or unconscientious conduct.  Crucially, however, that conduct must bear on the subject of the litigation.  See, e.g., Tribeca Lending Corp. v. Real Eastate Depot, Inc., 42 So. 3d 258, 262 (Fl. Dist. Ct. App. 2010) (noting that the unclean hands doctrine "applies not only to fraudulent and illegal transactions, but to any unrighteous, unconscientious, or oppressive conduct by one seeking equitable interference in his own behalf") (internal quotation marks omitted); Terraciano v. Com., Dept. of Transp., Bureau of Driver Licensing, 753 A.2d 233, 237–38 (Pa. 2000) ("The doctrine of unclean hands requires that one seeking equity act fairly and without fraud or deceit as to the controversy in issue."); Ingram v. Kasey's Assocs., 531 S.E.2d 287, 292 n.2 (S.C. 2000) (holding that a party will have unclean hands where the party behaves "unfairly in a matter that is the subject of the litigation to the prejudice of the defendant"); Whiten v. Murray, 599 S.E.2d 346, 352 (Ga. Ct. App. 2004) ("The unclean-hands maxim which bars a complainant in equity from obtaining relief has reference to an inequity which infects the cause of action so that to entertain it would be violative of conscience.  It must relate directly to the transaction concerning which complaint is made."); Green v. Higgins, 535 P.2d 446 (Kan.

1975) ("The application of the clean hands doctrine is subject to certain limitations.  Conduct

which will render a party's hands unclean so as to deny him access to a court of equity must be

willful conduct which is fraudulent, illegal or unconscionable. . . . Furthermore, the objectionable

misconduct must bear an immediate relation to the subject-matter of the suit and in some

measure affect the equitable relations subsisting between the parties to the litigation and arising

out of the transaction.").

　　　　Plaintiffs now argue that they have presented compelling evidence that Allstate acted with

unclean hands in connection with the Release.  Without separately addressing each individual

Plaintiff, they contend that the manner in which Allstate structured and implemented the Program

involved a "bad faith and inequitable attempt to deny the 6,200 employee agents terminated

under the Program with a *de facto* opportunity to challenge the legality of their termination."

(Pls.' Proposed Findings of Facts & Conclusions of Law ("Pls.' Proposed FOFCOL") ¶ 210.)

More specifically, Plaintiffs assert that, in the early 1980's Allstate promised its employee agents

job security and renewal commissions, conditioned on the employee agents' investment of

personal funds in order to grow their books of business.  As a result, many employee agents did,

in fact, invest their own money in their businesses.  In 1999, however, Allstate implemented the

Program and terminated its entire employee-agent work force, which, according to Plaintiffs,

"repudiated its promises of job security and disregarded the express detections against

termination contained in the NOAs contracts."  (Pls.' Proposed FOFCOL ¶ 219.).)  Thereafter, in

effectively coercing the employee agents to execute the Release, Allstate unilaterally terminated

Plaintiffs' employment contracts, took away their benefits and their careers, and then exploited

the vulnerabilities it created by offering to allow Plaintiffs to either keep their jobs and books of

businesses or recoup some of their investments, but only by signing the Release.  (Id. ¶¶ 221–22.)
Allstate also "wrongfully threatened to take legal action against any departing agent who ever
attempted to solicit any of their former Allstate clients for any purpose" and deprived the
terminated employees of the company's standard severance arrangement.  (Id. ¶¶ 224–225.)  The
only plausible explanation, according to Plaintiffs, is that Allstate sought to insulate itself from
significant liability for conduct it knew would likely be deemed unlawful.  Accordingly,
Plaintiffs contend that Allstate must be deemed to have acted with unclean hands and be
precluded from enforcing the Release as an affirmative defense to Plaintiffs' claims.

     Upon hearing all of the testimony, the Court agrees that Allstate's conduct with respect to
the Release and its inclusion in the Preparing for the Future Program was less than
commendable.  Undoubtedly, Allstate managers repeatedly represented to Plaintiffs that Allstate
provided a "job for life" if Plaintiffs worked hard and grew their businesses.  Moreover, the
Court agrees that Allstate structured the Program in such a way as to exert some financial
pressure on the employee agents to sign the Release and take one of the first three program
options.  Nevertheless, the fact remains that a party asserting an "unclean hands" defense must
introduce "clear, convincing evidence of 'egregious' misconduct."  Citizens Fin. Grp., Inc. v.
Citizens Nat'l Bank, 383 F.3d 110, 129 (3d Cir. 2004).  "[T]here can be no question that proof by
clear and convincing evidence is a more stringent standard than proof by a preponderance of the
evidence."  U.S. v. Askari, 222 F. App'x 115, 119 (3d Cir. 2007).  To that end, the Court does
not find that Plaintiffs have adduced sufficient evidence that Allstate's conduct was so egregious
as to constitute clear and convincing proof that they acted with unclean hands and should, in
equity, be precluded from seeking enforcement of that Release.

Under the Older Workers Benefit Protection Act ("OWBPA"), an individual may not waive any right or claim under the ADEA unless the waiver is knowing and voluntary. 29 U.S.C. § 626(f). A waiver may not be considered knowing and voluntary unless "at a minimum" the waiver satisfies a number of specific statutory requirements. Id. Conversely stated, the use of a Release in the termination of an employee may be entirely proper unless it fails to meet the minimum statutory requirements set forth in OWBPA or if the Release was not signed knowingly and voluntarily. As set forth in great detail in this Court's other opinions, the Release in this case met the statutory requirements under OWBPA. Moreover, as to two of the Plaintiffs in this case, the jury found that the Release was signed knowingly and voluntarily, thereby undermining Plaintiffs' attempt to establish that Allstate acted with unclean hands and should be precluded from enforcing the Release as to those Plaintiffs.

As to the remaining eight Plaintiffs as to whom the jury found the Release was not signed knowingly and voluntarily, the Court simply does not find sufficient evidence that Allstate's conduct—albeit, by most standards, not exemplary in nature—was so unscrupulous, unconscientious, or oppressive as to erect an equitable block on Allstate's attempted enforcement of the Release. In particular, although Allstate managers and some Allstate marketing materials undoubtedly indicated that employee agents had "job security" and/or a "job for life," those representations were made to sophisticated business people and were never included in any form of employment contract. Moreover, contrary to Plaintiffs' argument, this Court finds that the R830 and R1500, by their express terms, were at-will contracts.[4] The R1500 Agreement

---

[4] This legal finding is made only with respect to this Memorandum and shall not impact Plaintiffs' ability to prove otherwise if and when this case proceeds to the substantive merits of the underlying claims.

specifically stated that it was terminable at will and had no review procedures upon termination, whereas the R830 contract was also terminable at will so long as certain notice and review procedures were followed where an employee was being terminated for unsatisfactory work.  In addition, although Plaintiffs adduced some evidence of Allstate's misrepresentations about the Program—in particular with regard to the confidentiality and non-solicitation provisions and the rehire policy—the Court does not find clear and convincing evidence that these misrepresentations were intentionally made by Allstate in an effort to induce employee agents to sign the Release.  Further, the Court does not find that Allstate's alteration of the severance benefits was wrongful to the extent it would constitute unscrupulous conduct.  Finally, although some of the Plaintiffs may have not signed the Release knowingly and voluntarily due to the extensive economic pressure created by their situations and the extent of their personal investments, such a scenario—which is clearly individual to each Plaintiff—does not automatically result in a finding that Allstate acted with unclean hands.

　　　　In short, the Court finds a great deal of evidence on both sides of this issue.  On one hand, Allstate established that the Program and Release were business-related decisions that complied fully with federal statutory law and which made an effort to effectuate valid cost-savings measures while simultaneously offering employee agents alternative choices to preserve their financial futures.  On the other hand, Plaintiffs presented some proof that Allstate acted out of an unscrupulous and objectionable desire to preserve its profits, substantially cut the costs of remunerating its workforce, and then attempted to insulate itself from liability by way of the Release.  When placed on a scale, the parties' evidence balances somewhat evenly and, at times, tips ever so slightly in favor of Plaintiffs in terms of shocking the Court's moral sensibilities.

Under the clear and convincing standard, however, that is not enough to persuade the Court that enforcement of the Release will undermine this Court's integrity.  See Gaudiosi v. Mellon, 269 F.2d 873, 882 (3d Cir. 1959) (noting that the unclean hands doctrine is primarily intended to protect the Court's integrity where the conduct of a party shock's the judge's moral sensibilities; it has nothing to do with the rights or liabilities of the parties).  As such, the Court must find that Allstate is entitled to judgment on Plaintiffs' unclean hands defense.

### B.      Whether the Release is Unconscionable

The second question before the Court is whether Plaintiffs have established that the Release was unconscionable.  "[U]nconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them."  Simpson v. MSA of Myrtle Beach, Inc., 644 S.E.2d 663, 668 (S.C. 2007); see also Gainesville Health Care Ctr,, Inc. v. Weston, 857 So. 2d 278, 284 (Fla. Dist. Ct. App. 2003) ("Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.") (quotations omitted);  F.N. Roberts Pest Control Co. v. McDonald, 208 S.E.2d 13 (Ga. App. 1974) ("An unconscionable contract is one abhorrent to good morals and conscience.  It is one where one of the parties takes a fraudulent advantage of another.") (quotations omitted); Wisconsin Auto Title Loans, Inc. v. Jones, 714 N.W.2d 155, 165 (Wis. 2006) ("Unconscionability has often been described as the absence of meaningful choice on the part of one of the parties, together with contract terms that are unreasonably favorable to the other party.").  To prove unconscionability under Pennsylvania, Florida, Georgia, South Carolina,

13

and Wisconsin laws (as applicable to Plaintiffs Peterson, Lawson, Harper, Reinerio, Kelly, Murray, and Perkins), a plaintiff must show that a contract is both procedurally and substantively unconscionable.  Quilloin v. Tenet HealthSystem Phila., Inc., 673 F.3d 221, 230 (3d Cir. 2012); Gainesville Health Care Ctr., 857 So. 2d at 284; Wisconsin Auto, 714 N.W.2d at 165; York v. Dodgeland of Columbia, Inc., 749 S.E.2d 139, 148 (S.C. Ct. App. 2013); Mullis v. Speight Seed Farms, Inc., 505 S.E.2d 818, 820 (Ga. App. 1998).  In Washington and Kansas (the home states of Plaintiffs Kearney, Crease, and Boyd), however, a party alleging unconscionability need only prove *either* procedural or substantive unconscionability.  Adams v. John Deere Co., 774 P.2d 355, 357 (Kan. Ct. App. 1989); McKee v. AT & T Corp., 191 P.3d 845, 857 (Wash. 2008).  "The party challenging a contract provision as unconscionable generally bears the burden of proving unconscionability."  Harris v. Green Tree Fin. Corp., 183 F.3d 173, 181 (3d Cir. 1999).  The Court now examines each prong of the unconscionability test.

### 1.   Procedural Unconscionability

"Procedural unconscionability examines the process leading to the formation of the contract and the form and language of the agreement."  Porreca v. Rose Grp., No. Civ.A.13-1674, 2013 WL 6498392, at *7 (E.D. Pa. Dec. 11, 2013).  A procedurally unconscionable contract bears a lack of meaningful choice in the acceptance of the challenged provision. Quilloin, 673 F.3d at 235; see also Zuver v. Airtouch Commc'ns, 103 P.3d 753, 759 (Wash. 2004) ("Procedural unconscionability is the lack of meaningful choice, considering all the circumstances surrounding the transaction including the manner in which the contract was entered, whether each party had a reasonable opportunity to understand the terms of the contract, and whether the important terms [were] hidden in a maze of fine print.") (internal quotations and

14

quotation marks omitted); <u>Wisconsin Auto Title</u>, 714 N.W.2d at 165–66 ("Determining whether procedural unconscionability exists requires examining factors that bear upon the formation of the contract, that is, whether there was a "real and voluntary meeting of the minds" of the contracting parties.  The factors to be considered include, but are not limited to, age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms would have been permitted by the drafting party, and whether there were alternative providers of the subject matter of the contract."); <u>Mullis</u>, 505 S.E.2d at 820 (holding that procedural unconscionability focuses on two factors: oppression and surprise; noting that a non-inclusive list of some factors courts have considered in determining whether a contract is procedurally unconscionable includes the age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of a meaningful choice); <u>Simpson</u>, 644 S.E.2d at 669 ("In determining whether a contract was 'tainted by an absence of meaningful choice,' courts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause.") (internal quotations omitted).

In the present case, Plaintiffs argue that the Release was procedurally unconscionable based on three factors.  First, they assert that the relative bargaining power of the parties reveals that Allstate was in a significant position of dominance.  Second, they assert that the Release was

essentially a take-it-or-leave it adhesion contract that allowed Plaintiffs no bargaining room.

Finally, they claim that Plaintiffs were forced into the Release by a large degree of economic

compulsion.

Having considered all of the testimony and evidence at trial, however, the Court does not

find that Plaintiffs have met their burden of proving that the Release was procedurally

unconscionable, even as to those Plaintiffs deemed by the jury to have not signed the Release

knowingly and voluntarily. As to the first two factors identified by Plaintiffs, it is undisputed

that the Release was drafted entirely by Allstate, that Allstate had significantly greater bargaining

power, and that the Release was a standardized contract that did not allow for any alterations to

be made by Plaintiffs. In other words, it was a classic adhesion contract. [5] Nonetheless, the

various states' laws are in agreement that "[a]dhesion contracts . . . are not per se

unconscionable. Therefore, finding an adhesion contract is merely the beginning point of the

analysis." Simpson, 644 S.E.2d at 669. "[M]erely because a contract is one of adhesion does not

render it unconscionable and unenforceable as a matter of law." Salley v. Option One Mortg.

Corp., 925 A.2d 115, 127 (Pa. 2007), confirming as to certified question, 246 F. App'x 87 (3d

Cir. 2007); Mathis v. Orkin Exterminating Co., 562 S.E.2d 213 (Ga. Ct. App. 2002) (holding

that the fact that a contract is adhesive does not, standing alone, render the contract

unenforceable.); Mendez v. Palm Harbor Homes, Inc., 45 P.3d 594, 602 (Wash. 2002)

---

[5] A contract of adhesion has been defined as "a standardized contract offered on a 'take it or leave it' basis and under such conditions that a consumer cannot obtain the desired product or service except by acquiescing in the form contract." Realty Lenders, Inc. v. Levine, 649 S.E.2d 333, 336 (Ga. Ct. App. 2007) (quotation omited); see also Mendez v. Palm Harbor Homes, 45 P.3d 594, 602 (Wash. Ct. App. 2002) (holding that "generally, an adhesion contract is prepared on standard printed form, is prepared by one party and submitted to the other on a "take it or leave it basis," and there is "no true equality of bargaining power between the parties.").

("[A]dhesion contracts are not necessarily unconscionable."). Considering the other factors, the

Court notes that Plaintiffs were sophisticated and intelligent business people. Moreover, the

form and provisions of the Release satisfy the conspicuousness requirement, as the terms of the

document were bolded and highlighted—not hidden in small print—and Allstate offered multiple

informational packets regarding the Release. The Release itself was short and fully

understandable, and Plaintiffs had nearly seven months to consult with counsel regarding the

implications of signing the Release. As such, the Court cannot find that Plaintiffs were denied an

opportunity to understand the terms of the Release. See Zuver v. Airtouch Commc'ns, Inc., 103

P.3d 753, 761 (Wash. 2004) ("At minimum, an employee [asserting procedural

unconscionability] must show some evidence that the employer refused to respond to her

questions or concerns, placed undue pressure on her to sign the agreement without providing her

with a reasonable opportunity to consider its terms, and/or that the terms of the agreement were

set forth in such a way that an average person could not understand them.").

      The third factor identified by Plaintiffs causes the Court somewhat greater hesitation,

particularly in light of the jury's finding that certain Plaintiffs did not "voluntarily" enter into the

Release based on the degree of economic compulsion imposed upon them. While the Plaintiffs

in this case undoubtedly faced various economic pressures resulting from Allstate's corporate

restructuring, this Court's own consideration of the evidence does not, however, suggest that the

Release as a whole so deprived Plaintiffs of a meaningful choice as to render the entire

agreement procedurally unconscionable. Rather, Plaintiffs had some choice of signing the

Release and taking one of three fairly lucrative options with Allstate, or not signing the Release

and taking only a base severance pay. The power imbalance and economic compulsion in this

case was not so much more drastically striking than in the typical employer-employee context. While not signing the Release and facing the loss of both employment and investments may not have offered a preferable or economically-satisfying alternative to signing the Release and obtaining the incentives offered, the fact remains that Plaintiffs, who were business-savvy individuals, retained the viable option to not sign the Release, seek alternative employment with a base severance payment in hand, and bring suit against Allstate.  See generally Quilloin, 673 F.3d at 236–37 (distinguishing cases where the plaintiffs were either a minimally-educated crane operator[6] or an employee dependent on her employer for her immigration status, and finding that because the plaintiff in that case was well-educated and not surprised by the agreement, she did not lack meaningful choice in signing the agreement despite the broad disparity in bargaining power); Romney v. Franciscan Med. Grp., 349 P.3d 32, 38 (Wash. App. Div. 2015) (holding, under Washington law, that employees did not lack a meaningful choice in signing arbitration agreement since "as in other cases of employment, the employees could choose employment elsewhere.").

Considering all of these factors in conjunction, the Court simply cannot find that Plaintiffs have met their burden of proving that the Release was procedurally unconscionable. They were sophisticated individuals who were presented with a clear and understandable Release for which they were given time to consult with outside counsel.  While the Release was neither negotiable nor desirable in light of their current employment situations, the facts as presented at

---

[6] One of the cases distinguished in Quilloin was a case relied upon by Plaintiffs— Alexander v. Anthony Int'l L.P., 341 F.3d 256, 266 (3d Cir. 2003).  For the same reasons that the Quilloin court found Alexander to be not probative—i.e., the fact that the Alexander plaintiffs were crane operators with limited education and "at best, narrow options for other employment"—this Court finds that case distinguishable from the one at bar.

trial do not indicate that Plaintiffs so lacked meaningful choice as to render the Release invalid under a procedural unconscionability standard.

### 2.  **Substantive Unconcscionability**

The analysis of substantive unconscionability requires "looking at the contract terms and determining whether the terms are 'commercially reasonable,' that is, whether the terms lie outside the limits of what is reasonable or acceptable.  The issue of unconscionability is considered 'in the light of the general commercial background and the commercial needs.'" Wisconsin Auto Title, 714 N.W.2d at 166.  "Substantively unconscionable terms are those that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent."  Porreca, 2013 WL 6498392, at *10 (quoting Estate of Hodges, No. Civ.A.12-1698, 2013 WL 1294480, at *6 (E.D. Pa. Mar. 29, 2013).  "Substantive unconscionability focuses on the one-sidedness, unfairness, unreasonableness, harshness, overreaching, or oppressiveness of the provision at issue.  Wisconsin Auto Title, 714 N.W.2d at 171; see also Cronin v. Citifinancial Servs., Inc., No. Civ.A.08-1523, 2008 WL 2944869, at *3 (E.D. Pa. July 25, 2008) ("To establish substantive unconscionability, the plaintiff must show that the contract terms are unreasonably favorable to the drafter and that the other party had no meaningful choice but to accept those terms."); Mullis, 505 S.E.2d at 820 ("As to the substantive element of unconscionability, courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns."); Gainesville Health Care Ctr., 857 So. 2d at 284 ("To determine whether a contract is substantively unconscionable, a court must look to the terms of the contract, itself, and determine whether they are so 'outrageously unfair' as to 'shock the judicial conscience.'");

19

Zuver, 103 P.3d at 759 ("Substantive unconscionability involves those cases where a clause or term in the contract is alleged to be one-sided or overly harsh." "'Shocking to the conscience', 'monstrously harsh', and 'exceedingly calloused' are terms sometimes used to define substantive unconscionability.").

Plaintiffs advance several arguments in support of their substantive unconscionability contention. First, they assert that Allstate promised Plaintiffs job security and induced Plaintiffs to invest their personal funds in reliance on those promises. Subsequently, Allstate structured the Program so that Plaintiffs would face imminent unemployment, together with the loss of their investments and the prospect of multiple non-compete clauses, unless they signed the Release in order to take advantage of one of the three Release-based options in the Program.

Such an argument, however, does not convince the Court to make the drastic finding that the Release was so outrageously unfair as to be substantively unconscionable. As noted previously, the Court recognizes that Allstate managers repeatedly made oral promises that a job with Allstate was akin to a "job for life." Moreover, Allstate repeatedly encouraged their employee agents to invest in their agencies in order to grow their business and expand their profits. The fact remains, though, that the written employment contracts under which Plaintiffs operated were, at their core, at-will employment contracts that made no guarantee of employment. Experienced business people, such as Plaintiffs, could have no legitimate expectation that they were shielded from termination so long as they satisfactorily performed their jobs. In addition, as the Court found previously, Allstate did not simply terminate the contracts and require Plaintiffs to sign a Release. Rather, Allstate offered fairly significant consideration in exchange for their signatures on the Release, which, in Plaintiffs' cases, ranged

20

from the more than $42,000 received by Plaintiff Boyd in enhanced severance to the almost $1.2 million received by Plaintiff Lawson from the conversion option.  In other words, the bargain into which Plaintiffs entered was far from "overly harsh" or "oppressive."  While Plaintiffs could only continue in their chosen profession with their chosen employer and recoup their investments by signing the Release, that fact does not render the Release substantively unconscionable.

Second, Plaintiffs assert that there was a gross disparity between the benefits Allstate gained from the Release and any benefits the Release conferred on Plaintiffs.  Specifically, they contend that Allstate gained the benefit of the continued services of thousands of Allstate agents without having to provide them with benefits or expense reimbursements—thereby saving hundreds of millions of dollars—while employee agents who executed the Release found themselves in a far worse position as a result of the Program.  As such, Plaintiffs aver that the Release is substantively unconscionable because of the gross disparity in what each party gained and gave up by executing it.

This argument is completely inapposite as it makes an improper comparison between what Plaintiffs had before and after the Program, as opposed to what Plaintiffs had if they signed the Release and if they did not sign the Release.  Allstate completely terminated the R830 and R1500 contracts and, thus, no longer had the obligation to provide Plaintiffs with benefits and reimbursements, regardless of whether Plaintiffs signed the Release or not.  The question of whether that termination was legally wrongful was not at issue in this trial.  Rather, the proper question here is whether the Plaintiffs' surrender of their right to sue Allstate was grossly disparate to the consideration Allstate offered to Plaintiffs under the Program.  The Court finds that it was not.  Indeed, had the majority of the employee agents opted to take the enhanced

severance option or the conversion option, Allstate could have faced the payout of millions of dollars to such agents in exchange for only the Release, without the benefit of the agents' continued service.  Accordingly, the Court cannot deem the contract "monstrously harsh" or "exceedingly calloused."

Finally, Plaintiffs argue that public policy considerations support a finding of unconscionability.  They claim that "it contravened public policy for Allstate to condition Plaintiffs' ability to continue their agency relationship with the company (doing the same job, but without security or benefits), or to liquidate the personal investments they had made into the business at Allstate's behest, on a waiver of their rights, including under federal remedial employment statutes."  (Pls.' Proposed FOFCOL ¶ 261.)

This argument again raises the wrong question.  Irrespective of the Release, all R830 and R1500 contracts were terminated.  Plaintiffs do not now contend that it was against public policy for Allstate to terminate their employment contracts.  Indeed, Allstate was entitled—as many companies do—to engage in mass termination of employees given the fact that their agents were at-will employees.  The only question is whether it was against public policy for Allstate to condition a new form of employment, or alternatively an ability to liquidate assets or obtain enhanced assets, on Plaintiffs' willingness to sign a Release of claims.  Plaintiffs do not cite—and this Court cannot find—any jurisprudence indicating that such a Release was against public policy.  See Tayar v. Camelback Ski Corp., Inc., 47 A.3d 1190, 1199 (Pa. 2012) ("[W]e note that avoidance of contract terms on public policy grounds requires a showing of overriding public policy from legal precedents, governmental practice, or obvious ethical or moral standards" and should not be assumed "from general considerations of supposed public

interest."); <u>Emory Univ. v. Porubiansky</u>, 282 S.E.2d 903, 904–05 (Ga. 1981) ("[C]ourts must exercise extreme caution in declaring a contract void as against public policy and should do so "only in cases free from doubt.") (quotations omitted); <u>Banfield v. Louis</u>, 589 So. 2d 441, 446–47 (Fla. Dist. Ct. App. 1991) ("Courts . . . should be guided by the rule of extreme caution when called upon to declare transactions void as contrary to public policy and should refuse to strike down contracts involving private relationships on this ground, unless it be made clearly to appear that there has been some great prejudice to the dominant public interest sufficient to overthrow the fundamental public policy of the right to freedom of contract between parties sui juris.") (quoting <u>Bituminous Cas. Corp. v. Williams</u>, 17 So. 2d 98, 101 (Fla. 1944)).  Therefore, the Court rejects this argument as well.

In short, the Court's judicial conscience is not shocked by the Release at issue in this case.  While the Court sympathizes with Plaintiffs' undesirable predicament caused by Allstate's decision to implement such a sweeping termination of its employee agent contracts, the use of the Release in exchange for allowing Plaintiffs  to obtain one of several lucrative options under the Program—albeit not an admirable tactic by a large and profitable company—is not unreasonably harsh, overreaching, or unfair.  Thus, the Court declines to deem the Release substantively unconscionable.

### 3.     Conclusion as to Unconscionability

As set forth in detail above, the Release at issue, with respect to the ten named trial Plaintiffs, is neither procedurally nor substantively unconscionable.  In turn, the Release cannot be invalidated on this ground.

23

C.      <u>**Conclusion as to Issues Before the Court**</u>

Based on the evidence at trial and the parties' subsequent briefing, the Court rejects Plaintiffs' unclean hands and unconscionability defenses as to the ten trial Plaintiffs.  Given the fact that this trial was only the first of many trials to be held on the issue of the Release in this matter, this ruling shall have no bearing on these identical issues in the future Release trials.

A Judgment Order follows.